IN RE: )
)
CAH ACQUISITION COMPANY #1, )    **Case No. 19-00730-5-JNC**
LLC, d/b/a WASHINGTON COUNTY )
HOSPITAL, )    **Chapter 11**
)
      **Debtor.** )
)

## TRUSTEE'S EMERGENCY MOTION FOR AUTHORITY TO (1) REJECT CERTAIN EXECUTORY CONTRACTS WITH iHEALTHCARE MANAGEMENT II COMPANY AND iHEALTHCARE SOFTWARE SERVICES, INC. AND (2) ENTER INTO INTERIM MANAGEMENT AGREEMENT WITH iHEALTHCARE MANAGEMENT II COMPANY AND iHEALTHCARE SOFTWARE SERVICES, INC.

**NOW COMES** Thomas W. Waldrep, Jr., trustee (the "Trustee") for CAH Acquisition

Company #1, LLC d/b/a Washington County Hospital (the "Debtor"), by and through undersigned

counsel, and pursuant to Sections 363, 365, and 1107 of Title 11 of the United States Code, 11

U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), hereby moves the Court for entry of an order

authorizing the Trustee to: (i) reject certain pre-petition executory contracts between the Debtor,

iHealthcare Management II Company, a Florida corporation ("Manager"), and iHealthcare

Software Services, Inc., a Florida Corporation ("Consultant"); and (ii) enter into an *Interim*

*Management Agreement for Washington County Hospital* between the Debtor, Manager, and

Consultant. In support thereof, the Trustee respectfully states as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction to entertain the Motion pursuant to 28 U.S.C. §§

157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are Bankruptcy Code Sections 363, 365, and 1107, and Bankruptcy Rules 6004 and 6006.

## **FACTUAL BACKGROUND**

### *Procedural Background*

4. On February 19, 2019 (the "Petition Date"), Washington County, North Carolina, Medline Industries, Inc., and Dr. Robert Venable (collectively, the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtor [Dkt. No. 1].

5. On February 20, 2019, the Petitioning Creditors filed an *Emergency Motion for Order Appointing Trustee Pursuant to 11 U.S.C. § 303(g)* [Dkt. No. 5].

6. On February 22, 2019, the Court entered an Order approving the appointment of the Trustee [Dkt. No. 14]. The Trustee is the duly appointed, qualified, and acting trustee of the Debtor's estate.

7. On February 25, 2019, the Trustee filed his *Emergency Ex Parte Motion for Order for Authority to Operate Washington County Hospital Pursuant to 11 U.S.C. § 303(g)* [Dkt. No. 18].

8. On February 26, 2019, the Court entered an Order authorizing the Trustee to operate the business of the Debtor during the period of time that the Trustee remains in place, to the exclusion of any other parties [Dkt. No. 19].

9. On March 14, 2019, the Debtor filed an *Emergency Motion for Entry of Order for Relief and to Convert Involuntary Chapter 7 Case to Chapter 11 Case and Consent to Appointment of Chapter 11 Trustee* [Dkt. No. 27].

10. On March 15, 2019, the Court entered an Order for Relief in the Debtor's Chapter 7 case and simultaneously converted the Debtor's case from one under Chapter 7 to one under Chapter 11 of the Bankruptcy Code [Dkt. No. 28].

7. The Debtor owns Washington County Hospital ("WCH"), a twenty-five-bed, for-profit, Critical Access Hospital ("CAH") in Plymouth, North Carolina. Until February 14, 2019, WCH provided acute care, swing bed, emergency medicine, imaging, rehabilitation, laboratory, and related outpatient ancillary services to residents in Plymouth and in surrounding communities. WCH also operates Plymouth Primary Care Rural Health Clinic (the "Clinic"), a Provider-Based Rural Health Clinic. The Clinic is adjacent to WCH.

8. Upon information and belief, the Debtor is currently owned by HMC/CAH Consolidated, Inc., a Delaware corporation ("HMC/CAH"). Upon information and belief, HMC/CAH is in the business of acquiring and operating a system of acute care hospitals located in rural communities that are certified by The Centers for Medicare and Medicaid Services ("CMS") as CAHs. Upon information and belief, HMC/CAH owns rural hospitals in several states, including Kansas, Oklahoma, Missouri, Tennessee, and WCH in North Carolina.

*__Pre-Petition Management of WCH__*

9. Upon information and belief, through and until January 7, 2019, EmpowerHMS LLC ("EmpowerHMS") operated WCH. EmpowerHMS is a Delaware limited liability company headquartered in Kansas City, Kansas. Upon information and belief, EmpowerHMS formerly provided the financial support, legal support, centralized business office, and revenue cycle and IT services necessary to WHC's operations.

10. Upon information and belief, as of January 7, 2019, EmpowerHMS no longer operated or managed WCH, the management of which was transferred to Manager and Consultant

pursuant to (i) a *Management and Administrative Services Agreement* (the "Terminating Management Agreement") dated as of January 7, 2019, by and between the Debtor and Manager; (ii) an *EHR and RCM Services Agreement* dated as of January 7, 2019 by and between the Debtor and Consultant; and (iii) an *IT Help Desk Support & Daily Backup Services Agreement* also dated as of January 7, 2019 by and between the Debtor and Consultant (together with the *EHR and RCM Services Agreement*, collectively, the "Terminating Services Agreements").

11.     Upon information and belief, since January 7, 2019, Manager and Consultant attempted to begin to manage WCH, but such efforts were delayed by a number of transition and financial issues with EmpowerHMS.

***Post-Petition Events***

12.     Since his appointment on February 22, 2019, the Trustee has traveled to WCH in Plymouth, North Carolina on two separate occasions and met with several of the key personnel at WCH, including the remaining administrative and clinical staff of WCH, as well as with the Washington County, North Carolina Manager and County Attorney. The Trustee has also spent considerable time consulting with many entities that have an interest in WCH, including Washington County, the North Carolina Department of Health and Human Services, the main secured creditor for WCH, as well as Manager and Consultant.

13.     The Trustee has concluded that in order to preserve the property of the Debtor's estate, to prevent further loss to the estate, and to maximize the value of the assets of WCH for the benefits of creditors of WCH, WCH must be reopened and brought back to operational status. Reopening WCH will allow WCH to keep its license as a CAH; preserve and maintain WCH's drugs, equipment, and supplies; preserve and safeguard patient records; and, most importantly,

4

continue providing for the public health of residents of Washington County, many of whom depend on WCH and the Clinic as the only avenue for emergency healthcare in the County.

14.     Since February 22, 2019, the Clinic has reopened, and patients are being seen under the able care of Dr. Robert Venable and his staff at WCH. The remaining administrative and clinical staff of WCH have also been paid for their labor by the Trustee.

## *Post-Petition Interim Management of WCH*

15.     In order to reopen WCH, the Trustee must retain a healthcare management company that is able to provide the centralized business office, revenue cycle management, billing, patient record, patient intake, and IT services necessary to WCH's operations. In traditional "healthy" hospital settings, such management agreements can run well into the hundred of thousands of dollars per month. In addition, the transition from one management company to another can take several months to complete in a hospital setting, a period time which neither the Trustee nor WCH cannot spare.

