# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# GREENVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 19-00730-5-JNC |
| CAH ACQUISITION COMPANY #1, LLC, ) | |
| d/b/a WASHINGTON COUNTY ) | Chapter 11 |
| HOSPITAL, ) | |
| ) | |
| Debtor. ) | |
| ) | |

### TRUSTEE'S MOTION FOR AUTHORITY PURSUANT TO SECTION 363(B) OF BANKRUPTCY CODE TO ENTER INTO LEASE AGREEMENT BETWEEN DEBTOR AND HOSPITAL <u>EQUIPMENT RENTAL, LLC FOR GE LIGHT SPEED 16 SLICE CT SCANNER</u>

Thomas W. Waldrep, Jr., Chapter 11 trustee in the above-captioned case (the "Trustee"), hereby moves for the entry of an Order pursuant to Sections 363(b), 554(a), and 1108 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") authorizing the Trustee to enter into a certain lease agreement (the "Lease Agreement") for a GE Light Speed 16 Slice CT Scanner (the "GE Scanner") on behalf of the Debtor and by and between the Debtor and Hospital Equipment Rental, LLC, an Oklahoma limited liability company (the "Lessor"). In support of this Motion, the Trustee respectfully states as follows:

### JURISDICTION AND VENUE

1. This United States Bankruptcy Court for the Eastern District of North Carolina (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are Sections 363(b) and 1108 of the Bankruptcy Code.

**FACTUAL BACKGROUND**

4. On February 19, 2019 (the "Petition Date"), Washington County, North Carolina, Medline Industries, Inc., and Dr. Robert Venable (collectively, the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtor.

5. On February 20, 2019, the Petitioning Creditors filed an *Emergency Motion for Order Appointing Trustee Pursuant to 11 U.S.C. § 303(g)* [Dkt. No. 5].

6. On February 22, 2019, the Court entered an Order approving the appointment of the Trustee [Dkt. No. 14]. The Trustee is the duly appointed, qualified and acting trustee of the Debtor's Estate.

7. On February 25, 2019, the Trustee filed an *Emergency Ex Parte Motion for Order for Authority to Operate Washington County Hospital Pursuant to 11 U.S.C. § 303(g)* [Dkt. No. 18].

8. On February 26, 2019, the Court entered an Order authorizing the Trustee to operate the business of the Debtor during the period of time that the Trustee remains in place, to the exclusion of any other parties [Dkt. No. 19].

9. On March 14, 2019, the Debtor filed an *Emergency Motion for Entry of Order for Relief and to Convert Involuntary Chapter 7 Case to Chapter 11 Case and Consent to Appointment of Chapter 11 Trustee* [Dkt. No. 27].

10. On March 15, 2019, the Court entered an Order for Relief in the Debtor's Chapter 7 case and simultaneously converted the Debtor's case from one under Chapter 7 to one under Chapter 11 of the Bankruptcy Code [Dkt. No. 28].

11. The Debtor owns Washington County Hospital ("WCH"), a twenty-five bed, for-profit, Critical Access Hospital ("CAH") in Plymouth, North Carolina.  Until February 14, 2019, WCH provided acute care, swing bed, emergency medicine, imaging, rehabilitation, laboratory, and

related outpatient ancillary services to residents in Plymouth and in surrounding communities. WCH also operates Plymouth Primary Care Rural Health Clinic (the "Clinic"), a Provider-Based Rural Health Clinic. The Clinic is adjacent to WCH.

**Pre-Petition Management of WCH**

12. Upon information and belief, through and until January 7, 2019, EmpowerHMS LLC ("EmpowerHMS") managed WCH under one or more contracts with the Debtor. EmpowerHMS is a Delaware limited liability company headquartered in Kansas City, Kansas. Upon information and belief, EmpowerHMS formerly provided the financial support, legal support, centralized business office, and revenue cycle and IT services necessary to WCH's operations.

