lUNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| IN RE:<br><br>**CAH ACQUISITION COMPANY #1, LLC d/b/a WASHINGTON COUNTY HOSPITAL,**<br><br>                **Debtor.** | Case No. 19-00730-5-JNC<br><br>Chapter 11 |

**DISCLOSURE STATEMENT FOR AMENDED CHAPTER 11 PLAN OF ORDERLY LIQUIDATION PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

**WALDREP LLP**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC State Bar No. 39871)
Francisco T. Morales (NC State Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, North Carolina 27104
Telephone:    336-717-1440
Facsimile:    336-717-1340
Email:    notice@waldrepllp.com

*Co-Counsel for the Chapter 11 Trustee*

## DISCLAIMER

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT"), THE AMENDED CHAPTER 11 PLAN OF ORDERLY LIQUIDATION, DATED OCTOBER 17, 2019, ATTACHED HERETO AS EXHIBIT A (THE "PLAN"), AND THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH, ARE BEING PROVIDED BY THOMAS W. WALDREP, JR., CHAPTER 11 TRUSTEE FOR THE DEBTOR (THE "TRUSTEE"), TO KNOWN HOLDERS OF CLAIMS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED JOINTLY BY THE TRUSTEE.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE TRUSTEE URGES YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY, OR THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE TRUSTEE HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE

PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.  NO PERSON OR ENTITY SHOULD RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS DISCLOSURE STATEMENT OR THE PLAN, INCLUDING IN CONNECTION WITH ANY PURCHASE OR SALE OF THE DEBTOR'S SECURITIES PRIOR TO THE CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL,

OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

HOLDERS OF CLAIMS AND OTHER THIRD PARTIES SHOULD BE AWARE THAT THE PLAN CONTAINS INJUNCTIONS AND RELEASES THAT MAY MATERIALLY AFFECT THEIR RIGHTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE TRUSTEE AND HIS PROFESSIONALS. ALTHOUGH THE TRUSTEE HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE TRUSTEE CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS THE TRUSTEE'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE TRUSTEE RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN.  IT IS THE OPINION OF THE TRUSTEE THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE TRUSTEE BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

## I.    **INTRODUCTION**

On February 19, 2019 (the "Petition Date"), three Creditors of CAH Acquisition Company #1, LLC d/b/a Washington County Hospital (the "Debtor") —Medline Industries, Inc.; Robert Venable, M.D.; and Washington County, North Carolina—filed an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court").  On March 15, 2019, the Bankruptcy Court entered its Order converting the Debtor's case to a case under Chapter 11 of the Bankruptcy Code.

The case is jointly administered along with six other critical access hospitals (collectively, the "**Debtor Affiliates**") under the Debtor's Chapter 11 Case. On February 22. 2019, during the pendency of the Chapter 7 portion of the Debtor's case, Thomas W. Waldrep, Jr. was appointed as interim trustee for the Debtor.  On March 15, 2019, upon conversion of the case, Thomas W. Waldrep, Jr. was appointed as Chapter 11 Trustee (the "Trustee") for the Debtor pursuant to Section 1104 of the Bankruptcy Code.  No official committee of unsecured Creditors was appointed in this case.

The Trustee submits this disclosure statement (the "**Disclosure Statement**") pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject his Amended Chapter 11 Plan of Orderly Liquidation, dated October 17, 2019, a copy of which is attached hereto as **Exhibit A** (the "**Plan**").[1]  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan supplements or amendments) conflict, the terms of the Plan (including any Plan supplements or amendments) will control.  Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan.  Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

Pursuant to the local practices of the Bankruptcy Court, the Trustee expects that the Court will enter an Order conditionally approving the Disclosure Statement following the filing of such Disclosure Statement.  The sufficiency of the Disclosure Statement under Section 1125(b) of the Bankruptcy Code, which requires the provision of "adequate information" to enable a hypothetical, reasonable investor typical of Claimholders in a Class of Claims entitled to vote as set forth in the Plan to make an informed judgment about whether to accept or reject the Plan, can then be challenged by objection if a Claimholder believes such objection is appropriate.

The Bankruptcy Court will set a deadline to file and serve objections, if any, to confirmation of the Plan, in the manner described in section V(C) of this Disclosure Statement. The hearing to confirm the Plan (the "**Confirmation Hearing**") may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the

---

[1]  Unless otherwise defined in this Disclosure Statement, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition in the Plan shall control.

adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The following documents are referenced as Exhibits to this Disclosure Statement:

Exhibit A:    The Plan – attached.

Exhibit B:    Liquidation Analysis – attached.

You are urged to carefully review the contents of the Plan and Disclosure Statement, including all exhibits attached thereto, before making your decision to vote to accept or reject the Plan.  If your Claim is part of an "Impaired" Class (as defined in section V(B)(3) of this Disclosure Statement), you are entitled to vote to accept or reject the Plan. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they may presently exist, including, but not limited to, the provisions which provide for injunctions and releases.

This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtor's Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding (i) the Debtor's prepetition operating and financial history; (ii) the Debtor's need to file for relief under Chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Debtor's Chapter 11 Case; (iv) the terms of the Plan; (v) the manner in which distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN.  ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

## II.   DESCRIPTION OF THE DEBTOR'S BUSINESSES AND REASONS FOR THE DEBTOR'S CHAPTER 11 FILING[2]

### A.   The Debtor

The Debtor is a Delaware limited liability company that owns a for-profit 25-bed hospital (the "Hospital") and Rural Health Clinic on a 20-acre campus located at 958 US Hwy 64 East, Plymouth, North Carolina ("Hospital Real Property").  The Debtor purchased the Hospital from Washington County, North Carolina ("Washington County") on June 1, 2007.  The Hospital is Classified a Critical-Access Hospital ("CAH") by the Centers for Medicare and Medicaid Services ("CMS").  Washington County maintains that it owns the real property on which the Hospital is located pursuant to an automatic reverter, but the Trustee disputes the position of Washington County, and the issue of ownership is a bona fide dispute.

The Hospital is situated in Washington County, North Carolina.  The Hospital provides the following services: Emergency Room, Surgery, Radiology, Laboratory Services, Physical Rehabilitation, Acute Care, and Swing Beds.  The Hospital also serves as the morgue for Washington and adjacent Tyrell Counties as well as a headquarters and helipad site for the local EMS authority.  As of the submission of this Plan and Disclosure Statement, the Hospital is open and operating.

### 1.   Ownership of the Debtor and Management of the Hospital

The Debtor is currently owned by two members, HMC/CAH Consolidated, Inc. ("**HMC/CAH**," 20% membership) and Health Acquisition Company, LLC ("**HAC**," 80% membership).  Prior to March of 2017, the Debtor was wholly owned by HMC/CAH.

The Debtor, along with numerous other affiliated entities, filed a previous voluntary Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Western District of Missouri on October 10, 2011, Case No. 11-44739 (the "**Missouri Bankruptcy**").  The Missouri Bankruptcy culminated with the confirmation of a Plan on December 12, 2012, and the Debtor's case was closed on March 29, 2013.

The Debtor does not operate the Hospital; instead, the Debtor has contracted the management rights to other entities.  In 2013, the Debtor contracted its management rights with Rural Community Hospitals of America ("**RCHA**"), a company created by two shareholders in HMC/CAH, Paul Nusbaum ("**Nusbaum**") and Steve White ("**White**").

In March of 2017, HAC, owned 50% by Nusbaum and White and 50% by Jorge Perez, Ricardo Perez, and Carlos Perez (the "**Perez Group**," also the owners of EmpowerHMS), converted a debt owed to HAC by HMC/CAH into an 80% Equity Interest in the Debtor and all

---

[2] All representations in this section, including with respect to the Debtor's background, prepetition events, and the Debtor's reasons for filing the Chapter 11 Case, are based on publicly available information, information obtained by the Trustee during the pendency of the Chapter 11 Case, and information relayed to the Trustee by third-parties related to the Debtor during the pendency of the Chapter 11 Case.  The Trustee makes these representations for the purposes of this Disclosure Statement but reserves the right to amend any such representations if subsequent investigation reveals different or conflicting facts.  Nothing in this section shall bind the Trustee or be construed to constitute an admission or any fact or waiver of any right by the Trustee in his own capacity or on the Debtor's behalf.

affiliated hospitals. This ownership structure was the Debtor's ownership structure as of the Petition date.

In March of 2017, concurrent with the HAC equity conversion, EmpowerHMS was placed in charge of the Hospital's management. EmpowerHMS managed the Hospital for almost two years. On or about January 7, 2019, EmpowerHMS transferred the Debtor's management rights to iHealthcare Management Company ("**iHealthcare**"), a company that shared numerous key employees with former EmpowerHMS leadership.

In late 2018 and early 2019, the Hospital's management ceased paying premiums for employee benefits as well as employee wages, precipitating a reduction of operations in February 2019 that led to the involuntary petition filed against the Debtor. The clinic attached to the Hospital continued to see patients. Staff remained at the Hospital, but services were greatly curtailed. The Hospital resumed normal operations on May 1, 2019. Since May 15, 2019, Affinity Health Partners has managed the Hospital.

**B.    The Debtor's Capital Structure and Pre-Petition Indebtedness.**

**1.    The Debtor's Prepetition Capital Structure**

a.    2008 First Capital Corporation Transaction. On or about December September 30, 2008, the Debtor and Citizens Bank, N.A., successor-in-interest to First Capital Corporation ("**First Capital**") entered into a certain loan agreement by which Citizens Bank, N.A. loaned the Debtor $1,645,588.34 (the "**First Capital Loan**"). The First Capital Loan was modified following the Missouri Bankruptcy on or about January 17, 2013, and again on or about November 1, 2017. The First Capital Loan is secured by the Hospital Real Property and a blanket lien on the Debtor's personal property, including accounts receivable. As of the Petition Date, the amount outstanding on the First Capital Loan was $1,262,084.16.

**2.    The Debtor's Prepetition Other Indebtedness**

Within one-hundred-eighty (180) days prior to the Petition Date, the management company for the Debtor (EmpowerHMS and/or iHealthcare) caused the Debtor to cease paying employee wages or premiums for employee benefits. Additionally, EmpowerHMS and/or iHealthcare failed to cause the Debtor to pay various county, state, and federal taxes. Due to the unreliability of the Debtor's records, the Trustee cannot estimate the total extent of those liabilities as of the Petition Date. However, the total Priority Claims asserted against the Debtor amount to approximately $1,300,000.00.

Additionally, on or about March 5, 2019, Jorge Perez appears to have executed a consent judgment in favor of Cigna Health and Life Insurance Company ("**Cigna**") on behalf of HMC/CAH, the Debtor and its affiliated hospitals, and RCHA, purportedly creating a debt to Cigna valued at over $1,500,000.00 as of the Petition Date. This judgment was not domesticated to North Carolina.

Further, within the six-month period preceding the Debtor's Chapter 11 case, Jorge Perez caused the Debtor and its Debtor Affiliates to cross-collateralize millions of dollars in "merchant cash advance" and/or "factoring" agreements. Complete Business Solutions Group, Inc.

-4-

("**CBSG**") asserts a Claim, purportedly arising from December 2018, against the Debtor valued at over $6,000,000.  The Trustee disputes the validity of the Cigna consent judgment as well as any and all Claims arising from "merchant cash advance" / "factoring" type agreements through which Jorge Perez attempted to encumber the Debtor.

**C.      Factors Precipitating the Debtor's Chapter 11 Filing**

The factors described below, among others, led to the Debtor's Chapter 11 Case.  For the factors below, it is important to understand two concepts.  First, EmpowerHMS swept the bank accounts of the Debtor and its Debtor Affiliates daily into a consolidated management system in Kansas City, Missouri.  All hospitals managed by EmpowerHMS, including the Debtor, essentially contributed money into a single pooled fund that would pay the obligations of each hospital.  Second, the Debtor and the other Debtor Affiliates, from 2017 to the Petition Date, had no control over their finances and were generally prohibited by EmpowerHMS from even accessing their own financial data.

**1.      Laboratory Billing Schemes by EmpowerHMS and Other Litigation**

Jorge Perez and EmpowerHMS are currently at the center of a highly publicized national matter regarding the use of CAH facilities in fraudulent laboratory schemes, including investigations by state and federal authorities as well as private investigations by insurance companies.

In brief, pursuant to certain regulations promulgated by CMS, CAH facilities are reimbursed by insurance companies for certain laboratory testing procedures at far higher rates than other in-network facilities submitting for reimbursement of the same tests.  Jorge Perez allegedly coordinated a network of doctors and laboratory testing companies throughout the nation to bill such procedures through CAH facilities managed by EmpowerHMS, including the Debtor.  The reimbursement received from the insurance company to the CAH would then be swept into an EmpowerHMS bank account, and a portion of that reimbursement would be distributed as a kickback to the doctor or lab that performed the test.

**2.      Merchant Cash Advance and Factoring Agreements Greatly Diminished the Debtor's Liquid Operating Capital**

In addition to the insurance-related issues, Jorge Perez spent the approximately six-month period preceding the Petition Date cross-collateralizing the Assets of the HMC/CAH and HAC-owned hospitals, including the Debtor, in various "merchant cash advance" and "factoring" agreements with numerous short-term business capital lenders.

Through these agreements, Jorge Perez "sold" unspecified future accounts receivables at a discount in exchange for cash infusions valued at a portion of the receivables sold.  The business capital lenders were then authorized to perform daily sweeps of the various accounts of the Hospital, including the deposit account of the Debtor, up to a set amount per each agreement.

However, any cash infusions to the hospitals, including the Debtor, were immediately swept into the EmpowerHMS account. Even when management transitioned to iHealthcare, all hospitals were so thoroughly starved of cash resources that employee wages could not be paid.

-5-

### III.   <u>THE CHAPTER 11 CASE</u>

The foregoing events and conditions affecting the Debtor's cash flow, among others, resulted in the decline in the Debtor's financial condition and led to the filing of the Chapter 11 Case on the Petition Date.

### A.   Significant Events During the Bankruptcy Case

### 1.   The Employment of Professionals

During the course of the Chapter 11 Case, the Court approved the employment of the following Professionals:

- Waldrep LLP—Co-Counsel for the Trustee, retained March 19, 2019 *nunc pro tunc* to the February 22, 2019;

- Hendren, Redwine & Malone, PLLC—Co-Counsel for the Trustee, retained April 17, 2019 *nunc pro tunc* to the Petition Date;

- Spilman Thomas & Battle, PLLC—Counsel for the Debtor, retained May 8, 2019 *nunc pro tunc* to the Petition Date;

- Grant Thornton LLP—Financial Consultant for the Trustee, retained May 9, 2019 *nunc pro tunc* to the Petition Date;

- Arnett Carbis Toothman LLP—Certified Public Accountant for the Trustee, retained June 19, 2019 *nunc pro tunc* to May 6, 2019;

- Parker Hudson Rainer & Dobbs, LLP—Special Counsel for the Trustee, retained June 13, 2019 *nunc pro tunc* to May 3, 2019; and

- Sherwood Partners, Inc.—Investment Banker for the Trustee, not yet retained, but motion to employ filed on September 23, 2019.

### 2.   Appointment of Committee

No committee appointed.

### 3.   Post-petition Financing

No post-petition financing was obtained in the Chapter 11 Case.

### 4.   Use of Cash Collateral

In the ordinary course of its business, the Debtor has required cash on hand and cash flow from its operations to fund its working capital, liquidity needs and other routine payables.  In addition, the Debtor has required cash on hand to fund its Chapter 11 Case and to successfully restructure its debt.  Accordingly, during the course of the Chapter 11 Case, the Debtor sought and

obtained approval from the Bankruptcy Court to use "cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code, "**Cash Collateral**") through three agreed interim consent orders and two stipulations by and between the Trustee and First Capital throughout the pendency of the Chapter 11 Case.

**5.      The Debtor's Sale Process**

The Plan provides for the disposition of substantially all the Debtor's Assets through a sale under Section 363 of the Bankruptcy Code by public Auction, coordinated by the Investment Bank and including the concurrent Auction of the six other Debtor Affiliates, as defined in the Plan.

The Debtor's Assets to be sold include any real property, the physical plant, the equipment, any provider agreements, outstanding cost reports, any licenses, and any other personal property, including fixtures, of the Debtor.

**6.      Potential Unencumbered Assets**

The Trustee has worked diligently to preserve the Estate's Assets by identifying and pursuing Assets or proceeds thereof that may be unencumbered by liens of Secured Creditors (including First Capital) in the Chapter 11 Case. While First Capital appears to have a lien on substantially all Assets of the Debtor, the Trustee believes that First Capital is over-secured by such Collateral, and the Sale of the Debtor's Assets may produce Cash free and clear of such liens.

**7.      Potential Adversary Proceedings and Post-Confirmation Causes of Action**

Except as otherwise provided herein or in the Plan, the Trustee expressly reserves, retains, and preserves all Claims and Causes of Action, including, without limitation:

**a.**      All Causes of Action arising under Chapter 5 of the Bankruptcy Code and any state or federal fraudulent conveyance or voidable preference statutes;

**b.**      All Causes of Action under Chapter 5 of the Bankruptcy Code and any similar state or federal law against persons and entities identified as recipients of transfers from the Debtor prior to the Petition Date identified in the Debtor's Statement of Financial Affairs [Docket No. 95].

**c.**      All Tort Claims (as defined in the Plan);

**d.**      All D&O Claims (as defined in the Plan);

**e.**      All Fraud Claims (as defined in the Plan);

**f.**      All Claims under Insurance Policies applicable to the Debtor;

**g.**      All legal and equitable defenses against any Claim or Cause of Action asserted against the Debtor; and

h.      All Claims, demands and Causes of Action of any kind or nature whatsoever held by, through or on behalf of the Debtor and/or the Estate against any other Person, that have not otherwise been resolved or disposed of are preserved in full, whether or not such Claims or Causes of Action are specifically identified in this Disclosure Statement.

**This Disclosure Statement constitutes notice to any party in interest of the intent to pursue any and all such Causes of Action to judgment and collection, and that the proceeds of all such Causes of Action are essential to the Plan.**

8.      Establishment of Bar Dates

(A)     *Bar Date for Prepetition Claims*.  On March 15, 2019, the Clerk of the Bankruptcy Court issued a *Notice of Chapter 11 Bankruptcy Case*, which fixed July 15, 2019 as the last day for the filing of proofs of Claim in this case for all prepetition Claims against the Debtor arising prior to the Petition Date, except Claims by Governmental Units, which must have been filed by August 19, 2019 (together with the July 15, 2019 deadline, as applicable, the "**Bar Date**").