16.     Recognizing the truly distressed setting of WCH, coupled with the fact that the Trustee does not have an unlimited budget or timeline in this case, the Trustee has concluded in his business judgment that the current Manager and Consultant offer the only feasible alternative to manage WCH, on an interim basis, until the operations of WCH are properly stabilized.

17.     The Trustee has reviewed the Terminating Management Agreement and Terminating Services Agreement and concluded that such agreements are not appropriate to deal with the current, post-petition situation at WCH. Instead, the Trustee has proposed a new interim management agreement with Manager and Consultant (the "Interim Management Agreement"), one that recognizes the Trustee's authority over all of WCH's decisions, management, and operations during the Trustee's tenure as trustee, as well as significantly reduces the fees associated

5

with the Manager's and Consultant's interim management of WCH. The proposed Interim Management Agreement—which has been reviewed and approved by Manager and Consultant— is attached to this Motion as Exhibit A.

18. The key terms of the Interim Management Agreement are as follows:

    a. <u>Term</u>: Six (6) months, but subject to a 30-day termination for any reason by the Trustee.

    b. <u>Management Fee</u>: $30,000/month or twelve percent (12%) of the prior month's collected cash revenues, whichever is greater. Payment shall be one (1) month in arrears. In addition, Manager shall be entitled to a six percent (6%) fee on net collections in order to perform revenue cycle management (RCM) functions on behalf of WCH, which shall also be paid one (1) month in arrears.

    c. <u>Management Services</u>: Manager and Consultant shall perform all the duties that are typical and customary for a manager of an acute general medical and surgical hospital, as outlined in detail in the Interim Management Agreement.

    d. <u>Reports</u>: Manager shall provide Trustee with regular and timely written management reports, as needed, to ensure WCH maintains compliance with all federal and state law regulations, and with any relevant bankruptcy issues.

    e. <u>Limitations on Manager's Duties and Powers</u>: Manager lacks the authority to carry out any decisions out of the ordinary course of business unless with prior written authority by the Trustee.

    f. <u>Termination</u>: Trustee may terminate the Interim Management Agreement for any reason upon providing thirty (30) days' notice to Manager and Consultant.

## RELIEF REQUESTED

### *Authority to Reject Terminating Management Agreement and Terminating Services Agreement*

19. The Trustee seeks authority from this Court, pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, to reject the Terminating Management Agreement and Terminating Services Agreements, both executory contracts, because these contracts (i) are no longer necessary or appropriate in connection with the operation of WCH's business, (ii) offer no economic value to the Debtor's estate, and (iii) will impede the goal of reopening WCH without a significant fee associated with such management contracts.

20. Section 365(a) authorizes a trustee or debtor-in-possession to reject any executory contract or unexpired lease, subject to bankruptcy court approval. 11 U.S.C. § 365(a).

21. Although Section 365(a) does not provide a standard for determining when rejection is appropriate, bankruptcy courts have traditionally applied the "business judgment standard in determining whether to permit the rejection of any executory contract or unexpired lease." See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Lubrizol Enters., Inc. v. Richmond Metal Finishes, Inc., 756 F.2d 1043, 1046-47 (4th Circ. 1985); In re Minges, 602 F. 2d 38, 42 (2d Cir. 1979). The decision to reject a lease or executory contract is to be accepted unless it is shown that the debtor's decision was one taken in bad faith or in gross abuse of the debtor's retained business discretion. Lubrizol, supra.

22. For the reasons stated herein, the Trustee submits that it has satisfied the business judgment standard in seeking rejection of the Terminating Management Agreement and Terminating Services Agreement with Manager and Consultant, respectively, and requests authority from this Court to do so effective as of the Petition Date.

23.     In addition, the Trustee seeks authority from this Court, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004, to enter into the Interim Management Agreement with Manager and Consultant.

24.     Section 363(b) authorizes a trustee or debtor-in-possession to use, sell, or lease property of the estate other than in the ordinary course of business, subject to notice, a hearing, and bankruptcy court approval. 11 U.S.C. § 363(b).

25.     As previously stated, the Trustee believes that in order to preserve the property of the Debtor's estate, to prevent further loss to the estate, and to maximize the value of the assets of WCH for the benefits of creditors of WCH, WCH must be reopened and brought back to operational status. In order to reopen WCH, the Trustee must engage a hospital management company that can provide the centralized business office, revenue cycle management, billing, patient record, patient intake, and IT services necessary to WCH's operations.

26.     The Trustee believes Manager and Consultant are best suited to provide such management services to WCH, on an interim basis, given that Manager and Consultant (i) are already familiar with WCH's situation; (ii) already have access to all of the software, patient records, billing records, and administrative records of WCH; (iii) have agreed to the terms of the Interim Management Agreement that recognize the truly distressed nature of WCH with regard to management fees and management services; and (iv) are willing and able to undertake the management tasks at WCH without significant delay or immediate expenditure by the Debtor's estate.

27.     The Manager and Consultant have prepared a proposed budget, and the Trustee has approved it.    The proposed budget gives the Court some indication of the costs that the Trustee

expects to incur and the revenues that the Trustee expects to obtain in re-opening WCH. The proposed budget is attached hereto as Exhibit B. The budget will be finalized if the Court grants this Motion, but the Trustee does not expect it to change significantly.

28.     Therefore, the Trustee believes it is in the best interests of the Debtor's estate to enter into the Interim Management Agreement with Manager and Consultant for the management of WCH on an interim basis.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

1.     Authorizing the Trustee to reject the Terminating Management Agreement and Terminating Services Agreement effective as of the Petition Date, pursuant to Section 365(a) of the Bankruptcy Code;

2.     Authorizing the Trustee to enter into the Interim Management Agreement, pursuant to Section 363(b) of the Bankruptcy Code; and

3.     Granting such other and further relief as this Court deems just and proper.

Respectfully submitted, this the 21st day of March, 2019.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
Jennifer B. Lyday (NC Bar No. 39871)
Francisco T. Morales (NC Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

*Attorneys for the Trustee*

**- and -**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
    rredwine@hendrenmalone.com

*Proposed Attorneys for the Trustee*

# EXHIBIT "A"

# WASHINGTON COUNTY HOSPITAL
# INTERIM MANAGEMENT AGREEMENT

THIS INTERIM MANAGEMENT AGREEMENT (the "Agreement") is made as of the ____ day of March, 2019 (the "Effective Date"), by and among the following parties:

(i) **Thomas W. Waldrep, Jr.,** in his capacity as the Court-appointed trustee ("Trustee") for **CAH Acquisition Company #1, LLC** (the "Debtor"), a Delaware limited liability company that owns, operates, and holds the license for that certain acute general medical and surgical hospital known primarily as *Washington County Hospital* and sometimes as *Washington County Community Hospital* located 958 US Highway 64 East Plymouth, NC 27962 ("WCH"); and

(ii) **iHealthcare Management II Company,** a Florida Corporation and hospital management company that assumed management of WCH on January 7, 2019 ("Manager"); and

(iii) **iHealthcare Software Services, Inc.,** a Florida Corporation that has been providing Data Services (as defined below) and EHR and RCM Services (as defined below) to WCH since November 1, 2018 and January 7, 2019, respectively (the 'Consultant")

Trustee, Debtor, Manager, and Consultant are sometimes referred to herein individually as a "Party" or collectively as the "Parties."