13. Upon information and belief, as of January 7, 2019, EmpowerHMS no longer operated or managed WCH, the management of which was transferred by EmpowerHMS to iHealthcare Management II Company ("Manager"), a Florida Corporation, pursuant to (i) a *Management and Administrative Services Agreement* (the "Management Agreement") dated as of January 7, 2019, by and between the Debtor and Manager; (ii) an *EHR and RCM Services Agreement* dated as of January 7, 2019 by and between the Debtor and iHealthcare Software Services, Inc. ("Consultant"),[1] a Florida Corporation; and (iii) an *IT Help Desk Support & Daily Backup Services Agreement* also dated as of January 7, 2019 by and between the Debtor and Consultant (together with the *EHR and RCM Services Agreement*, collectively, the "Services Agreements").

14. Upon information and belief, after January 7, 2019, iHealthcare attempted to begin managing CAH, but such efforts were delayed by a number of transition and financial issues with EmpowerHMS.

---

[1] Manager and Consultant shall hereinafter be referred to collectively as "iHealthcare."

3

**Post-Petition Management of WCH**

15. On March 21, 2019, the Trustee filed an *Emergency Motion for Authority to (1) Reject Certain Executory Contracts with iHealthcare Management II Company and iHealthcare Software Services, Inc. and (2) Enter into Interim Management Agreement with iHealthcare Management II Company and iHealthcare Software Services, Inc.* [Dkt. No. 47].

16. On April 2, 2019, the Court entered an Order allowing the *Trustee's Emergency Motion for Authority to (1) Reject Certain Executory Contracts with iHealthcare Management II Company and iHealthcare Software Services, Inc. and (2) Enter into Interim Management Agreement with iHealthcare Management II Company and iHealthcare Software Services, Inc.* [Dkt. No. 76].

17. On a post-petition basis, iHealthcare served as the Debtor's management company from April 2, 2019 to May 12, 2019 and assisted the Trustee in reopening WCH.

18. On May 12, 2019, iHealthcare provided the Trustee with a thirty (30) day notice to terminate agreement.

19. To preserve the Debtor's estate and maintain management at WCH, the Trustee entered into an Interim Management Agreement with Affinity Health Partners, LLC ("Affinity") on May 13, 2019, in the ordinary course of business.

20. On June 12, 2019, the Trustee filed the *Trustee's Motion for Order Confirming Management Agreement Executed by Trustee in Ordinary Course of Business* [Dkt. No. 287]. On July 9, 2019, the Court entered the *Order Granting Trustee's Motion for Order Confirming Management Agreement Executed by Trustee in Ordinary Course of Business* [Dkt. No. 317].

**The Current CT Scanning Equipment and the Proposed Lease Agreement**

21. The current CT scanner at WCH, the Toshiba Scanner, was purchased as refurbished

equipment approximately ten (10) years ago.

22. While the sixteen-slice technology remains generally adequate for WCH's use, the Toshiba Scanner suffers from mechanical and technical failures that, upon information and belief and based upon a review of the Toshiba Scanner by Affinity, appear to be the result of inconsistent maintenance, age, and constant use. The Toshiba Scanner currently needs around $16,000 in repairs.

23. Further, the Toshiba Scanner is a tube-cooled unit, which extends the time between possible utilizations of the scanner, limiting both inpatient and outpatient access. The age and condition of the Toshiba Scanner often results in necessary repeat scans, creating concerns about patient radiation exposure and concerns of misdiagnoses. These same issues also reduce the revenues for WCH that are realized through the provision of CT scans for both private pay and Medicare/Medicaid payors in the community. Further, the problems with the Toshiba Scanner have impacted WCH's ability to accept referrals from ambulatory services.

24. Affinity has reviewed the records at WCH and informed the Trustee that, over the past several years, WCH has conducted approximately 898 CT scans per year. This number could be higher but for the mechanical issues with the Toshiba Scanner as well as its functional limitations.

25. Upon information and belief, it would cost the estate approximately $10,000 to move the Toshiba Scanner to another location. Due to the Toshiba Scanner's age and current condition, it would be of little to no value on the resale market. Upon information and belief, a radiological salvage company could remove the Toshiba Scanner from the WCH facility with little or no cost incurred by the estate.

26. Having reviewed alternative courses of action—such as taking no action or purchasing a new machine outright—and having consulted with Affinity concerning the costs and benefits expected from leasing a new CT scanner for WCH, the Trustee has identified the Lease

Agreement, attached hereto as **Exhibit A**, by and between the Debtor and the Lessor, as the best option for maintaining and improving the provision of CT scanning services at WCH.