Any Claim required to be filed before the Bar Date that was not timely filed is forever barred from assertion against the Debtor, the Estate, or property thereof, and the Holder of such Claim is not entitled to vote on the Plan or to participate in any distribution in this case.

(B)     *Administrative Bar Date*.  The Bankruptcy Court has not set a bar date for filing Administrative Expense Claims (the "**Administrative Bar Date**").  The Trustee will request that such a bar date be established.

The Plan provides that any Administrative Expense Claims required to be filed pursuant to the provisions of the Administrative Bar Date Order and not filed on or before the Administrative Bar Date are forever barred from assertion against the Debtor, the Estate, or property thereof, and the Holder of such Administrative Expense Claim is not entitled to vote on the Plan or to participate in any distribution in this case.

Notwithstanding the fact that a Creditor may have provided goods or services to the Debtor and such Claim may be entitled to administrative expense status or listed on the Debtor's books and records, **the Plan expressly provides that only Creditors who timely filed proof of an Administrative Expense Claim and such Claim becomes Allowed will be entitled to participate in any distribution as Holders of Administrative Expense Claims in this Case**.

## IV.    SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.  THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE, AND CREDITORS ARE URGED TO READ THE PLAN IN FULL.

The Claims against the Debtor are divided into Classes according to their seniority and other criteria. The Classes of Claims for each of the Debtor and the funds and other property to be distributed under the Plan are described more fully below.

## A.    Introduction

Pursuant to the Plan, the Trustee proposes an orderly liquidation of the Debtor's remaining Assets. The Plan provides that all funds realized from the collection and liquidation of the Debtor's Assets will be paid to Creditors on account of their Allowed Claims in accordance with the distributive priorities of the Bankruptcy Code and the Plan. The Plan will be implemented by establishing a Litigation Trust that will be administered by the Litigation Trustee. On the Effective Date, the Debtor's Assets, including the D&O Claims, Tort Claims, Insurance Policy Claims, and rights in and proceeds of any related Insurance Policies, will be transferred to the Litigation Trust for the benefit of Holders of Allowed Claims. Thereafter, the Litigation Trustee will be responsible for liquidating the Assets, including the pursuit and resolution of any Causes of Action and making distributions to Holders of Allowed Claims in accordance with the terms of the Plan.

## B.    Voting Procedures and Confirmation Requirements

### 1.    Ballots and Voting Deadlines

After approval of this Disclosure Statement, a Ballot for acceptance or rejection of the Plan will be sent to all Creditors. Ballots must be timely filed, and all Creditors will be given notice of the deadline to file Ballots (the "**Voting Deadline**"). Ballots not actually received by the Voting Deadline may not be counted, and Ballots that do not indicate either an acceptance or rejection of the Plan will not be counted.

It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

### 2.    Parties in Interest Entitled to Vote

Any Holder of a Claim or Equity Interest against the Debtor whose Claim or Interest has not been Disallowed previously by the Bankruptcy Court is entitled to vote to accept or reject the Plan if such Claim or Interest belongs to an "Impaired" Class (see subsection 3 below) under the Plan and either (i) has been scheduled by the Debtor and is not scheduled as disputed, contingent, or unliquidated, or (ii) such Holder has filed a proof of Claim before the Bar Date. In addition, any Claim or Interest to which an objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the Holder of the Claim or Interest, temporarily allows the Claim or Interest in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before the Voting Deadline. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 3.     Definition of Impairment

Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims is Impaired under a plan unless, with respect to each Claim of such Class, the plan:

1.     leaves unaltered the legal, equitable, and contractual rights of the Holder of the Claim or Equity Interest; or

2.     notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default:

   (A)     cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

   (B)     reinstates the maturity of such Claim or interest as it existed before such default;

   (C)     compensates the Holder of such Claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

   (D)     if such Claim or such interests arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, compensates the Holder of such Claim or such interest (other than the debtor or an insider) for actual pecuniary loss incurred by such Holder as a result of such failure; and

   (E)     does not otherwise alter the legal, equitable or contractual rights to which such Claim or interest entitles the Holder of such Claim or interest.

**The following Classes are Impaired under the Plan and entitled to vote:**

- **Class 2 (First Capital Secured Claim)**
- **Class 4 (General Unsecured Claims)**
- **Class 5 (Convenience Claims)**
- **Class 6 (Equity Interests)**

## C.     Confirmation Procedure

### 1.     Confirmation Hearing

After approval of this Disclosure Statement, the Confirmation Hearing will be set before the Honorable Joseph N. Callaway, United States Bankruptcy Judge.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

-10-

### 2.    Procedure for Objections

Any objection to confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection, and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on counsel for the Trustee, the Bankruptcy Administrator, and all parties who have filed a notice of appearance by the deadline set by the Bankruptcy Court.

### 3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of Section 1129 of the Bankruptcy Code.  Among the requirements for confirmation are that the Plan be: (a) accepted by all Impaired Classes of Claims or Interests that are entitled to vote or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; (b) feasible; and (c) in the "best interests" of Creditors Impaired under the Plan that have not voted to accept the Plan.  The Bankruptcy Court also must find that:

- the Plan has Classified Claims in a permissible manner;

- the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

### 4.    Voting and Acceptance of the Plan

As a condition to confirmation of the Plan, the Bankruptcy Code requires each Class of "Impaired" Claims or Equity Interests entitled to vote on the Plan to vote to accept the Plan. The Bankruptcy Code defines acceptance of a plan by a Class of Creditors as acceptance by Holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) number of those Claims in that Class actually voting.  Holders of Claims or Interests who fail to vote will not be counted as either accepting or rejecting the Plan.  A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

Classes of Claims that are not "Impaired" under the Plan are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote.  Classes of Claims that receive no distribution under the Plan are conclusively presumed to have rejected the Plan and are not entitled to vote.

### 5.    Best Interests Test

The "best interests" of Impaired Creditors test requires that each Holder of a Claim or Interest that has not voted to accept the Plan and belongs to an Impaired Class receive or retain under the Plan property of a value that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  To determine what members of each Impaired Class of Claims would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtor's Assets would generate in the context of a Chapter 7 liquidation.  The amount available for satisfaction of

-11-

Claims would consist of the proceeds resulting from the liquidation, reduced by the Claims of Secured Creditors to the extent of the value of their Collateral, and the costs and expenses of the liquidation.

Because the Plan is a plan of orderly liquidation, each Class of Creditors will receive substantially the same treatment that it would receive if the Debtor's Assets were liquidated pursuant to Chapter 7 of the Bankruptcy Code, except that the Estate will neither be taxed with the additional expenses and commissions of a Chapter 7 trustee nor delayed by such a trustee's appointment and need to become familiar with this case. Attached as <u>Exhibit B</u> is a liquidation analysis prepared by the financial analyst for the Trustee, Grant Thornton LLP, reflecting a greater distribution to Creditors pursuant to the Plan than Creditors would receive in a hypothetical Chapter 7 liquidation. Accordingly, the Trustee believe the Plan satisfies the "best interests" of Impaired Creditors test.

### 6.        The Feasibility Test

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtor. Substantially all the Debtor's Assets have been sold, and the Plan provides for the orderly liquidation of the Debtor's Assets. Thus, confirmation of the Plan will not be followed by a liquidation (other than the orderly liquidation provided for in the Plan) or further reorganization.

### 7.        The Fair and Equitable Test

If any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan despite such non-acceptance under the "cram down" provisions set forth in Section 1129(b) of the Bankruptcy Code. To obtain a confirmation under those circumstances, the Trustee must show, among other things, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each Impaired Class of Claims that has rejected the plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a Class of Claims or Equity Interests if, among other things, the plan provides: (i) with respect to Secured Claims, that each Holder of a Claim included in the rejecting Class will receive or retain on account of its Claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such Claim; and (ii) with respect to unsecured Claims and Equity Interest, that the Holder of any Claim or Equity Interest that is junior to the Claims or Equity Interest of such Class will not receive or retain on account of such junior Claim or Equity Interest any property at all unless the senior Class is paid in full. A plan does not discriminate unfairly if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are similar to those of the dissenting Class and if no Class receives more than it is entitled to receive on account of its Claim or interest.

THE TRUSTEE WILL SEEK CONFIRMATION OF THE PLAN UNDER THE "CRAM DOWN" PROVISIONS OF SECTION 1129(b) IF LESS THAN THE REQUISITE AMOUNT OR NUMBER OF CLAIMS OR INTERESTS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.

### 8.    Other Requirements of Section 1129

The Trustee believe that the Plan meets all the other technical requirements of Section 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

## D.    Classification of Claims and Interests and Their Treatment Under the Plan

### 1.    Classification of Claims

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim in a particular Class only if such Claim is substantially similar to the other Claims in that Class.  The Trustee believes the Plan's Classifications place substantially similar Claims in the same Class and thus meets the requirements of Section 1122 of the Bankruptcy Code.

The Plan Classifies Claims into six (6) Classes: Class 1 consisting of all Priority Non-Tax Claims; Class 2 consisting of the First Capital Secured Claim; Class 3 consisting of all Secured Claims of Other Lienholders; Class 4 consisting of all General Unsecured Claims; Class 5 consisting of all Convenience Claims; and Class 6 consisting of all Equity Interests.  For each Class, the Plan states whether the Claims are Impaired (Classes 1 and 3 are not Impaired; Classes 2, 4, 5, and 6 are Impaired) and how the Holders of the Claims and Equity Interests will be treated under the Plan.  The Classes and proposed treatment of Allowed Claims of each Class under the Plan are summarized and described below.  After Confirmation, and upon the occurrence of the Effective Date, the Plan binds the Debtor and all Creditors, whether or not those Creditors have accepted the Plan.

### 2.    Unclassified Claims

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Claims of a kind specified in Sections 507(a)(2) or (8) of the Bankruptcy Code are not to be designated in a Class.  Thus, Administrative Expense Claims and Priority Tax Claims against the Debtor, as well as statutory fees under 28 U.S.C. § 1930, are treated separately under the Plan as unclassified Claims.

#### a.    Administrative Expense Claims

Administrative expenses are Claims for fees, costs or expenses of administering the Debtor's Chapter 11 Case that are allowed under Section 503(b) of the Bankruptcy Code, including all Professional compensation requests pursuant to Sections 330 and 331 of the Bankruptcy Code. As of the filing of this Disclosure Statement, the filed Administrative Expense Claims are estimated to be approximately $220,662.57.[3]

**i.    General.**    The Plan provides that, subject to the allowance procedures and the deadlines provided in the Plan, except to the extent any entity entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of its Allowed

---

[3]  This figure only includes the Professional fees and expenses that have been approved on an interim basis by the Bankruptcy Court as of the filing of this Disclosure Statement.

Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim, on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Allowed Administrative Expense Claim, or as soon thereafter as is practicable.

        **ii.**    **Professional Compensation and Reimbursement Claims.**  The Plan provides that all Professionals seeking payment of Professional Compensation and Reimbursement Claims shall file their respective final Fee Applications no later than sixty (60) days after the Effective Date.  All Professional Compensation and Reimbursement Claims shall be treated as Administrative Expense Claims as set forth in section IV(A)(1)(a) of the Plan, or shall be paid on such other terms as may be mutually agreed upon between the Holder of an Allowed Professional Compensation and Reimbursement Claim and the Debtor, or the Litigation Trustee, as the case may be.  Failure to timely file a final Fee Application shall result in the Professional Fee Compensation and Reimbursement Claim being forever barred and discharged.

        **iii.**    **Priority Tax Claims.**  The Plan provides that, in full and final satisfaction of each Allowed Priority Tax Claim, if any, except to the extent any entity entitled to payment of any Allowed Priority Tax Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to the amount of such Allowed Priority Tax Claim on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Allowed Priority Tax Claim, or as soon thereafter as is practicable.

        **iv.**    **Statutory Fees.**  The Plan provides that, on or before the date that is thirty (30) days after the Effective Date, the Litigation Trustee shall make all payments required to be paid to the Bankruptcy Administrator pursuant to Section 1930 of Title 28 of the United States Code.  All fees payable pursuant to Section 1930 of Title 28 of the United States Code after the Effective Date shall be paid by the Litigation Trustee on a quarterly basis until the Chapter 11 Case is closed, converted, or dismissed.

    **3.**    **Classified Claims**

    The following describes the Plan's Classification of those Claims against the Debtor required to be Classified under the Bankruptcy Code:

        **a.**    **Class 1** consists of Priority Non-Tax Claims of the Debtor.  In full and final satisfaction of each Allowed Priority Non-Tax Claim, if any, except to the extent any entity entitled to payment of any Allowed Priority Non-Tax Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to the amount of such Allowed Priority Non-Tax Claim on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.  The Priority Non-Tax Claims are not Impaired.  Holders of Class 1 Priority Non-Tax Claims, therefore, are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

**b.** **Class 2** consists of the First Capital Secured Claim. To the extent the First Capital Secured Claim is Allowed, First Capital will receive, in full and final satisfaction of such Claim, on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of both (a) a Final Order allowing the First Capital Secured Claim and (b) a Final Order determining any applicable surcharge under Section 506(c) of the Bankruptcy Code, or as soon thereafter as is practicable, Cash in an amount up to the amount of the Allowed First Capital Secured Claim, less the amount of the costs of Sale of First Capital's Collateral and the amount of any surcharge under Section 506(c) of the Bankruptcy Code. To the extent the Sale of First Capital's Collateral fails to produce Cash in the amount of the Allowed First Capital Secured Claim, any deficiency that may remain would receive treatment as a Class 4 General Unsecured Claim. Therefore, with respect to the First Capital Secured Claim, First Capital is Impaired and entitled to vote to accept or reject the Plan.

**c.** **Class 3** consists of the Secured Claims of Other Lienholders. Each Holder of an Allowed Secured Claim of an Other Lienholder shall, in the sole discretion of the Trustee, be treated in one of the following ways:

**i.** on the Effective Date, the legal, equitable, and contractual rights of the Holder of an Allowed Secured Claim of an Other Lienholder shall be reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Secured Claim of an Other Lienholder to demand or receive payment of such Allowed Secured Claim before the stated maturity of such Allowed Secured Claim from and after the occurrence of a default; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date;

**ii.** on the Effective Date, the Holder of an Allowed Secured Claim of an Other Lienholder shall (i) retain a Lien securing such Allowed Secured Claim and (ii) receive deferred Cash payments from the Litigation Trust totaling at least the value of such Allowed Secured Claim as of the Effective Date in full and final satisfaction of such Allowed Secured Claim;

**iii.** on the Effective Date, the Collateral securing such Allowed Secured Claim of an Other Lienholder shall be surrendered to the Holder of such Allowed Secured Claim in full satisfaction of such Allowed Secured Claim; or

**iv.** the Holder of an Allowed Secured Claim of an Other Lienholder shall be paid, in Cash, an amount equal to such Holder's Allowed Secured Claim, on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Claim as a Secured Claim, or as soon thereafter as is practicable, in full and final satisfaction of such Allowed Secured Claim. To the extent the Collateral securing an Allowed Secured Claim of an Other Lienholder has been or is to be sold

pursuant to an Order of the Bankruptcy Court, any amount to be paid to the Holder of such Allowed Secured Claim pursuant to the preceding sentence shall be net of the costs of Sale of such Collateral and otherwise subject to the rights of the Debtor or the Litigation Trustee pursuant to Section 506(c) of the Bankruptcy Code.

Holders of a Claim under this Class 3 are not Impaired under the Plan. Therefore, Holders of a Class 3 Secured Claim are not entitled to vote to accept or reject the Plan. Each Holder of a Class 3 Secured Claim is conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Treatment of a Claim under this Class 3 shall not affect any General Unsecured Claim for any Allowed Deficiency Claim of the applicable Holder.

      **d.**      **Class 4** consists of all General Unsecured Claims.  Each Holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such Claim, on one or more GUC Distribution Dates, a Pro Rata share of the net proceeds of the GUC Litigation Trust Assets.  Class 5 is Impaired.  Therefore, Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

      **e.**      **Class 5** consists of all Convenience Claims.  Each Holder of an Allowed Convenience Claim will receive, in full and final satisfaction of such Claim, on or before the date that is thirty (30) Business Days after the Effective Date, or as soon thereafter as practicable, Cash in an amount equal to the lesser of (i) one thousand dollars ($1,000.00) and (ii) the Allowed amount of such Holder's Convenience Claim; provided, however, that the total distribution to Holders of Allowed Convenience Claims under this Plan shall not exceed one hundred twenty thousand dollars ($120,000.00) (the "Convenience Class Cap"), and if the foregoing treatment would result in distributions to Holders of Allowed Convenience Claims that exceed the Convenience Class Cap in the aggregate, each Holder of an Allowed Convenience Claim will instead receive a Pro Rata share of one hundred twenty thousand dollars ($120,000.00), with the amount of each such Holder's Convenience Claim fixed at the lesser of (i) one thousand dollars ($1,000.00) and (ii) the Allowed amount of such Holder's Convenience Claim for the purpose of determining its Pro Rata share.

      **f.**      **Class 6** consists of all Equity Interests.  Holders of Equity Interests will retain their interests. Provided however, the Holders of Equity Interests will not receive any distribution under this Plan unless and until the Holders of Allowed General Unsecured Claims have been paid in full. Class 6 is Impaired. Therefore, Holders of Class 6 Equity Interests are entitled to vote to accept or reject the Plan.

      **4.**      **General Claim Treatment Provisions**

      **a.**      **Objections.**  The failure of any party to object to any Claim in the Chapter 11 Case, including Secured Claims (including the First Capital Secured Claim and Secured Claims of Other Lienholders), shall be without prejudice to the rights of the Debtor or the Litigation Trustee to contest, object to, or otherwise defend against such Claim if and when such Claim is sought to be enforced by the Holder of such Claim.  Procedures for objections to Claims are set forth in section VII(M) of the Plan.

**b.      Attachment of Liens.**  Pursuant to the Sale Order, no Lien with respect to any Secured Claim shall attach to any property sold free and clear pursuant to the APA.

**c.      Survival and Release of Liens.**  Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of the Debtor held with respect to any Allowed Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Claim until such Allowed Secured Claim is satisfied, at which time such Lien shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; provided, however, that the Debtor or Litigation Trustee, as the case may be, may condition delivery of any final payment upon receipt of an executed release of the Lien.