## RECITALS

**WHEREAS,** Debtor owns and operates WCH;

**WHEREAS,** Debtor holds all such permits and licenses required under applicable law and regulations to own and operate WCH;

**WHEREAS,** on February 19, 2019, Debtor was placed in an involuntary Chapter 7 bankruptcy (the "Bankruptcy Case") before the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court"), Case No. 19-00730;

**WHEREAS,** on February 20, 2019, upon motion of Debtor's petitioning creditors, the Bankruptcy Court appointed Thomas W. Waldrep, Jr. as Trustee for the Debtor;

**WHEREAS,** on March 14, 2019, the Debtor filed an *Emergency Motion for Entry of Order for Relief and to Convert Involuntary Chapter 7 Case to Chapter 11 Case and Consent to Appointment of Chapter 11 Trustee* in the Bankruptcy Case;

WHEREAS, on March 15, 2019, the Bankruptcy Court entered an Order for Relief in the Debtor's Chapter 7 case and simultaneously converted the Debtor's case from one under Chapter 7 to one under Chapter 11 of the Bankruptcy Code;

**WHEREAS,** Manager has been managing WCH pursuant to that certain *Management and Administrative Services Agreement* dated January 7, 2019 (together with all amendments and modifications thereof and supplements relating thereto, the "Terminating Management Agreement");

**WHEREAS,** Debtor engaged Consultant to oversee WCH's (i) information technology and technical support services (collectively, the "Data Services") pursuant to that certain *IT Help Desk Support & Daily Backup Services Agreement* dated November 1, 2018; and (ii) electronic-health-record ("EHR"), reimbursement, revenue-cycle-management ("RCM"), and third-party-billing services (collectively, the "EHR

1

and RCM Services") pursuant to that certain *EHR and RCM Services Agreement* dated January 7, 2019 (collectively, and together with all amendments and modifications thereof and supplements relating thereto, the "Terminating Services Agreements"); and

**WHEREAS**, Trustee, on behalf of Debtor, and pursuant to Section 365 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), has chosen to reject the Terminating Management Agreement and the Terminating Services Agreements as of the Effective Date;

**WHEREAS**, to the extent permitted by applicable law, and notwithstanding anything in the Terminating Management Agreement and Terminating Services Agreements to the contrary, Trustee desires to engage Manager to manage WCH under the restated terms as provided for herein, effective as the Effective Date, which management shall continue through and until the conclusion of the Bankruptcy Case, unless terminated sooner by Trustee as provided for herein;

**WHEREAS**, the Parties wish to provide for an orderly transition of Manager's management of WCH, replacing the terms and conditions as provided for in the Terminating Management Agreement and Terminating Services Agreements with the terms and conditions as set forth herein, while ensuring the continuing operation of WCH and the safety, care, and protection of WCH's patients, and to clarify each Party's responsibilities and obligations with regard to transition of management of WCH, including certain financial adjustments relating thereto.

**NOW THEREFORE**, for and in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

<div align="center">

**AGREEMENT**

</div>

1. **Recitals.** The foregoing recitals are hereby incorporated into this Agreement.

2. **Appointment and Status of Parties**.

   a. Appointment: Effective as of the Effective Date, Trustee, on behalf of Debtor, engages Manager to manage WCH during the Term (as defined in Section 3 herein), pursuant to the terms and conditions herein provided, which shall include assumption of services analogous to those formerly provided to WCH by the Consultant under the Terminating Services Agreements. Notwithstanding Manager's responsibility for managing WCH, Trustee shall retain ultimate control of the Debtor and WCH, and Manager shall obtain Trustee's approval for any and all material decisions concerning management of WCH.

   b. Independent Contractor: Manager is an independent contractor and there is no employer/employee relationship between the Debtor, the Trustee, and Manager. Moreover, this Agreement does not create a joint venture or partnership between the Debtor, the Trustee, and Manager. Manager will perform its duties under this Agreement as an independent contractor and will not hold itself out in any way to the general public or otherwise as an employee or subsidiary of the Debtor or the Trustee.

3. **Term**. This Agreement shall commence on the Effective Date and shall continue for a minimum of six [6] month term basis for the duration of the Bankruptcy Case, unless sooner terminated as set forth in Section 7 of this Agreement, or otherwise by the mutual and written agreement of the Parties or Order of the Bankruptcy Court. This agreement shall automatically extend and renew for an additional six [6] month period unless canceled.

4. **Management Fee.** As compensation for the Management Services (as defined in Section 5 herein), consulting, and advisory services to be provided hereunder, Manager shall be entitled to receive and retain a management fee equal to $30,000 per month or twelve percent (12%) of the prior month's collected cash revenues (the "Management Fee"), whichever is greater. Manager shall prepare and submit an invoice to Trustee requesting a reconciliation payment of the Management Fee that shall reflect the preceding month's collected cash revenues and the percentage thereof that Manager is owed as a Management Fee. Manager shall be paid one month in arrears upon Trustee's review and approval of the submitted monthly invoice.

5. **Duties and Responsibilities of Manager; Limitations on Manager's Exercise of Duties.**

   a. Description of Management Services: Manager shall perform the duties set forth herein and all other duties that are typical and customary for a manager of an acute general medical and surgical hospital and shall do so in accordance with a standard of care, skill, and diligence as is required by applicable Federal and State laws and regulations; provided, however, that Trustee shall maintain complete and total control over WCH's business affairs given the bankrupt nature of the Debtor. Without the prior written consent of Trustee, Manager shall not have the authority to enter into any contract or incur any debt or liability in the name of or on behalf of Debtor or Trustee; to enter into any contract or other agreement inconsistent with the terms of this Agreement or that may have a durational term that extends beyond the Term of this Agreement; or to borrow money in the name or on behalf of Debtor or Trustee. During the Term of this Agreement, Manager shall assist Trustee and Debtor in connection with the operation of WCH by providing the following management-related services (collectively, the "Management Services"):

      i. Hire and discharge employees of WCH including physicians, physician assistants, nurse practitioners, registered nurses, care aides, and office and other employees, in accordance with all applicable laws, rules, regulations, and standards that govern WCH's operations;

      ii. Provide and maintain proper accounting, billing, and patient records (including medical, financial, and collection records, whether in hard copy or EHR format). Given the state of affairs with respect to currently available systems of WCH, Manager intends to utilize Quickbooks Online, CPSI, ESolutions/Claimremedi Paper Charts, certain elements of iHeatlhConnect and the reporting available from those systems to meet the requirements of this section to prepare and file all necessary reports, claims, and rate increase requests related to RCM and revenue production; and prepare and file all reports necessary to ensure WCH's regulatory compliance as a licensed acute general medical and surgical hospital and as otherwise provided for herein. Preparation of Medicare and Medicaid Cost Reports will be outsourced to expert consultants for a fee as preapproved by the Trustee;