27. The GE Scanner, which is the subject of the Lease Agreement, is a newer machine with a higher operating capacity than the Toshiba Scanner, requiring less time to cool between patients. Further, the Lease Agreement includes provisions for on-call repair and a preventative maintenance support for the GT Scanner throughout the term of the Lease Agreement.

28. The payments proposed under the Lease Agreement include monthly ACH payments of $5,300.00 for the sixty (60) month term of the Lease Agreement, as well as certain hourly fees for travel and services rendered other than those described in the Lease Agreement as Emergency Service and Preventative Maintenance Service.

## RELIEF REQUESTED

29. The Trustee seeks an order authorizing him, in his sole and absolute discretion and pursuant to Section 363(b) of the Bankruptcy Code, to enter into the Lease Agreement on behalf of the Debtor.

## BASIS FOR RELIEF

30. The Trustee has the authority to operate the Debtor's business pursuant to 11 U.S.C. § 1108. The Trustee also has the authority to use the property of the estate in the ordinary course of the Debtor's business. 11 U.S.C. § 363(b)(1) and (c)(1).

31. The Toshiba Scanner is was purchased used approximately ten years ago. It currently needs around $16,000 in repairs to restore it to full functionality. Even in optimum condition, the dated cooling technology unnecessarily constrains WCH's ability to conduct multiple CT scans in relatively quick succession, which would be possible with more modern equipment. Finally, the dated Toshiba Scanner would fetch little to no value on the resale market, as it (i) currently needs

costly repairs and (ii) would require the estate to incur the substantial expense of relocation if sold, regardless of condition.

32. The Toshiba Scanner is a constraint on the Debtor's ability to provide medical services and realize the revenues otherwise possible with newer, well-maintained equipment. The Trustee is informed and believes that a radiological salvage company could remove the Toshiba Scanner from WCH at little or no cost to the estate, which would be a necessary prerequisite to the installation of the new GE Scanner.

33. Entering into the Lease Agreement, so as to replace the old Toshiba Scanner with a newer GE Scanner, may be outside the ordinary course of business. If so, this Court must approve the payments pursuant to 11 U.S.C. § 363(b) upon the showing of a sound business reason for doing so. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); see also In re Stiletto Mfg., Inc., 588 B.R. 762, 768 (Bankr. E.D.N.C. 2018) (citing Lionel Corp and In re FCX, Inc., 60 B.R. 405, 411 (E.D.N.C. 1986) regarding the application of the business judgment standard to applications under Section 363(b) of the Bankruptcy Code).

34. Good business reasons exist to grant the Trustee's request to enter into the Lease Agreement. The current Toshiba Scanner suffers from mechanical and technical issues that limit its operational capacity, require costly repairs, and prevent the Debtor from realizing increased revenues from the acceptance of additional referrals from ambulatory services. Although the proposed outlays associated with the Lease Agreement are expected to be at least $318,000 over the course of the Lease Agreement's Term, the included maintenance services and the ability to conduct more CT scans—with fewer repeat scans and between-patient downtime—are expected to realize increased

revenues above and beyond the costs associated with the Lease Agreement. Therefore, the benefits of the Lease Agreement not only extend to the Debtor, but the Debtor's patients, community, and creditors as well.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

A. Granting the Trustee the authority in his sole and absolute discretion to enter into the Lease Agreement attached hereto as **Exhibit A** on behalf of the Debtor; and

B. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 15th day of July, 2019.

        **WALDREP LLP**

        /s/ *Jennifer B. Lyday*
        Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
        James C. Lanik (NC State Bar No. 30454)
        Jennifer B. Lyday (NC Bar No. 39871)
        Francisco T. Morales (NC Bar No. 43079)
        101 S. Stratford Road, Suite 210
        Winston-Salem, NC 27104
        Telephone: 336-717-1440
        Telefax: 336-717-1340
        Email: notice@waldrepllp.com

        **- and –**

        **HENDREN, REDWINE & MALONE, PLLC**

        Jason L. Hendren (NC State Bar No. 26869)
        Rebecca F. Redwine (NC Bar No. 37012)
        4600 Marriott Drive, Suite 150
        Raleigh, NC 27612
        Telephone: 919-420-7867
        Telefax: 919-420-0475
        Email: jhendren@hendrenmalone.com
              rredwine@hendrenmalone.com