Any and all Liens securing any Secured Claim that is not an Allowed Claim shall be released, shall be deemed null and void, and shall be unenforceable for all purposes.  Nothing in the Plan shall preclude the Debtor or the Litigation Trustee from challenging the validity of any alleged Lien on any Asset of the Debtor or the value of the property that secures any alleged Lien, and all such rights are expressly preserved.

**d.      Surcharge under Section 506(c) of the Bankruptcy Code.**  All rights of Holders of Secured Claims under the Plan are subject to the rights of the Debtor or the Litigation Trustee to surcharge the applicable Collateral pursuant to Section 506(c) of the Bankruptcy Code, which rights are expressly preserved.

**This Disclosure Statement constitutes notice to any party in interest of the intent to pursue the surcharge of any and all Collateral of First Capital and any Other Lienholders pursuant to Section 506(c) of the Bankruptcy Code (including as set forth in the Sale Order and any other Orders of the Bankruptcy Court), and that such surcharges and the proceeds thereof are essential to the Plan.**

The Cash Collateral Orders entered by the Court included certain carve-outs that may impact the amount to be surcharged.  If the affected parties are unable to reach a consensus on the amount to be surcharged, litigation may become necessary to obtain a determination by the Court.

**E.      Potential Recoveries for Impaired Classes of Claims**

The actual distributions to Holders of Allowed Claims in the Classes of Impaired Claims will necessarily be affected by a variety of contingencies that cannot be determined with certainty at this time, including, without limitation, the ultimate amount of funds that will be available for distribution with respect to the Allowed Claims after payment in full of unclassified Claims, Claims senior in priority to each such Class, and the expenses of effectuating the Plan and administering the Litigation Trust; the aggregate amount of Allowed Claims in each such Class; the results of the Claim objection and reconciliation process; and the results of prosecution of the Chapter 5 Actions and other Causes of Action, which may have a material effect on funding a distribution to Holders of Allowed Claims in Classes of Impaired Claims.

Based on an initial review of the Debtor's scheduled Claims and the Claims filed in the Case, it is estimated that the total Allowed General Unsecured Claims will be approximately

$7,800,000, not including potential deficiencies arising from the partial satisfaction of Allowed Secured Claims.  The actual amount distributed to Holders of Class 5 General Unsecured Claims (and the timing any such distributions) will vary based on the Assets recovered and the reconciled amount of General Unsecured Claims that are Allowed.

**F.**     **Means for Execution of the Plan**

    **1.**     **Overview**

This Plan provides for the disposition of substantially all the Assets and the distribution of the net proceeds thereof to Holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code. This Plan will provide for the Sale of most of the Assets at an Auction conducted pursuant to Section 363 of the Bankruptcy Code. This Plan also creates a mechanism for the Litigation Trustee to pursue Claims and Causes of Action, including the D&O Claims, Tort Claims, Fraud Claims, to enable recoveries to Creditors.

    **2.**     **Establishment of Litigation Trust; Appointment of Litigation Trustee**

Prior to the Effective Date, the Trustee shall execute the Litigation Trust Agreement.  The Litigation Trust Agreement is hereby incorporated into this Plan in its entirety as if set forth in full.  The Litigation Trust Agreement contains provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, provisions necessary to ensure the continued treatment of the Litigation Trust as a grantor trust.

On the Effective Date, and in accordance with the Confirmation Order, the Estate's title to all the Assets shall automatically pass to the Litigation Trust, free and clear of all Claims and Equity Interests in accordance with Section 1141 of the Bankruptcy Code.  Notwithstanding the foregoing, the Trustee reserves the right to modify the Plan to exclude certain Assets from transfer to the Litigation Trust. The Confirmation Order shall constitute a determination that the transfers of the Assets to the Litigation Trust are legal and valid and consistent with the laws of the State of North Carolina.

All parties shall execute any documents or other instruments as necessary to cause title to the applicable Assets to be transferred to the Litigation Trust.  The Assets will be held in trust for the benefit of all Holders of Allowed Claims pursuant to the terms of the Plan and the Litigation Trust Agreement.

The Litigation Trustee shall be Thomas W. Waldrep, Jr.  The Litigation Trustee will pay or otherwise make distributions on account of all Allowed Claims against the Debtor in accordance with the terms of the Plan.

**This Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Litigation Trustee on the Assets, Chapter 5 Actions, D&O Claims, Fraud Claims, Tort Claims, and rights in and proceeds of any Insurance Policies.  The Proceeds of all Causes of Action are material to the implementation of this Plan and the recoveries to Creditors herein.**

### 3.      Income Tax Status

For federal income tax purposes, all parties (including, without limitation, the Debtor, the Litigation Trustee, and the Beneficiaries of the Litigation Trust Estate) shall treat the Litigation Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124.  For federal income tax purposes, the transfer of Assets to the Litigation Trust under the Plan shall be treated as a deemed transfer to the Beneficiaries of the Litigation Trust Estate in satisfaction of their Claims followed by a deemed transfer of the Assets by the Beneficiaries to the Litigation Trust.  For federal income tax purposes, the Beneficiaries will be deemed to be the grantors and owners of the Litigation Trust and its Assets.  For federal income tax purposes, the Litigation Trust will be taxed as a grantor trust within the meaning of Internal Revenue Code ("**IRC**") sections 671-677 (a non-taxable pass-through tax entity) owned by the Beneficiaries.  The Litigation Trust will file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss deductions, and credits ("**Tax Items**").  The Beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability.  All parties will use consistent valuations of the Assets transferred to the Litigation Trust for all federal income tax purposes.  The Assets shall be valued based on the Litigation Trustee's good faith determination of their fair market value.

### 4.      Powers and Authority of the Litigation Trustee

The powers of the Litigation Trustee are set forth in full in the Litigation Trust Agreement and shall include, among other things: (a) the power to sell, lease, license, abandon, or otherwise dispose of all remaining Assets of the Litigation Trust Estate subject to the terms of the Plan; (b) the power to effect distributions under the Plan to the Holders of Allowed Claims; (c) the authority to pay all costs and expenses of administering the Litigation Trust Estate after the Effective Date (including the Post-Effective Date Expenses), including the power to employ and compensate Persons to assist the Litigation Trustee in carrying out his duties hereunder, and to obtain and pay premiums for insurance and any other powers necessary or incidental thereto; (d) the power to implement the Plan including any other powers necessary or incidental thereto; (e) the authority to prosecute all Causes of Action on behalf of the Debtor and the Litigation Trust Estate, including Chapter 5 Actions, D&O Claims, Fraud Claims, and Tort Claims; (f) the authority to settle Claims, applicable Causes of Action, or disputes as to amounts owing to the Estate; (g) the authority to participate in any post-Effective Date motions to amend or modify the Plan or the Litigation Trust Agreement, or appeals from the Confirmation Order; (h) the authority to participate in actions to enforce or interpret the Plan; (i) the authority to manage the Litigation Trust Estate; and (j) the power to bind the Litigation Trust.  Each of the foregoing powers may be exercised by the Litigation Trustee without further order of the Bankruptcy Court.  Notwithstanding any of the foregoing, the Litigation Trustee may not materially amend or alter the terms and provisions of this Plan.

### 5.      Litigation Sharing Agreement

The Litigation Trustee may enter into a Litigation Sharing Agreement, which will provide a mechanism for the bankruptcy estates of the Other Hospitals to share common expenses of

litigation, including Chapter 5 Actions, D&O Claims, Fraud Claims, and Tort Claims. Litigation expenses and fees that must be incurred for multiple cases may be shared on a Pro Rata basis, including expenses and fees for data analysis, vendor fees, expert witness fees, and researching and drafting common pleadings. Litigation expenses and attorneys' fees that are incurred for a specific estate will be billed only to that estate. Bankruptcy estates that participate in a Litigation Sharing Agreement will waive all Claims and Causes of Action against other participating estates.

### 6.     Funding of the Litigation Trust

The funding of the Litigation Trust for the payments to be made to Holders of Allowed Claims under the Plan and the payment of Post-Effective Date Expenses will be from (i) the Litigation Trust Expense Reserve, (ii) the Debtor's Cash on hand as of the Effective Date, which will be transferred to the Litigation Trust as of the Effective Date and proceeds from the investment of such Cash, and (iii) the proceeds of the liquidation of the Assets, including, without limitation, any Claims or Causes of Action.

### 7.     Litigation Trust's Post-Effective Date Expenses

All expenses related to implementation of the Plan incurred from and after the Effective Date through the date on which the Litigation Trust is dissolved will be expenses of the Litigation Trust, and the Litigation Trustee will disburse funds from the Litigation Trust Expense Reserve, as appropriate, for purposes of paying the Post-Effective Date Expenses of the Litigation Trust without the need for any further Order of the Court. The Post-Effective Date Expenses shall include, but are not limited to, the fees and expenses of the Litigation Trustee, the fees and expenses of the Professionals employed by the Litigation Trustee, and other costs, expenses and obligations of the Litigation Trust until the date the Litigation Trust is terminated in accordance with section VII(M) and the Litigation Trust Agreement.

Prior to making a distribution to any Holders of Allowed Claims under the Plan, the Litigation Trustee may place in reserve and/or in a separate account any funds that may be needed to pay Claims that are subject to dispute and Claims that have otherwise not been Allowed in the event that all or a portion of such Claims become Allowed Claims (the **"Distribution Reserve"**). When a Claim is Allowed or Disallowed (and thus becomes an Allowed Claim or a Disallowed Claim, in whole or in part), the funds set aside on account of such Claim shall be released from the Distribution Reserve and shall be available for distribution in accordance with the terms of the Plan to either (i) the Holder of the Claim that has become an Allowed Claim, or (ii) if Disallowed, the Holders of Allowed Claims. Consistent with the terms of the Plan, the Litigation Trustee, in its sole discretion, on and after the Effective Date, shall have authority to increase or decrease the Distribution Reserve, as reasonably necessary and appropriate, and upon satisfaction of all Allowed Claims required to be paid from the Distribution Reserve, to transfer amounts held therein for distribution pursuant to the Plan.

### 8.     Use of Existing Accounts

The Litigation Trustee may use the Debtor's existing bank accounts (as of the Effective Date) for the purposes set forth herein, to the extent possible and desired. The Litigation Trustee also may close the Debtor's existing bank accounts, at its discretion, and transfer all amounts

therein to one or more accounts, in accordance with the terms of the Plan. Alternatively, notwithstanding any provisions to the contrary in the Plan, the Litigation Trustee may invest some or all the funds that would otherwise be deposited into the accounts established pursuant to the Plan in allowed investments under applicable non-bankruptcy law.

### 9.    Employment and Compensation

The Litigation Trustee shall serve without bond and shall receive compensation for serving as Litigation Trustee as set forth in the Litigation Trust Agreement. At any time after the Effective Date and without further Order of the Bankruptcy Court, the Litigation Trustee may employ Persons or Entities, including Professionals (which may, but need not, include Professionals previously or currently employed in the Chapter 11 Case) reasonably necessary to assist the Litigation Trustee in the performance of his duties under the Litigation Trust Agreement and the Plan. Such Persons or Entities shall be compensated and reimbursed by the Litigation Trustee for their reasonable and necessary fees and out of pocket expenses on a monthly basis in arrears.

### 10.    Litigation Trustee as Successor in Interest to the Trustee

The Litigation Trustee is the successor in interest to the Trustee, and thus, after the Effective Date, to the extent the Plan requires an action by the Trustee, the action shall be taken by the Litigation Trustee.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtor, the Litigation Trustee, and the Beneficiaries of the Litigation Trust Estate) shall treat the transfer of Assets to the Litigation Trust, as a sale by the Trustee of such Assets to the Litigation Trust Estate at a selling price equal to the fair market value of such Assets on the Effective Date. The Litigation Trust shall be treated as the owner of all Assets that it holds.

### 11.    Termination of the Litigation Trust Estate

The existence of the Litigation Trust and the authority of the Litigation Trustee will commence as of the Effective Date and will remain and continue in full force and effect until the earlier of (a) the date on which all of the Assets are liquidated in accordance with the Plan, the funds in the Litigation Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities and the Order closing the Chapter 11 Case is a Final Order or (b) seven (7) years after the date of creation of the Litigation Trust, unless extended by the Bankruptcy Court as provided in the Litigation Trust Agreement.

At such time as the Litigation Trust has been fully administered (*i.e.*, when all things requiring action by the Litigation Trustee have been done, and the Plan has been substantially consummated) and in all events within sixty (60) days after the Final Distribution Date, the Litigation Trustee will file an application for approval of his final report and the entry of the final decree by the Bankruptcy Court.

## G.       Jurisdiction

**1.       Retention of jurisdiction.**  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Case until the Chapter 11 Case is closed, including jurisdiction to issue any other Order necessary to administer the Estate or the Litigation Trust Estate and enforce the terms of the Plan, and/or the Litigation Trust Agreement pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

**a.**       To determine the type, allowance, and payment of any Claims upon any objections thereto (or other appropriate proceedings) by the Litigation Trustee or any other party-in-interest entitled to proceed in that manner;

**b.**       Except as otherwise limited herein, to recover all Assets of the Debtor and property of the Debtor's Estate, wherever located;

**c.**       To hear and determine any issue arising under the Plan; provided, however, any action, controversy, dispute, Claim, or question arising out of or relating to the right of any party to enforce, contest, and/or litigate the existence, primacy, and/or scope of available coverage and/or any defenses to coverage under the Insurance Policies shall be referred to and resolved solely in accordance with the terms and conditions of the Insurance Policies and applicable non-bankruptcy law, including, but not limited to, any choice of law, forum, or jurisdiction provision therein;

**d.**       To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

**e.**       To hear any other matter not inconsistent with the Bankruptcy Code;

**f.**       To enter a final decree closing the Chapter 11 Case;

**g.**       To ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

**h.**       To decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on or instituted by the Litigation Trustee after the Effective Date;

**i.**       To issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided therein;

**j.**       To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

**k.** To enforce, interpret, and determine any disputes arising in connection with any stipulations, Orders, the Sale Order, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

**l.** To adjudicate any adversary proceeding or other proceeding that may be commenced against any Person or Entity arising from, related to, or in connection with (i) any Chapter 5 Action; (ii) the D&O Claims; (iii) the Tort Claims; (iv) the Fraud Claims; and (v) Claims against third parties relating to the facts and circumstances surrounding the same;

**m.** To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

**n.** To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the applicable Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim is discharged hereunder, or for any other purpose;

**2.    Consent to jurisdiction.**  All Creditors who have filed Claims in the Chapter 11 Case shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for purposes of the Causes of Action.

**H.    Releases, Exculpations and Related Provisions**

**1.    Term of bankruptcy injunction or stay.**  All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Except as otherwise expressly provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate Order of the Bankruptcy Court, as of the Effective Date, all entities who have held, hold, or may hold Claims against the Debtor, are permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or taking any act to recover such Claim outside of the Claims allowance procedure discussed in the Plan and the Bankruptcy Code and Bankruptcy Rules; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or Order against the Debtor, the Litigation Trust, or the Litigation Trustee on account of any such Claim; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim.  Such injunction shall extend for the benefit of the Litigation Trustee, and any successor, and to any property and interests in property subject to this Plan.

**2.    Exculpation.**  Except to the extent arising from willful misconduct or gross negligence, any and all Claims, liabilities, Causes of Action, rights, damages, costs, and obligations held by any party other than the United States of America against the Debtor, the

Trustee, and his attorneys, accountants, agents, and other Professionals, whether known or unknown, matured or contingent, liquidated or unliquidated, existing, arising, or accruing, whether or not yet due in any manner related to or in connection with (i) the Chapter 11 Case or any act or omission in connection with, arising out of, or related to the Chapter 11 Case; (ii) any act or omission in connection with, arising out of, or related to the Sale of the Assets; (iii) the formulation, negotiation, prosecution, or implementation of the Plan; (iv) the solicitation of acceptances of the Plan; or (v) the Confirmation, consummation, or implementation of the Plan, will be deemed fully waived, barred, enjoined, released, and discharged in all respects, except as to rights, obligations, duties, Claims, and responsibilities preserved, created, or established by terms of the Plan.

 **3.** **Limitation on liability of Litigation Trustee.** The Litigation Trustee will not be liable for any act he may do or omit to do as Litigation Trustee under the Plan and the Litigation Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment; nor will the Litigation Trustee be liable in any event except for gross negligence, willful fraud, or willful misconduct. The foregoing limitation on liability also will apply to any Person (including any Litigation Trustee Professional) employed by the Litigation Trustee and acting on behalf of the Litigation Trustee in the fulfillment of their respective duties hereunder or under the Litigation Trust Agreement. Also, the Litigation Trustee and all Litigation Trustee Professionals shall be entitled to indemnification out of the Assets of the Litigation Trust against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or Claims that the Litigation Trustee may incur or sustain by reason of being or having been a Litigation Trustee of the Litigation Trust or for performing any functions incidental to such service; provided, however, that the foregoing shall not relieve the Litigation Trustee or the Litigation Trustee's Professionals from liability for bad faith, willful misfeasance, reckless disregard of duty, gross negligence, fraud, self-dealing, or breach of fiduciary duty.

 The Litigation Trust is deemed to release each Person and Entity exculpated, or whose liability is limited, under this subsection from any liability arising from any act or omission occurring after the Petition Date and in connection with, relating to or arising out of the Chapter 11 Case, except as provided herein.

 **4.** **Releases by the Debtor.** Pursuant to Section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtor and the consummation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor and its Estate from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertible on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor's Chapter 11 Case, the Sale, the transactions or events giving rise to any Claim that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims before or during the Debtor's Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, or any related agreements, instruments, or other

documents, other than a Claim against a Released Party arising out of the gross negligence or willful misconduct of any such person or entity.