      iii. Once implemented, Administer and oversee WCH's computerized physician order entries, clinical service records, and other information technology ("IT") systems required for the efficient management of WCH and its clinical services and customer service affairs;

      iv. Handle all aspects of billing and collecting all revenues, rents, fees, and other charges from WCH patients or the applicable third-party payors, including Medicare and Medicaid. This includes executive oversight, off site transaction processing, analysis and reporting, payment posting and other elements RCM process for which a 6% fee of net collections will be billed, in arrears, monthly. Manager will evaluate and advise

the Trustee regarding software maintenance support for CPSI as updates have not been made for months;

v.  Establish and maintain accounting systems via Quickbooks Online and internal controls consistent and in accordance with all applicable government regulations;

vi.  Pay when due, and only after obtaining Trustee's prior written consent, the cost of those third-party provider services necessary for Manager to carry out the management of WCH, together with those certain ordinary and necessary management expenses of WCH (collectively, the "<u>Administrative Expenses</u>"), including, but not limited to:

1.  The cost of all supplies and equipment necessary to provide care and services to the patients of WCH. For purposes of this subparagraph, supplies include those items required for routine hospital maintenance and janitorial services, linens and bedclothes, bathroom and toileting supplies, patient medications and personal hygiene products (other than those paid for and purchased by a third party), laboratory reagents/supplies, radiology contrast supplies, infusion services and such other supplies as Manager, in its reasonable discretion, believes are necessary and appropriate for the safe and hygienic operation of WCH;

2.  Insurance premiums and related charges for the insurance described in this Agreement;

3.  All taxes for WCH, including real estate taxes, tangible property taxes, sales taxes and the like;

4.  Any other expense reasonably incurred in the operation of WCH as an acute general medical and surgical hospital.

b.  <u>Maintenance of WCH</u>: Manager shall, at all times during the Term, keep, manage, and maintain WCH, including, without limitation, all furniture, fixtures, furnishings, equipment, and other property, in the same condition and repair as originally found, normal wear and tear excepted. The equipment et al mentioned in this section has not been surveyed nor inventoried by the hospital or Manager at inception and will be managed in an "as is" condition as no warranty can be made as to the "originally found" condition or state or quantity of the assets in general. Defects shall be reported to the Trustee as they are discovered for resolution. Manager specifically disclaims any warranty on the condition of the assets at inception.

c.  <u>Rates and Charges</u>: Manager shall advise Trustee with respect to rates and fees for the services furnished at WCH consistent with any applicable governmental regulations.

d.  <u>Use and Operation of WCH</u>: WCH shall be used and operated as an acute general medical and surgical hospital. WCH and its staff shall provide care and services to patients in a manner consistent with said use and operation and for no other purpose without Trustee's prior written consent. Without Trustee's prior written consent, Manager shall not utilize WCH for any other purpose than as an acute general medical and surgical hospital and shall not reduce the number of licensed beds. Manager shall not cause or permit any waste of WCH.

e.  <u>Reports</u>: Manager shall keep Trustee informed as to the general operating condition and management status of WCH and shall provide Trustee with regular and timely written

management reports, as may be needed to ensure that WCH maintains compliance with all applicable Federal and State laws and regulations, any formal action taken or requests made by any regulatory agency, any relevant Bankruptcy Case proceedings, and any Order or other ruling issued by the Bankruptcy Court with respect to the Bankruptcy Case of Debtor. Further, Manager shall timely respond to any *ad-hoc* or emergency request made by Trustee for a written report or other information.

f.  <u>Limitations on Manager's Exercise of Duties.</u> Manager shall not have inherent or discretionary authority to undertake certain actions on WCH's behalf in the exercise of its management duties without the advanced written consent of Trustee. Such actions that Manager lacks authority to carry out under this Agreement include, but are not be limited to, the following items:

  i.  Purchase capital assets or incur any capital expenses on WCH or Debtor's behalf;

  ii.  Incur debt on behalf of WCH or Debtor beyond Administrative Expenses approved by the Trustee in writing;

  iii.  Encumber WCH or Debtor property, or sell or dispose of any material assets;

  iv.  File or settle litigation arising out of this Agreement or in connection to the management or operations of WCH;

  v.  Grant any person any rights with respect to the ownership of, or limiting the activities of, WCH;

  vi.  Adopt or amend employee equity and benefit plans;

  vii.  Hire or fire officers or key employees;

  viii.  Enter into employment agreements, or amending the terms of employment, for officers or key employees;

  ix.  Borrow or lend money;

  x.  Adopt operating budgets without authority from the Trustee in writing; and

  xi.  Enter into agreements of material importance to WCH's operations without authority from the Trustee in writing.

6.  **WCH's Existing Operational Challenges**. Trustee acknowledges and agrees that WCH is currently in the midst of substantial operational challenges and that Debtor is currently in bankruptcy. As such, Manager is assuming interim management of WCH on an as-is, at-risk basis, it being the intention of Trustee, Debtor, and Manager that Manager will utilize its skill and expertise as a manager of acute general medical and surgical hospitals to deal with existing challenges and deficiencies—operational, regulatory, or otherwise—currently present at WCH . After the Effective Date, Manager will coordinate as needed with Trustee, Debtor, Consultant on the Management Services. Manager acknowledges and agrees that during the Term of this Agreement, it shall not voluntarily surrender WCH's license and that it shall cooperate in good faith and use commercially reasonable efforts to support Trustee's efforts in the Bankruptcy Case.

7. **Termination of Agreement**.

    a. <u>Termination by Trustee</u>: This Agreement may be terminated by the Trustee for any reason upon providing thirty [30] days' advanced written notice to the other Parties. Termination by any other Party shall require the consent of the Trustee and the approval of the Bankruptcy Court.

    b. <u>Automatic Termination</u>: This Agreement shall automatically terminate, unless Trustee in its sole discretion elects not to terminate this Agreement, should:

        i. Manager (a) file a petition in bankruptcy or a petition to take advantage of any insolvency act; (b) make an assignment for the benefit of its creditors; (c) consent to the appointment of a receiver of itself or of the whole or any substantial part of its property; (d) file a petition or answer seeking reorganization or arrangement under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any State thereof; or

        ii. Any petition be filed against Manager under the federal bankruptcy laws, or any other proceeding is instituted by or against Manager seeking to adjudicate it bankrupt or insolvent, or seeking liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors.

8. **Rights and Obligations Upon Termination**.

    a. <u>Books and Records</u>: Manager shall promptly deliver to Trustee all books, records, contracts, leases, documents, receipts, and other papers or documents that pertain to WCH or Debtor and have been held by Manager.

    b. <u>Mutual Cooperation</u>: Manager and Trustee shall cooperate and fully comply with all requirements of this Agreement to ensure a smooth transition.

    c. <u>Accounts</u>: Should Manager receive any funds from any source related to the operation of WCH after the termination of this Agreement, Manager shall deliver said funds to Trustee within three (3) business days of their receipt.