        *Attorneys for the Trustee*

# EXHIBIT A

# Hospital Equipment Rental Company

## EQUIPMENT RENTAL AGREEMENT

This Rental Agreement is by and between Hospital Equipment Rental Company located at 21900 E. 96th Street, Broken Arrow, OK 74014, hereinafter referred to as "RENTAL SERVICE", also referred to as "WE", and Washington County Hospital located at 958 US Highway 64 East, Plymouth, NC, 27962, hereinafter referred to as "CUSTOMER", also referred to as "YOU", is entered into and becomes effective on TBD

Equipment Location: Washington County Hospital, Plymouth, NC

You agree to rent the following equipment (the "Equipment") described on the attached Schedule A. The Equipment will be covered by parts and service warranty described on the attached Schedule B.

The RENTAL AGREEMENT TERM shall be Sixty (60) months, commencing on TBD, and ending on TBD.

As rent for the Equipment, you will pay sixty (60) month rental payments of $5,300.00 each payable on the first day of each month during the rental agreement term. All payments must be made by ACH monthly debit.

### RENTAL TERMS AND CONDITIONS

You request that we rent to you the Equipment for business or commercial purposes. Your offer will be binding upon us when we accept it by having an authorized employee sign it. All rental payments and other sums due and to become due shall be payable to us at our address shown above until we direct you otherwise in writing.

1.  **RENTAL SERVICE REQUIREMENTS.** We will provide the Equipment full-time, 24-hours per day, 7 days per week. We will deliver the Equipment as described in Schedule A attached hereto, in good running order and will provide a parts and labor warranty, only, subject to all the terms and conditions of this rental agreement and schedules.

2.  **CUSTOMER REQUIREMENTS.** You will provide your own management, professional and technical personnel. You will provide us with a prepared parking pad and/or room with an adequate electrical power supply and all other necessary site provisions required by existing and future codes to install and operate the Equipment, i.e. permits and licenses. You will provide the technologist and all consumable materials.

3.  **WARRANTIES.** Notwithstanding anything stated in Paragraph 1 or elsewhere in this document, you acknowledge that we did not design or manufacture the Equipment and that we make no warranties, express or implied, nor shall any warranties arise by operation of law, as to the Equipment, specifically including, but not limited to, fitness for any particular purpose or use, merchantability, design, capacity or performance. We will assign any warranties made by any seller or manufacturer of the Equipment to you during the term of

1 | P a g e

this Rental Agreement. Any claim concerning the Equipment, regardless of the cause or consequence, shall be made only against the seller or manufacturer of the Equipment.

4. **RENTAL TERM; TERMINATION.** This Rental Agreement begins when we accept your offer of rent and continues for the number of months shown above as the rental agreement term and ends after you have fulfilled all of your obligations. This Rental Agreement can be terminated by mutual agreement after 90 days of providing written termination notice.

5. **PAYMENT:** You will pay each and every rental payment as shown above via automatic ACH debit, the first of which is due on the acceptance of this Rental Agreement and will be applied to the first and last months' rent. Regardless of any dispute with the seller or manufacturer of the Equipment, including, but not limited, to disputes under the seller's or manufacturer's warranties or any equipment maintenance agreement, or loss or damage to the Equipment or for any other reason, you are required to pay us.

6. **EQUIPMENT LOCATION.** The Equipment shall be delivered to and not removed without our consent from the "equipment location" shown above. We shall have the right to inspect the Equipment at any reasonable time during business hours.

7. **REPAIRS; USE; ALTERATION.** At our own cost and expense, we shall keep the Equipment in good repair, condition and working order. You shall use the Equipment lawfully, in accordance with the manufacturer's instructions and shall not alter the Equipment without our prior written consent (see schedule B).