5.     **Releases by Holders of Claims.**  ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN AND EXCEPT FOR THE RIGHT TO ENFORCE THIS PLAN, ALL PERSONS WHO HAVE (I) (A) VOTED TO ACCEPT THIS PLAN OR WHO ARE PRESUMED OR DEEMED TO HAVE VOTED TO ACCEPT THIS PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE AND/OR (B) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND WHO VOTE TO REJECT THIS PLAN OR ABSTAIN FROM VOTING, AND (II) DO NOT MARK THEIR BALLOTS AS OPTING OUT OF THE RELEASES GRANTED UNDER THIS SECTION OR OTHERWISE OPT OUT OF THE RELEASES GRANTED UNDER THIS SECTION IN WRITING BY THE DEADLINE TO VOTE TO ACCEPT OR REJECT THIS PLAN, AS APPLICABLE, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE THE RELEASED PARTIES AND EACH OF THEIR RESPECTIVE CONSTITUENTS, PRINCIPALS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ATTORNEYS, PROFESSIONALS, ADVISORS, AFFILIATES, FUNDS, SUCCESSORS, PREDECESSORS, AND ASSIGNS, OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS, OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTOR, THE CHAPTER 11 CASE, OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO THE DEBTOR, AGAINST SUCCESSORS OR ASSIGNS OF THE DEBTOR AND THE INDIVIDUALS AND ENTITIES LISTED ABOVE WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT, OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING, OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTOR, THE TRUSTEE, THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THIS PLAN, THE NEGOTIATION AND CONSUMMATION OF THE SALE. THE CONSUMMATION OF THIS PLAN OR THE ADMINISTRATION OF THIS PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THIS PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM HAS VOTED TO ACCEPT OR REJECT THIS PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.   FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS PLAN.

6.     **Injunction.**  FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING

PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

**7.** **Nondischarge of the Debtor.** In accordance with Section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge Claims. However, no Holder of a Claim may receive any payment from, or seek recourse against, any Assets that are to be distributed under the Plan other than Assets required to be distributed to that Holder pursuant to the Plan. As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

**8.** **Cancellation of Documents.** On the Effective Date, except to the extent otherwise provided in the Plan, any and all notes, instruments, debentures, certificates, and other documents evidencing Claims against the Debtor shall be deemed inoperative and unenforceable solely as against the Debtor and its Estate.

**9.** **Effect of Plan on Released Claims and Liens.** Nothing contained in the Plan shall revive, preserve, or transfer any Claims or Liens that have been released pursuant to the Sale Order, the APA, or otherwise.

## V.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Trustee believe the Plan is in the best interests of the Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtor: (i) a liquidation of the Debtor's Assets pursuant to Chapter 7 of the Bankruptcy Code; (ii) an alternative plan of liquidation may be proposed and confirmed; or (iii) the Debtor's Chapter 11 Case may be dismissed.

### A.    Chapter 7 Liquidation

If a plan pursuant to Chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtor's Chapter 11 Case may be converted to a liquidation case under Chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed, pursuant to applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Trustee believes that such a liquidation would result in smaller distributions being made to the Debtor's Creditors than those provided for in the Plan because (a) the likelihood that other Assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other Professionals, (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts. The Trustee has determined that confirmation of the Plan

will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

**B.     Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code**

If the Plan is not confirmed, the Trustee may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Debtor's Assets.  However, it is difficult to speculate on or assess the terms and potential treatment of Allowed Claims under any such alternative plan.  Furthermore, for the Debtor and/or Creditors to formulate, solicit and confirm any such alternative plan would likely require the Estate to incur additional administrative and other expenses, may substantially delay distributions to Creditors, and may result in lower recoveries to Creditors than the proposed Plan.  The Trustee believes that the terms of the Plan provide for an orderly and efficient liquidation of the Debtor's Assets and will result in the realization of the most value for Holders of Claims against the Debtor's Estate.

**C.     Dismissal of the Debtor's Chapter 11 Case.**

Dismissal of the Debtor's Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various Creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions.  Most significantly, dismissal of the Debtor's Chapter 11 Case would permit Secured Creditors to foreclose upon any Assets that are subject to their Liens.  Dismissal would also permit unpaid unsecured Creditors to obtain and enforce judgments against the Debtor.  The Trustee believes that these actions could lead ultimately to the liquidation of the Debtor's Assets under Chapter 7 of the Bankruptcy Code. Therefore, the Trustee believes that dismissal of the Chapter 11 Case is not a preferable alternative to the Plan.

**VI.     <u>CERTAIN FEDERAL TAX CONSEQUENCES</u>**

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER**

**UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.     General

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtor, the Litigation Trust, and Holders entitled to vote on the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "**Service**"). There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims, the Litigation Trust or the Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital Assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special Class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held;

(vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

**B.     U.S. Federal Income Tax Consequences to the Debtor**

MMH is a not-for-profit corporation that is exempt from federal income taxation under 501(c)(3) of the IRC. It is intended that nothing in the Plan shall adversely affect the tax-exempt status of MMH. Accordingly, the Debtor does not expect the implementation of the Plan to have any adverse federal income tax consequences on the Debtor before or after the Effective Date. If the tax-exempt status of MMH would terminate, MMH may be subject to tax on its income, which would reduce the amount of distributions payable to the Holders of Claims.

**C.     U.S. Federal Income Tax Treatment with Respect to the Litigation Trust**

It is intended that the Litigation Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a Litigation Trust under a Chapter 11 plan. The Debtor is not requesting a private letter ruling regarding the status of the Litigation Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Litigation Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Debtor's Assets to the Litigation Trust as (i) a transfer of such Assets to the Beneficiaries of the Litigation Trust (to the extent of the value of their respective interests in the applicable Litigation Trust Assets) followed by (ii) a transfer of such Assets by such Beneficiaries to the Litigation Trust (to the extent of the value of their respective interests in the applicable Litigation Trust Assets), with the beneficiaries of the Litigation Trust being treated as the grantors and owners of the Litigation Trust. Each beneficiary of the Litigation Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other Assets received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-cash Asset under the Plan in respect of its Claim should generally have a tax basis in such Asset in an amount equal to the fair market value of such Asset on the date of its deemed receipt.

The Plan and the Litigation Trust Agreement generally provide that the Beneficiaries of the Litigation Trust must value the Assets of the Litigation Trust consistently with the values determined by the Litigation Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Litigation Trustee shall make a good faith valuation of the Assets transferred to the Litigation Trust.

Consistent with the treatment of the Litigation Trust as a grantor trust, the Litigation Trust Agreement and the Plan will require each Holder to report on its U.S. federal income tax return its allocable share of the Litigation Trust's income.  Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Litigation Trust whether or not the Litigation Trust has made any distributions to such Holder.  The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a distribution of underlying Assets from the Litigation Trust to a Beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such Assets.  Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Litigation Trust.

The Litigation Trustee will file with the Service tax returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Litigation Trust income, gain, loss, deduction, or credit.  Each such Holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Litigation Trust will be respected as a grantor trust for U.S. federal income tax purposes.  If the Service were to successfully challenge such Classification, the U.S. federal income tax consequences to the Litigation Trust and the beneficiaries of the Litigation Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Litigation Trust).

**D.    U.S. Federal Income Tax Treatment with Respect to Holders of Allowed Claims that are Beneficiaries of the Litigation Trust.**

Holders of Allowed Claims as of the Effective Date that are Beneficiaries of the Litigation Trust should be treated as receiving from the Debtor their respective shares of the applicable Assets of the Litigation Trust in satisfaction of their Allowed Claims, and simultaneously transferring such Assets to the Litigation Trust.  Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim.  Additionally, such Holders should generally recognize their allocable share of income, gain, loss, and deductions recognized by the Litigation Trust on an annual basis.

Because a Holder's ultimate share of the Assets of the Litigation Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the Assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the Assets of the Litigation Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Claim that is a beneficiary of the Litigation Trust should

recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including:  (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously Claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount.  A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules (subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Litigation Trustee makes its final distribution of the Assets of the Litigation Trust.  Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the Assets of the Litigation Trust.

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the Litigation Trust Assets are transferred to the Litigation Trust, but should recognize gain or loss in an amount equal to:  (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Litigation Trust Assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims.  The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear.  The Debtor and the Litigation Trust intend to take the position, and the Plan provides, that such cash or property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon.  Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any).  A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## VII.   RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Claims against the Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the

Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.    Bankruptcy Considerations

Although the Trustee believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in the Plan, and there can be no assurance that such conditions will be satisfied or waived. In the event that the conditions precedent described in the Plan have not been satisfied, or waived (to the extent possible) by the Trustee or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Trustee believe that the Classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The liquidation of certain Assets and the prosecution of certain Causes of Action may result in the availability of additional Assets for distribution pursuant to the Plan's terms. The potential recoveries from any such actions, however, are unknown. In addition, there can be no assurance that the Litigation Trust Assets will be sufficient to pay the fees and expenses of the Litigation Trustee or make any distributions to the Beneficiaries.

As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes. The Trustee believes that the Plan satisfies these requirements. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.    No Duty to Update Disclosures

The Trustee has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Trustee is required to do so pursuant to an Order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.      Representations Outside this Disclosure Statement**

This Disclosure Statement contains representations concerning or related to the Debtor and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court.  Please be advised that any representations or inducements made outside this Disclosure Statement and any related documents that are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims that are entitled to vote to accept or reject the Plan.

**D.      No Admission**

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Trustee, the Litigation Trustee, or Holders of Claims.

**E.      Tax and Other Related Considerations**

A discussion of potential tax consequences of the Plan is set forth in this Disclosure Statement.  However, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business, or other Professional advice.  Holders of Claims should seek advice from their own independent tax, legal or other Professional advisors based on their own individual circumstances.

**VIII.    <u>RECOMMENDATION AND CONCLUSION</u>**

The Trustee believes the Plan provides the best available alternative for maximizing the recoveries that Creditors may receive from the Estate.  Therefore, the Trustee recommends that all Creditors that are entitled to vote on the Plan vote to accept the Plan.

Dated:  October 17, 2019

CAH ACQUISITION COMPANY #1, LLC d/b/a WASHINGTON COUNTY HOSPITAL

By: *Thomas W. Waldrep, Jr.*
Name: Thomas W. Waldrep, Jr.
Title: Chapter 11 Trustee for CAH Acquisition Company #1, LLC d/b/a Washington County Hospital

# EXHIBIT A – PLAN OF LIQUIDATION

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

IN RE:

CAH ACQUISITION COMPANY #1, LLC
d/b/a WASHINGTON COUNTY
HOSPITAL,

           Debtor.

Case No. 19-00730-5-JNC

Chapter 11

## AMENDED CHAPTER 11 PLAN OF ORDERLY LIQUIDATION

Nothing contained herein shall constitute an offer, an acceptance, or a legally binding obligation of the Trustee or any other party in interest. This Plan is subject to approval of the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. This is not a solicitation of acceptances or rejections of the Plan. Acceptances or rejections with respect to this Plan may not be solicited until a Disclosure Statement has been conditionally approved by the United States Bankruptcy Court for the Eastern District of North Carolina in accordance with Section 1125 of the Bankruptcy Code. Such a solicitation will only be made in compliance with applicable provisions of securities and bankruptcy laws.

      YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

# I.

## INTRODUCTION

Thomas W. Waldrep, Jr., Trustee for CAH Acquisition Company #1, LLC d/b/a Washington County Hospital (the "**Trustee**"), the Trustee in the above-captioned Chapter 11 case, proposes the following plan of liquidation (as defined herein, the "**Plan**") pursuant to the provisions of Chapter 11 of the Bankruptcy Code.

Pursuant to the Plan, the Trustee proposes an orderly liquidation of the Assets of the above-referenced debtor (the "**Debtor**"). The Plan provides that all funds realized from the collection and liquidation of the Debtor's Assets will be paid to Creditors on account of their Allowed Claims in accordance with the distributive priorities of the Bankruptcy Code and this Plan. The Trustee proposes to implement the Plan by establishing, *inter alia*, a Litigation Trust that will be administered by the Litigation Trustee. On the Effective Date, certain of the Debtor's Assets will be transferred to the Litigation Trust for the benefit of Creditors and certain Assets will be distributed to Creditors. Thereafter, the Litigation Trustee will be responsible for conducting litigation, liquidating any unsold Assets, and making distributions to Creditors in accordance with the terms of the Plan.

Transmitted with this Plan is a copy of the Disclosure Statement required by Section 1125 of the Bankruptcy Code (as defined herein, together with its exhibits and as amended from time to time, the "**Disclosure Statement**"). The Disclosure Statement is provided to help Creditors understand this Plan. The Disclosure Statement contains, among other things, a discussion of the Debtor's history, business and operations, risk factors, and other related matters. The Disclosure Statement also provides a summary of this Plan. All Creditors and other parties-in-interest are encouraged to carefully review the Disclosure Statement prepared by the Trustee before voting to accept or reject this Plan.

The Trustee urges all Creditors and other parties in interest to read this Plan and the Disclosure Statement in their entirety. No solicitation materials other than the Disclosure Statement and any documents, schedules, exhibits, or letters attached thereto or referenced therein, have been authorized by the Trustee or the Bankruptcy Court for use in soliciting acceptances or rejections of this Plan.

The Voting Deadline to accept or reject this Plan will be set by Order of the United States Bankruptcy Court for the Eastern District of North Carolina.

The Trustee believes that this Plan will enable the Estate to efficiently liquidate its Assets for the benefit of the Creditors and accomplish the objectives of Chapter 11. Additionally, the Trustee believes that the Plan presents the most advantageous outcome for all the Debtor's Creditors and, therefore, confirmation of the Plan is in the best interests of the Estate. The Trustee recommends that Creditors vote to accept the Plan.

## II.

## DEFINITIONS AND RULES OF CONSTRUCTION

### A.    Definitions

In addition to such other terms as are defined in other sections of the Plan, the following terms (which appear in the Plan as capitalized terms) have the following meanings as used in the Plan:

**"Administrative Bar Date"** means that certain date sixty (60) days after the Confirmation Date constituting the final day for filing Administrative Expense Claims, other than (A) fees payable to the Clerk of the Bankruptcy Court or the Bankruptcy Administrator pursuant to 28 U.S.C. § 1930; (B) any Administrative Expense Claim already fixed and approved by Order of the Bankruptcy Court prior to the entry of an Administrative Bar Date Order; (C) any Administrative Expense Claim that has been paid in full prior to the entry of any Administrative Bar Date Order; (D) any Administrative Expense Claim of a Governmental Unit that is subject to Section 503(b)(1)(D) of the Bankruptcy Code; (E) any Professional Compensation and Reimbursement Claim; and (F) any Administrative Expense Claims that may be excepted from an Administrative Bar Date Order.

**"Administrative Expense Claim"** means any Allowed and/or approved Claim (other than a Claim included in a Class under the Plan) that is entitled to administrative expense priority in accordance with Sections 503(b) and 507(a)(2) of the Bankruptcy Code or Order of the Bankruptcy Court, including (i) Claims for the actual, necessary costs and expenses of preserving the Estate arising or accruing during the period commencing on the Petition Date and ending on any Administrative Bar Date that may be set by the Bankruptcy Court, (ii) Section 503(b)(9) Administrative Claims, and (iii) Professional Compensation and Reimbursement Claims.

**"Allowed"** means, with respect to a Claim, a Claim that is an Allowed Claim.

**"Allowed Claim"** means any Claim, proof of which was timely and properly filed or, if no proof of Claim was filed, which has been or hereafter is listed by the Debtor in its Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and, in each case, as to which: (A) no objection to allowance has been interposed within the applicable period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (B) such Claim has been Allowed, in whole or in part, by a Final Order (including, with respect to those Claims that are Allowed pursuant to the terms of the Plan, the Confirmation Order);  provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an Order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by Order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of computation of distributions under the Plan, include interest on such Claim from and after the Petition Date.

**"APA"** means an Asset Purchase Agreement entered into by the Purchaser of the Assets and the Trustee and approved by the Bankruptcy Court.

-3-

**"Assets"** means each and every item of property and interest of the Debtor or its Estate as of the Effective Date, whether tangible or intangible, legal or equitable, liquidated or unliquidated, and includes, without limitation, (i) all Excluded Assets (as defined in the APA); and (ii) all Cash (including, without limitation, all proceeds of the Sale), Chapter 5 Actions, rights in and proceeds of Insurance Policies applicable to the Debtor, and any other rights, privileges, deferred taxes, Claims, Causes of Action or defenses, whether arising by statute or common law, and whether arising under the laws of the United States, other countries, or applicable state or local law.

**"Auction"** means the process by which the Trustee will sell, with the assistance of an investment banker, substantially all the Assets of the Debtor, including real estate owned by the Hospital, the physical plant, the equipment, the Hospital's provider agreement, including any amounts owed pursuant to outstanding cost reports, the Hospital's license, and all accounts receivable, pursuant to Section 363(f) of the Bankruptcy Code, and such sale shall be free and clear of all Liens, Claims, interests, and encumbrances, with any liens or encumbrances attaching to Sale proceeds.

**"Bankruptcy Administrator"** means the Office of the United States Bankruptcy Administrator for the Eastern District of North Carolina.

**"Bankruptcy Code"** means Title 11 of the United States Code as now in effect or hereafter amended.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of North Carolina, having jurisdiction over the Chapter 11 Case, or if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as amended from time to time, and any Local Rules of the Bankruptcy Court, as now in effect or hereafter amended.

**"Bar Date"** means the last date fixed by the Bankruptcy Court for filing proofs of Claim in the Chapter 11 Case.  For Creditors holding a General Unsecured Claim, except Governmental Units, the Bar Date is July 15, 2019 and for Governmental Units, the Bar Date is August 19, 2019.

**"Beneficiary"** means a "Beneficiary" as defined in the Litigation Trust Agreement.

**"Business Day"** means any day that is not a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a).

**"Cash"** means cash constituting legal tender of the United States of America, cash equivalents and other readily marketable direct obligations of the United States of America, and fully FDIC-insured certificates of deposit issued by a bank.

**"Causes of Action"** means any and all causes of action, grievances, arbitrations, suits, demands, demand letters, Claims, complaints, notices of non-compliance or violation, enforcement actions, investigations or proceedings that belong to the Debtor and/or the Estate that

-4-

are or may be pending on the Effective Date or that may be instituted or prosecuted by the Litigation Trustee on behalf of the Estate against any Person or Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date including, without limitation: (i) the right to object to Claims; (ii) all avoidance powers, actions (including all Claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code), rights, remedies or affirmative defenses under the Bankruptcy Code and state law; (iii) all Tort Claims; (iv) all Fraud Claims; (v) all Claims under Insurance Policies applicable to the Debtor; (vi) all D&O Claims.  Except as otherwise expressly provided in the Plan, any and all Causes of Action are preserved under the Plan.

"**Chapter 5 Actions**" means any and all Claims arising under Chapter 5 of the Bankruptcy Code and any and all fraudulent conveyance or transfer Claims that, in either instance, could be brought under state or federal law.