9. **LIMITATION OF LIABILITY:** NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR INDIRECT DAMAGES, NOR THE COST OF PROCURING SUBSTITUTE ITEMS OR SERVICES, ARISING FROM OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF ANY NOTICE OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL MANAGER BE LIABLE FOR SPECIAL OR CONSEQUENTIAL DAMAGES ARISING FROM THE PROVISIONS AND THE PERFORMANCE OF SERVICES BY MANAGER UNDER THIS AGREEMENT, EVEN IF MANAGER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT AS PROVIDED HEREIN, MANAGER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED [EITHER IN FACT OR BY OPERATION OF LAW], WITH RESPECT TO ANY ITEM OR SERVICE PROVIDED HEREUNDER, INCLUDING BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY, TITLE, NON-INFRIGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE OR ANY WARRANTY ARISING FROM CONDUCT, COURSE OF DEALING, CUSTOM, OR USAGE IN TRADE. In accordance with <u>United Artists Theatre Co. v. Walton</u>, 315 F.3d 217 (3rd Cir. 2003), this indemnification does not include: (1) claims by Washington County

Hospital or Trustee against Manager for bad faith, gross negligence, or willful misconduct; and (2) any contractual disputes between or among Washington County Hospital, Trustee, and Manager.

10. **MUTUAL HOLD HARMLESS.** Each Party shall defend, indemnify and hold the other Party, its affiliated companies, shareholders, officers, directors, board members, agents, and employees harmless from any and all claims by any other party (including reasonable attorneys' fees and costs of litigation) and liabilities resulting from, but not limited to, each Party's errors, acts, omissions, misrepresentations or negligence in the performance of this Agreement.

11. **Assignment**. This Agreement may not be assigned or delegated by any Party without the express and written consent of the Trustee. Trustee may assign its rights and obligations hereunder without the consent of the other parties, provided however that such assignment has been approved by the Bankruptcy Court. Any assignment or delegation in violation of the foregoing restriction shall be void.

12. **Miscellaneous**.

   a. <u>Notices</u>: All notices or other communications required or permitted to be given under this Agreement must be in writing. Notices are considered properly given and received three business days after the postmark if sent by certified mail, return receipt requested, from within the United States or one business day after being sent via overnight courier with delivery confirmation (e.g., Express Mail, UPS or Federal Express) to any of the Parties at the addresses shown below, or at such other address as any of the Parties may designate from time to time by giving notice as required by this Agreement.

   <div style="margin-left:2em">

   If to Debtor:   CAH Acquisition Company #1, LLC
                   d/b/a *Washington County Hospital*
                   958 US Highway 64 East
                   Plymouth, NC 27962
                   Attn: Thomas W. Waldrep, Jr., Interim Chapter 7 Trustee
                   Email: notice@waldrepllp.com

   If to Manager/Consultant   iHealthcare Management II Company
                              3901 SW 28th Street, 2nd Floor
                              Miami, FL, 33142
                              Attn: Noel Mijares
                              Email: Noel.Mijares@ihealthcaresystems.com

                              iHealthcare Software Services, Inc.
                              3901 SW 28th Street, 2nd Floor
                              Miami, FL, 33142
                              Attn: Noel Mijares
                              Email: Noel.Mijares@ihealthcaresystems.com

   </div>

   b. <u>HIPAA and Business Associate Agreement</u>: The Parties, as Business Associates, hereby acknowledge and agree to ensure compliance with the privacy standards adopted by the U.S. Department of Health and Human Services as they may be amended from time to time, 45 C.F.R. Parts 160 and 164, subparts A, D and E, the security standards adopted by the U.S. Department of Health and Human Services as they may be amended from time to time, 45 C.F.R. Parts 160, 162 and 164, subpart C , and the requirements of Title XIII, Subtitle D of the Health Information Technology for Economic and Clinical Health (HITECH) Act provisions of the American Recovery and Reinvestment Act of 2009, 42 U.S.C. §§ 17921-

17954, and all its implementing regulations, when and as each is effective and compliance is required, as well as any applicable state confidentiality laws.

c.  Liability Insurance. Manager shall use reasonable commercial efforts to obtain and/or maintain in effect, on WCH's behalf, throughout the term of this Agreement, such policies (or programs) of property/casualty coverage, public liability, professional liability, and hazard insurance and other customary insurance coverages in commercially reasonable amounts and as consistent with industry standards and the reasonable and prudent view of Trustee, who shall be granted the sole discretion to designate the required amounts of coverage should the coverage amounts be deemed inadequate. WCH shall be solely responsible for payment of premiums for insurance levels obtained as required by this section.

d.  Complete Agreement: This Agreement (i) contains the final, complete, and exclusive agreement of the Parties with respect to the transactions contemplated by them and (ii) supersedes any prior or contemporaneous agreement, representation or understanding, oral or written, by and among any of them—including but not limited to the Terminating Agreements. The Parties specifically disclaim reliance upon any statement or representation not contained in this Agreement.

e.  Severability: If any of the provisions of this Agreement are held invalid for any reason, the remainder of this Agreement will not be affected and will remain in full force and effect in accordance with its terms.

f.  Captions: The captions preceding the text of each section of this Agreement have been inserted solely for convenient reference. The captions neither constitute a part of this Agreement nor affect its meaning, interpretation or effect.

g.  Facsimiles/Counterparts: A signed facsimile or photocopy of this Agreement shall be binding as an original. The Parties may sign this Agreement in counterparts. Each counterpart will be deemed an original, and all of them, together, will constitute one and the same Agreement.

h.  Governing Law/Jurisdiction: This Agreement shall be governed by North Carolina law without regard to its conflicts-of-law law and the Parties agree that the Bankruptcy Court shall be the exclusive venue for resolving any and all claims and disputes arising from the Agreement or the provision of services as herein provided .

i.  Binding Effect: This Agreement is binding upon and inures to the benefit of the parties and their respective successors-in-interest, heirs, successors and assigns, except as otherwise provided.

*[Remainder of Page Left Intentionally Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement to be effective as of the Effective Date.

<div align="center">

**ACCEPTED AND AGREED TO BY:**

</div>

**DEBTOR:**

CAH ACQUISITION COMPANY #1, LLC,
*a Delaware limited liability company* d/b/a
*Washington County Hospital* and a/k/a
*Washington County Community Hospital*

    **By: TRUSTEE:**

    THOMAS W. WALDREP, JR.,
    *Interim Chapter 7 Trustee*

    By: _____
    Name: <u>Thomas W. Waldrep, Jr.</u>
    Title: <u>Trustee</u>

**MANAGER:**

IHEALTHCARE MANAGEMENT II COMPANY,
*a Florida corporation*

By: _____
Name: <u>Noel Mijares</u>
Title: <u>Chief Executive Officer</u>

**CONSULTANT:**

IHEALTHCARE SOFTWARE SERVICES, INC.,
*a Florida corporation*

By: _____
Name: <u>Noel Mijares</u>
Title: <u>Chief Executive Officer</u>

EXHIBIT "B"