8. **INSURANCE.** You shall provide, maintain and pay for (a) insurance against the loss or theft or damage to the Equipment, for the full replacement value thereof, with the loss payable to us, and (b) public liability and property damage insurance naming us as an additional insured. All insurance shall be in form and amount and with companies satisfactory to us and shall contain the insurer's agreement to give 30 days' written notice to us before cancellation or material change of any policy of insurance. Upon our request, you shall deliver the policies or copies thereof or certificates of insurance to us.  Failure to maintain insurance upon the Equipment as required by this paragraph shall constitute default of this agreement.

9. **LOSSES OR DAMAGE.** No loss or damage to the Equipment or any part thereof shall relieve you of your obligation to pay each and every total payment or other obligation under this Rental Agreement. In the event of any such loss or damage, and after you have satisfied all obligations under section 7 hereof, we, at our option shall (a) place the Equipment in good condition and repair or (b) replace the Equipment with like equipment in good condition and repair. Title to the Equipment, whether repaired or replaced shall at all times remain with us.

10. **OWNERSHIP; PERSONAL PROPERTY.** The Equipment shall at all times remain the property of Rental Service, and you have no right or interest in it except the right to use it as expressly set forth herein. The Equipment is and shall at all times remain personal property, whether or not it is affixed or attached to real property or improvements thereon.

11. **TAXES.** As we direct, you shall pay all charges and taxes incurred after _____, 2019, (local, state, and federal) incurred by us which may now or hereafter be imposed or levied upon the sale, purchase, ownership, rental, possession, or use of the Equipment, excluding, however all taxes on or measured by our income. You shall keep the Equipment free and clear of all liens and encumbrances.

12. **INDEMNITY.** You shall indemnify, defend, and hold us harmless from any claims or causes of action concerning the rental, possession, use, performance, or condition of the Equipment, and from any costs, expenses, damages, fines, loss or amounts paid in settlement of claims or causes of action arising from the rental, possession, use, performance, condition, or return of the Equipment, except for Rental Service's liability for claims arising directly from Rental Service's negligent maintenance or repair of the equipment. Your obligations under this section shall survive the expiration or termination of this Rental Agreement.

13. **ASSIGNMENT, OFFSET.** You may not assign, transfer, or sublet any interest in this Rental Agreement or the Equipment without our consent. We may assign this Rental Agreement or mortgage the Equipment, or both, in whole or in part without notice to you. If you receive notice, you will acknowledge receipt thereof in writing. Each assignee or mortgagee shall have all of the rights, but none of the obligations under this Rental Agreement. In the event this Rental Agreement is assigned to a third party, Rental Service shall remain responsible for performance of the necessary maintenance and repairs described in paragraph numbers one (1) and seven (7) above, and Schedule B attached hereto, unless assignment thereof is agreed upon by the parties. You shall not assert against any assignee or mortgagee any defense, counterclaim, or offset you may have against us. This Rental Agreement inures to the benefit of and is binding upon the heirs, legatees, successors, and assigns of the parties hereto.

14. **LATE PAYMENT CHARGES.** (a) **Late Charge.** Since it would be impractical or extremely difficult to fix our actual damages for collecting and accounting for a late payment, if any payment to us required herein is not paid on or before its due date, you shall pay to us an amount equal to four percent (4%) of any such late payment (but not less than $5.00) provided, however, that not more than one such service charge shall be made on any delinquent payment, regardless of the length of the delinquency. (b) **Interest.** You shall also pay interest on any such late payment from the due date thereof until the date paid at the lesser of 1 1/2% per month or the maximum rate allowed by law.

15. **DEFAULT/TERMINATION:** Without prejudice to our other remedies at law, in equity or otherwise provided herein, if you fail to pay when due any amount required herein or under any other rental agreement or agreement between us, or if your failure to perform any other obligation hereunder or thereunder continues for thirty (30) days after we demand in writing performance thereof, we shall have the right to recover the rental amounts then past due and, in addition, exercise any one or more of the following remedies:

   (a) We may take possession of any or all of the Equipment, which shall not terminate this Rental Agreement and re-rent the Equipment or any portion of it, for such period and for such amount, and to such persons as we shall elect and apply the proceeds of any such re-renting, after deducting all costs and expenses incurred in connection with the recovery, repair, storage, and re-renting of the Equipment in payment of the rent

and other obligations due us from you under this Rental Agreement with you remaining responsible for any deficiency; or