"**Chapter 11 Case**" means the case under Chapter 11 of the Bankruptcy Code styled *CAH Acquisition Company #1, LLC d/b/a Washington County Hospital,* Case No. 19-00730-5-JNC, currently pending before the Bankruptcy Court.

"**Claim**" means a "Claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Class**" means any group of substantially similar Claims classified by the Plan pursuant to Section 1123(a)(1) of the Bankruptcy Code.

"**Closing**" means the closing date of the Sale of the Purchased Assets to the Purchaser pursuant to the APA.

"**Collateral**" means any property or interest in property of the Estate of the Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code.

"**Confirmation Date**" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court pursuant to Section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the Order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

"**Convenience Claim**" means any Claim that is (i) equal to or less than one thousand five hundred dollars ($1,500.00) or (ii) greater than one thousand five hundred dollars ($1,500.00) that the Holder of such Claim has voluntarily elected to reduce to one thousand five hundred dollars ($1,500.00); provided, however, that "Convenience Claim" does not include any Unclassified Claim, any Priority Non-Tax Claim, or any Secured Claim (including the First-Citizens Secured Claim, the First Capital Secured Claim, and Secured Claims of Other Lienholders).  All

Convenience Claims are deemed Allowed for the purposes of this Plan and distributions thereunder.

"**Creditor**" means a "creditor," as defined in Section 101(10) of the Bankruptcy Code.

"**Cure**" means, with respect to the assumption of an Executory Contract or unexpired lease pursuant to Section 365(b) of the Bankruptcy Code, (A) the distribution of Cash, or the distribution of such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties under an Executory Contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law or (B) the taking of such other actions as may be agreed upon by the parties or ordered by the Bankruptcy Court.

"**D&O Claims**" means rights and Claims against the Debtor's current and former directors and officers for, *inter alia*, breach of fiduciary duty, breach of the implied duty of good faith and fair dealing, and the proceeds of any such Claims, including from any Insurance Policies associated therewith.

"**D&O Policies**" means, collectively, any "Directors and Officers" and other fiduciary liability Insurance Policies belonging to the Debtor or under which either the Debtor is named as an insured or as an additional insured.

"**Debtor**" means CAH Acquisition Company #1, LLC d/b/a Washington County Hospital.

"**Deficiency Claim**" means a General Unsecured Claim in an amount equal to the difference between the total Allowed amount of a Claim and the value of any Collateral securing such Claim (*i.e.*, the total Allowed Claim amount minus the Allowed Secured Claim amount), as determined consistent with Section 506(a) of the Bankruptcy Code or otherwise agreed to by the Holder of the Claim.

"**Disallowed**" means, with reference to any Claim, a Claim or any portion thereof that is or has been disallowed or expunged by Final Order of the Bankruptcy Court.

"**Disclosure Statement**" means the disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code.

"**Disputed Claim**" means any Claim that has not been Allowed by a Final Order of the Bankruptcy Court and (i) has not been listed on the Schedules, or has been or hereafter is listed on the Schedules as unliquidated, disputed or contingent, regardless of whether a proof of Claim has been filed as to such Claim; (ii) as to which the Debtor or, if not prohibited by the Plan, any other party in interest has interposed a timely objection and/or request for estimation in accordance with Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3007, which objection and/or request for estimation has not been withdrawn or determined by a Final Order; or (iii) as to which proof of Claim was required to be filed by Order of the Bankruptcy Court but as to which a proof of Claim or interest was not timely or properly filed.

**"Distribution Reserve"** shall have the meaning attributed to such term in section VII(I) of this Plan.

**"Effective Date"** means the first Business Day after the Confirmation Order becomes a Final Order and all conditions to the Effective Date as set forth in section XII(A) of this Plan have been satisfied or, if waivable, waived by the Trustee.

**"Entity"** means an "entity," as defined in Section 101(15) of the Bankruptcy Code.

**"Equity Interests"** means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options, or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights, or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights, or other interests are outstanding on any date of determination.

**"Estate"** means the Estate created upon the commencement of the Chapter 11 Case under Section 541 of the Bankruptcy Code.

**"Executory Contract"** means any executory contract or unexpired lease as of the Petition Date, subject to Section 365 of the Bankruptcy Code, between a Debtor and any other Person or Persons, specifically excluding contracts and agreements entered into pursuant to the Plan or subject to Section 1113 of the Bankruptcy Code.

**"Fee Application"** means an application by a Professional for a Professional Compensation and Reimbursement Claim.

**"First Capital Loan Documents"** means, collectively, the First Capital Note and each of the other agreements, mortgages, instruments and other documents that purports to evidence, memorialize, secure and/or perfect the associated debt and security interests, mortgages and other liens relating to the First Capital Note.

"**First Capital Note**" means that certain Promissory Note dated September 30, 2008 executed by the Debtor in favor of First Capital in the principal amount of $1,645,588.34, and for which a proof of Claim was filed in the amount of $1,262,084.16. A copy of the First Capital Note is attached to proof of Claim number 68 filed by First Capital in the Chapter 11 Case.

**"First Capital Secured Claim"** means the Secured Claim of First Capital pursuant to the First Capital Loan Documents for the outstanding principal, interest, fees, and other amounts owed by the Debtor as of the Petition Date under the First Capital Note.

**"Final Distribution Date"** means the date on which the distribution is made from the Litigation Trust that finally and fully exhausts the assets of the Litigation Trust.

**"Final Order"** means an Order of the Bankruptcy Court or any other adjudicative body, which Order has not been stayed, and as to which the time to appeal or to move for reargument or rehearing has expired and no appeal, or motion for reargument or rehearing shall then be pending; provided, however, that the Confirmation Order shall be deemed a Final Order unless it has been stayed.

**"Fraud Claims"** means rights and Claims of the Estate against third parties that perpetrated, abetted, or assisted, by action or failure to act, fraud against the Debtor or parties with which the Debtor was in privity and that caused the Debtor to suffer a loss or harm or to incur indebtedness or liability, including conversion, fraudulent misrepresentation, and fraudulent concealment.

**"General Unsecured Claim"** means any Claim against the Debtor that is not an Unclassified Claim, a Priority Non-Tax Claim, a Secured Claim (including the First Capital Secured Claim and Secured Claims of Other Lienholders), or a Convenience Claim.

**"Governmental Unit"** means a "governmental unit," as defined in Section 101(27) of the Bankruptcy Code.

**"GUC Distribution Date"** means: (a) initially, the first Business Day that is thirty (30) days after the Effective Date or as soon thereafter as practicable; (b) thereafter, any interim date(s) that the Litigation Trustee deems appropriate based on, among other things, the amount of the proceeds of the Litigation Trust Estate on hand, whether there remain any other unpaid obligations under this Plan, the time and the status of pending or potential litigation, if any, affecting payment of such obligations, and the amount of any necessary reserves; and (c) thereafter, the Final Distribution Date.

**"GUC Litigation Trust Assets"** means all Assets and other corpus of the Litigation Trust Estate available for distribution to Holders of Allowed General Unsecured Claims (Class 4) after payment of all other amounts required by this Plan, including, but not limited to (i) payments to Holders of Allowed Unclassified Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims (including, to the extent Allowed, the First Capital Secured Claim and the Secured Claims of Other Lienholders), and Allowed Convenience Claims; (ii) all required statutory fees; and (iii) all costs and expenses of administration of the Litigation Trust, including all Post-Effective Date Expenses.

**"Holder"** means the legal or beneficial holder of any Claim against the Estate.

**"Hospital"** means the for-profit community hospital with its principal place of business located at 958 US Highway 64 East, Plymouth, North Carolina 27962.

**"Impaired"** means, when used in reference to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**"Insurance Policy"** includes any policy of insurance coverage of any kind (including any and all amendments, endorsements, renewals, and extensions thereof) that at any time belonged or belongs to or included or includes the Debtor as a named insured, additional insured, beneficiary, or assignee, including, without limitation, any D&O Policies.

**"Lien"** means a "lien," as defined in Section 101(37) of the Bankruptcy Code.

**"Litigation Trust"** means the trust to be established pursuant to this Plan and the Litigation Trust Agreement that will (a) pursue various Causes of Action, whether arising before or after the Petition Date of the Debtor, to enable further recoveries to Creditors of the Estate and (b) effectuate the wind down of the Debtor and make distributions pursuant to the terms of the Plan and Litigation Trust Agreement.  With respect to any action required or permitted to be taken by the Litigation Trust, the term includes the Litigation Trustee or any other Person authorized to take such action in accordance with the Litigation Trust Agreement.  In the event of any conflict between the terms of this Plan and the terms of the Litigation Trust Agreement, the terms of this Plan shall govern.

**"Litigation Trust Agreement"** means that certain agreement which will be entered into prior to the Effective Date by the Trustee and the Litigation Trustee pursuant to article VII of the Plan, will be subject to approval by the Bankruptcy Court, and will become part of the Plan pursuant to the Confirmation Order.  The Litigation Trust Agreement will be filed with Bankruptcy Court ten days prior to the date that ballots are due to be filed.

**"Litigation Trust Estate"** means collectively, (i) all Assets transferred to the Litigation Trust pursuant to this Plan on the Effective Date or at any time thereafter pursuant to this Plan, and (ii) such additional or different corpus as the Litigation Trustee may from time to time acquire and hold in trust pursuant to the Litigation Trust Agreement.

**"Litigation Trust Expense Reserve"** means the reserve established by the Litigation Trustee to pay the Post-Effective Date Expenses.

**"Litigation Trustee"** means Thomas W. Waldrep, Jr., who shall serve as the trustee of the Litigation Trust as of the date of execution of the Litigation Trust Agreement, and any successor Litigation Trustee appointed as provided in the Litigation Trust Agreement.  Any changes to the identity of the Litigation Trustee will be subject to approval of the Bankruptcy Court and will become part of the Plan pursuant to the Confirmation Order.

**"Litigation Trustee Professionals"** means Professionals for whom retention has been or is sought by the Litigation Trustee for carrying out the objectives of the Litigation Trust Agreement.

**"Litigation Sharing Agreement"** means the agreement described in section VII(G) of this Plan whereby the Litigation Trustee may share common expenses of litigation with the bankruptcy estates of the Other Hospitals.

**"Order"** means an order or judgment of the Bankruptcy Court or other adjudicative body.

**"Other Lienholders"** means the Holders of Liens against property of the Debtor or the Estate, other than Liens held by First Capital.

**"Other Hospitals"** means the other hospitals that will be auctioned in the same place and on the same date as the Hospital, including (a) CAH Acquisition Company 2, LLC, d/b/a Oswego Community Hospital, Case No. 19-01230-5-JNC (Bankr. E.D.N.C.); (b) CAH Acquisition Company 3, LLC, d/b/a Horton Community Hospital, Case No. 19-01180-5-JNC (Bankr.

E.D.N.C.); (c) CAH Acquisition Company #6, LLC, d/b/a I-70 Community Hospital, Case No. 19-01300-5-JNC (Bankr. E.D.N.C.); (d) CAH Acquisition Company 7, LLC, d/b/a Prague Community Hospital, Case No. 19-01298-5-JNC (Bankr. E.D.N.C.); (e) CAH Acquisition Company 12, LLC, d/b/a Fairfax Community Hospital, Case No. 19-01697-5-JNC (Bankr. E.D.N.C.); and (f) CAH Acquisition Company 16, LLC, d/b/a Haskell County Community Hospital, Case No. 19-01227-5-JNC (Bankr. E.D.N.C.).

**"Patient Care Ombudsman"** means Suzanne Koenig, who was appointed by the Bankruptcy Court on July 1, 2019 pursuant to Section 333 of the Bankruptcy Code.

**"Person"** means a "person," as defined in Section 101(41) of the Bankruptcy Code.

**"Petition Date"** means February 19, 2019, the date on which certain Creditors of the Debtor filed an involuntary petition for relief commencing the Chapter 7 case later converted to the Chapter 11 Case.

**"Plan"** means this plan of orderly liquidation under Chapter 11 of the Bankruptcy Code, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be altered, amended, or modified from time to time.

**"Post-Effective Date Expense(s)"** means all voluntary and involuntary costs, expenses, charges, obligations, or liabilities of any kind or nature, whether unmatured, contingent, or unliquidated incurred by the Litigation Trust after the Effective Date until the Litigation Trust is dissolved, including, but not limited to, those expenses described in section VII(I) of this Plan.

**"Post-Effective Date Notice List"** means the list, created pursuant to section XII(I) of the Plan, of Persons who desire to receive notices after the Effective Date of the Plan.

**"Priority Claim"** means any Priority Non-Tax Claim or Priority Tax Claim.

**"Priority Non-Tax Claim"** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code. Priority Non-Tax Claims include all Claims for past-due wages and unpaid benefits accrued within 180 days of the Petition Date by current or former employees of the Debtor as a result of the Chapter 11 Case.

**"Priority Tax Claim"** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**"Pro Rata"** means a number (expressed as a percentage) equal to the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of: (a) Allowed Claims plus (b) Claims, Disputed or undisputed, otherwise asserted but not yet Disallowed (in their aggregate face or, if applicable, estimated amount) in such Class as of the date of determination.

**"Professional"** means a Person or Entity employed pursuant to a Final Order in accordance with Section 327 or Section 1102 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to Sections 327, 328, 329, 330 and/or 331 of the

Bankruptcy Code, or for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**"Professional Compensation and Reimbursement Claim"** means a Claim of a Professional pursuant to Sections 330(a) and 503(b)(2) of the Bankruptcy Code for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date and prior to the Effective Date.

"**Purchased Assets**" means the "Assets" as defined in the APA.

**"Purchaser"** means the winning bidder at the Auction and the purchaser of the Assets (as defined in the APA) pursuant to the APA.

**"Record Date"** means the Confirmation Date.

**"Released Parties"** means, collectively and individually, the Trustee and the Trustee's attorneys, accountants, agents, and other Professionals.

**"Sale"** means the sale of the Purchased Assets to the Purchaser pursuant to the terms of the APA and approved by the Sale Order.

**"Sale Order"** means the Order (a) authorizing the Sale of the Assets free and clear of all Liens, Claims, encumbrances, and other interests, (b) approving the Asset Purchase Agreement and (C) granting related relief entered by the Bankruptcy Court.

**"Schedules"** means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtor with the Bankruptcy Court, pursuant to Section 521(a) of the Bankruptcy Code, Bankruptcy Rule 1007(b), and the Official Bankruptcy Forms, as may be amended from time to time.

**"Section 503(b)(9) Administrative Claim"** means a Claim against the Debtor alleged to be entitled to an administrative expense priority under Section 503(b)(9) of the Bankruptcy Code for goods sold to the Debtor in the ordinary course of the Debtor's business and received by the Debtor within twenty (20) days before the Petition Date.

**"Secured Claim"** means a Claim that is secured by a Lien on property in which the Estate has or had an interest, which Lien is valid, perfected, and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estate's  interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Section 506(a) of the Bankruptcy Code; provided, however, that a Secured Claim shall not include any portion of the Claim to the extent that the value of such Entity's Collateral is less than the amount of such Claim.  Nothing herein revives or preserves any Lien on property sold free and clear pursuant to the APA.

**"Secured Creditor"** means a Creditor that holds a Secured Claim in the Chapter 11 Case.

**"Stalking Horse Bidder"** means a bidder that has (a) met the requirements to be a qualified bidder at the Auction; (b) been selected by the Trustee prior to the Auction to be the first

bid at the Auction; (c) signed a mutually agreeable asset purchase agreement with the Trustee to purchase the Assets; and (d) been approved by the Court.

**"Tort Claims"** means any and all Claims of the Debtor against any of its former Professionals, managers, and owners, including but not limited to breach of fiduciary duty, conversion, fraud, fraudulent misrepresentation, fraudulent concealment, promissory estoppel, and unjust enrichment.

**"Unclassified Claim"** means any Claim that is not part of any Class, including Administrative Expense Claims and Priority Tax Claims.

**"Voting Deadline"** means the date fixed by the Bankruptcy Court Order after approval of the Disclosure Statement.

**B.      Interpretation, Rules of Construction, Computation of Time**

   **1.      Defined Terms**

Any term used in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code or Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

   **2.      Rules of Interpretation**

For purposes of this Plan:

   a.   whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural;

   b.   any reference in this Plan to a contract, lease, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

   c.   any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented through and including the Confirmation Date, which, after they are filed, may be amended, modified, or supplemented only with the express written consent of the Trustee;

   d.   unless otherwise specified in a particular reference, all references in the Plan to sections, articles, and exhibits are references to sections, articles, and exhibits of or to the Plan;

   e.   the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

   f.   captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

   g.   all exhibits to the Plan are incorporated herein, regardless of when those exhibits are filed;

h.  to the extent any discrepancy exists between the description contained herein of a document or agreement that is an exhibit to the Plan and with the provisions of that exhibit, the actual agreement or document shall govern; and

i.  the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; and

**3.    Time Periods**

a.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

b.  Whenever a distribution of property is required to be made on a particular date, the distribution shall be made on such date, or as soon as practicable thereafter.

**III.**

**DESIGNATION OF CLASSES OF CLAIMS**

The following is a designation of the Classes of Claims for all purposes, including voting, confirmation, and distribution pursuant to the Plan and Sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim and has not been paid, released, or otherwise satisfied before the Effective Date.

This Plan is intended to deal with all Claims against the Debtor of whatever character, whether known or unknown, whether or not with recourse, whether or not contingent or unliquidated, and whether or not previously Allowed by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code.  **However, only Holders of Allowed Claims will receive any distribution under this Plan.**  For purposes of determining Pro Rata distributions under this Plan and in accordance with this Plan, Disputed Claims shall be included in the Class in which such Claims would be included if Allowed, until such Claims are finally Disallowed.  This Plan will not provide any distributions on account of a Claim to the extent that such Claim has been Disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date. Classified Claims shall receive the treatment described in section IV(B) herein.

**A.    Classes of Claims**

**1.    Class 1** consists of all Priority Non-Tax Claims.

**2.    Class 2** consists of the First Capital Secured Claim.

**3.    Class 3** consists of all Secured Claims of Other Lienholders.

**4.    Class 4** consists of all General Unsecured Claims.

**5.    Class 5** consists of all Convenience Claims.

-13-

6.      **Class 6** consists of all Equity Interests.

**B.**      **Impaired Classes**

Class 2, Class 4, Class 5, and Class 6 are Impaired under the Plan.  The treatment of Allowed Claims in the Impaired Classes under this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights of each Holder of an Allowed Claim in each such Impaired Class.  Subject to the provisions of any Order approving the Disclosure Statement, Holders of Claims in the Impaired Classes are entitled to vote on the Plan.