# Washington County
## March 2019 Financial Estimates

### Net Revenues

| | Weekly | Pay Period | Monthly Rev | Per Diem Cash | # Pat or Days | 1st 30 Days | # Pat or Days | Month 2 | # Pat or Days | Month 3 | # Pat or Days | Month 4 | # Pat or Days | Month 5 | # Pat or Days | Month 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | **2019 Hospital Reopens** | | | | | | |
| **Monthly Average 2018:** | | | | | | | | | | | | | | | | |
| IP - Acute | | | | $1,622 | 3 | $4,866 | 25 | $40,550 | 30 | $48,660 | 40 | $64,880 | 50 | $81,100 | 60 | $97,320 |
| IP - Swing Bed | | | | $1,197 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 |
| OP (Includes Lab & Radiology) | | | 9% Avg Admits | $400 | 200 | $80,000 | 250 | $100,000 | 300 | $120,000 | 350 | $140,000 | 400 | $160,000 | 450 | $180,000 |
| ER (Includes Lab & Radiology) | | | | $1,000 | 50 | $50,000 | 150 | $150,000 | 175 | $175,000 | 200 | $200,000 | 225 | $225,000 | 250 | $250,000 |
| OP Infusion Therapy | | | | | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 |
| Observation | | | | $557 | 0 | $0 | 5 | $2,785 | 6 | $3,342 | 7 | $3,899 | 8 | $4,456 | 9 | $5,013 |
| ER Professional Fees | | | | $75 | 50 | $3,750 | 150 | $11,250 | 175 | $13,125 | 200 | $15,000 | 225 | $16,875 | 250 | $18,750 |
| **Patient Revenue Total** | | | $692,000 | | | $138,616 | | $304,585 | | $360,127 | | $423,779 | | $487,431 | | $551,083 |
| | | | | | | | | | | | | | | | | |
| **Cost of Sales/Revenue Adjustments:** | | | | | | | | | | | | | | | | |
| Billing at 6% | | | $41,520 | | | $8,317 | | $18,275 | | $21,608 | | $25,427 | | $29,246 | | $33,065 |
| Clearinghouse | | | $1,200 | | | $1,200 | | $1,200 | | $1,200 | | $1,200 | | $1,200 | | $1,200 |
| | | | | | | | | | | | | | | | | |
| **Total Cost of Sales/Rev Adjustments** | | | $42,720 | | | $9,517 | | $19,475 | | $22,808 | | $26,627 | | $30,446 | | $34,265 |
| | | | | | | | | | | | | | | | | |
| **Total Mo Avg Rev** | | | $649,280 | | | $129,099 | | $285,110 | | $337,319 | | $397,152 | | $456,985 | | $516,818 |

### Expenses

| | Weekly | Pay Period | Monthly (Weekly X 4.33) | | | 1st 30 Days | | Month 2 | | Month 3 | | Month 4 | | Month 5 | | Month 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Trimmed Down Payroll:** | | | | | | | | | | | | | | | | |
| Admin | $14,580 | $29,160 | $63,131 | | | $63,131 | | $63,131 | | $63,131 | | $63,131 | | $63,131 | | $63,131 |
| Clinical | $23,440 | $46,880 | $101,495 | | | $40,000 | | $75,000 | | $101,495 | | $101,495 | | $101,495 | | $101,495 |
| Providers | $19,040 | $38,080 | $82,443 | | | $19,312 | | $42,384 | | $82,443 | | $82,443 | | $82,443 | | $82,443 |
| **Total Payroll:** | $57,060 | $114,120 | $247,070 | | | $122,443 | | $180,515 | | $247,070 | | $247,070 | | $247,070 | | $247,070 |
| **Trimmed Down Benefits & Taxes:** | | | | | | | | | | | | | | | | |
| Admin | $2,740 | $5,480 | $11,864 | | | $4,000 | | $6,000 | | $11,864 | | $11,864 | | $11,864 | | $11,864 |
| Clinical | $4,632 | $9,264 | $20,057 | | | $4,000 | | $15,000 | | $20,057 | | $20,057 | | $20,057 | | $20,057 |
| Providers | $1,120 | $2,240 | $4,850 | | | $1,600 | | $1,600 | | $4,850 | | $4,850 | | $4,850 | | $4,850 |
| **Total Benefits and Taxes** | $8,492 | $16,984 | $36,770 | | | $9,600 | | $22,600 | | $36,770 | | $36,770 | | $36,770 | | $36,770 |
| | | | | | | | | | | | | | | | | |
| **Total Staff Expenses** | $65,552 | $131,104 | $283,840 | | | $132,043 | | $203,115 | | $283,840 | | $283,840 | | $283,840 | | $283,840 |
| | | | | | | | | | | | | | | | | |
| **Supplies:** | | | | | | | | | | | | | | | | |
| All Medical Supplies | | | $10,000 | | | $10,000 | | $10,000 | | $10,000 | | $10,000 | | $10,000 | | $10,000 |
| ICD10/CPT/HCPCS Coding Books | | | $1,000 | | | $1,000 | | $0 | | $0 | | $0 | | $0 | | $0 |
| Pharmacy | | | $20,000 | | | $20,000 | | $20,000 | | $20,000 | | $20,000 | | $20,000 | | $20,000 |
| Infusion Pharmaceuticals | | | $5,000 | | | $5,000 | | $5,000 | | $5,000 | | $5,000 | | $5,000 | | $5,000 |
| Oxygen | | | $1,500 | | | $1,500 | | $1,500 | | $1,500 | | $1,500 | | $1,500 | | $1,500 |
| Linen Services | | | $2,000 | | | $2,000 | | $2,000 | | $2,000 | | $2,000 | | $2,000 | | $2,000 |
| Paper Products | | | $750 | | | $750 | | $750 | | $750 | | $750 | | $750 | | $750 |
| Patient Supplies | | | $8,000 | | | $8,000 | | $8,000 | | $8,000 | | $8,000 | | $8,000 | | $8,000 |
| Food | | | $2,000 | | | $2,000 | | $2,000 | | $2,000 | | $2,000 | | $2,000 | | $2,000 |
| **Supplies Total** | | | $50,250 | | | $50,250 | | $49,250 | | $49,250 | | $49,250 | | $49,250 | | $49,250 |
| | | | | | | | | | | | | | | | | |
| **LAB Operations:** | | | | | | | | | | | | | | | | |
| Maintenance Contracts | | | $2,600 | | | $2,600 | | $2,600 | | $2,600 | | $2,600 | | $2,600 | | $2,600 |
| Consumables/Reagents | | | $20,000 | | | $20,000 | | $20,000 | | $20,000 | | $25,000 | | $27,000 | | $30,000 |
| Reference Lab Costs | | | $3,000 | | | $3,000 | | $3,000 | | $3,000 | | $3,000 | | $3,000 | | $3,000 |
| Lab Proficiency Testing | | | $5,000 | | | $5,000 | | $0 | | $0 | | $0 | | $0 | | $0 |
| CLIA Consultant | | | $150 | | | $150 | | $150 | | $150 | | $150 | | $150 | | $150 |
| Blood -O Negative Only (Emergency Only) | | | $184 per Unit | | | $0 | | $184 | | $368 | | $552 | | $736 | | $920 |
| **Total Lab Expenses** | | | $30,750 | | | $30,750 | | $25,934 | | $26,118 | | $31,302 | | $33,486 | | $36,670 |
| | | | | | | | | | | | | | | | | |
| *Management Fee / Flat Minimum Per* | | | | | | | | | | | | | | | | |
| *Interim Management Agreement with Trustee\*:* | | | $30,000 | | | $0 | | $30,000 | | $30,000 | | $30,000 | | $30,000 | | $30,000 |

| # | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60 | *Professional Fees:* | | | | | | | | | | | | | | | | |
| 61 | Lab Medical Director | | | $1,500 | | | $500 | $1,000 | | | $1,500 | | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 |
| 62 | Medical Director | | | $2,500 | | | $2,000 | $2,500 | | | $2,500 | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| 63 | Cost Report Consultant | | | $3,000 | | | $3,000 | $3,000 | | | $3,000 | | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| 64 | ChargeMaster Consultant | | | $1,000 | | | $0 | $1,000 | | | $0 | | $1,000 | $0 | $0 | $0 | $0 |
| 66 | **Total Professional Fees** | | | **$8,000** | | | **$5,500** | **$7,500** | | | **$7,000** | | **$8,000** | **$7,000** | **$7,000** | | **$6,000** |
| 68 | *Purchased Services:* | | | | | | | | | | | | | | | | |
| 69 | IT Server(s) Hosting & Backups | | | $3,500 | | | $3,500 | $3,500 | | | $3,500 | | $3,500 | $3,500 | $3,500 | $3,500 | $3,500 |
| 70 | Software Support (24/7 Helpdesk) | | | $2,170 | | | $2,170 | $2,170 | | | $2,170 | | $2,170 | $2,170 | $2,170 | $2,170 | $2,170 |
| 71 | BYOWEBDOC | | | $400 | | | $400 | $400 | | | $400 | | $400 | $400 | $400 | $400 | $400 |
| 72 | Transcription Solutions | | | $400 | | | $150 | $200 | | | $250 | | $300 | $400 | $400 | $600 | $600 |
| 73 | Copier Leases | | | $1,300 | | | $1,300 | $1,300 | | | $1,300 | | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 |
| 74 | **Total Purchased Services** | | | **$7,770** | | | **$7,520** | **$7,570** | | | **$7,620** | | **$7,670** | **$7,770** | **$7,770** | | **$7,770** |
| 76 | *Maintenance:* | | | | | | | | | | | | | | | | |
| 77 | Facility | | | $2,000 | | | $2,000 | $2,000 | | | $2,000 | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| 78 | Medical Equipment | | | $2,500 | | | $2,500 | $2,500 | | | $2,500 | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| 79 | Video Laryngoscope | | | $1,700 | | | $1,700 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 80 | Waste Disposal | | | $1,000 | | | $1,000 | $1,000 | | | $1,000 | | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| 81 | Pest Control | | | $185 | | | $185 | $185 | | | $185 | | $185 | $185 | $185 | $185 | $185 |
| 82 | *Radiology:* | | | | | | | | | | | | | | | | |
| 83 | Contrast Materials | | | $1,500 | | | $1,500 | $1,500 | | | $1,500 | | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 |
| 84 | Inspections | | | $1,701 | | | $1,701 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 85 | CT Scanner | | | $1,475 | | | $1,475 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 86 | FDA Inspection | | | $1,400 | | | $1,400 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 87 | Mammo Equip Repairs | | | $4,973 | | | $4,973 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 88 | BioMed | | | $1,700 | | | $1,700 | $1,700 | | | $1,700 | | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 |
| 89 | Ventilator Rental | | | $725 | | | $0 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 90 | Telemetry System Lease | | | $2,260 | | | $2,260 | $2,260 | | | $2,260 | | $2,260 | $2,260 | $2,260 | $2,260 | $2,260 |
| 91 | **Total Maintenance** | | | **$23,119** | | | **$22,394** | **$11,145** | | | **$11,145** | | **$11,145** | **$11,145** | **$11,145** | | **$11,145** |
| 93 | *Utilities:* | | | | | | | | | | | | | | | | |
| 94 | Phone & Fax | | | $1,000 | | | $1,000 | $1,000 | | | $1,000 | | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| 95 | Cable TV | | | $500 | | | $0 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 96 | LP Gas | | | $500 | | | $500 | $500 | | | $500 | | $500 | $500 | $500 | $500 | $500 |
| 97 | Electric | | | $5,000 | | | $5,000 | $5,000 | | | $5,000 | | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| 98 | Water | | | $2,000 | | | $2,000 | $2,000 | | | $2,000 | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| 99 | Internet | | | $2,500 | | | $2,500 | $2,500 | | | $2,500 | | $2,500 | $2,500 | $2,500 | $2,500 | $2,500 |
| 100 | Diesel Fuel | | | $16,000 | | | $12,000 | $8,000 | | | $4,000 | | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |
| 101 | **Total Utilities** | | | **$27,500** | | | **$23,000** | **$19,000** | | | **$15,000** | | **$13,000** | **$13,000** | **$13,000** | | **$13,000** |
| 103 | *Insurance:* | | | | | | | | | | | | | | | | |
| 104 | Malpractice (Prepaid for 2019) | | | $30,000 | | | $0 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 105 | Liability | | | $20,000 | | | $0 | $0 | | | $0 | | $0 | $0 | $0 | $0 | $0 |
| 106 | Workers Compensation | | | $4,000 | | | $4,000 | $4,000 | | | $4,000 | | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| 107 | **Total Insurance** | | | **$54,000** | | | **$4,000** | **$4,000** | | | **$4,000** | | **$4,000** | **$4,000** | **$4,000** | | **$4,000** |
| 109 | *Compliance:* | | | | | | | | | | | | | | | | |
| 110 | Damper Repairs | | | | | | $18,000 | | | | | | | | $0 | | $0 |
| 111 | Generator Repairs | | | | | | $6,500 | | | | | | | | | | |
| 112 | Fire Extinguisher | | | $226 | | | $226 | | | | $225 | | $226 | | $226 | | $225 |
| 114 | **Total Compliance** | | | **$226** | | | **$24,726** | **$226** | | | **$226** | | **$226** | | **$226** | | **$226** |
| 116 | **Total Expenses** | | | **$485,229** | | | **$300,184** | **$357,740** | | | **$434,199** | | **$438,433** | | **$437,717** | | **$443,991** |
| 118 | **Estimated Revenue Minus Expenses** | | | **$164,051** | | | **-$171,085** | **-$72,630** | | | **-$96,880** | | **-$41,281** | | **$19,268** | | **$72,517** |