(b) We may take possession of the Equipment and sell it or any portion of it a public or private sale, without demand or notice of intention to sell, and apply the proceeds of any such sale, after deducting all costs and expenses incurred in connection with the recovery, repair, storage and sale of the Equipment in payment of the rent and other obligations due us from you under this Rental Agreement with you remaining responsible for any deficiency and if we are unable to sell or otherwise dispose of equipment within a reasonable time, we may recover from you an amount not less than the sum of the rental agreement payments and other amounts as set forth in this Rental Agreement; or

(c) Terminate this Rental Agreement and take possession of the Equipment. A termination hereunder shall only occur upon our written notice to you and only with respect to the item or items of equipment which we specifically elect to terminate in such notice. Except as to such item or items with respect to which there is a termination this Rental Agreement shall continue in full force and effect and you shall be obligated to perform all acts and to pay all rental and other amounts required with respect to the remaining items of Equipment under this Rental Agreement.

Should you file for protection from creditors under any provision of the bankruptcy laws of the United States, such filing shall be sufficient to constitute a default under this Rental Agreement and all remedies for default shall be available to Rental Service at that time, regardless of any action taken or not taken by any bankruptcy court or trustee, and regardless of the status of payments made by you to that time.

16. **RENTER'S EXPENSE.** You shall pay us all costs and expenses, including reasonable attorney's fees we incur in enforcing any of the terms, conditions, or provisions hereof.

17. **NOTICES.** Service of all notices under this Rental Agreement shall be sufficient if given personally, mailed, delivered by courier or by facsimile transmission, to the recipient at its respective address set forth on this agreement, or at such other address as said party may provide in writing from time to time. Any mailed notice or confirmation shall be effective 3 days after it is deposited in the United States mail, duly addressed and with postage prepaid.

18. **EQUIPMENT RETURN.** Upon termination of this Rental Agreement by default, you will return the Equipment by delivering it to us at your cost at any reasonable location we specify in the same condition as it was in when delivered to you, reasonable wear and tear resulting from proper use alone excepted.  Should you fail to return the Equipment as required, then and in that event Rental Service shall be entitled to payment from you for all amounts incurred in reacquiring the Equipment, including but not limited to cartage or transportation services, shipping costs, duties, fees, and/or rental of equipment or services necessary for such reacquisition.

Upon termination of this Rental Agreement, regardless of the reason therefor, should the Equipment not be in the same condition as it was in when delivered to you, reasonable wear and tear resulting from proper use alone excepted, then and in that event you shall be

liable to pay to Rental Service an amount necessary to compensate it for any reduction in fair market value caused by such condition, as well as for loss of rental income caused by the failure to return the Equipment in proper condition.

19. **MISCELLANEOUS.** This Rental Agreement constitutes the entire agreement between the parties as to the subject matter contained herein, and it shall not be amended, altered, or changed, except by a written agreement signed by the parties hereto. No provision of this Rental Agreement can be waived except by our written consent. You shall provide us with such documents as we shall reasonably request from time to time. If more than one renter is named in this Rental Agreement, liability shall be joint and several. If we so request, you shall execute such documents as we shall request or require, including a financing statement. However, you authorize us to sign and file a financing statement on your behalf where permitted by the Uniform Commercial Code and you authorize us to do all other acts which we may reasonably deem necessary to protect our interests hereunder. This is a contract of rent only and is not intended as security and nothing shall create in you or give you any equity or other property interest in the Equipment. Any financing statement filed by us is intended only to give public notice of our ownership of the Equipment.

20. **RENT SCHEDULE.** If you later rent additional personal property from us which is described in one or more schedules of additional rented equipment, any future schedule we and you execute which is identified as being a part of this Rental Agreement shall be deemed to incorporate by reference all the terms and conditions of this Rental Agreement except as provided in any such schedule.

21. **LAWS GOVERNING ENTIRE AGREEMENT:** This Rental Agreement, and any addenda attached hereto and incorporated herein, as well as any amendments hereto signed by both parties, shall be governed by the laws of the State of Oklahoma.

22. **ENTITLEMENT TO RECOVERY**: Any dispute, controversy or claim arising out of or relating to this Rental Agreement or breach thereof shall be subject to binding arbitration. Such arbitration shall:

    (a) be conducted before the American Arbitration Association;

    (b) be conducted in accordance with the rules of the American Arbitration Association;

    and

    (c) be conducted in Tulsa, OK.