**C.**      **Terms of Confirmed Plan Control Unless Otherwise Specified**

If the Plan is confirmed by the Bankruptcy Court, except as specifically set forth in this Plan and the Confirmation Order, the treatment of Claims set forth in the Plan and the Confirmation Order supersedes and replaces any agreements or rights the Holders of the Claims have in or against the Debtor or their property.  **EXCEPT AS SPECIFICALLY SET FORTH IN THIS PLAN OR IN THE CONFIRMATION ORDER, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM, WHETHER AN ALLOWED CLAIM OR NOT.**

**D.**      **Holders of Claims as of Record Date**

All distributions under the Plan will be tendered to the Persons or Entities that are the Holders of the relevant Claims as of the Record Date.

**IV.**

**TREATMENT OF CLAIMS**

**A.**      **Unclassified Claims**

Certain types of Claims are not placed into Classes; instead, such Claims are Unclassified Claims.  Such Unclassified Claims are not considered Impaired and their Holders are not entitled to vote on the Plan because they automatically receive specific treatment provided for them in the Bankruptcy Code.  As such, the Trustee did not place the following Claims in a Class.  The respective treatment for these Claims is provided below.

1.      **Administrative Expense Claims**

a.      <u>General</u>

Subject to the allowance procedures and the deadlines provided in this Plan, except to the extent any Entity entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of its Allowed Administrative Expense Claim, Cash in an amount equal to the amount of such Allowed Administrative Expense Claim, on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Allowed Administrative Expense Claim, or as soon thereafter as is practicable.

      b.    <u>Professional Compensation and Reimbursement Claims</u>

All Professionals seeking payment of Professional Compensation and Reimbursement Claims shall file their respective final Fee Applications no later than sixty (60) days after the Effective Date.  All Professional Compensation and Reimbursement Claims shall be treated as Administrative Expense Claims as set forth in section IV(A)(1)(a) above, or shall be paid on such other terms as may be mutually agreed upon between the Holder of an Allowed Professional Compensation and Reimbursement Claim and the Debtor, or the Litigation Trustee, as the case may be.  Failure to timely file a final Fee Application shall result in the Professional Compensation and Reimbursement Claim being forever barred and discharged.

## 2.    Priority Tax Claims

In full and final satisfaction of each Allowed Priority Tax Claim, if any, except to the extent any Entity entitled to payment of any Allowed Priority Tax Claim has received payment on account of such Claim prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to the amount of such Allowed Priority Tax Claim on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Allowed Priority Tax Claim, or as soon thereafter as is practicable.

## 3.    Statutory Fees

On or before the date that is thirty (30) days after the Effective Date, the Litigation Trustee shall make all payments required to be paid to the Bankruptcy Administrator pursuant to Section 1930 of Title 28 of the United States Code.  All fees payable pursuant to Section 1930 of Title 28 of the United States Code after the Effective Date shall be paid by the Litigation Trustee on a quarterly basis until the Chapter 11 Case is closed, converted, or dismissed.

## B.    Classified Claims

The Allowed Claims classified in article IV of this Plan shall be deemed fully and finally satisfied in the manner set forth herein unless the Holder of such Allowed Claim agrees to accept less favorable treatment.

## 1.    Class 1 – Priority Non-Tax Claims

Each Holder of an Allowed Priority Non-Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to the amount of such Allowed Priority Non-Tax Claim on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Priority Non-Tax Claim, or as soon thereafter as is practicable.

## 2.    Class 2 – First Capital Secured Claim

To the extent the First Capital Secured Claim is Allowed, First Capital will receive, in full and final satisfaction of such Claim, on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of both (a) a Final Order allowing the First Capital

-15-

Secured Claim and (b) a Final Order determining any applicable surcharge under Section 506(c) of the Bankruptcy Code, or as soon thereafter as is practicable, Cash in an amount equal to the amount of the Allowed First Capital Secured Claim, less the amount of the costs of Sale of First Capital's Collateral and the amount of any surcharge under Section 506(c) of the Bankruptcy Code.

### 3.     Class 3 – Secured Claims of Other Lienholders

Each Holder of an Allowed Secured Claim of an Other Lienholder shall, in the sole discretion of the Trustee, be treated in one of the following ways:

a.     on the Effective Date, the legal, equitable, and contractual rights of the Holder of an Allowed Secured Claim of an Other Lienholder shall be reinstated in accordance with the provisions of Section 1124(2) of the Bankruptcy Code notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Secured Claim of an Other Lienholder to demand or receive payment of such Allowed Secured Claim before the stated maturity of such Allowed Secured Claim from and after the occurrence of a default; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, covenants regarding corporate existence, or covenants prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be enforceable as to any breach that occurred on or prior to the Effective Date or any breach determined by reference back to a date preceding the Effective Date;

b.     on the Effective Date, the Holder of an Allowed Secured Claim of an Other Lienholder shall (i) retain a Lien securing such Allowed Secured Claim and (ii) receive deferred Cash payments from the Litigation Trust totaling at least the value of such Allowed Secured Claim as of the Effective Date in full and final satisfaction of such Allowed Secured Claim;

c.     on the Effective Date, the Collateral securing such Allowed Secured Claim of an Other Lienholder shall be surrendered to the Holder of such Allowed Secured Claim in full satisfaction of such Allowed Secured Claim; or

d.     the Holder of an Allowed Secured Claim of an Other Lienholder shall be paid, in Cash, an amount equal to such Holder's Allowed Secured Claim, on or before the date that is thirty (30) Business Days after the later of (i) the Effective Date and (ii) entry of a Final Order determining and allowing such Claim as a Secured Claim, or as soon thereafter as is practicable, in full and final satisfaction of such Allowed Secured Claim. To the extent the Collateral securing an Allowed Secured Claim of an Other Lienholder has been or is to be sold pursuant to an Order of the Bankruptcy Court, any amount to be paid to the Holder of such Allowed Secured Claim pursuant to the preceding sentence shall be net of the costs of Sale of such Collateral and otherwise subject to the rights of the Debtor or the Litigation Trustee pursuant to Section 506(c) of the Bankruptcy Code.

Holders of a Claim under this Class 3 are not Impaired under the Plan. Treatment of a Claim under this Class 3 shall not affect any General Unsecured Claim for any Allowed Deficiency Claim of the applicable Holder.

### 4. Class 4 – General Unsecured Claims

Each Holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such Claim, on one or more GUC Distribution Dates, a Pro Rata share of the net proceeds of the GUC Litigation Trust Assets.

### 5. Class 5 – Convenience Claims

Each Holder of an Allowed Convenience Claim will receive, in full and final satisfaction of such Claim, on or before the date that is thirty (30) business Days after the Effective Date, or as soon thereafter as practicable, Cash in an amount equal to the lesser of (i) one thousand five hundred dollars ($1,500.00) and (ii) the Allowed amount of such Holder's Convenience Claim; provided, however, that the total distribution to Holders of Allowed Convenience Claims under this Plan shall not exceed eighty thousand dollars ($80,000.00) (the "**Convenience Class Cap**"), and if the foregoing treatment would result in distributions to Holders of Allowed Convenience Claims that exceed the Convenience Class Cap in the aggregate, each Holder of an Allowed Convenience Claim will instead receive a Pro Rata share of $80,000.00, with the amount of each such Holder's Convenience Claim fixed at the lesser of (i) one thousand five hundred dollars ($1,500.00) and (ii) the Allowed amount of such Holder's Convenience Claim for the purpose of determining its Pro Rata share.

### 6. Class 6 – Equity Interests

Holders of Equity Interests will retain their interests. Provided however, the Holders of Equity Interests will not receive any distribution under this Plan unless and until the Holders of Allowed General Unsecured Claims have been paid in full.  Class 6 is Impaired.  Therefore, Holders of Class 6 Equity Interests are entitled to vote to accept or reject the Plan.

## C. General Claim Treatment Provisions

### 1. Objections

The failure of any party to object to any Claim in the Chapter 11 Case, including Secured Claims (including the First Capital Secured Claim and Secured Claims of Other Lienholders), shall be without prejudice to the rights of the Debtor or the Litigation Trustee to contest, object to, or otherwise defend against such Claim if and when such Claim is sought to be enforced by the Holder of such Claim.  Procedures for objections to Claims are set forth in section VII(N) of this Plan.

### 2. Attachment of Liens

Pursuant to the Sale Order, no Lien with respect to any Secured Claim shall attach to any property sold free and clear pursuant to the APA.

### 3. Survival and Release of Liens

Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of the Debtor held with respect to any Allowed Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Claim until such Allowed Secured Claim is satisfied, at which time

-17-

such Lien shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; provided, however, that the Debtor or Litigation Trustee, as the case may be, may condition delivery of any final payment upon receipt of an executed release of the Lien.

Any and all Liens securing any Secured Claim that is not an Allowed Claim shall be released, shall be deemed null and void, and shall be unenforceable for all purposes. Nothing in this Plan shall preclude the Debtor or the Litigation Trustee from challenging the validity of any alleged Lien on any asset of the Debtor or the value of the property that secures any alleged Lien, and all such rights are expressly preserved.

### 4. Surcharge Under Section 506(c) of the Bankruptcy Code

All rights of Holders of Secured Claims under this Plan are subject to the rights of the Trustee or the Litigation Trustee to surcharge the applicable Collateral pursuant to Section 506(c) of the Bankruptcy Code, which rights are expressly preserved.

### V.

### ACCEPTANCE OR REJECTION OF THIS PLAN

**A.**      **Voting Classes**

Subject to the provisions of any Order approving the Disclosure Statement, Holders of Claims in each Impaired Class, or their designees, shall be entitled to vote such Claims separately to accept or reject the Plan. Class 2, Class 4, Class 5, and Class 6 are Impaired under this Plan.

**B.**      **Non-Voting Classes**

Holders of Claims in Classes that are not Impaired are not entitled to vote such Claims to accept or reject this Plan. Each such Holder is conclusively presumed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code. Class 1 and Class 3 are not Impaired under this Plan.

**C.**      **Controversy Concerning Impairment**

In the event of a controversy as to whether any Holder of an Allowed Claim or Equity Interest or any Class is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

**D.**      **Acceptance by Impaired Classes**

An Impaired Class of Claims or Interests shall be deemed to have accepted the Plan if (a) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims or Interests actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims or Interests actually voting in such Class have voted to accept the Plan.

-18-

### E.   Non-Consensual Confirmation

At the request of the Trustee, this Plan may be confirmed under the so-called "cram down" provisions set forth in Section 1129(b) of the Bankruptcy Code if, in addition to satisfying the other requirements for confirmation (other than Section 1129(a)(8) of the Bankruptcy Code), this Plan "does not discriminate unfairly" and is determined to be "fair and equitable" with respect to each Class of Claims that has not accepted this Plan (i.e., dissenting Classes).  The Trustee will request confirmation under this provision for any Impaired Class that rejects the Plan.  The Trustee reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any amendment or supplement thereto, including to amend or modify it to satisfy the requirements of Section 1129(b) of the Bankruptcy Code, if necessary, in accordance with Section 1127 of the Bankruptcy Code and this Plan.

**VI.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

### A.   Rejection of Executory Contracts and Unexpired Leases

On the Effective Date and subject to this section VI(A) and VI(C), all Executory Contracts and unexpired leases of the Debtor will be deemed rejected, as of the Effective Date, other than Executory Contracts and unexpired leases that were previously assumed, assumed and assigned, or rejected by Final Order of the Bankruptcy Court (which contracts will be treated in accordance with such Final Order).  The Confirmation Order will constitute an Order approving the foregoing.

### B.   Bar Date for Rejection Damages

If the rejection of an Executory Contract or unexpired lease pursuant to the Plan and the Confirmation Order or a previous or subsequent order of the Court gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtor, the Litigation Trust, or the Estate unless a proof of Claim is filed and served on the Debtor or the Litigation Trust, as the case may be, and its counsel within thirty (30) days after the Confirmation Date.  Notwithstanding the foregoing, to the extent that any such Claim is or was subject to a previously established Bar Date in the Chapter 11 Case, such previously established Bar Date shall be deemed operative and will not be deemed extended by virtue of this section VI(B).  All such Claims for which proofs of Claim are required to be filed for contracts to which the Debtor is a party, if Allowed, will be classified and treated as Class 4 General Unsecured Claims, subject to the provisions of the Plan.

### C.   Insurance Policies

All Insurance Policies shall be transferred to the Litigation Trust from the Effective Date until its dissolution, unless any such Insurance Policy is otherwise cancelled by the Litigation Trustee in its discretion.  Notwithstanding any provision providing for the rejection of Executory Contracts, any Insurance Policy that is deemed to be an Executory Contract shall neither be rejected nor assumed by operation of this Plan and shall be the subject of a specific motion by the Litigation Trust, which shall retain the right to assume or reject any such Executory Contracts

-19-

pursuant to and subject to the provisions of Section 365 of the Bankruptcy Code following the Effective Date.

The Confirmation Order shall constitute a determination that no default by the Debtor exists with respect to any of the Insurance Policies requiring Cure and that nothing in the Sale Order, any underlying agreements or this Plan shall be construed or applied to modify, impair, or otherwise affect the enforceability of the Insurance Policies or any coverage thereunder with regard to any Claims or Causes of Action, including the D&O Claims. The Plan shall be liberally construed to protect the interests of all Creditors in all Causes of Action and to limit any Claims and Interests against the Estate.

## VII.

## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.    Overview

This Plan provides for the disposition of substantially all the Assets and the distribution of the net proceeds thereof to Holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code. This Plan will provide for the Sale of most of the Assets at an Auction conducted pursuant to Section 363 of the Bankruptcy Code. This Plan also creates a mechanism for the Litigation Trustee to pursue Claims and Causes of Action, including Chapter 5 Actions, the D&O Claims, the Fraud Claims, and the Tort Claims, to enable recoveries to Creditors herein.

### B.    The Auction of Assets

The Trustee will employ an investment banker to assist in an Auction of substantially all the Assets of the Debtor. The Trustee will request the Court to approve an auction process pursuant to which the Hospital will be sold "as a going concern," including real estate owned by the Hospital, the physical plant, the equipment, the Hospital's provider agreement, including any amounts owed pursuant to outstanding cost reports, the Hospital's license, and all accounts receivable. Such Auction shall be conducted pursuant to Section 363(f) of the Bankruptcy Code, and the Sale shall be free and clear of all Liens, Claims, interests, and encumbrances, with any Liens or encumbrances attaching to Sale proceeds.

The Trustee will invite bids and will select a Stalking Horse Bidder for the Assets. If the Trustee does not identify a Stalking Horse Bidder for the Auction, the Auction will proceed without such a bidder. If the Stalking Horse Bidder does not want to purchase the accounts receivable of the Hospital, then the Trustee will negotiate the collection of the accounts receivable, either by the Purchaser or by a third party, for a fee.

The Trustee will request that the Bankruptcy Court approve the bidding procedures for the Auction, including the Stalking Horse Bidder, a breakup fee, minimum overbids, bidding increments, and the criteria by which bidders may become qualified to participate in the Auction. The Sale process will also include notice procedures for the assumption and assignment of Executory Contracts and unexpired leases.

## C.    Coordination of the Auction of the Hospital with the Auctions of Other Hospitals

To maximize the purchase price of the Assets, the Trustee will attempt to coordinate the Auction of the Hospital with the Auctions of the Other Hospitals.  The Trustee intends for the Auction of the Hospital to occur at the same place and on the same day as the Auctions of the Other Hospitals.  The Trustee will coordinate with the trustees for the Other Hospitals regarding all aspects of the Auctions, including bidding procedures and the criteria by which bidders may become qualified to bid at the Auctions.  The Trustee will request the Bankruptcy Court to approve similar, if not identical, Sale procedures for the Other Hospitals.  The Trustee will request that the Bankruptcy Court schedule a hearing to approve the proposed Sale of the Assets to the highest or otherwise best bid at the Auction.

The Trustee will coordinate further bidding at the Auctions of the Hospital and the Other Hospitals.  After the Hospital and the Other Hospitals are each auctioned individually, qualified bidders will be given the opportunity to group two or more hospitals for further bidding.  For purposes of further bidding, the minimum bidding increment for any group of two or more hospitals shall be one percent (1%) more than the sum of the highest bid of each individual hospital that comprises the group that is to be bid upon.  Further bidding on the grouped hospitals will be allowed until a best bid is reached for the grouped hospitals.  This process will continue until no further groupings are requested by bidders.  Should two or more hospitals be grouped for sale, the allocation of sale proceeds from the group bid will be divided proportionally (Pro Rata) based on the high bid on each individual hospital at its initial auction.  For example, if the best bid for Hospital A is $4,000,000, and the best bid for Hospital B is $6,000,000, and if those hospitals are later grouped together for further bidding that results in a best bid of $12,000,000 for both of them, then $800,000 (40% of the additional $2,000,000) will be allocated to the estate of Hospital A and $1,200,000 (60% of the additional $2,000,000) will be allocated to the estate of Hospital B.

## D.    Establishment of Litigation Trust; Appointment of Litigation Trustee

Prior to the Effective Date, the Trustee shall execute the Litigation Trust Agreement.  The Litigation Trust Agreement is hereby incorporated into this Plan in its entirety as if set forth in full.  The Litigation Trust Agreement contains provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, provisions necessary to ensure the continued treatment of the Litigation Trust as a grantor trust.

On the Effective Date, and in accordance with the Confirmation Order, the Estate's title to all the Assets shall automatically pass to the Litigation Trust, free and clear of all Claims and Equity Interests in accordance with Section 1141 of the Bankruptcy Code.  Notwithstanding the foregoing, the Trustee reserves the right to modify the Plan to exclude certain Assets from transfer to the Litigation Trust.  The Confirmation Order shall constitute a determination that the transfers of the Assets to the Litigation Trust are legal and valid and consistent with the laws of the State of North Carolina.

All parties shall execute any documents or other instruments as necessary to cause title to the applicable Assets to be transferred to the Litigation Trust.  The Assets will be held in trust for the benefit of all Holders of Allowed Claims pursuant to the terms of the Plan and the Litigation Trust Agreement.

The Litigation Trustee shall be Thomas W. Waldrep, Jr. The Litigation Trustee will pay or otherwise make distributions on account of all Allowed Claims against the Debtor in accordance with the terms of the Plan.