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 120 | Revenue Assumptions | | | | | | | | | | | | | | | | |
| 121 | Washington thru Fiscal Yr March 2018 | | | | | | | | | | | | | | | | |
| 122 | | Total | Pay % | | | | | | | | | | | | | | |
| | | | 46% | | | | | | | | | | | | | | |
| 123 | IP Rev Per Diem | $3,527 | $1,622 | | | | | | | | | | | | | | |
| 124 | IP Swing Bed Per Diem | $2,603 | $1,197 | | | | | | | | | | | | | | |
| 125 | ER Per Visit | $1,057 | $486 | | | | | | | | | | | | | | |
| 126 | OP / Clinic Per Visit | $148 | $68 | | | | | | | | | | | | | | |
| 127 | Observation Revenue | $1,211 | $557 | | | | | | | | | | | | | | |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### GREENVILLE DIVISION

IN RE:                                     )
                                           )
CAH ACQUISITION COMPANY #1,    )      **Case No. 19-00730-5-JNC**
LLC, d/b/a WASHINGTON COUNTY )
HOSPITAL,                                  )      **Chapter 11**
                                           )
            **Debtor.**                    )
                                           )

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN of the **TRUSTEE'S EMERGENCY MOTION FOR AUTHORITY TO (1) REJECT CERTAIN EXECUTORY CONTRACTS WITH iHEALTHCARE MANAGEMENT II COMPANY AND iHEALTHCARE SOFTWARE SERVICES, INC. AND (2) ENTER INTO INTERIM MANAGEMENT AGREEMENT WITH iHEALTHCARE MANAGEMENT II COMPANY AND iHEALTHCARE SOFTWARE SERVICES, INC.** ("Motion") filed simultaneously herewith in the above captioned case; and,

FURTHER NOTICE IS HEREBY GIVEN that this Motion may be allowed provided no responses and request for a hearing is made by a party in interest in writing to the Clerk of this Court by **5:00p.m. on March 26, 2019**; and,

FURTHER NOTICE IS HEREBY GIVEN, that a hearing will be conducted on the motion and any response thereto on **Wednesday, March 27, 2019 at 11:00 a.m. at the United States Bankruptcy Court, 150 Reade Circle, Greenville, North Carolina**. Any party requesting a hearing shall appear at said hearing in support of such request or he may be assessed Court costs. If no request for a hearing is timely filed, the Court may rule on the Motion and response thereto *ex parte* without further notice. Any party filing an objection requesting a hearing, shall appear at said hearing or they may be taxed with Court costs

DATED: March 21, 2019          **WALDREP LLP**

                               */s/ Thomas W. Waldrep, Jr.*
                               Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
                               Jennifer B. Lyday (NC Bar No. 39871)
                               Francisco T. Morales (NC Bar No. 43079)
                               101 S. Stratford Road, Suite 210
                               Winston-Salem, NC 27104
                               Telephone: 336-717-1440
                               Telefax: 336-717-1340
                               Email: notice@waldrepllp.com
                               *Attorneys for the Trustee*

- and -

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
        rredwine@hendrenmalone.com

*Proposed Attorneys for the Trustee*

12

## CERTIFICATE OF SERVICE

I, Thomas W. Waldrep, Jr., 101 S. Stratford Road, Suite 210, Winston Salem, North Carolina 27104, certify:

That I am, at all times hereinafter mentioned, was, more than eighteen (18) years of age;

That on the 21st day of March, 2019, I served copies of the foregoing pleading on the parties listed below and attached exhibit "A", by depositing a copy of the same in the United States mail bearing sufficient postage.

I certify under penalty of perjury that the foregoing is turn and correct.

Dated: March 21, 2019        **WALDREP LLP**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
Jennifer B. Lyday (NC Bar No. 39871)
Francisco T. Morales (NC Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

*Attorneys for the Trustee*

**- and -**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
       rredwine@hendrenmalone.com

*Proposed Attorneys for the Trustee*

To:

Marjorie K. Lynch          (via CM/ECF)
Office of the Bankruptcy Administrator

Rayford K. Adams        (via CM/ECF)
Counsel for the Debtor

Terri L. Gardner         (via CM/ECF)
Counsel for Medline Industries, Inc.
Counsel for Washington County, NC
Counsel for Robert Venable, M.D.

Katherine M. McCraw     (via CM/ECF)
Counsel for NC DHHS

iHealthcare Management II Company
Attn: Noel Mijares
3901 SW 28th Street, 2nd Floor
Miami, FL, 33142
Email: Noel.Mijares@ihealthcaresystems.com

iHealthcare Software Services, Inc.
Attn: Noel Mijares
3901 SW 28th Street, 2nd Floor
Miami, FL, 33142
Email: Noel.Mijares@ihealthcaresystems.com


Ex A

Label Matrix for local noticing
0417-5
Case 19-00730-5-JNC
Eastern District of North Carolina
Raleigh
Thu Mar 21 10:25:28 EDT 2019

(p)BANKRUPTCY ADMINISTRATOR EDNC
434 FAYETTEVILLE STREET
SUITE 640
RALEIGH NC 27601-1888

CAH Acquisition Company # 1, LLC
c/o Corporation Service Co. Reg. Agent
2626 Glenwood Avenue Suite 550
Raleigh, NC 27608-1370

Terri L. Gardner
Nelson Mullins Riley & Scarborough, LLP
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612-3731

Katherine Montgomery McCraw
North Carolina Department of Justice
PO Box 629
Courier Number 51-41-22
Raleigh, NC 27602-0629

NC Department of Revenue
Office Services Div., Bankruptcy Unit
PO Box 1168
Raleigh, NC 27602-1168

Quest Diagnostics Clinical Laboratories Inc.
c/o Melody Graden MR 481
1001 Adams Ave
Norristown, PA 19403-2401

Robert Venable, M.D.
Post Office Box 1026
Plymouth, NC 27962-1026

Washington County, NC
Post Office Box 1007
Plymouth, NC 27962-1007

Rayford K. Adams III
Spilman Thomas & Battle, PLLC
110 Oakwood Dr., Suite 500
Winston-Salem, NC 27103-1958

Bankruptcy Administrator
Two Hannover Square, Ste. 640
434 Fayetteville Street
Raleigh, NC 27601-1701

CAH Acquisition Company #1, LLC d/b/a W
958 U.S. Highway 64 East
Plymouth, NC 27962-9216

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

Medline Industries, Inc.
Three Lakes Drive
Northfield, IL 60093-2753

Jorge Perez
PO Box 953296
Saint Louis, MO 63195-3296

Shane Reed
Director/Credit A/R Escalation Finance
Three Lakes Drive
Northfield, IL 60093-2753

Thomas W. Waldrep Jr.
Waldrep LLP
101 S Stratford Road, Suite 210
Winston-Salem, NC 27104-4224

App Group International, LLC
Jason Gang, Esq
1245 Hewlett Plaza, #478
Hewlett, NY 11557-4021

Baxter Healthcare
1 Baxter Pkwy, DF3-2E
Deerfield, IL 60015-4633

Employment Security Commission
PO Box 26504
Raleigh, NC 27611-6504

Marjorie K. Lynch
Bankruptcy Administrator
434 Fayetteville Street, Suite 640
Raleigh, NC 27601-1888

Francisco T. Morales
Waldrep LLP
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104-4224

Curtis S. Potter
Washington County, County Manager/Atty
PO Box 1007
Plymouth, NC 27962-1007

US Attorney
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461

Waldrep LLP
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104-4224

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).