    In the event of arbitration under this provision, the arbitrator shall award, and the prevailing party shall recover from the other party, all expenses incurred in connection with the arbitration, including, but not limited to, reasonable and necessary attorneys' fees.

23. **OTHER TERMS:** We will have the right to audit your records as we deem necessary. In the case of fraudulent reporting, you will be in default under this Rental Agreement and we will have the rights set out in Paragraph 15, above.

**THE ABOVE AGREEMENT IS CONTINGENT UPON APPROVAL OF CUSTOMER'S CREDIT.**

**IN WITNESS WHEREOF,** the parties hereto have executed this agreement as of the day and year first above written.

Hospital Equipment Rental Company                    Washington County Hospital

By:_____                By:_____
Title: _____                 Title:_____

# Hospital Equipment Rental Company

**SCHEDULE B**

**EQUIPMENT MAINTENANCE AND REPAIR AGREEMENT**

1. **EMERGENCY SERVICE:** We agree to provide ordinary service during the term of this agreement from 8:00 A.M. to 5:00 P.M., five (5) days per week, Monday through Friday, excluding the legal holidays listed in paragraph 10, to keep the Equipment in good working order. In the event of an emergency, you may request us to provide emergency service, and we will do so expeditiously. In the event that our local service technician cannot respond in a timely manner, we agree to provide emergency service by sending the nearest available General Electric service engineer. For purposes of this agreement, AN EMERGENCY WILL BE DEEMED TO EXIST WHENEVER THE CUSTOMER REQUIRES THE USE OF THE EQUIPMENT DURING THE HOURS SPECIFIED IN THIS PARAGRAPH, BUT THE EQUIPMENT IS INCAPABLE OF PERFORMING IN THE MANNER REQUIRED BY THE CUSTOMER AT THAT TIME.

2. **PREVENTATIVE MAINTENANCE SERVICE:** We shall provide the preventative maintenance service recommended by the manufacturer of the Equipment. Such preventative maintenance service shall comply with the manufacturer's specifications. Preventative maintenance shall be performed monthly, between the hours of 8:00 A.M. and 5:00 P.M., Monday through Friday (other than the legal holidays specified in paragraph 10). Preventative maintenance service may be performed concurrently with emergency service. Customer should not confuse emergency service with preventative maintenance service; each is distinctively different from the other. For the purpose of this agreement, PREVENTATIVE MAINTENANCE IS ROUTINE SCHEDULED MAINTENANCE ACCORDING TO MANUFACTURER'S SPECIFICATIONS.

3. **FREE AND SAFE ACCESS:** You shall provide us free and safe access to the Equipment on each date that service and other associated work is to be performed. If you or your representatives, agents, employees or independent contractors do not promptly provide free and safe access and assistance in the manner provided by this paragraph, we will be relieved of our obligation to perform any services during the time that such access or assistance is being denied.

4. **EXTRA CHARGES:** In the event that we agree to perform the following additional service (such not being required by the terms of this agreement), such additional services shall subject to an extra charge of $120.00 per hour, with a minimum charge of two (2) hours. After hours specified in paragraph 7, and on Saturdays, a rate of $120.00 per hour will apply. On Sundays and Legal Holidays, a charge of $180.00 per hour will apply. Travel time will be at a rate of $65.00 per hour and all charges will be computed portal to portal. The following additional services are subject to extra charges:
    (a) Preventative maintenance requested by the customer to be performed outside the hours specified in Paragraph 8.
    (b) Services outside the scope of service to be performed under this agreement and performed upon the written request of the customer.

5. **EXCLUSIONS:** This agreement does not include: service, or repair required as a result of misuse, abuse or other improper operation, damage to the Equipment resulting from external causes; reimbursement for services provided by, or contracted with others; work required to be performed at a location other than the locations specified in paragraph 3; installation of new accessories, peripherals, or devices; moving of equipment; or certified radiation surveys.

6. **REPLACEMENT PARTS:** Except as otherwise provided by this agreement (See attached addenda for any additional coverage), we shall provide all necessary replacement parts including tube replacement, at no additional charge to you.