**This Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Litigation Trustee on the Assets, Chapter 5 Actions, D&O Claims, Fraud Claims, Tort Claims, and rights in and proceeds of any Insurance Policies. The Proceeds of all Causes of Action are material to the implementation of this Plan and the recoveries to Creditors herein**.

E.     **Income Tax Status of Litigation Trust**

For federal income tax purposes, all parties (including, without limitation, the Debtor, the Litigation Trustee, and the Beneficiaries of the Litigation Trust Estate) shall treat the Litigation Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124. For federal income tax purposes, the transfer of Assets to the Litigation Trust under the Plan shall be treated as a deemed transfer to the Beneficiaries of the Litigation Trust Estate in satisfaction of their Claims followed by a deemed transfer of the Assets by the Beneficiaries to the Litigation Trust. For federal income tax purposes, the Beneficiaries will be deemed to be the grantors and owners of the Litigation Trust and its Assets. For federal income tax purposes, the Litigation Trust will be taxed as a grantor trust within the meaning of Internal Revenue Code ("**IRC**") sections 671-677 (a non-taxable pass-through tax entity) owned by the Beneficiaries. The Litigation Trust will file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss deductions, and credits ("**Tax Items**"). The Beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability. All parties will use consistent valuations of the Assets transferred to the Litigation Trust for all federal income tax purposes. The Assets shall be valued based on the Litigation Trustee's good faith determination of their fair market value.

F.     **Powers and Authority of the Litigation Trustee**

The powers of the Litigation Trustee are set forth in full in the Litigation Trust Agreement and shall include, among other things: (a) the power to sell, lease, license, abandon, or otherwise dispose of all remaining Assets of the Litigation Trust Estate subject to the terms of this Plan; (b) the power to effect distributions under this Plan to the Holders of Allowed Claims; (c) the authority to pay all costs and expenses of administering the Litigation Trust Estate after the Effective Date (including the Post-Effective Date Expenses), including the power to employ and compensate Persons to assist the Litigation Trustee in carrying out his duties hereunder, and to obtain and pay premiums for insurance and any other powers necessary or incidental thereto; (d) the power to implement this Plan including any other powers necessary or incidental thereto; (e) the authority to prosecute all Causes of Action on behalf of the Debtor and the Litigation Trust Estate, including Chapter 5 Actions, D&O Claims, Fraud Claims, and Tort Claims; (f) the authority to settle Claims, applicable Causes of Action, or disputes as to amounts owing to the Estate; (g) the authority to participate in any post-Effective Date motions to amend or modify this Plan or the Litigation Trust Agreement, or appeals from the Confirmation Order; (h) the authority to participate in actions to enforce or interpret this Plan; (i) the authority to manage the Litigation Trust Estate; and (j) the

power to bind the Litigation Trust. Each of the foregoing powers may be exercised by the Litigation Trustee without further order of the Bankruptcy Court. Notwithstanding any of the foregoing, the Litigation Trustee may not materially amend or alter the terms and provisions of this Plan.

## G. Litigation Sharing Agreement

The Litigation Trustee may enter into a Litigation Sharing Agreement, which will provide a mechanism for the bankruptcy estates of the Other Hospitals and/or the bankruptcy estates of other CAH hospitals with common ownership to share expenses of litigation, including Chapter 5 Actions, D&O Claims, Fraud Claims, and Tort Claims. Litigation expenses and fees that must be incurred for multiple cases may be shared on a Pro Rata basis, including expenses and fees for data analysis, vendor fees, expert witness fees, and researching and drafting common pleadings. Litigation expenses and attorneys' fees that are incurred for a specific estate will be billed only to that estate. Bankruptcy estates that participate in the Litigation Sharing Agreement will waive all Claims and Causes of Action against other participating estates.

## H. Funding of the Litigation Trust

The funding of the Litigation Trust for the payments to be made to Holders of Allowed Claims under the Plan and the payment of Post-Effective Date Expenses will be from (i) the Litigation Trust Expense Reserve, (ii) the Debtor's Cash on hand as of the Effective Date, which will be transferred to the Litigation Trust as of the Effective Date and proceeds from the investment of such Cash, and (iii) the proceeds of the liquidation of the Assets, including, without limitation, any Claims or Causes of Action.

## I. Litigation Trust's Post-Effective Date Expenses

All expenses related to implementation of the Plan incurred from and after the Effective Date through the date on which the Litigation Trust is dissolved will be expenses of the Litigation Trust, and the Litigation Trustee will disburse funds from the Litigation Trust Expense Reserve, as appropriate, for purposes of paying the Post-Effective Date Expenses of the Litigation Trust without the need for any further Order of the Court. The Post-Effective Date Expenses shall include, but are not limited to, the fees and expenses of the Litigation Trustee, the fees and expenses of the Professionals employed by the Litigation Trustee, and other costs, expenses and obligations of the Litigation Trust until the date the Litigation Trust is terminated in accordance with section VII(M) and the Litigation Trust Agreement.

Prior to making a distribution to any Holders of Allowed Claims under the Plan, the Litigation Trustee may place in reserve and/or in a separate account any funds that may be needed to pay Claims that are subject to dispute and Claims that have otherwise not been Allowed in the event that all or a portion of such Claims become Allowed Claims (the **"Distribution Reserve"**). When a Claim is Allowed or Disallowed (and thus becomes an Allowed Claim or a Disallowed Claim, in whole or in part), the funds set aside on account of such Claim shall be released from the Distribution Reserve and shall be available for distribution in accordance with the terms of this Plan to either (i) the Holder of the Claim that has become an Allowed Claim, or (ii) if Disallowed, the Holders of Allowed Claims. Consistent with the terms of this Plan, the Litigation Trustee, in his sole discretion, on and after the Effective Date, shall have authority to increase or decrease the

Distribution Reserve, as reasonably necessary and appropriate, and upon satisfaction of all Allowed Claims required to be paid from the Distribution Reserve, to transfer amounts held therein for distribution pursuant to the Plan.

## J.    Use of Existing Accounts

The Litigation Trustee may use the Debtor's existing bank accounts (as of the Effective Date) for the purposes set forth herein, to the extent possible and desired. The Litigation Trustee also may close the Debtor's existing bank accounts, at his discretion, and transfer all amounts therein to one or more accounts, in accordance with the terms of this Plan. Alternatively, notwithstanding any provisions to the contrary in this Plan, the Litigation Trustee may invest some or all the funds that would otherwise be deposited into the accounts established pursuant to the Plan in allowed investments under applicable non-bankruptcy law.

## K.    Employment and Compensation

The Litigation Trustee shall be bonded and shall receive compensation for serving as Litigation Trustee as set forth in the Litigation Trust Agreement. At any time after the Effective Date and without further Order of the Bankruptcy Court, the Litigation Trustee may employ Persons or Entities, including Professionals (which may, but need not, include Professionals previously or currently employed in the Chapter 11 Case) reasonably necessary to assist the Litigation Trustee in the performance of his duties under the Litigation Trust Agreement and this Plan. Such Persons or Entities shall be compensated and reimbursed by the Litigation Trustee for their reasonable and necessary fees and out of pocket expenses on a monthly basis in arrears.

## L.    Litigation Trustee as Successor in Interest to the Trustee

The Litigation Trustee is the successor in interest to the Trustee, and thus, after the Effective Date, to the extent this Plan requires an action by the Trustee, the action shall be taken by the Litigation Trustee.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtor, the Litigation Trustee, and the Beneficiaries of the Litigation Trust Estate) shall treat the transfer of Assets to the Litigation Trust as a sale by the Trustee of such Assets to the Litigation Trust Estate at a selling price equal to the fair market value of such Assets on the Effective Date. The Litigation Trust shall be treated as the owner of all Assets that it holds.

## M.    Termination of the Litigation Trust Estate

The existence of the Litigation Trust and the authority of the Litigation Trustee will commence as of the Effective Date and will remain and continue in full force and effect until the earlier of (a) the date on which all of the Assets are liquidated in accordance with the Plan, the funds in the Litigation Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities and the Order closing the Chapter 11 Case is a Final Order or (b) seven (7) years after the date of creation of the Litigation Trust, unless extended by the Bankruptcy Court as provided in the Litigation Trust Agreement.

At such time as the Litigation Trust has been fully administered (*i.e.*, when all things requiring action by the Litigation Trustee have been done, and the Plan has been substantially consummated) and in all events within sixty (60) days after the Final Distribution Date, the Litigation Trustee will file an application for approval of his final report and the entry of the final decree by the Bankruptcy Court.

**N.    Objections to Claims**

**1.    Objection Procedures**

From and after the Effective Date, the Litigation Trustee shall have the exclusive right and standing to (i) object to and contest the allowance of all Claims, (ii) compromise and settle any Disputed Claim or Claim that has not otherwise been Allowed without Bankruptcy Court approval, subject to the notice procedure set forth in section VII(N)(2); and (iii) litigate to final resolution objections to Claims.

**No distribution shall be made pursuant to this Plan to a Holder of Claim, Disputed or otherwise, unless and until such Claim is or becomes an Allowed Claim.**

All objections to Claims shall be filed with the Bankruptcy Court, and served upon the Holders of such Claims, on or before the one hundred eightieth (180th) day after the Effective Date. The time period for filing objections to Claims shall automatically renew for successive periods of one hundred eighty (180) days each until the earlier of (i) the date upon which all Claims have been Allowed or Disallowed or (ii) the date fixed by the Court upon motion of the Litigation Trustee or a Holder of a Claim.

**2.    Resolution of Disputed Claims and Claims that Have Not Otherwise Been Allowed**

If the Holder of a Disputed Claim or Claim that has not otherwise been Allowed and the Litigation Trustee agree to a settlement of such Claim for an amount that does not exceed $10,000, the Litigation Trustee shall be authorized to enter into and effectuate such settlement without any further notice or approval of the Bankruptcy Court, and the settled Claim shall be deemed an Allowed Claim. If the Holder of such a Claim and the Litigation Trustee agree to a settlement of such Claim and the settlement amount exceeds $10,000, the Litigation Trustee shall provide notice of the proposed settlement (with a fourteen-day (14) period to object) to the Persons or Entities on the Post-Effective Date Notice List. If no objection is received within the fourteen-day (14) period, the settled Claim shall be deemed to be an Allowed Claim, without the need for further review by or approval of the Bankruptcy Court or any other party. If an objection to a proposed settlement is received within the fourteen-day (14) period and such objection cannot otherwise be resolved, then the Litigation Trustee shall schedule a hearing in the Bankruptcy Court to resolve the objection.

Until such time as an unliquidated Claim, contingent Claim, or a contingent portion of a Claim becomes Allowed or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions. The Holder of an unliquidated or contingent Claim will be

entitled to a distribution under the Plan only when and if such unliquidated or contingent Claim becomes an Allowed Claim.

## VIII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Delivery of Distributions

Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated on the records of the Debtor, or a filed proof of Claim, as applicable.

### B.     Undeliverable Distributions

If any Allowed Claim Holder's distribution is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Litigation Trustee is notified in writing of such Holder's then-current address.  Undeliverable distributions shall remain in the possession of the Litigation Trustee until such time as a distribution becomes deliverable. Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind. Within twenty-one (21) days after the end of each calendar quarter following the Effective Date, the Litigation Trustee shall make all distributions that become deliverable during the preceding calendar quarter, except as otherwise provided herein.  Any check that is not cashed or otherwise deposited within three months after the check's date shall be deemed an undeliverable distribution under this Plan.

### C.     Failure to Claim Undeliverable Distributions

To ensure that all Holders of Allowed Claims receive their allocated distributions, the Litigation Trustee will file with the Bankruptcy Court a listing of undistributed payments made pursuant to an Allowed Claim.  This list will be maintained and updated as needed for as long as the Chapter 11 Case stays open.  Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable distribution within three (3) months after the first attempted delivery shall have its Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Debtor, the Litigation Trust Estate, or the Litigation Trustee, or their respective property.  In such cases, any Cash held for distribution on account of such Claims shall be property of the Litigation Trust Estate, free of any restrictions thereon, and shall revert to the account from which such payment was originally issued to be redistributed among other Holders of Allowed Claims pursuant to the Plan.  Nothing contained in the Plan shall require the Litigation Trustee to attempt to locate any Holder of an Allowed Claim.

### D.     Compliance with Tax Requirements

In connection with the Plan, the Litigation Trustee shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued on such Claims.

**Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Litigation Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon any disbursing agent in connection with such distribution. Any property to be distributed pursuant to this Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution under this Plan.**

## E.    Minimum Distributions

If the amount of Cash to be distributed to the Holder of an Allowed Claim is less than $50 on a particular Distribution Date, the Litigation Trustee may hold the Cash distributions to be made to such Holder until the aggregate amount of Cash to be distributed to such Holder is in an amount equal to or greater than $50.  Notwithstanding the preceding sentence, if the aggregate amount of Cash distribution owed to any Holder of an Allowed Claim never equals or exceeds $50, then the Litigation Trustee shall not be required to distribute Cash to any such Holder.

This section VIII(E) shall not apply to Holders of Allowed Convenience Claims, who shall be entitled to receive distributions in the amounts determined by section IV(B)(5) above irrespective of the amounts of such distributions.

## F.    Rounding

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent, with one-half cent being rounded up to the nearest whole cent.

## G.    Setoffs and Recoupments

The Litigation Trustee may, pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, exercise the right of setoff or recoupment against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before distribution is made on account of such Claim), the Claims, rights, and Causes of Action of any nature that the Debtor may hold against the Holder of such Allowed Claim; provided, however, that (i) neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Litigation Trustee of any such Claims, rights and Causes of Action that the Litigation Trust may possess against such Holder, and (ii) no such setoff or recoupment shall be in derogation of the APA.

## H.    Settlement of Claims and Controversies

Pursuant to Sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies

-27-

relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of such Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, their Estate, and Holders of Claims and is fair, equitable, and reasonable.

## IX.

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS AND CLAIMS THAT HAVE OTHERWISE NOT BEEN ALLOWED

A.    **Payments and Distributions on Disputed Claims and Claims That Have Otherwise Not Been Allowed**

Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by the Litigation Trustee, in his sole discretion, no partial payments and no partial distributions will be made with respect to a Disputed Claim or Claim that has otherwise not been Allowed until such disputes are resolved by settlement or Final Order and the Claim has been Allowed. Notwithstanding the foregoing, any Person or Entity who holds both an Allowed Claim(s) and a separate and distinct Disputed Claim(s) or Claim that has otherwise not been Allowed will receive the appropriate payment or distribution on account of the Allowed Claim(s), although, except as otherwise agreed by the Litigation Trustee in his sole discretion, no payment or distribution will be made on the Disputed Claim(s) or Claim(s) that have otherwise not been Allowed until such dispute is resolved by settlement or Final Order and the Claim(s) have been Allowed. In the event there are Disputed Claim(s) or Claim(s) that have otherwise not been Allowed requiring adjudication and resolution, the Litigation Trustee reserves the right, or upon Order of the Bankruptcy Court, to establish appropriate reserves for potential payment of such Claims.

B.    **Safekeeping of Distributable Property**

Pending entry of a Final Order determining an objection to any Disputed Claim or Allowing a Claim that has not otherwise been Allowed, the Litigation Trustee shall take appropriate steps to safeguard the Cash, notes or other instruments that would be distributed on account of such Claim if Allowed, but the Litigation Trustee shall not be required to establish any formal escrow or reserve for such distributable property unless it determines, or the Bankruptcy Court orders, that an escrow or reserve is necessary to ensure that such property is available if and when such Claim is Allowed.

C.    **Allowance of Claims**

Except as expressly provided herein or in any Order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Case allowing such Claim. Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), the Litigation Trust Estate on and after the Effective

Date will have and retain any and all rights and defenses the Debtor had with respect to such Claim as of the Petition Date.

# X.

# JURISDICTION

## A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Chapter 11 Case until the Chapter 11 Case is closed, including jurisdiction to issue any other Order necessary to administer the Estate or the Litigation Trust Estate and enforce the terms of this Plan, and/or the Litigation Trust Agreement pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

a.    To determine the type, allowance, and payment of any Claims upon any objections thereto (or other appropriate proceedings) by the Litigation Trustee or any other party-in-interest entitled to proceed in that manner;

b.    Except as otherwise limited herein, to recover all Assets of the Debtor and property of the Debtor's Estate, wherever located;

c.    To hear and determine any issue arising under this Plan;

d.    To hear and determine any issue that is in any way related to the Litigation Trust Estate of the Litigation Trustee;

e.    To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

f.    To hear any other matter not inconsistent with the Bankruptcy Code;

g.    To enter a final decree closing the Chapter 11 Case;

h.    To ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

i.    To decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on or instituted by or against the Litigation Trustee after the Effective Date;

j.    To issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

k.    To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure

-29-

Statement, including but not limited to the Litigation Trust Agreement, the Litigation Trust Estate, and the Litigation Trustee;

l.      To enforce, interpret, and determine any disputes arising in connection with any stipulations, Orders, the Sale Order, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

m.      To adjudicate any adversary proceeding or other proceeding that may be commenced by or on behalf of the Litigation Trust Estate against any Person or Entity arising from, related to, or in connection with (i) any Chapter 5 Action; (ii) the D&O Claims; (iii) the Tort Claims; (iv) the Fraud Claims; and (v) Claims against third parties relating to the facts and circumstances surrounding the same;

n.      To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

o.      To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the applicable Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim is discharged hereunder, or for any other purpose;

p.      If the APA created any obligations for the Purchaser to construct a new hospital or to operate certain functions or practice areas of the Hospital for a certain period of time, to hear and determine any attempts to enforce said obligations.

## B.      Consent to Jurisdiction

All Creditors who have filed Claims in the Chapter 11 Case shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for purposes of the Causes of Action.

## XI.

## RELEASES, EXCULPATIONS AND RELATED PROVISIONS

## A.      Term of Bankruptcy Injunction or Stay

All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Except as otherwise expressly provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate Order of the Bankruptcy Court, as of the Effective Date, all entities who have held, hold, or may hold Claims against the Debtor, are permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or taking any act to recover such Claim outside of the Claims allowance procedure discussed in this Plan and the Bankruptcy Code and Bankruptcy Rules; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or Order against the Debtor, the Litigation Trust or the Litigation Trustee on account

of any such Claim; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim. Such injunction shall extend for the benefit of the Litigation Trustee, and any successor, to any property and interests in property subject to this Plan.