7. **CONSUMABLES:** You will, at your cost provide all necessary consumables, (including, but not limited to: X-Ray, Polaroid, and special purpose film) and the use of process facilities required by us for emergency service.

8. **LOST PROFITS:** In the event we fail to perform our obligations hereunder, you shall not be entitled to recover any lost profits from us.

9. **NON-RESPONSIBILITY:** We shall not be responsible or liable for any failure to render services herein described due to strikes, illness of personnel, manufacturer's inability to supply replacement parts or any other cause beyond our control.

10. **LEGAL HOLIDAYS:** Legal holidays as referred to in this agreement will be the following:

| | |
|---|---|
| Labor Day | Martin Luther King's Birthday |
| Washington's Birthday | Thanksgiving Day |
| Veterans Day | Day after Thanksgiving |
| Good Friday | Christmas Eve (after 2:00 p.m.) |
| Memorial Day | New Year's Eve (after 2:00 p.m.) |
| Independence Day | New Year's Day |

    IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

Hospital Equipment Rental Company                    Washington County Hospital

By: _____                             By: _____

# Hospital Equipment Rental Company

### SCHEDULE A

1 x GE LightSpeed 16 Helical CT System

1 x GE A1 Main Disconnect Panel for LightSpeed 16

1 x Eaton Powerware 9155-10 UPS Power Protection System

1 x Medrad Injector

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 19-00730-5-JNC |
| CAH ACQUISITION COMPANY #1, LLC, ) | |
| d/b/a WASHINGTON COUNTY ) | Chapter 11 |
| HOSPITAL, ) | |
| ) | |
| Debtor. ) | |
| ) | |

### NOTICE OF TRUSTEE'S MOTION FOR AUTHORITY PURSUANT TO SECTION 363(B) OF BANKRUPTCY CODE TO ENTER INTO LEASE AGREEMENT BETWEEN DEBTOR AND HOSPITAL EQUIPMENT RENTAL, LLC FOR <u>GE LIGHT SPEED 16 SLICE CT SCANNER</u>

NOTICE IS HEREBY GIVEN that the Trustee has filed the **TRUSTEE'S MOTION FOR AUTHORITY PURSUANT TO SECTION 363(B) TO ENTER INTO LEASE AGREEMENT BETWEEN DEBTOR AND HOSPITAL EQUIPMENT RENTAL COMPANY FOR GE LIGHT SPEED 16 SLICE CT SCANNER** (the "<u>Motion</u>").

FURTHER NOTICE IS HEREBY GIVEN that the Motion filed by the Trustee may be allowed provided no responses and request for hearing is made by a party-in-interest in writing to the Clerk, United States Bankruptcy Court, P.O. Box 791, Raleigh, NC 27602, **within TWENTY-ONE (21) DAYS** from the date of this notice, and,

FURTHER NOTICE IS HEREBY GIVEN that any responses to the Motion shall also be mailed to the Trustee at the address given below.

FURTHER NOTICE IS HEREBY GIVEN that, if a response and request for hearing is filed by a party-in-interest in writing within the time indicated, a hearing will be conducted on the Motion and Response thereto at a date, time, and place to be later set by the Court, and all interested parties will be notified accordingly. If no request for hearing is timely filed, the Court may rule on the Motion and any Response thereto *ex parte* without further notice.

DATE OF NOTICE: July 15th, 2019

**WALDREP LLP**

/s/ *Jennifer B. Lyday*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)

10

      Francisco T. Morales (NC Bar No. 43079)
      101 S. Stratford Road, Suite 210
      Winston-Salem, NC 27104
      Telephone: 336-717-1440
      Telefax: 336-717-1340
      Email: notice@waldrepllp.com

**- and –**

**HENDREN, REDWINE & MALONE, PLLC**

      Jason L. Hendren (NC State Bar No. 26869)
      Rebecca F. Redwine (NC Bar No. 37012)
      4600 Marriott Drive, Suite 150
      Raleigh, NC 27612
      Telephone: 919-420-7867
      Telefax: 919-420-0475
      Email: jhendren@hendrenmalone.com
            rredwine@hendrenmalone.com

*Attorneys for the Trustee*