**B.      Exculpation**

Except to the extent arising from willful misconduct or gross negligence, any and all Claims, liabilities, Causes of Action, rights, damages, costs, and obligations held by any party other than the United States of America against the Trustee and his attorneys, accountants, agents, and other Professionals, whether known or unknown, matured or contingent, liquidated or unliquidated, existing, arising, or accruing, whether or not yet due in any manner related to or in connection with (i) the Chapter 11 Case or any act or omission in connection with, arising out of, or related to the Chapter 11 Case; (ii) any act or omission in connection with, arising out of, or related to the Sale of the Assets; (iii) the formulation, negotiation, prosecution, or implementation of the Plan; (iv) the solicitation of acceptances of the Plan; or (v) the Confirmation, consummation, or implementation of the Plan, will be deemed fully waived, barred, enjoined, released, and discharged in all respects, except as to rights, obligations, duties, Claims, and responsibilities preserved, created, or established by terms of this Plan.

**C.      Limitation on Liability of Litigation Trustee**

The Litigation Trustee will not be liable for any act he may do or omit to do as Litigation Trustee under the Plan and the Litigation Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment; nor will the Litigation Trustee be liable in any event except for gross negligence, willful fraud, or willful misconduct. The foregoing limitation on liability also will apply to any Person (including any Litigation Trustee Professional) employed by the Litigation Trustee and acting on behalf of the Litigation Trustee in the fulfillment of their respective duties hereunder or under the Litigation Trust Agreement. Also, the Litigation Trustee and all Litigation Trustee Professionals shall be entitled to indemnification out of the Assets of the Litigation Trust against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or Claims that the Litigation Trustee may incur or sustain by reason of being or having been a Litigation Trustee of the Litigation Trust or for performing any functions incidental to such service; provided, however, that the foregoing shall not relieve the Litigation Trustee or the Litigation Trustee's Professionals from liability for bad faith, willful misfeasance, reckless disregard of duty, gross negligence, fraud, self-dealing, or breach of fiduciary duty.

The Litigation Trust is deemed to release each Person and Entity exculpated, or whose liability is limited, under this subsection from any liability arising from any act or omission occurring after the Petition Date and in connection with, relating to or arising out of the Chapter 11 Case, except as provided herein.

### D.    Releases by the Debtor

Pursuant to Section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Debtor and the consummation of the transactions contemplated by this Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor and its Estate from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's Chapter 11 Case, the Sale, the transactions or events giving rise to any Claim that is treated in this Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims before or during the Debtor's Chapter 11 Case, the negotiation, formulation, or preparation of this Plan, the Disclosure Statement, or any related agreements, instruments, or other documents, other than a Claim against a Released Party arising out of the gross negligence or willful misconduct of any such Person or Entity.

### E.    Releases by Holders of Claims

ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN AND EXCEPT FOR THE RIGHT TO ENFORCE THIS PLAN, ALL PERSONS WHO HAVE (I) (A) VOTED TO ACCEPT THIS PLAN OR WHO ARE PRESUMED OR DEEMED TO HAVE VOTED TO ACCEPT THIS PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE AND/OR (B) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND WHO VOTE TO REJECT THIS PLAN OR ABSTAIN FROM VOTING, AND (II) DO NOT MARK THEIR BALLOTS AS OPTING OUT OF THE RELEASES GRANTED UNDER THIS SECTION OR OTHERWISE OPT OUT OF THE RELEASES GRANTED UNDER THIS SECTION IN WRITING BY THE DEADLINE TO VOTE TO ACCEPT OR REJECT THIS PLAN, AS APPLICABLE, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE THE RELEASED PARTIES AND EACH OF THEIR RESPECTIVE CONSTITUENTS, PRINCIPALS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ATTORNEYS, PROFESSIONALS, ADVISORS, AFFILIATES, FUNDS, SUCCESSORS, PREDECESSORS, AND ASSIGNS, OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS, OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE DEBTOR, THE CHAPTER 11 CASE, OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO THE DEBTOR, AGAINST SUCCESSORS OR ASSIGNS OF THE DEBTOR AND THE INDIVIDUALS AND ENTITIES LISTED ABOVE WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT,

OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT, OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING, OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE DEBTOR, THE TRUSTEE, THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION OF THIS PLAN, THE NEGOTIATION AND CONSUMMATION OF THE SALE. THE CONSUMMATION OF THIS PLAN OR THE ADMINISTRATION OF THIS PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THIS PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM HAS VOTED TO ACCEPT OR REJECT THIS PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.   FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS PLAN.

**F.      Injunction**

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.

**G.      Nondischarge of the Debtor**

In accordance with Section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge Claims.  However, no Holder of a Claim may receive any payment from, or seek recourse against, any Assets that are to be distributed under the Plan other than Assets required to be distributed to that Holder pursuant to the Plan.  As of the Confirmation Date, all Persons are enjoined from asserting against any property that is to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

**H.      Termination and Discharge of the Patient Care Ombudsman.**

As of the Effective Date, the Patient Care Ombudsman appointed in the Chapter 11 Case shall be discharged and relieved from her duties and responsibilities as Patient Care Ombudsman. As of the Effective Date, any and all Professionals retained by the Patient Care Ombudsman pursuant to this Chapter 11 Case shall terminate representation of and service to the Patient Care Ombudsman. Neither the Patient Care Ombudsman nor the Patient Care Ombudsman's Professionals shall have any liability with respect to any act or omission, statement or representation arising out of, relating to, or involving in any way, the Patient Care Ombudsman's evaluations, her reports, or any pleadings or other writings filed by the Patient Care Ombudsman

in connection with the Chapter 11 Case other than acts or omissions involving or arising out of gross negligence or willful misconduct.  Prior to issuing or serving upon the Patient Care Ombudsman or the Patient Care Ombudsman's Professionals any formal or informal Discovery request, including, but not limited to, any subpoena, requests for production of documents, requests for admission, interrogatories, subpoena duces tecum, requests for testimony, or any other Discovery of any kind whatsoever in any way related to the Debtor, the Trustee, the Chapter 11 Case, the Patient Care Ombudsman's evaluations, or the Patient Care Ombudsman's reports (the **"Discovery"**), any Creditor or party in interest must first file an appropriate pleading with the Bankruptcy Court to request permission to initiate the Discovery.  The Patient Care Ombudsman and the Patient Care Ombudsman's Professionals are authorized to dispose of or destroy any documents provided by the Debtor, the Trustee, or any third parties to the Patient Care Ombudsman, if any, in the course of her evaluation, in accordance with their respective document retention policies or applicable law, if any.

**I.      Cancellation of Documents**

On the Effective Date, except to the extent otherwise provided in this Plan, any and all notes, instruments, debentures, certificates, and other documents evidencing Claims against the Debtor shall be deemed inoperative and unenforceable solely as against the Debtor and its Estate.

**J.      Effect of Plan on Released Claims and Liens**

Nothing contained in this Plan shall revive, preserve, or transfer any Claims or Liens that have been released pursuant to the Sale Order, the APA, or otherwise.

## XII.

## MISCELLANEOUS PROVISIONS

**A.      Conditions Precedent to the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing:

a.  the Confirmation Order, authorizing and directing that the Trustee take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan and the transactions contemplated thereby, including, without limitation, the transactions contemplated by the Litigation Trust Agreement, shall have been entered and become a Final Order;

b.  the Litigation Trust shall have been established; and

c.  all other actions, authorizations, consents and regulatory approvals required (if any) and necessary to implement the provisions of the Plan shall have been obtained, effected or executed in a manner acceptable to the Trustee or, if waivable, waived by the Person or Persons entitled to the benefit thereof, including but not limited to the Closing of the Sale.

### B.      Effect of Failure of Condition

If each condition to the Effective Date has not been satisfied or duly waived within thirty (30) days after the Confirmation Date, then (unless the period for satisfaction or waiver of conditions has been extended at the option of the Trustee for a period not exceeding sixty (60) days) upon motion by any party-in-interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties-in-interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Trustee before the Bankruptcy Court enters a Final Order granting such motion.  If the Confirmation Order is vacated pursuant to this Plan, the Plan shall be deemed null and void in all respects, and nothing contained herein shall (A) constitute a waiver or release of any Claims by or against the Trustee or (B) prejudice in any manner the rights of the Trustee.

### C.      Waiver of Conditions to the Effective Date

Upon notice and an Order of the Bankruptcy Court, the Trustee may waive any or all conditions to the Effective Date, in whole or in part.  In that event, the Trustee will be entitled to render any or all of his performance under the Plan prior to what otherwise would be the Effective Date if the above-referenced conditions were not waived, including, but not limited to, the right to perform under any circumstances which would moot any appeal, review, or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review, or other challenge. The failure to satisfy or to waive any condition may be asserted by the Trustee regardless of the circumstances giving rise to failure of such condition to be satisfied (including any action or inaction by the Trustee).  The failure of the Trustee to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each such right will be deemed an ongoing right that may be asserted at any time.

### D.      Modification of the Plan

The Plan and any exhibits thereto may be modified jointly by the Trustee, or the Litigation Trustee, as applicable, from time to time in accordance with Bankruptcy Code Section 1127 and Bankruptcy Rule 3019.  The Plan and any exhibits thereto may be modified at any time before the entry of the Confirmation Order pursuant to Section 1127(a) of the Bankruptcy Code; and after the entry of the Confirmation Order, the Trustee, or the Litigation Trustee, as applicable may, upon Order of the Bankruptcy Court, amend or modify the Plan and any exhibits thereto in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

Objections with respect to any amendments or modifications to the Plan (as and to the extent permitted hereby) filed after the deadline for objections to the Plan, as set by the Bankruptcy Court, may be brought at the Confirmation Hearing.  The Plan, and any modification or supplement thereof, may be inspected in the Office of the Clerk or its designee during normal business hours. Holders of Claims may obtain a copy of the Plan and any supplement or modification, if any, by contacting the Trustee at (336) 717-1440.  The documents annexed to the Disclosure Statement or

contained in any modification or supplement to the Plan or the Disclosure Statement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

### E.    Extension of Time

For cause shown, any deadlines herein that are applicable to the Trustee, the Litigation Trustee, or the Litigation Trust Estate and that are not otherwise extendable, may be extended by the Bankruptcy Court.

### F.    Post-Effective Date Notice List

Because certain Persons may not desire to continue to receive notices after the Effective Date, this Plan provides for the establishment of a Post-Effective Date Notice List. Persons on such Post-Effective Date Notice List will be given certain notices and in some cases an opportunity to object to certain matters under this Plan (as described herein). Any Person desiring to be included in the Post-Effective Date Notice List must (i) file a request to be included on the Post-Effective Date Notice List and include thereon its name, contact person, address, telephone number and facsimile number, within thirty (30) days after the Effective Date, and (ii) concurrently serve a copy of its request to be included on the Post-Effective Date Notice List on the Litigation Trustee and his counsel. On or before sixty (60) days after the Effective Date, the Litigation Trustee shall compile a list of all Persons on the Post-Effective Date Notice List and file such list with the Bankruptcy Court.

### G.    Revocation of Plan

The Trustee reserves the right to revoke or withdraw the Plan prior to the Effective Date and to jointly file subsequent plans of reorganization or liquidation. If the Plan is withdrawn or revoked, or if confirmation or the Effective Date of the Plan does not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or leases affected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, except as herein provided; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against the Debtor or any other Person, (b) prejudice in any manner the rights of the Trustee, the Debtor, or any other Person, or (c) constitute the admission of the Trustee, the Debtor, or any other Person.

### H.    Successors and Assigns

The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, and lawful successor or assign of such Person or Entity.

### I.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect until the Bankruptcy Court has entered the Confirmation Order. Neither the filing of the Plan, any statement or provision contained in the Plan, nor the Trustee's taking of any action with respect to the Plan

or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any of the Debtor's or Trustee's rights with respect to the Holders of Claims prior to the Effective Date.

**J.      Service of Documents**

Any pleading, notice, or other document required or permitted to be made in accordance with this Plan shall be made in writing and shall be delivered personally, by facsimile transmission, electronic mail or by first class U.S. mail, postage prepaid, as follows:

> Waldrep LLP
> Attn:   Thomas W. Waldrep, Jr.
>             Jennifer B. Lyday
>             James C. Lanik
> 101 S. Stratford Road, Suite 210
> Winston-Salem, NC 27104

**K.      Filing of Additional Documents and Notice of Effective Date**

On or before the Effective Date, the Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Litigation Trustee shall file a notice of the Effective Date as soon as practicable after the Effective Date and shall serve such notice on all parties that are entitled to notice under Bankruptcy Rule 2002.

**L.      Severability**

The provisions of the Plan shall not be severable unless the Trustee agrees to such severance and such severance would constitute a permissible modification of the Plan pursuant to Section 1127 of the Bankruptcy Code.

**M.      Entire Agreement**

The Plan, and any supplements or amendments hereto, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects (other than the Litigation Trust Agreement), all of which have become merged and integrated into the Plan.

**N.      Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of North Carolina, without giving effect to the principles of conflicts of law of such jurisdiction.

**O.      Closing of the Chapter 11 Case**

Consistent with the other terms of this Plan, the Litigation Trustee shall promptly, upon the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required

by Bankruptcy Rule 3022 and any applicable Order of the Bankruptcy Court to close the Chapter 11 Case.


Dated:  October 17, 2019

CAH ACQUISITION COMPANY #1, LLC d/b/a WASHINGTON COUNTY HOSPITAL

By: */s/ Thomas W. Waldrep, Jr.*
Name: Thomas W. Waldrep, Jr.
Title: Trustee for CAH Acquisition Company #1, LLC d/b/a Washington County Hospital

# EXHIBIT B – LIQUIDATION ANALYSIS

CAH #1 Washington County Hospital

*Grant Thornton LLP has relied upon information provided by hospital management and other parties with knowledge relevant to the case. Because the work we completed in providing these services constitutes neither an examination nor a compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA), we do not express an opinion on or offer any other assurances as to whether the prospective financial statements are presented in conformity with AICPA presentation guidelines or as to whether the underlying assumptions provide a reasonable basis for the prospective financial statements.  As with any prospective financial information, there will usually be differences between projected and actual results because events and circumstances frequently do not occur as expected, and those differences and related information may be material.*

Exhibit B - Liquidation Analysis

*$ in actuals*

|  | Note: | Total | Chapter 11 Liquidation | | Chapter 7 Liquidation | | | |
|  |  |  | Recovery | Total | Recovery | | Total | |
|  |  |  |  |  | Low | High | Low | High |
| **Assets for Distribution** |  |  |  |  |  |  |  |  |
| Cash as of 9/30/19 | (1) | 313,002 | 100% | 313,002 | 100% | 100% | 313,002 | 313,002 |
| Plus Estimated Receipts: |  |  |  |  |  |  |  |  |
| October 2019 Receipts | (2) | 761,300 | 100% | 761,300 | 75% | 75% | 570,975 | 570,975 |
| November 2019 Receipts | (3) | 1,124,800 | 100% | 1,124,800 | 75% | 75% | 843,600 | 843,600 |
| December 2019 Receipts | (4) | 1,160,700 | 100% | 1,160,700 | 75% | 75% | 870,525 | 870,525 |
| January 2020 Receipts | (5) | 1,160,700 | 100% | 1,160,700 | 75% | 75% | 870,525 | 870,525 |
| Less Estimated Disbursements: |  |  |  |  |  |  |  |  |
| October 2019 Disbursements | (6) | (856,886) | 100% | (856,886) | 100% | 100% | (856,886) | (856,886) |
| November 2019 Disbursements | (7) | (896,792) | 100% | (896,792) | 100% | 100% | (896,792) | (896,792) |
| December 2019 Disbursements | (8) | (863,756) | 100% | (863,756) | 100% | 100% | (863,756) | (863,756) |
| January 2020 Disbursements | (9) | (818,756) | 100% | (818,756) | 100% | 100% | (818,756) | (818,756) |
| Adjusted Cash |  | 1,084,312 |  | 1,084,312 |  |  | 32,437 | 32,437 |
| Accounts Receivable | (10) | 3,039,215 | 100% | 3,039,215 | 75% | 100% | 2,279,411 | 3,039,215 |
| Cost Report | (11) | (243,452) | 100% | (243,452) | 100% | 100% | (243,452) | (243,452) |
| Property, Plant & Equipment | (12) | 3,478,032 | 100% | 3,478,032 | 75% | 100% | 2,608,524 | 3,478,032 |
| **Total Est. Cash for Distribution prior to conversion to Ch. 7** |  | **7,358,107** |  | **7,358,107** |  |  | **4,676,921** | **6,306,232** |
|  |  |  |  |  |  |  |  |  |
| Less: Trustee Fees | (13) |  |  | (220,743) |  |  | (140,308) | (189,187) |
| Less: Estimated Post-Confirmation / Conversion Professional Fees | (14) |  |  | (120,000) |  |  | (240,000) | (180,000) |
|  |  |  |  |  |  |  |  |  |
| **Total Estimated Cash for Distribution** |  |  |  | **7,017,364** |  |  | **4,296,613** | **5,937,046** |

*See additional footnotes on Page 2*

1

**Notes:**

(1)  Reflects cash in Trustee-owned bank accounts as of end of day 9/30/2019.

(2)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 9/30/19 and ending the week beginning 10/28/2019.

(3)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 10/28/2019 and ending the week beginning 11/25/2019.

(4)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 11/25/19 and ending the week beginning 12/30/2019.

(5)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 12/30/19 and ending the week beginning 1/27/2020.

(6)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 9/30/19 and ending the week beginning 10/28/2019.

(7)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 10/28/2019 and ending the week beginning 11/25/2019.

(8)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 11/25/19 and ending the week beginning 12/30/2019.

(9)  Based upon estimates provided by management in cash flow forecast for the 4.5 week period beginning 12/30/19 and ending the week beginning 1/27/2020.

(10)  Estimation provided by management company, calculated as 28% PCR of gross AR as of 9/30/2019.

(11)  Outstanding cost report payable per data provided by Trustee to Sales Agent.

(12)  **Estimated as purchase value of land, building, and improvements, and 15% of equipment per latest available trial balance as of 4/30/2019. Thus, this is likely not a reliable indication of market value and actual results may be significantly different.**

(13)  Trustee fees estimated at 3%. Adjusments can be made at a later date based on actuals.

(14)  Estimated Professional Fees are higher under a Chapter 7 Liquidation to account for the loss of institutional knowledge amongst professionals following conversion.

2