**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-00730-5-JNC** |
| **CAH ACQUISITION COMPANY #1,** | ) | |
| **LLC d/b/a WASHINGTON COUNTY** | ) | **Chapter 11** |
| **HOSPITAL,** | ) | |
| | ) | |
| Debtor. | ) | |

**TRUSTEE'S MOTION FOR (I) AN ORDER (A) ESTABLISHING BIDDING
PROCEDURES, (B) APPROVING STALKING HORSE BIDDER, (C) APPROVING
FORM AND MANNER OF NOTICES, (D) SCHEDULING HEARING TO CONSIDER
FINAL APPROVAL OF SALE AND TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (E) GRANTING RELATED RELIEF; AND (II) AN
ORDER (A) APPROVING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS,
INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, AND (C) GRANTING RELATED RELIEF**

Thomas W. Waldrep, Jr., the duly appointed Chapter 11 Trustee (the "Trustee" or "Seller")

in the case of CAH Acquisition Company #1, LLC d/b/a Washington County Hospital (the

"Debtor"), hereby moves the Court, pursuant to Section 363(f), (m), and (n) and Section 365 of

the Bankruptcy Code and Rules 2002, 6004, 6006, 9006, and 9007 of the Federal Rules of

Bankruptcy Procedure for (i) an Order (a) establishing bidding procedures, (b) approving a stalking

horse bidder, (c) approving the form and manner of notices, (d) scheduling a hearing to consider

final approval of sale and treatment of executory contracts and unexpired leases, and (e) granting

related relief (the "Bidding Procedures Order"); and (ii) an Order (a) authorizing the private sale

of all real property and associated personal property of the Debtor, free and clear of all liens,

claims, interests, and encumbrances, with the same to attach to the sale proceeds in their relative

order of priority, but subject to objection, (b) authorizing the assumption and assignment of certain

1

executory contracts and unexpired leases, and (c) granting related relief (the "Sale Order").  In support hereof, the Trustee respectfully shows the Court and interested parties as follows:

### Jurisdiction and Venue

1.      On February 19, 2019 (the "Petition Date"), three creditors of the Debtor—Medline Industries, Inc.; Robert Venable, M.D.; and Washington County, North Carolina ("Washington County")—filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of North Carolina.  On March 15, 2019, this Court entered its Order converting the Debtor's case to a case under Chapter 11 of the Bankruptcy Code.

2.      The case is jointly administered along with six other critical access hospitals (collectively, the "Debtor Affiliates") under the Debtor's Chapter 11 Case.  On February 22. 2019, during the pendency of the Chapter 7 portion of the Debtor's case, the Trustee was appointed as interim trustee for the Debtor.  On March 15, 2019, upon conversion of the case, the Trustee was appointed as Chapter 11 Trustee for the Debtor pursuant to Section 1104 of the Bankruptcy Code.  No official committee of unsecured creditors was appointed in this case.

3.      This Court as jurisdiction over all matters set forth herein pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested are Sections 363 and 365 of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure.

### Case Background

4.      The Debtor is a Delaware limited liability company that owns a for-profit 25-bed hospital (the "Hospital") and Rural Health Clinic on a 20-acre campus located at 958 US Hwy 64

East, Plymouth, North Carolina (the "Hospital Real Property"). The Debtor purchased the Hospital from Washington County on June 1, 2007. The Hospital is classified a Critical-Access Hospital ("CAH") by the Centers for Medicare and Medicaid Services ("CMS"). Washington County maintains that it owns the real property on which the Hospital is located pursuant to an automatic reverter, but the Trustee disputes the position of Washington County. Accordingly, the issue of ownership of the Hospital Real Property is a bona fide dispute.

5.      The Hospital is situated in Washington County, North Carolina. The Hospital provides the following services: Emergency Room, Surgery, Radiology, Laboratory Services, Physical Rehabilitation, Acute Care, and Swing Beds. The Hospital also serves as the morgue for Washington and adjacent Tyrell Counties as well as a headquarters and helipad site for the local EMS authority. As of the submission of this Motion, the Hospital is open and operating.

6.      On September 23, 2019, the Trustee filed his *Motion to Employ Sherwood Partners, Inc. as Sales Agent to the Trustee* [Docket No. 433] (the "Sherwood Employment Motion"). The Sherwood Employment Motion was granted through a consent order entered on October 23, 2019 [Docket No. 498].

7.      Sherwood Partners, Inc. ("Sherwood") embarked on a marketing process for the Hospital and the hospitals owned by the Debtor Affiliates immediately upon its retention by the Trustee in September. A four-page brochure describing the properties and the terms of sale was created and sent as follows:

- To all parties previously identified by the Trustee.

- To 618 individuals at 409 companies known to Sherwood to be in the health care space via e-mail. Sherwood then contacted each party by phone.

- To 277 law firms known to work in this area via email.

- To 140 hospitals in the Oklahoma/Kansas area via U.S. mail.

- To 5,250 contacts of the National Rural Health Association.

8.      With assistance from the Trustee and the local management companies, Sherwood also assembled an online diligence room.  Additionally, a professional photographer was hired to photograph the interiors and exteriors of each property.

9.      As of October 31, 2019, Sherwood had received 38 executed non-disclosure agreements from interested parties.  Those parties were granted access to the online diligence room, introduced to the local management companies, and (if requested) attended tours of the properties from October 24, 2019 through October 30, 2019.  A form Asset Purchase Agreement was made available to all requesting parties.  After consultation with Sherwood, the Trustee set a deadline to present stalking horse bids for Monday November 4, 2019.

10.     On November 4, 2019, the Trustee selected Affinity Health Partners LLC as the stalking horse bidder (the "Stalking Horse Bidder"), which presented a bid in the amount of $3,500,000 for the Debtor's Transferred Assets (as defined below).  The Trustee has selected the Stalking Horse Bidder for the following reasons:

a.      The cash amount of the bid presents sufficient consideration;

b.      The Stalking Horse Bidder further commits to the expenditure of at least $1,065,000 over the next three years to benefit the Debtor's existing facility;

c.      The Stalking Horse Bidder will cooperate in addressing the outstanding potential reverter issue involving Washington County; and

d.      The Stalking Horse Bidder intends to construct a new hospital facility for the Debtor.

11.    A draft of a proposed asset purchase agreement (the "Sale Agreement") is attached hereto as Exhibit A.  The Trustee and the Stalking Horse Bidder are still negotiating the specific terms of the Sale Agreement, and the Trustee intends to file the final version of the Sale Agreement prior to the hearing on this Motion.

12.    The proposed Sale (defined below) of the Hospital is consistent with the terms of the *Amended Chapter 11 Plan of Orderly Liquidation* [Docket No. 480] (the "Plan"), filed by the Trustee on October 17, 2019, which provides for the disposition of substantially all the Debtor's assets through a sale under Section 363 of the Bankruptcy Code by public auction, coordinated by Sherwood and including the concurrent auction of the six other Debtor Affiliates, as defined in the Plan.

## Summary of Relief Requested

13.    Under the Sale Agreement, the Trustee has reserved the right to accept a higher or otherwise better bid to purchase the Transferred Assets (defined below) on and subject to the terms set forth in the Sale Agreement.  Accordingly, the Trustee hereby requests entry of the Bidding Procedures Order (i) approving of certain bidding procedures (the "Bidding Procedures") for additional bidding on the Transferred Assets (defined below) and the "stalking horse" bid protections set forth in the Bidding Procedures and the Sale Agreement, (ii) approving the form and manner of notice of the Sale Procedures and the Sale Agreement, and (iii) scheduling a final hearing to approve the sale of the Transferred Assets (defined below) to the Stalking Horse Bidder or the Successful Bidder (defined below) free and clear of all liens, claims, interests, and encumbrances under 11 U.S.C. § 363(f), including but not limited to (i) any successor liability associated with the Medicare/Medicaid Provider Agreements (the "CMS Agreements") between

the Hospital and CMS[1] and (ii) Washington County's alleged interest in the Hospital Real Property.[2]  The Bidding Procedures Order, attached hereto as <u>Exhibit B</u>, establishes the procedures by which parties may become qualified to participate at an auction for the Transferred Assets (defined below), schedules a hearing to approve the proposed sale to the highest or otherwise best bid received at the Auction (defined below), and establishes notice procedures related to the assumption and assignment of executory contracts and unexpired leases.

14.     In this Motion, the Debtor also seeks entry of the Sale Order approving a sale of the Transferred Assets (defined below) free and clear of all liens, claims, interests, and encumbrances, with such liens, claims, interests, and encumbrances attaching to the net proceeds of the sale.  The Sale Order provides that the sale of the Transferred Assets (defined below) shall include the assumption and assignment to the Stalking Horse Bidder or the Successful Bidder of all the unexpired leases and other executory contracts designated by the Stalking Horse Bidder or the Successful Bidder for acquisition (the "<u>Assumed Contracts</u>").

**<u>Relief Requested</u>**

**A.     The Sale Procedure, Form of Sale Agreement, and Form of Notice**

15.     The Trustee seeks approval of the following Bidding Procedures:

<u>**Assets to be Sold**</u>.  The Trustee shall have the right, consistent with the procedures set forth herein, to sell (the "<u>Sale</u>") substantially all of the assets of the Debtor's bankruptcy estate (the "<u>Transferred Assets</u>").  Certain assets of the Debtor's bankruptcy estate are not being sold as part of the proposed sale transaction; these excluded assets include cash, cash equivalents (including investments), restricted use assets, causes of action under Chapter 5 of the Bankruptcy Code, any claims or

---

[1] Recent decisions by bankruptcy courts have held that CMS Agreements are statutory entitlements, not "executory contracts" under Section 365 of the Bankruptcy Code.  Different from the assignee of an executory contract, the assignee of a statutory entitlement has no successor liability, and the debtor's liability under an entitlement program remains a claim against the debtor's bankruptcy estate.  Contemporaneously with the filing of this Motion, the Trustee is filing a brief in support of his position that the CMS Agreements are statutory entitlements and not executory contracts.

[2] The Trustee's brief in support of this Motion also explains in more detail why the Trustee may sell the Hospital free and clear of Washington County's alleged interest in the Hospital Real Property.

causes of action (other than claims or causes of action arising under any Assumed Contract), any amounts payable to the Debtor as a result of any underpayments to the Debtor based on any cost reports (including Medicare and Medicaid cost reports) for the periods prior to the closing of the Sale, any grants, payments, or subsidies payable to the Debtor relating to the Debtor's operations prior to the closing of the Sale, any insurance policies and the rights and proceeds thereunder, and any other assets that the Trustee may determine to exclude from the Sale.

**Summary of Important Dates.**[3]

| | |
|---|---|
| December 12, 2019, 5:00 p.m. Eastern Time | • Deadline for prospective bidders to submit Bids |
| December 16, 2019, 5:00 p.m. Eastern time | • Deadline for Trustee to file notice of Qualified Bidders |
| December 18, 2019 | • Deadline for Trustee to designate and communicate Starting Bid to Qualified Bidders |
| December 19, 2019, 10:00 a.m. Eastern Time | • Auction to be conducted at _____[4] |
| December 20, 2019[5] | • Deadline for Trustee to file notice of Successful Bidder and Next-Highest Bidder |
| December 23, 2019 | • Deadline to object to Sale and Cure Amount (if applicable) |
| December 27, 2019, 2:00 p.m. Eastern Time | • Sale Hearing, to be conducted at the U.S. Bankruptcy Court for the Eastern District of North Carolina [courtroom TBD] |

**Bid Protections.** Pursuant to the Sale Agreement, the Trustee agrees to pay a break-up fee equal to 4% of the cash purchase offer, or $140,000, if the Stalking Horse Bidder is not the Successful Bidder at the Auction (the "Break-Up Fee"). In addition, any overbid must offer a purchase price for the Transferred Assets that exceeds the purchase price offered by the Stalking Horse Bidder in its Sale Agreement by an amount greater than the Break-Up Fee plus $50,000.00.

**Bid Requirements.** All bids (each hereinafter, a "Bid") must (collectively, the "Bid Requirements"):

(a)     be accompanied by a letter:

---

[3] All terms used in the schedule below shall have the meanings ascribed to them in this Motion.
[4] The Auction location will be chosen prior to the hearing on this Motion.
[5] If the Auction continues past December 19, 2019, the notice of Successful Bidder and Next-Highest Bidder shall be filed one (1) business day after the conclusion of the Auction.

(i)    stating with specificity (i) the Transferred Assets (including the specific executory contracts and unexpired leases) contemplated in the Bid any person seeking to acquire any of the Transferred Assets (a "Potential Bidder") wishes to bid on, and (ii) the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(ii)    agreeing that the Potential Bidder's offer is binding and irrevocable until the earlier of (i) the Closing Date (as defined herein), or (ii) ten (10) days after the Sale Hearing (unless selected as the Next-Highest Bidder (as defined below)), in which case such offer will remain open until the Closing Date);

(iii)    providing evidence of committed financing or available capital sufficient to consummate the transaction and stating that such Bid is not subject to any due diligence or financing contingency;

(iv)    providing that the Potential Bidder agrees to serve as a backup bidder (the "Next-Highest Bidder") if the Potential Bidder's Qualified Bid (as defined below) is the next highest and best bid after the Successful Bid (as defined below) (the "Next-Highest Bid") with respect to the relevant Assets; and

(v)    be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), including (i) information about the Potential Bidder's financial statements and federal tax returns for two years, and bank account statements, (ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, (iv) the identity and exact legal name of the Potential Bidder (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale), including the legal name of the entity that the Potential Bidder intends to be the assignee of any leases that are included in the Bid, (v) a summary of the Potential Bidder's operational experience for hospitals and skilled nursing facilities if the Potential Bidder intends to operate the hospital or skilled nursing facility as such a facility, (vi) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Trustee may disseminate their Adequate Assurance Information to affected contract counterparties, and the Consultation Parties, among others, in the event that the Trustee determines such bid to be a Qualified Bid (as defined below); and

(b)    be accompanied by a duly executed purchase agreement substantially in the form of the Sale Agreement (a "Purchase Agreement").

The closing shall not be contingent in any way on the Successful Bidder's financing or such other evidence of ability to consummate the transaction(s) as the Trustee may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence, or credit committee approvals (provided that such commitments may have covenants and conditions acceptable to the Trustee).

**Qualified Bidders**.  Only Qualified Bidders may participate in the Auction (as defined below). To become a Qualified Bidder, a Potential Bidder must (i) execute and deliver to the Trustee a confidentiality agreement prepared by the Trustee, (ii) deposit with counsel for the Trustee ten percent (10%) of the Bid amount (the "Bidder's Deposit"), which deposit shall be refundable only as described below; (iii) submit to the Trustee an unqualified and binding bid that meets the Bid Requirements; (iv) describe the Potential Bidder's ability to obtain any regulatory approvals necessary to consummate the Sale sufficient to allow the Trustee, in consultation with the Bankruptcy Administrator and Washington County (the "County," and collectively with the Bankruptcy Administrator, the "Consultation Parties"), to make a reasonable determination as to the ability of such Potential Bidder to consummate a Sale as contemplated herein; and (v) if applicable, provide that the Potential Bidder, if successful, will accept assignment of the Debtor's Medicare and Medicaid provider agreements or will obtain its own within a timeframe acceptable to the Trustee in consultation with the Consultation Parties (each, a "Qualified Bid").  The Trustee shall timely provide copies of all Bids received to counsel to the Consultation Parties, and shall determine, in consultation with the Consultation Parties, which Bids, if any, constitute Qualified Bids.

The Trustee, in his business judgment, and in consultation with the Consultation Parties, reserves the right to reject any Bid if such Bid, among other things:

(a)    lacks adequate consideration for the assets being purchased;

(b)    requires any indemnification of the Potential Bidder in its Purchase Agreement;

(c)    is not received by the Bid Deadline (as defined below);

(d)    is subject to any contingencies (including representations, warranties, covenants and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Transferred Assets; or

(e)    does not, in the Trustee's determination (after consultation with the Consultation Parties), include a fair and adequate price, the acceptance of which would not be in the best interests of the Debtor's bankruptcy estate.

Any Bid rejected pursuant to the preceding paragraph shall not be deemed to be a Qualified Bid.

**Bid Deadline.**  Bids must be delivered to the Trustee, Thomas W. Waldrep, Jr., via email (twaldrep@waldrepllp.com) on or before **5:00 p.m. Eastern Time on December 12, 2019** (the "Bid Deadline").

**Notice of Qualified Bidders.**  On or before **5:00 p.m. Eastern Time on December 16, 2019**, the Trustee shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received without attaching copies of the accompanying letters outlined in III(a).  Also on or before 5:00 p.m. Eastern Time on December 16, 2019, the Trustee shall serve a copy of the notice and the corresponding bids without attaching the accompanying letters outlined above on all Qualified Bidders by (a) facsimile; (b) electronic mail; or (c) overnight delivery.

**Auction.**  If one or more timely Qualified Bids are received, an open auction (the "Auction") for the Transferred Assets will be conducted on **December 19, 2019, commencing at 10:00 a.m. Eastern Time,** or such other time as the Trustee may announce, at a location to be determined by the Trustee prior to the hearing upon this Motion.  Only Qualified Bidders may participate in the Auction.  The following parties shall be entitled to attend but not participate in the Auction (unless they are also a Qualified Bidder): (i) the Bankruptcy Administrator, (ii) the Consultation Parties and their respective professionals (including professionals for any member of such Consultation Party), and (iii) any creditor providing written notice to Trustee's counsel of their intention to attend and observe the Auction on or before the Bid Deadline.

Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the bidding process, and (b) its Qualified Bid is a good faith, bona fide offer that it intends to consummate if selected as the Successful Bidder (as defined below).

The Trustee will conduct the Auction and shall determine, after consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for the Transferred Assets (the "Starting Bid"), which determination will be communicated to Qualified Bidders on or before **December 18, 2019**.

Bidding at the Auction for the Transferred Assets that are subject to Qualified Bids will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid and (ii) the Trustee reasonably determines, in consultation with the Consultation Parties, is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below) (a "Subsequent Bid").  Each Subsequent Bid at the Auction shall provide net value to the estate in a minimum amount to be announced at or prior the Auction ("Incremental Overbid") over the Starting Bid or the Leading Bid (as defined below), as the case may be, as determined by the Trustee in the exercise of his reasonable business judgment and in consultation with the Consultation Parties.  After the first round of bidding and between each subsequent round of bidding, the Trustee shall announce the bid that he believes to be the highest or otherwise best offer for the Transferred Assets (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Starting Bid or Leading Bid, as applicable, subject to the Trustee's authority to revise the Auction procedures as set forth below.  Qualified Bidders may not pass or otherwise decline to bid in any round of bidding without forfeiting their standing in the Auction. The Auction will not be concluded until the Further Bidding (described below) is concluded.

All Qualified Bidders must be physically present at the Auction. Authorized representatives of such Qualified Bidders, with prior consent of the Consultation Parties, may be physically present or present via teleconference at the Auction.

The Trustee may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the maximum amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids, or other rules to facilitate the Auction) for conducting the Auction or otherwise modify these Bid Procedures; provided that such rules (1) are not materially inconsistent with the Bankruptcy Code or any Order of the Bankruptcy Court, and (2) are disclosed to each Qualified Bidder during the Auction. The bidding at the Auction shall be transcribed or videotaped, and the Trustee shall maintain a transcript of all Bids made and announced at the Auction.

Notwithstanding anything to the contrary herein, the Trustee, in consultation with its professionals and in consultation with the Consultation Parties, may conduct the Auction in any manner that may result in one or more of the highest or best offers for the Transferred Assets that will maximize the value of any of the Transferred Assets. Further, the Trustee, in consultation with the Consultation Parties, reserves the right to decline any or all the Bids received at auction as insufficient to proceed with a sale of the Transferred Assets or otherwise unacceptable.

All Potential and Qualified Bidders at the Auction will be deemed to have consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale, and the construction and enforcement of any Purchase Agreement and all other agreements entered into in connection with any proposed Sale transaction. Further, by participating in the bidding process, all Potential Bidders will be deemed to have waived any right to seek a claim for substantial contribution pursuant to Section 503 of the Bankruptcy Code or the payment of any fees or costs, including, but not limited to, any break-up, termination or similar fee. Except as otherwise ordered by this Court, there shall be no payment of any broker fees or costs in connection with the Sale.

**Further Bidding with Other Hospitals.** Immediately after the completion of (a) the Auction and (b) the auctions of other individual CAH hospitals, as identified in the Plan (the "Other Hospitals"), the Trustee will give certain Qualified Bidders the opportunity to group two or more hospitals for further bidding ("Further Bidding"). Only Qualified Bidders who are qualified to bid on each of the hospitals for which they want to bid will be eligible for Further Bidding. For purposes of Further Bidding, the minimum bidding increment for any group of two or more hospitals shall be one percent (1%) more than the sum of the highest bid of each individual hospital that comprises the group that is to be bid upon. Further Bidding on the grouped hospitals will be allowed until a best bid is reached for the grouped hospitals. This process will continue until no further groupings are requested by Qualified Bidders.

**Selection of the Successful Bid.** Immediately prior to the conclusion of the Auction and the Further Bidding, the Trustee, in consultation with the Consultation Parties will, for the Transferred Assets that were subject to the Auction: (a) determine, consistent with these bid procedures, which bid constitutes the highest or otherwise best bid (the "Successful Bid"); and (b) notify all Qualified Bidders at the Auction for the subject Assets, prior to its conclusion, of the name of the party submitting the Successful Bid (the "Successful Bidder") with respect to the subject Transferred

11

Assets, and the amount and other material terms of the Successful Bid.  The Trustee may, in its discretion after consultation with the Consultation Parties, designate the Next-Highest Bidder (and the corresponding Next-Highest Bid) to close with respect to the Transferred Assets in the event that the Successful Bidder does not close the Sale. Unless the Bankruptcy Court orders otherwise upon application by the Trustee, the Trustee shall not consider any Bids or Subsequent Bids submitted after the conclusion of the Auction and any and all such Bids and Subsequent Bids shall be deemed untimely and shall not constitute Qualified Bids.

The Trustee may seek approval of any Successful Bid and any Next-Highest Bid at the Sale Hearing (defined below).  If, for any reason, the Qualified Bidder submitting the Successful Bid fails to timely consummate the purchase of the Transferred Assets, the Trustee may seek to consummate the Sale based on the Next-Highest Bid without further approval by the Court.  The Next-Highest Bid and the obligation of the party submitting such bid to consummate the purchase of the Transferred Assets shall remain open and in full force, including with respect to the Bidder's Deposit, until the close of a Sale of the Transferred Assets to the party making the Successful Bid or the party making the Next-Highest Bid.

The Trustee's presentation to the Bankruptcy Court for approval of a selected Bid as a Successful Bid does not constitute the Trustee's acceptance of such Bid.  The Trustee will have accepted the Successful Bid only when such Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing.  The Trustee intends to close the Sale(s) within thirty (30) days after the Sale(s) is approved by the Bankruptcy Court, unless another time or date, or both, are agreed to in writing by the Trustee and the Successful Bidder (the "Closing Date"), or upon direction from the Bankruptcy Court.

**Notice of Successful Bid and Next-Highest Bid.**  On **December 20, 2019**, the Trustee shall file a notice with the Court identifying the Successful Bidder and the Next-Highest Bidder.  If the Auction continues past December 19, 2019, the notice shall be filed one (1) business day after the conclusion of the Auction.

**Sale Hearing.**  A hearing to approve a sale based on the Successful Bid (the "Sale Hearing") shall take place on **December 27, 2019, at 2:00 p.m. Eastern Time** in the United States Bankruptcy Court, Greenville, North Carolina.  The Sale Hearing may be adjourned by the Trustee in consultation with the Consultation Parties from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice on the docket of the Debtor's Chapter 11 case.

**Objections to Sale.**  All objections to the proposed Sale must be filed on or before **December 23, 2019**.  All rights of Consultation Parties to object to the proposed Sale, including under Section 363(f) of the Bankruptcy Code, are preserved.

**Return of Deposits.**  Within three business days after the conclusion of the Auction described above, the Trustee shall return by check or wire the full amount of the Bidder's Deposit submitted by each party that is not selected as submitting the Successful Bid or the Next-Highest Bid.  If the Sale of the Transferred Assets is consummated with the party submitting the Successful Bid, the Bidder's Deposit of the party that is declared to have submitted the Next-Highest Bid shall be returned by check or wire transfer within three (3) business days after the closing of the Sale to the

party submitting the Successful Bid.  If the party submitting the Successful Bid fails to consummate the Sale of Transferred Assets, the deposit of the party submitting the Successful Bid will not be returned and will be retained by the Trustee as liquidated damages.

**Notice of Bid Procedures, Auction, and Sale Hearing.**  On the next business day following the entry of the Bidding Procedures Order, the Trustee will serve by first-class mail a copy of the Bidding Procedures Order and a notice containing the date of the Auction, the Sale Hearing, and the deadline to file objections to the Sale, substantially in the form attached hereto as Exhibit C to: (i) all potential purchasers previously identified or solicited by the Trustee and its professionals; (ii) the Office of the Bankruptcy Administrator; (iii) all parties that are known to possess or assert a lien, claim, encumbrance, or interest in or upon any of the Transferred Assets; (iv) all applicable United States, state, and local regulatory or taxing authorities, recording offices, or any governmental entity that have a reasonably known interest in the Transferred Assets; and (v) all parties on the most current master service list filed in this case.  Such notice shall be sufficient and proper notice of the sale with respect to known interested parties.

**Reservation of Rights and Modifications.**  Notwithstanding any of the foregoing, the Trustee, in consultation with the Consultation Parties, reserves the right to modify these Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Qualified Bid requirements), impose additional terms and conditions with respect to any or all potential bidders, adjourn or cancel or change the location of the Auction at or prior to the Auction, and adjourn the Sale Hearing.

16.    The Bid Procedures are designed to maximize value for the Debtor's estate, while ensuring an orderly sale process.  The Bid Procedures are transparent and represent a fair balance of the competing issues present in this case.

**B.    Notice Relating to Potential Assumption/Assignment of Executory Contracts and Unexpired Leases**

17.    As part of the Sale, the Trustee seeks authority to assume and assign the Assumed Contracts to the Successful Bidder.

18.    With respect to the Assumed Contracts, no later than one business day after entry of the Bidding Procedures Order, the Trustee will file with the Court and serve on each party to an Assumed Contract a notice setting forth the amount of cure owed thereunder according to the Debtor's books and records (the "Cure Notice").  The Cure Notice shall state the cure amount that the Trustee believes is necessary to assume such contract or lease pursuant to Section 365 of the

Bankruptcy Code (the "Cure Amount"), and notify each party that such party's lease or contract may be assumed and assigned to the Successful Bidder to be identified at the conclusion of the Auction.

19.    Any objection to the Cure Amount must be filed on or before December 23, 2019 (the "Cure Objection Deadline").  Any objection to the Cure Amount must state with specificity what cure the party to the Assumed Contract believes is required with appropriate documentation in support thereof.  If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assumed Contract or other document as of the date of the Cure Notice; the non-debtor party to the Assumed Contract shall be deemed to have stipulated that the Cure Amount set forth in the Cure Notice is correct; the non-debtor party shall be forever barred, estopped, and enjoined from asserting or claiming that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Contract, or that there is any objection or defense to the assumption and assignment of such Assumed Contract, including any argument that there exist conditions to assumption and assignment that must be satisfied under such Assumed Contract or that any required consent to assignment has not been given.

## C.    The Bid Protections

20.    The Trustee believes that the Break-Up Fee set forth above is reasonable and well within the normal practices in this Court.  The Break-Up Fee represents 4% of the proposed cash purchase price of the Stalking Horse Bidder, or $140,000.00.  Because the Bidding Procedures require any potentially higher or otherwise better offer to exceed such purchase price by an amount to include initially, the Break-Up Fee plus an additional $50,000.00, the Trustee is assured that there will be funds to pay the Break-Up Fee if the Stalking Horse Bidder is not approved as the

highest and best offer. Nonetheless, the payment of the Break-Up Fee shall have priority as an administrative expense of the Debtor's Chapter 11 estate under Section 503(b)(1) of the Bankruptcy Code.

21. The bid protections were a material inducement for, and a condition of the Stalking Horse Bidder's decision to enter into the Sale Agreement. They are fair and reasonable in view of the fact that as a result of the competitive sale process already undertaken by the Trustee and Sherwood Partners, the Trustee now has an offer that will realize for the Debtor's bankruptcy estate the full going concern value of the Transferred Assets. Additionally, the bid protections provide the Trustee with the opportunity to solicit and accept superior offers for those assets in accordance with the proposed Bidding Procedures. Accordingly, the Trustee believes that the bid protections have increased the likelihood that the estate will receive the highest or otherwise best offer for the Transferred Assets, to the benefit of the Debtor's bankruptcy estate, its creditors, and all other parties in interest.

**D.      Request to Approve Sale Free and Clear Pursuant to 11 U.S.C. § 363(f)**

22. By this Motion, the Trustee also requests that the Court approve the Sale of the Transferred Assets to the Stalking Horse Bidder or the party submitting the Best Bid free and clear of all liens, claims, interests, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code. This portion of the relief is requested to be entered after the Sale Hearing, pursuant to a form of Sale Order to be filed prior to the Sale Hearing. The Debtor submits that the Sale of the Transferred Assets is in the Debtor's best interests and should be approved.

23. A debtor or trustee is authorized to sell assets out of the ordinary course of business pursuant to Section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so. See, e.g., In re Gucci, 126

F.3d 380, 387 (2nd Cir. 1997); <u>Stephens Industries, Inc. v. McClung</u>, 789 F.2d 386, 389, 390 (6th Cir. 1986); <u>In re Continental Air Lines, Inc.</u>, 780 F.2d 1223, 1226 (5th Cir. 1986); <u>Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063 (2d Cir. 1983); <u>In re W. A. Mallory Company, Inc.</u>, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); <u>In re Taylor</u>, 198 B.R. 142, 157 (Bankr. D. S.C. 1996); <u>In re Lady H Coal Company, Inc.</u>, 193 B.R. 233, 243 (Bankr. S.D. W. Va. 1996); <u>In re WBQ Partnership</u>, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); <u>In re Naron & Wagner, Chartered</u>, 88 B.R. 85, 87-88 (Bankr. D. Md. 1988); <u>see also</u> <u>In re Gulf Oil Corp.</u>, 404 B.R. 407 (Bankr. S.D. Tex. 2009).  Factors considered in approving a sale outside of plan include (i) the business justification, (ii) the amount of elapsed time since the filing date, (iii) whether the proposed bid procedures and APA facilitate competitive bidding, (iv) whether the assets have been aggressively marketed, (v) the likelihood that a plan will be confirmed in the near future, (vi) the effect of disposition on the future plan, and (vii) whether the assets are increasing or decreasing in value.  404 B.R. at 422-27.

24.      The business justification for the proposed Sale is simple.  The Debtor has been operating at a loss since it reopened in May 2019.  The Debtor's cash flow projections demonstrate that it cannot operate any longer on projected cash from revenues.  A Sale on the timeline requested herein is also appropriate because the Transferred Assets have been marketed extensively since early September 2019.  Additional time will not increase the likelihood that the Transferred Assets will be sold for a higher price.

25.      Furthermore, the Trustee maintains that one of the five subsections of Section 363(f) will be satisfied, and therefore, the Trustee may sell the Transferred Assets free and clear of all liens, claims, interests, and encumbrances.  Specifically, the Trustee submits that any such lien, claim, or encumbrance will be adequately protected by attachment to the net proceeds of the

16

Sale, subject to any claims and defenses that the Trustee may possess with respect thereto and/or the Trustee will obtain the consent of the party holding the lien, claim, or encumbrance. Accordingly, the Trustee requests that the Transferred Assets be sold to the party submitting the Best Bid free and clear of all liens, claims, interests, and encumbrances, with such liens, claims, interests, and encumbrances attaching to the proceeds of the Sale of the Transferred Assets.

E.    **Authorization of Assumption and Assignment of Executory Contracts and Unexpired Leases**

26.    To enhance the value to the Debtor's bankruptcy estate of the proposed Sale, the Trustee requests approval under Section 365 of the Bankruptcy Code of the Trustee's assumption and assignment of the Assumed Contracts to the party submitting the Best Bid. The Trustee further requests that the Sale Order provide that the Assumed Contracts will be transferred to, and remain in full force and effect for the benefit of the party submitting the Best Bid notwithstanding any provisions in the Assumed Contracts, including those described in Sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

27.    Adequate assurance of future performance depends on the facts and circumstances of each case but should be given a "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Rachels Indus., Inc., 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance was

present when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

28.    The Trustee will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the successful bidder to perform under the Assumed Executory Contracts.  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the successful bidder to provide adequate assurance of future performance under the Assumed Executory Contracts, as required under Section 365(b)(1)(C) of the Bankruptcy Code.  Further, as set forth above, the Trustee will give notice to all parties to the Assumed Contracts of what the Debtor believes are the Cure Amounts.  Accordingly, the Court should authorize the Trustee to assume and assign the Assumed Contracts to the successful bidder.

**F.    Waiver of Bankruptcy Rules 6004(h) and 6006(d)**

29.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise."  Here, an expeditious closing of the Sale is necessary and appropriate to maximize value for the estate.  Accordingly, the Trustee requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

WHEREFORE, the Trustee respectfully requests that the Court (i) enter the Bidding Procedures Order; (ii) schedule the Sale Hearing to consider the Sale Order; and (iii) grant the Debtor such other relief as the Court may deem necessary and proper.

Respectfully submitted, this the 6th day of November, 2019.

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

*Attorneys for the Trustee*

# EXHIBIT A

Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**THOMAS W. WALDREP, JR., AS CHAPTER 11 TRUSTEE FOR CAH ACQUISITION COMPANY #1, LLC d/b/a WASHINGTON COUNTY HOSPITAL**

(AS SELLER)

**AND**

**AFFINITY HEALTH PARTNERS LLC**

**or Appointed Entity**

(AS PURCHASER)

**Dated as of November 4, 2019**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................ 2

    1.1    Certain Definitions.............................................................................................. 2

    1.2    Other Definitional and Interpretive Matters ..................................................... 9

ARTICLE II PURCHASE AND SALE OF ASSETS ...................................................... 10

    2.1    Sale of Assets .................................................................................................. 10

    2.2    Purchase of Assets .......................................................................................... 10

    2.3    Excluded Liabilities ........................................................................................ 10

    2.4    Excluded Assets .............................................................................................. 11

    2.5    Nonassignable Assets ...................................................................................... 11

    2.6    Method of Conveyance ................................................................................... 11

    2.7    Assumed Contracts ......................................................................................... 12

    2.8    Assumption of Liabilities................................................................................ 12

    2.9    Taxes and Assessments ................................................................................... 13

    2.10    Intentionally Deleted....................................................................................... 13

    2.11    Purchaser's Deposit ........................................................................................ 13

    2.12    Purchase Price ................................................................................................. 13

    2.13    Bankruptcy Court Approval............................................................................. 14

    2.14    Closing ............................................................................................................ 15

    2.15    Medicare and Medicaid Provider Agreements ............................................... 15

    2.16    Closing Payments............................................................................................ 16

    2.17    Closing Deliveries of Seller ............................................................................ 16

    2.18    Closing Deliveries of Purchaser ..................................................................... 16

    2.19    Intentionally Deleted....................................................................................... 17

    2.20    Further Conveyances and Assumptions.......................................................... 17

    2.21    Right to Pay Off Monetary Liens.................................................................... 17

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ............................... 18

    3.1    Power of Seller................................................................................................. 18

    3.2    Validity and Enforceability of Agreement...................................................... 18

    3.3    Consents; Waivers and Approvals .................................................................. 18

    3.4    No Conflict....................................................................................................... 18

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 3.5 | Rights to Acquire Assets | 18 |
| 3.6 | Title to and Adequacy of the Assets | 18 |
| 3.7 | Intentionally Deleted | 19 |
| 3.8 | Existing Medicare and Medicaid Provider Agreements | 19 |
| 3.9 | Intentionally Deleted | 19 |
| 3.10 | Intentionally Deleted | 19 |
| 3.11 | Intentionally Deleted | 19 |
| 3.12 | Intentionally Deleted | 19 |
| 3.13 | Intentionally Deleted | 19 |
| 3.14 | Compliance with Laws; Permits | 19 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 20 |
| 4.1 | Corporate Existence of Purchaser | 20 |
| 4.2 | Validity and Enforceability of Agreement | 20 |
| 4.3 | Authorization and Authority | 20 |
| 4.4 | No Conflict | 20 |
| 4.5 | Ability to Consummate Transaction | 20 |
| 4.6 | Solvency | 20 |
| 4.7 | Litigation and Arbitration | 21 |
| 4.8 | Brokers and Intermediaries | 21 |
| ARTICLE V | CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER | 21 |
| 5.1 | Access and Information | 21 |
| 5.2 | Authorizations | 23 |
| 5.3 | Conduct of Business | 23 |
| 5.4 | Commercially Reasonable Efforts | 25 |
| 5.5 | Adequacy of Purchaser's Review | 25 |
| 5.6 | Intentionally Deleted | 25 |
| 5.7 | Tax Matters | 25 |
| 5.8 | Announcement | 26 |
| 5.9 | Post-Closing Business Operations Commitment | 26 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 5.10 | Risk of Loss; Casualty Loss | 26 |
| 5.11 | Bankruptcy Actions | 27 |
| 5.12 | Intentionally Deleted | 27 |
| 5.13 | DISCLAIMERS | 27 |
| 5.14 | Further Assurances | 27 |
| 5.15 | Confidentiality | 28 |
| 5.16 | Acceptance and Discharge | 29 |
| 5.17 | Cooperation | 29 |
| 5.18 | Surrender of License | 30 |
| 5.19 | Removal of Certain Liens | 30 |
| 5.20 | Insurance | 30 |
| 5.21 | Final Cost Report | 30 |
| ARTICLE VI | CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS | 30 |
| 6.1 | Entry of the Sale Order | 30 |
| 6.2 | No Injunctions | 31 |
| 6.3 | Compliance with Applicable Law | 31 |
| 6.4 | Consents | 31 |
| 6.5 | Intentionally Deleted | 31 |
| ARTICLE VII | CONDITIONS TO PURCHASER'S OBLIGATIONS | 31 |
| 7.1 | Representations and Warranties of Seller | 31 |
| 7.2 | Schedules | 31 |
| 7.3 | Documents | 31 |
| 7.4 | Performance of Obligations | 32 |
| 7.5 | No Changes to Business | 32 |
| 7.6 | Intentionally Deleted | 32 |
| 7.7 | Release of Liens | 32 |
| 7.8 | Consents | 32 |
| 7.9 | Intentionally Deleted | 32 |
| 7.10 | Intentionally Deleted | 32 |

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE VIII CONDITIONS TO SELLER'S OBLIGATIONS ............................................. 32

    8.1    Representations and Warranties of Purchaser ...................................... 32

    8.2    Performance of this Agreement ........................................................... 32

    8.3    Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts ............................................................................................. 33

    8.4    Documents ........................................................................................... 33

ARTICLE IX SURVIVAL ............................................................................................... 33

    9.1    Survival ................................................................................................ 33

ARTICLE X LIMITED AGREEMENT TERMINATION RIGHTS ....................................... 33

    10.1    Termination of Agreement .................................................................. 33

    10.2    Procedure for Termination ................................................................. 34

    10.3    Effects of Termination ....................................................................... 34

ARTICLE XI MISCELLANEOUS ................................................................................... 34

    11.1    Assignment; Binding Agreement ....................................................... 34

    11.2    Post-Closing Cooperation .................................................................. 35

    11.3    Expenses ............................................................................................ 35

    11.4    Entire Agreement and Modification ................................................... 35

    11.5    Severability ........................................................................................ 35

    11.6    Waiver ................................................................................................ 35

    11.7    Counterparts ....................................................................................... 36

    11.8    Headings; Interpretation ..................................................................... 36

    11.9    Governing Law ................................................................................... 36

    11.10    Bankruptcy Court Jurisdiction .......................................................... 36

    11.11    Notices ............................................................................................... 36

    11.12    Effectiveness ...................................................................................... 37

    11.13    No Third Party Beneficiaries ............................................................. 37

-iv-

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is made as of the 4th day of November, 2019, by and between Thomas W. Waldrep, Jr., as Chapter 11 Trustee ("Seller" or "Trustee") for CAH Acquisition Company #1, LLC d/b/a Washington County Hospital ("Debtor") and Affinity Health Partners LLC or Appointed Entity ("Purchaser").

## WITNESSETH:

WHEREAS, on February 19, 2019 (the "Petition Date"), three creditors of the Debtor—Medline Industries, Inc.; Robert Venable, M.D.; and Washington County, North Carolina ("Washington County")—filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of North Carolina.  On March 15, 2019, this Court entered its Order converting the Debtor's case to a case under Chapter 11 of the Bankruptcy Code;

WHEREAS, the Debtor is a Delaware limited liability company that owns a for-profit 25-bed hospital and Rural Health Clinic (the "Hospital") on a 20-acre campus located at 958 US Hwy 64 East, Plymouth, North Carolina.  The Debtor purchased the Hospital from Washington County on June 1, 2007.  The Hospital is classified a Critical-Access Hospital ("CAH") by the Centers for Medicare and Medicaid Services ("CMS");

WHEREAS, Washington County maintains that it owns the real property on which the Hospital is located pursuant to an automatic reverter, but the Trustee disputes the position of Washington County.

WHEREAS, Debtor presently owns and operates the Hospital, provides hospital services and other health care programs and services at the Hospital, operates the Business, and owns the Assets;

WHEREAS, Seller desires to sell to Purchaser all right, title, and interest of Seller and Debtor's bankruptcy estate in, to, and under the Assets and to assign to Purchaser the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser desires to purchase from Seller all right, title, and interest of Seller and Debtor's bankruptcy estate in, to, and under the Assets and to assume the Assumed Contracts, on the terms and conditions set forth in this Agreement, pursuant to Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1

# ARTICLE I
## DEFINITIONS

1.1    **Certain Definitions**.  For purposes of this Agreement, defined terms used herein have the meanings specified in this Section 1.1.

"Action" means any suit, action, Claim, hearing, administrative action, demand, demand letter, Governmental investigation, notice of violation, or proceeding arising out of any violation or alleged violation of any Law or any breach or alleged breach of any Contract or Order.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person referred to. In this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract, or otherwise.

"Agreement" means this Agreement, as hereafter amended, supplemented, or otherwise modified.

"Assessed Cost Report Liability" means the aggregate liability as finally determined and assessed by any Healthcare Program arising from any Cost Reports ending prior to the Effective Time.

"Assets" has the meaning ascribed to it in Section 2.1 herein, provided that (whether or not expressly stated) for all purposes of this Agreement, Assets always exclude Excluded Assets.

"Assignment of Lease" has the meaning ascribed to it in Section 2.6.

"Assumed Contracts" has the meaning ascribed to in Section 2.7.

"Assumed Liabilities" has the meaning ascribed to it in Section 2.8(a).

"Authorizations" means all Healthcare Regulatory Consents, Permits, licenses, certificates, grants, or other authorizations of Governmental Authorities.

"Bankruptcy Case" means the case under Chapter 11 of the Bankruptcy Code, styled, *CAH Acquisition #1, LLC, d/b/a Washington County Hospital*, Case No. 19-00730-5-JNC, pending before the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code Section 101, et seq. (11 U.S.C. § 101, *et seq.*).

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of North Carolina and, to the extent of the withdrawal of any reference made pursuant to 28 U.S.C. § 157, the United States District Court for the Eastern District of North Carolina with jurisdiction over the Bankruptcy Case.

2

"Bill of Sale" has the meaning ascribed to it in Section 2.6.

"Billing Services" has the meaning ascribed to it in Section 2.15.

"Books and Records" includes, without limitation, books, ledgers, files, reports, records, inventory data, accounts receivable records, accounts payable records, vendor lists, financing records, personnel and payroll records and other business books and records (including without limitation documents), regardless of the form of and the medium on which such books and records are maintained.

"Business" means the Hospital, the services and programs provided thereat, and the outpatient, ancillary, and other healthcare businesses incident to the operation of the Hospital.

"Business Day" means any day of the year, other than Saturday or Sunday, on which national banking institutions in North Carolina are open to the public for conducting business and are not permitted, required, or authorized to close.

"Business Confidential Information" has the meaning ascribed to it in Section 5.15(b).

"Business Records" has the meaning ascribed to it in Section 5.1(e).

"Casualty" has the meaning ascribed to it in Section 5.10.

"Claims" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, any and all deeds of trust, Liens, mortgages, assessments, security interests, encumbrances, claims, defenses, demands, damages, causes of action, offset rights, setoff rights, recoupment rights, interests, debts, obligations, guaranties, options, commitments, product liability claims (relating to all products sold or produced prior to the Closing), warranty claims, claims of employees or former employees or their beneficiaries or dependents, including but not limited to, severance or termination payments, pension or employee benefit claims, Taxes, all tort or contractual claims and any claims or obligations arising from Environmental Law, whether absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, known or unknown, in law or in equity, including, without limitation, any claims predicated upon any theory of successor liability or any similar theory, and all Liabilities or guaranties of any kind or nature, arising from or in any way connected with any action or inaction of Seller, arising prior to the Closing Date but excluding the Permitted Encumbrances.

"CLIA" means Clinical Laboratory Improvement Amendments (CLIA) of 1988, which are United States federal regulatory standards that apply to all clinical laboratory testing performed on humans in the United States.

"Closing" means the consummation of the transactions contemplated by this Agreement.

"Closing Date" means such date following the satisfaction of each Party's conditions to Closing or, where permitted, waiver by each Party of the other Party's conditions to Closing as set forth in Articles VI, VII and VIII to this Agreement, as shall be selected by the

3

Parties, but in no event later than January 31, 2020, or such later date, as may be required to obtain Authorizations, or as the Parties may in writing agree; provided that if the Closing shall not have occurred by such outside date and this Agreement shall not have been terminated in accordance with its terms by Purchaser based on an uncured material breach hereunder by Seller, then Seller shall have the right to extend the outside closing date for an additional sixty (60) days.

"CMS" means the Centers for Medicare & Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, agreement, arrangement, understanding, lease, indenture, note, bond, evidence of indebtedness, license, sublicense, undertaking, binding commitment or instrument, or purchase order entered into or made by or on behalf of Debtor in connection with the Business.

"Cost Reports" means all cost and other reports filed pursuant to the requirements of Healthcare Programs for payment or reimbursement of amounts due from such programs for services provided.

"Court" means any court, administrative or regulatory body, Government agency, arbitration or mediation panel or similar body.

"Cure Payments" means the amounts necessary to cure defaults, if any, under each Assumed Contract.

"Data Room" has the meaning ascribed to it in Section 1.2(a)(viii) herein.

"Debtor" means CAH Acquisition Company #1, LLC, d/b/a Washington County Hospital.

"Deed" has the meaning ascribed to it in Section 2.6.

"Deposit" has the meaning ascribed to the term "Bidder's Deposit" in the Order (A) Establishing Bidding Procedures, (B) Approving Stalking Horse Bidder, (C) Approving Form and Manner of Notices, (D) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases and, (E) Granting Related Relief entered on [Date] [Docket No. ___].

"DMA" has the meaning ascribed to it in Section 2.15.

"Dispute" has the meaning ascribed to it in Section 11.10(a)

"Effective Time" means the effective time of the Closing, which shall be as of 12:00:01 a.m. prevailing Eastern Time, on the day of the Closing Date.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection or pollution of the environment or natural resources, including, without limitation, the Comprehensive

Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 *et seq.*), the Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*) the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 *et seq.*), The Medical Waste Tracking Act (42 U.S.C. § 6992 *et seq.*), the Oil Pollution Act (33 U.S.C. § 2701 *et seq.*), the Emergency Planning and Community Right to Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), and the Occupational Safety Health Act (29 U.S.C. § 651 *et seq.*).

"Excluded Assets" means those assets of Debtor that are set forth on Schedule 1 attached hereto.

"Excluded Liabilities" means each and every Liability, obligation, debt, or commitment of the Business or Debtor, as principal, or a successor of any kind or nature (provided Seller shall take no action causing or resulting in Purchaser being deemed to be a successor owner or operator of the Business for purposes of any Environmental Law), whether absolute or contingent, accrued or unaccrued, asserted or unasserted, known or unknown, liquidated or unliquidated, due or to become due, or otherwise, other than the Assumed Liabilities.

"Excluded Records" means (a) any materials about employees, disclosure of which would violate Law, (b) any materials that are subject to a Privilege or requirement to maintain confidentiality or (c) any Patient Records but only to the extent access to Patient Records is prohibited by Law.

"Exhibits" means the exhibits provided for and referred to in this Agreement.

"Final Cost Report Liability" means the amounts necessary, if any, to satisfy liability incurred as a result of the filing of any Cost Report including, without limitation, the Assessed Cost Report Liability.

"Government" or "Governmental" means or refers to the United States of America, any other nation or sovereign state, any federal, bilateral or multilateral governmental authority, state, possession, territory, county, district, city or other governmental unit or subdivision, and any branch, agency, or judicial body of any of the foregoing.

"Governmental Authority" means (i) any federal, state, county, municipal or other local Government or governmental authority, including, without limitation, any regulatory or administrative agency, commission, department, board, bureau, agency, instrumentality or Court and (ii) any arbitrator or arbitral body of any Government.

"Health Care Laws" means, all applicable laws of any Governmental Authority regulating health services or payment, including, but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalty laws (42 U.S.C. § 1320a-7a), the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d-1320d-8), the Medicare Prescription Drug,

5

Improvement and Modernization Act of 2003, Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), the Food, Drug and Cosmetic Act (21 U.S.C.§§ 301 et seq.), the Prescription Drug Marketing Act of 1987, the Deficit Reduction Act of 2005, the Controlled Substances Act (21 U.S.C. §§ 801 et seq.), the regulations promulgated pursuant to such laws, and any other law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other issuance of any Governmental Authority with legally binding effect which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, pharmacy practice, licensure, accreditation or any other aspect of providing health care.

"Healthcare Programs" shall have the meaning set forth in Section 3.8 of this Agreement.

"Healthcare Regulatory Consents" means in respect of Seller or Purchaser, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained by such party in order for such party to consummate the transactions contemplated of it by this Agreement in compliance with all applicable Law relating to health care or healthcare services of any kind, to the extent necessary, under or through CLIA, CMS, DEA, and any other approvals, authorizations, waivers, Orders, licenses, or Permits of any Governmental Authority required to consummate the transactions contemplated hereby and for Purchaser to operate the Business.

"Hospital" means the hospital operated by Seller located in Washington County, North Carolina known as Washington County Hospital or Washington Regional Medical Center and operated in connection with the Business.

"Knowledge" means (a) as to Seller, the actual knowledge of Seller and (b) as to Purchaser, the actual knowledge, after due inquiry, of the senior leadership team members of Purchaser listed on Schedule 2.

"Law" means any statute, law, code, treaty, ordinance, rule, regulation, instrument, directive, decree, agreement, policy, Order, consent decrees and consent orders, or injunction of or with any Government, Governmental Authority, quasi-Governmental Authority, or Court, and includes, without limitation, all judicial and administrative interpretations thereof, and all rules or regulations of any regulatory or self-regulatory authority compliance with which is required by Law.

"Liabilities" means debts and liabilities, whether known or unknown, contingent or absolute, liquidated or unliquidated, and whether or not required to be reflected on the financial statements of a business, whether arising under any Contract, Law, Lien, Order or otherwise.

"Lien" means any lien, security interest, mortgage, deed of trust, option, lease, tenancy, occupancy, covenant, condition, easement, agreement, royalty, pledge, hypothecation, charge, claim or other encumbrance.

6

"Nonassignable Asset" shall have the meaning set forth in Section 2.5 of this Agreement.

"North Carolina Regulations" means the North Carolina General Statutes as well as the rules and regulations imposed by the North Carolina Division of Health Service Regulation.

"Order" means any order, judgment, writ, injunction, award or decree of any Court or Governmental Authority.

"Ordinary Course of Business" means with respect to the Business, the ordinary course of commercial operations customarily engaged in by the Business reasonably consistent with past practices.

"Party" or "party" means either Purchaser or Seller, and "Parties" means both Purchaser and Seller together.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, including, without limitation, Medicare and Medicaid provider numbers and agreements, certificates of need, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Authority.

"Permitted Encumbrances" means (i) the Assumed Liabilities and other obligations assumed by Purchaser under this Agreement, (ii) those Liens or exceptions listed on or described in Schedule 5 attached hereto, and (iii) Liens imposed pursuant to any Assumed Contract.

"Permitted Parties" has the meaning ascribed to it in Section 5.1(e).

"Person" means any natural person, any corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, company, or other legal entity, and any Government or Governmental Authority.

"Private Programs" means any private insurance or reimbursement programs.

"Privilege" means the attorney-client privilege (including the common interest privilege) or the attorney work product doctrine.

"Privileged Materials" means any materials that are protected by or the subject of a Privilege.

"Provider Agreements" means Debtor's existing provider agreements with the Medicare and Medicaid programs.

7

"Purchased Intellectual Property Licenses" means those intellectual property licenses of the Debtor included within the Assets, if any.

"Purchase Price" has the meaning ascribed to it in Section 2.12(a).

"Purchaser" has the meaning set forth in the Preamble to this Agreement.

"Real Property" means each parcel of real property included in the Assets, including, without limitation, all rights of way, easements, facilities and other improvements and fixtures thereon and appurtenances thereto and all rights associated therewith, to the extent owned or leased by Debtor, as set forth in Schedule 6 attached hereto.

"Relating to" means arising from, in connection with or otherwise relating to. "Relates to" and "relate to" have corresponding meanings.

"Sale Hearing" means the hearing(s) on the Sale Motion held before the Bankruptcy Court.

"Sale Motion" means the Trustee's Motion for (I) an Order (A) Establishing Bidding Procedures, (B) Approving Stalking Horse Bidder, (C) Approving Form and Manner of Notices, (D) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases and, (E) Granting Related Relief, and (II) an Order (A) Approving Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief filed on November 6, 2019 [Docket No. ___].

"Sale Order" has the meaning ascribed to it in Section 6.1.

"Schedules" means the schedules provided for and referred to in this Agreement.

"Seller" has the meaning set forth in the Preamble to this Agreement.

"Seller's Confidential Information" has the meaning ascribed to it in Section 5.15(a).

"Survey" has the meaning ascribed to it in Section 2.19.

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4979 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Taxing Authority" means any Government or Governmental Authority responsible for the imposition or collection of any Tax.

"Title Company" has the meaning ascribed to it in Section 2.19.

"Title Report" has the meaning ascribed to it in Section 2.19.

"Transferred Business Records" has the meaning ascribed to it in Section 5.1(f).

"Transfer Taxes" means all excise, sales, use, transfer (including Real Property transfer or gains), value added, stamp, documentary, filing, recording and similar Taxes and fees which may be imposed or assessed as a result of the transactions effected pursuant to this Agreement together with any interest, additions, penalties with respect thereto and any interest in respect of such additions or penalties.  Income taxes do not constitute Transfer Taxes.

1.2     **Other Definitional and Interpretive Matters**.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     Calculation of Time Periods.  When calculating the period before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     Dollars.  Any reference in this Agreement to "$" means United States dollars.

(iii)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent it is reasonably apparent that it is pertinent to the subject matter of such other Schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)     Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including.    The word "including" means "including, without limitation," and "includes" and "include" have corresponding meanings, and such words shall not be construed to limit any general statement to the specific or similar items or matters immediately following it.

(viii)    Made Available to Purchaser.    The phrase "made available to Purchaser" means, for all purposes of this Agreement, made available to Purchaser through posting in Seller's electronic data room (the "Data Room"), via email, facsimile or other electronic transfer or through other written means for all purposes of this Agreement.

(b)    No Construction Against Drafter.    No presumption, burden of proof, burden of persuasion or similar method of interpretation or standard shall arise or otherwise apply favoring or disfavoring any Party (including, without limitation, the draftsperson) by virtue of the authorship of any one or more provisions of this Agreement, including in any arbitration or litigation proceeding.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1    **Sale of Assets**.  At the Closing and as of the Effective Time but in all events subject to the approval of the Bankruptcy Court by and through the Sale Order, Seller agrees, upon and subject to the terms and conditions hereinafter set forth, to sell, transfer, convey, assign, and deliver or cause to be sold, transferred, conveyed, assigned, and delivered to Purchaser, all right, title, and interest of Seller and Debtor's bankruptcy estate in, to and under all of the assets and properties and associated rights and interests, real, personal, and mixed, tangible and intangible, of whatever kind, owned by Debtor (no matter where located, including without limitation, on leased property) including, without limitation, all of the assets and properties used in or related to the Business, but excluding the Excluded Assets (collectively, after excluding the Excluded Assets, the "Assets"), but only if Purchaser   The Assets shall include, to the extent transferrable, all Patient Records (Seller and its representatives shall continue to have access to all Patient Records as necessary to respond to governmental or other inquiries or issues, to defend malpractice claims, and for other reasonable legitimate reason upon request) but excluding any Excluded Documents.  None of the Excluded Assets will be conveyed to Purchaser.

2.2    **Purchase of Assets**.  Purchaser agrees to purchase the Assets upon and subject to the terms, conditions and provisions set forth herein and pursuant to the terms in the Sale Order.

2.3    **Excluded Liabilities**.  Except for the Permitted Encumbrances, the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances.

(a)    Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Excluded Liabilities.  Purchaser shall, at the Closing, assume the Assumed Liabilities pursuant to the terms of Section 2.8 of this Agreement.

(b)    Purchaser shall not assume, satisfy, discharge, or otherwise be responsible for any Liabilities of Debtor related to any pension or retirement plans or programs.

(c)     Subject to, and consistent with the Sale Order, Purchaser shall not be responsible for any Liabilities of Debtor related to Debtor's participation in the Healthcare Programs, including any liability or obligation for overpayments, recapture, recoupment, or set off for previously paid or reimbursed amounts.

(d)     The Parties hereto further agree that, as between Purchaser and Seller, all the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of Seller.

(e)     Notwithstanding the foregoing, Purchaser shall be responsible for all Liabilities applicable to and incurred with respect to the period after the Effective Time that relate to the Business, the Hospital, or Purchaser's post-Closing ownership or operation of the Assets; provided, however, that no statement made in this Agreement shall be deemed to allocate or attribute any Liability or obligation to Purchaser which has been released pursuant to the Sale Order.  To the extent this Section 2.3(d) conflicts with any other provision of this Agreement, this Section 2.3(d) controls.

2.4     **Excluded Assets**.  Nothing herein contained shall be deemed to obligate Seller to sell, transfer, assign, or convey any Excluded Asset, as described on Schedule 1, to Purchaser.  The Seller shall retain all right, title, and interest to, in, and under the Excluded Assets. To the extent this Section 2.4 conflicts with any other provision of this Agreement, this Section 2.4 controls.

2.5     **Nonassignable Assets.**  To the extent that the assignment of any Asset shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code (each, a "Nonassignable Asset") nothing in this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign such Nonassignable Asset unless and until such consent shall have been obtained.

2.6     **Method of Conveyance**.  The sale, transfer, conveyance, assignment, and delivery by Seller of the Assets to Purchaser hereunder shall be effected on the Closing Date by delivery by Seller of: (a) an assignment of deed, substantially in the form of Exhibit A, conveying to Purchaser all right, title, and interest of Debtor in and to the Real Property, such title to be free and clear of all Liens pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances (the "Deed"); and (b) assignments(s) and bill(s) of sale and such other instruments of conveyance in the form of Exhibit B (collectively, "Bill of Sale") conveying all right, title, and interest of Seller and Debtor's bankruptcy estate in all Assets that comprise tangible or intangible personal property, including separate assignment(s) of any U.S. trademark registrations and applications, if any, included within the Purchased Intellectual Property Licenses in a form suitable for recording with the U.S. Patent and Trademark Office, all to the fullest extent permitted by Law, free and clear of any and all Liens, except for Permitted Encumbrances.

2.7     **Assumed Contracts**.  On and after the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their terms, all obligations (i) arising after the Effective Time with respect to executory contracts and unexpired leases identified on Schedule 2.7 (the "Assumed Contracts").  Except for the Assumed Contracts, Purchaser shall not assume and shall not be responsible for any of Debtor's contracts or leases.

11

2.8     **Assumption of Liabilities**.

(a)     As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms all Liabilities of the Hospital or the Business (the "<u>Assumed Liabilities</u>") accruing from and after the Effective Time incurred in connection with or otherwise relating to the Assets or the Business.

(b)     As of the Effective Time, Purchaser shall assume and be responsible for, and shall timely pay, perform, and discharge in accordance with their respective terms the obligations of Seller arising from and after the Effective Time under Assumed Contracts which Seller shall assign and as to which Purchaser shall assume all obligations thereunder, including that Purchaser shall, subject to the provisions of Section 2.8(e), assume the obligations to pay Cure Payments relating to the Assumed Contracts.

(c)     On the Closing Date, Purchaser shall assume no liability for Debtor's accrued payroll, accrued payroll taxes, and accrued paid annual leave.

(d)     Purchaser shall, subject to the limitations set forth below, be responsible for the payment of the Cure Payments, if any, required with respect to the Assumed Contracts with said payments being made to the counterparty to the Assumed Contracts when the Cure Payments become due pursuant to the Sale Order unless the Purchaser and the counterparty to an Assumed Contract agree otherwise.

(e)     Notwithstanding anything to the contrary in this Agreement, (i) Purchaser shall consult with Seller with respect to the terms of the assumption of the Assumed Contracts provided that Purchaser shall not modify any terms thereof without the prior written consent of Seller if such modification would be or could reasonably be expected to be adverse to Seller in any respect, and (ii) the rights of each of Seller to object to such terms are expressly preserved and reserved.

(f)     Debtor shall not assume any contracts and/or assign any contracts to Purchaser unless Purchaser agrees to pay the full Cure Payments with respect to any contract so assumed and any non-permitted assumption or assignment shall be void and of no effect.

(g)     Purchaser shall be responsible for prosecuting all objections to the Cure Payments.  Purchaser shall, at Purchaser's sole cost, (i) negotiate the amount of all Cure Payments and/or (ii) pay all of Purchaser's legal and other fees and expenses (and, if any, Seller's legal fees and expenses to the extent incurred because of Seller being required to intervene or defend) relating to any litigation or other dispute in connection with or otherwise relating to Cure Payments.

2.9     **Taxes and Assessments**.  The Liability for payment of accrued but unbilled or unpaid Taxes (including, but not limited to, real estate taxes, personal property tax, ad valorem tax and similar non-income Taxes) and other assessments relating to, or arising out of the ownership or transfer of, the Assets or the Assumed Contracts (including, but not limited to any water, sewer and other municipal charges owed to any Governmental Authority), imposed on a periodic basis beginning before and ending after the Effective Time or as a result of the consummation of the transactions evidenced by this Agreement or otherwise, shall be paid by Seller at the Closing, provided that Seller has received at Closing the purchase price required to be paid by Purchaser

12

pursuant to this Section. All Taxes and other assessments shall be listed on Schedule 7, which shall be prepared and delivered at Closing. If any Taxes or other assessments paid by Seller at any time on or prior to the Closing Date are attributable in whole or in part to any period following the Closing, then the Purchase Price payable at Closing shall be increased to adjust for the prior payment of such Taxes and assessments by Seller attributable to the post-closing period.

2.10 **Intentionally Deleted**.

2.11 **Purchaser's Deposit**.

(a) Upon entry of the Sale Order, Seller and Purchaser shall have the obligation to consummate the Closing pursuant to and subject to the terms of this Agreement and the Sale Order. If Purchaser fails to consummate the purchase of the Assets on or before January 31, 2020 (unless such failure arises from Seller's uncured material breach and unless Seller and Purchaser agree to extend such deadline in writing), Seller is authorized but not required to effect the sale of the Assets to one or more third parties as soon as is commercially reasonable subject to further Orders of the Bankruptcy Court. If Purchaser fails to consummate the purchase of Assets hereunder through no fault of its own, Seller shall not consummate any transaction unless the Deposit is repaid to Purchaser. If Purchaser fails to consummate the transaction as a result of Purchaser's uncured material default, the entire Deposit and all accrued interest thereon will be retained by Seller as liquidated damages (it being agreed that it may be difficult to measure damages arising from such failure and such amount is a reasonable estimate of the amount of damages Seller will suffer under the circumstances), which, except in cases of an intentional tort, shall constitute Seller's sole or exclusive remedy and limitation of damages for any default hereunder by Purchaser.

2.12 **Purchase Price**.

(a) In consideration of the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall at Closing: (i) assume the Assumed Liabilities, (ii) pay or deliver to Seller cash by wire transfer of immediately available funds in the amount of $3,500,000.00 (the "Cash Purchase Price"); (iii) assume the liabilities described in Sections 2.7 and 2.8 on the terms contained therein; (iv) pay the amount required under Section 2.9; and (v) pay all Transfer Taxes due in connection with the closing of the transactions contemplated herein (collectively, the "Purchase Price").

(b) As additional consideration for the sale, transfer, conveyance, and assignment of the Assets to Purchaser, Purchaser shall spend at least $1,065,000.00 in capital investments at the Hospital during the three (3) year period following the Closing Date. As used in this Section 2.12(b), the term "capital investments" shall mean investments in new equipment including information technology systems, equipment replacement, facility renovations, new facilities (including additional personnel), medical office space, development of new services and expansion of existing clinical services, working capital, information systems, physician recruitment, and other capital improvements, including commitments incurred pursuant to operating or capital leases, or other off balance sheet financing mechanisms. The dollar amount of capitalized expenditures made under this Section 2.12(b) will be determined in accordance with GAAP.

13

(c)     It is the intent of Purchaser to work with the community, Washington County, and the State of North Carolina to design, build, and operate a replacement facility for the existing Hospital.  It is the commitment of Purchaser to form the appropriate committees, councils, and boards to develop and present an appropriate and acceptable replacement for the current facility within the first year of its ownership of the current facility.  Initial design concepts and details are attached hereto as Exhibit C.

(d)     The Parties agree to report this transaction for federal, state, and local Tax purposes consistently and in accordance with this Section 2.12.

2.13     **Bankruptcy Court Approval**.

(a)     No later than one (1) Business Day after execution of this Agreement by the Parties hereto, Seller shall file a motion (the "Sale Procedures Motion") with the Bankruptcy Court seeking entry of an Order establishing bidding procedures for an auction of the Assets that shall include at least the following provisions (the "Sale Procedures Order"):

(i)      Competing offers to acquire the Assets shall be submitted in writing to Seller and his counsel on or before 5:00 p.m. (Eastern Time) on December 12, 2019, or such other date as set by the Bankruptcy Court (the "Bid Deadline");

(ii)     provide for a purchase price to be paid to Seller that exceeds the Purchase Price by at least the amount of the Break-Up Fee (as defined below) plus an initial overbid increment of $50,000;

(iii)    be accompanied by a signed asset purchase agreement in form and substance substantially similar to this Agreement;

(iv)    must not be subject to due diligence contingencies or other conditions beyond those imposed by Purchaser;

(v)     remain open until the conclusion of the Sale Hearing (as defined below); and

(vi)    be accompanied by a ten percent deposit.[1]

(b)     If any bidders have submitted a qualifying competing bid in accordance with the Sale Procedures Order (each such bid, a "Qualified Bid"), then an auction shall be held.

(c)     A hearing to approve the successful bid at the auction, or, if no auction is held, to approve this Agreement, shall be scheduled following the auction, or if there is no Auction, following the Bid Deadline (the "Sale Hearing").

(d)     The Breakup Fee in an amount of ($140,000) (the "Breakup Fee") shall be paid to Purchaser from the proceeds of sale actually paid by a successful bidder only after a closing in the event that the Bankruptcy Court enters an Order approving an offer to purchase the Assets submitted by a party other than Purchaser.

---

[1] Purchaser shall likewise submit the Deposit to Seller on or before the Bid Deadline.

(e)     No other bidder for the Assets shall be entitled to payment of any breakup fee.

(f)     If no timely, conforming Qualified Bid is submitted, Seller shall request at the Sale Hearing that the Court approve the proposed sale of the Assets to Purchaser under this Agreement.

(g)     Notwithstanding anything to the contrary in this Agreement, in the event that a Qualified Bid of a third party (an "Alternative Purchaser," and the underlying agreement between the Alternative Purchaser and Seller, the "Alternative APA") is approved by the Bankruptcy Court at the Sale Hearing, this Agreement, may become an approved "back-up bid," unless at the auction, other higher and better bids are received and Seller elects to make a different Alternative Purchaser the "back-up bidder."

(h)     In the event there is no auction, or that Purchaser presents the winning bid at the auction, then Seller shall use his reasonable best efforts to obtain entry of an Order of the Bankruptcy Court approving the sale on the terms of this Agreement.

2.14   **Closing**.  The Closing shall take place at 10:00 a.m., prevailing Eastern Time, on the Closing Date at the offices of Seller's bankruptcy counsel, or at such other time and place as the Parties may agree in writing.  The Closing shall be deemed to have occurred and to be effective as between the parties as of the Effective Time.  Seller will operate the Business until immediately prior to the Effective Time.

2.15   **Medicare and Medicaid Provider Agreements**.  Purchaser shall seek to have assigned to Purchaser all current and valid provider contracts of Debtor with the Medicare, Medicaid and TRICARE programs, including, without limitation, the Provider Agreements, subject to the Government's approval of Seller's assignment and Purchaser's assumption thereof. Seller shall provide Purchaser with information and other assistance as may be reasonably requested by Purchaser with respect to its request to assume the Provider Agreements.  Purchaser shall be solely liable for any and all amounts that are or may become due in connection with the assignment of such Provider Agreements.

(a)     Upon the Effective Date, to the extent permitted by applicable laws, Purchaser may use Debtor's National Provider Identifier and Medicare/Medicaid provider/supplier numbers and provider/supplier agreements to submit claims to the Part A Medicare Administrative Contractor and the North Carolina Department of Health and Human Services, Department of Medical Assistance ("DMA", collectively with the Part A Medicare Administrative Contractor, the "Payors") for health care services provided after the Effective Date (the "Billing Services").

(b)     Seller agrees not to take any action to change its EFT/bank account information used by Payors to deposit monies to be paid as a result of the Billing Services (any such monies deposited to be referred to herein as a "Payment").  Seller acknowledges and agrees that any Payments deposited into the Seller's bank account for Billing Services for services provider after the Effective Date shall be the property of Purchaser and shall be provided to Purchaser by wire transfer along with an accounting of all payments received on a weekly basis or by some other method mutually agreed to by the parties.

(c)    In the event Seller receives notice of any adjustment to any Payments related to Billing Services, Seller agrees to inform Purchaser and send a copy of such notice to Purchaser by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice.

(d)    Whenever a Payor sends other notice to or requests information from Seller regarding a claim for services rendered after the Closing Date, Seller shall send a copy of such notice or inform Purchaser of such request by overnight mail or electronic transmission no later than three (3) business days after receipt of such notice or request.

2.16    **Closing Payments**.  No later than five (5) Business Days prior to the Closing Date, Seller shall provide to Purchaser, in writing, Seller's calculation of the Closing payments due as of the Effective Time based on the payment of the Purchase Price, as set forth in Section 2.12, and the estimated apportionment of Taxes and assessments.  If within three (3) Business Days following receipt of such calculation, Purchaser has not given Seller written notice of its good faith objection to Seller's calculations, then the transaction shall close based on Seller's calculations.  If Purchaser gives such notice of objection, then the Parties will work together in good faith to resolve the estimated apportionment of Taxes and assessments provided that if they are unable to agree, the Parties shall close and the disputed amount shall be appropriately escrowed.

2.17    **Closing Deliveries of Seller**.  At the Closing, in addition to any other documents, assignments, certificates, letters, orders, or agreements described in Section 2.6 or otherwise required to be delivered pursuant to the terms of this Agreement, and the satisfaction of all the conditions set forth in Articles VI and VIII, Seller shall deliver to Purchaser the following:

(a)    the execution and delivery of this Agreement by Seller;

(b)    a certified copy of the final, non-appealable Sale Order authorizing and ratifying the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby; and

(c)    copies of Debtor's most recent Cost Reports as filed with the Medicare and Medicaid programs.

2.18    **Closing Deliveries of Purchaser**.  At the Closing, in addition to any other documents otherwise required to be delivered by Purchaser pursuant to the terms of this Agreement and the satisfaction of all other conditions set forth in Articles VI and VII, Purchaser shall deliver to Seller the following:

(a)    the payment of the Cash Purchase Price, by wire transfer of immediately available funds, pursuant to Section 2.12 herein;

(b)    a true and complete copy of Purchaser's organizational documents and, if applicable, a certificate of existence of Purchaser from the State of North Carolina, together with a certificate by an authorized officer of Purchaser that the certificate of formation of Purchaser has not been amended since the date of the certification described above and that nothing has occurred since the date of issuance of the certificate of existence that would adversely affect Purchaser's existence;

(c)     certificates from an authorized officer of Purchaser as to the incumbency and signatures of each officer of Purchaser executing this Agreement and any other documents required under this Agreement;

(d)     a certificate of an officer of Purchaser certifying to Seller (a) compliance in all material respects with Purchaser's covenants set forth in this Agreement, (b) that all of the conditions contained in Articles VI and VII have been satisfied except those, if any, waived in writing by Purchaser, and (c) that all of the representations and warranties set forth in Article IV are true and correct in all material respects as of the Closing Date; and

(e)     copies of the resolutions of all corporate bodies of Purchaser necessary to authorize the transactions contemplated hereby, authorizing the purchase of the Assets and the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby, certified by an authorized signatory of Purchaser.

2.19     **Intentionally Deleted.**

2.20     **Further Conveyances and Assumptions**.  From time to time following Closing, each Party shall, and shall cause their respective Affiliates to execute, acknowledge, and deliver all such further conveyances, notices, assumptions, releases, and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (i) to assure fully to Purchaser and its successors and permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Purchaser under this Agreement and (ii) to assure fully to Seller and its successors and permitted assigns, the assumption of the Assumed Liabilities and other obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated herein.  Without limiting the generality of the foregoing, if Seller receives any Assets or payments related to the Assets after the Closing Date, it will promptly turn over same to Purchaser.

2.21     **Right to Pay Off Monetary Liens**.  Seller shall have the right to pay off on the Closing Date any monetary Liens that do not constitute Permitted Encumbrances from the sale proceeds then payable by Purchaser and the Parties shall cooperate to facilitate deletion of such encumbrance from the Title Policy by the Title Company.  Seller shall pay the costs of cancelling or discharging all such monetary Liens.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties, subject to any exceptions included in Seller's Disclosure Schedule:

3.1     **Power of Seller**.  Seller has the power to enter into this Agreement, to perform his obligations hereunder, and to consummate the transactions contemplated hereby.  Seller has all necessary power and authority to enter into this Agreement and all other documents that the Seller is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

17

3.2 **Validity and Enforceability of Agreement**. Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes a legal, valid, and binding obligation of Purchaser, this Agreement constitutes, and all documents required to be executed and delivered at Closing by Seller hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to general principles of equity.

3.3 **Consents; Waivers and Approvals**. Except for the approval of the Bankruptcy Court as required by Section 363 of the Bankruptcy Code and approvals relating to the Healthcare Regulatory Consents, no consent, waiver, approval, authorization, license or order of, registration or filing with, or notice to, any Governmental Authority or any other Person is necessary to be obtained, made or given by Seller in connection with the execution and delivery of this Agreement, the performance by Seller of its obligations hereunder or the consummation by Seller of the transactions contemplated hereby.

3.4 **No Conflict**. Subject to the issuance of the Sale Order and approvals relating to the Healthcare Regulatory Consents and the transfer of the Provider Agreements, the execution and delivery by Seller of this Agreement and the other agreements, documents and instruments required to be executed and delivered by Seller pursuant to this Agreement and the consummation by Seller of the transactions contemplated hereby or thereby, and compliance by Seller with any of the provisions hereof or thereof, will not:

(a) violate (with or without the giving of notice or the lapse of time or both) any Law or any Order to which Seller, the Assets, or the Business is subject to.

3.5 **Rights to Acquire Assets**. Except for Ordinary Course of Business transactions involving the disposition of personal property that are not, individually or in the aggregate, material to the Seller, there are no agreements, options, or other rights to which Seller is a party pursuant to which a Claim exists that Seller is, or may become, obligated to sell or grant any Lien in any of the Assets. Notwithstanding the foregoing, Seller acknowledges and agrees that the Assets shall be transferred pursuant to the Sale Order and Section 363 of the Bankruptcy Code, to the fullest extent permitted by applicable Law, free and clear of all Liens, Claims, interests, and encumbrances other than the Permitted Encumbrances.

3.6 **Title to and Adequacy of the Assets**. Debtor owns each of the Assets and, subject to the approval of this Agreement by the Bankruptcy Court, title to the Assets will be transferred free and clear of any Liens by Order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, except for Permitted Encumbrances. The Assets and the Real Property comprise all items used in the operation of the Hospital and the Business except for (i) Contracts that require consents to the transfer of Contracts made available to Purchaser prior to the date hereof that have not been obtained, (ii) Authorizations that are not transferrable or not transferrable without a consent that has not been obtained, and (iii) the Provider Agreements.

3.7 **Intentionally Deleted.**

3.8 **Existing Medicare and Medicaid Provider Agreements**. Debtor is eligible to receive payment under Titles XVIII and XIX of the Social Security Act, is a "provider" under the

Provider Agreements with the Medicare and Medicaid programs (collectively, the "Healthcare Programs") through the applicable intermediaries.

3.9 **Intentionally Deleted.**

3.10 **Intentionally Deleted.**

3.11 **Intentionally Deleted.**

3.12 **Intentionally Deleted.**

3.13 **Intentionally Deleted**.

3.14 **Compliance with Laws; Permits**.

(a) To Seller's Knowledge, the Hospital is duly licensed and authorized by all applicable Governmental Authorities including, but not limited to, the State of North Carolina, to operate all of its health care and medical services.

(b) To Seller's Knowledge, Seller has all permits that are necessary to enable it to own, lease or otherwise hold the Assets and to enable it to operate the Business as currently conducted. All such permits are in full force and effect. To the Knowledge of Seller, no proceedings are pending or threatened where the remedy sought is to revoke or materially modify any such permit, materially restrict any renewal of any such permit or deny the right to transfer any such permit that is permitted to be transferred with consent.

(c) To Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws respecting the Business. There are no charges of a material violation of a Law pending or to the Knowledge of Seller threatened against Seller.

(d) There is not now pending or, to Seller's Knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Business or the Assets.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the following representations and warranties:

4.1 **Corporate Existence of Purchaser**. Purchaser is duly authorized to conduct business in [state]. Purchaser has all necessary power and authority to enter into this Agreement and all other documents that the Purchaser is required to execute and deliver hereunder, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.

4.2 **Validity and Enforceability of Agreement**. Upon the entry of the Sale Order approving the sale of the Assets to the Purchaser, this Agreement constitutes, and all documents

executed and delivered by Purchaser at Closing hereunder or in connection herewith will each constitute, the legal, valid, and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as enforcement hereof may be limited by general principles of equity.

4.3     **Authorization and Authority**.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized, approved and ratified by all necessary action on the part of Purchaser.  Purchaser has full authority to enter into and deliver this Agreement, to perform its obligations hereunder, and to consummate the transactions contemplated hereby.

4.4     **No Conflict**.  Neither the execution and delivery by Purchaser of this Agreement nor the performance by Purchaser of its obligations hereunder, (a) (i) violates or breaches the terms of or causes a default under any legal requirement applicable to Purchaser, (ii) contravenes the certificate of incorporation or bylaws or the certificate of formation and operating agreement or other organizational documents of Purchaser, or (iii) violates or breaches the terms or causes a default under any contract, indenture, evidence of indebtedness or other commitment to which Purchaser is a party or by which it or its properties is bound, or (b) will, with or without the passage of time, the giving of notice or the taking of any action by a third person, have any of the effects set forth in this subsection, except to the extent that any such matter would reasonably be expected to have a material adverse change with regard to Purchaser.

4.5     **Ability to Consummate Transaction**.  Purchaser has or will have sufficient immediately available funds and/or access to credit facilities necessary to consummate the purchase of the Assets and perform of its obligations under this Agreement.

4.6     **Solvency.**  Purchaser is solvent.  The consummation of the transactions provided for in this Agreement will not render Purchaser insolvent.  There are no conditions, obligations or commitments of Purchaser, or Claims against Purchaser, which will or could be reasonably expected to render Purchaser insolvent.

4.7     **Litigation and Arbitration**.

(a)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser, including any before any Governmental Authority or any arbitration panel, that seeks to prevent the consummation of the transactions contemplated by this Agreement.

(b)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives, and there are no existing facts relating to any Person referred to in this Section 4.7(b), that may cause any required Health Care Regulatory Consent or other consent to the transactions contemplated hereby to not be given.

(c)     There is no Action pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, directors, or other senior executives or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement

or the ability of Purchaser to consummate the transactions contemplated hereby.  Purchaser or any of its Affiliates, or any of their respective members, owners, managers, officers, or senior executives are not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transactions contemplated hereby.

4.8     **Brokers and Intermediaries**.  Neither Purchaser nor any of its Affiliates has employed any broker, finder, advisor or intermediary that is entitled, in connection with the consummation of the transactions contemplated hereby, to a broker's, finder's, or similar fee or commission. Provided, however, the Parties acknowledge and agree that, to the extent allowed by Order of the Bankruptcy Court, any fees and expenses payable by Seller to Sherwood Partners, Inc. shall be paid from the cash proceeds of the Sale.

## ARTICLE V
## CERTAIN COVENANTS AND AGREEMENTS OF SELLER AND PURCHASER

5.1     **Access and Information**.

(a)     Purchaser agrees to retain and maintain all employee and medical records as required under all applicable laws and regulations.

(b)     Before the Closing and to the extent permitted by Law, and except as required to preserve any Privilege, Seller will provide Purchaser and its representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, medical staff members, agents, accountants, and books and records of Seller and will furnish or make available to Purchaser and its representatives during such period all such information and data concerning Seller in its possession or control as Purchaser reasonably may request; *provided, however*, such access shall be coordinated through such persons as may be designated in writing by Seller for such purpose.  Purchaser's access shall include IT access to allow Purchaser to prepare to transition/preserve any electronic data as may be customary or required.

(c)     Before the Closing, Seller shall permit Purchaser to engage in discussions and negotiations with Debtor's vendors for the purpose of negotiating the terms of contracts between Purchaser and such vendors in connection with Purchaser's purchase of the Assets.

(d)     Before the Closing, Seller shall grant Purchaser and its representatives reasonable access to the employees within the Hospital for the purpose of administering the hiring process as to such employees.  Thus, by way of example and without limitation, except to the extent prohibited by applicable Law, Seller will grant reasonable access to enable Purchaser and its representatives to disseminate documents and information to such employees; collect documents and information from such employees; interview such employees and their supervisors and managers; investigate the backgrounds, experience, education, qualifications and work records of such employees; offer employment to such employees; and hire such employees.  Purchaser agrees to conduct all such activities in compliance with applicable Law.

21

(e)     After the Closing, Purchaser shall permit, for a period of not less than six (6) years, each of the Seller, any direct or indirect successor to the Seller and their respective professionals (collectively, the "Permitted Parties") access to all Books and Records that are in connection with or that otherwise relate to the Hospital (including the Business) prior to the Closing and/or to Seller and that are in the control or the possession of Purchaser or any of its Affiliates or their respective agents or representatives except for Excluded Records (collectively, "Business Records") for the purposes of (i) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets, (ii) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any Claim, Action, or cause of action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (iii) performing and/or otherwise dealing with any obligations of the Seller pursuant to this Agreement, including the Excluded Liabilities, (iv) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the Claims reconciliation process relating to Seller, including, without limitation, with respect to Claims against any Person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative Claims and any other general unsecured Claims that accrue prior to the Closing Date and (v) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering Debtor's estate including, without limitation, the preparation and confirmation of a plan relating to Debtor and the preparation of a disclosure statement relating to Debtor, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down Debtor's estate, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.

(f)     The right of access for the Permitted Parties shall include, without limitation, (a) (i) the right of such Permitted Party to copy at the Permitted Party's premises or the Hospital at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to in Section 5.1(e) and (ii) Purchaser's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may be requested, but only to the extent as to this clause (ii) such Permitted Party furnishes Purchaser with reasonable written descriptions of the materials to be so copied. Purchaser shall not dispose of or destroy any of the Business Records transferred to Purchaser ("Transferred Business Records") before the seventh anniversary of the Closing Date and will provide the Permitted Parties and the Bankruptcy Court pursuant to a filing with the Bankruptcy Court with at least ninety (90) days written notice before doing so and will provide each Party that requests copies of any Transferred Business Records within such ninety (90) day period copies of all requested Transferred Business Records at the cost of the requesting Permitted Party.

(g)     Subsequent to the Closing Date, Purchaser will cooperate with each of the Permitted Parties relating to all matters in connection with the administration of Debtor's estate, including without limitation, in connection with all Claims, Actions, and causes of action relating to the Excluded Assets or Excluded Liabilities that any Permitted Party elects to pursue, dispute, or defend.  Without limiting the generality of the preceding sentence, Purchaser shall use commercially reasonable efforts to make reasonably available to Seller employees of the Business who became employees of Purchaser to assist Seller in connection with the administration of Debtor's estate, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

(h)    Seller shall provide to Purchaser at the Closing or as soon thereafter as is reasonably possible all appropriate books and records and other documents in the possession or control of Seller, its representatives or its agents relating to the Assets being sold pursuant to this Agreement and the transactions contemplated hereby.  Such books, records, and documents shall include, but are not limited to, patient records, all paper and electronic financial, operational, administrative, research, regulatory reporting, maintenance, and HR records.

5.2    **Authorizations**.  Purchaser shall use its commercially reasonable efforts to promptly obtain all Authorizations required to enable Purchaser to purchase the Assets and/or operate the Hospital.  Purchaser shall provide to Seller a weekly report as to the status of obtaining such Authorizations.  Seller agrees to execute and deliver such instruments and documents reasonably satisfactory to Seller, and to take all such other and further actions reasonably satisfactory to Seller, that Purchaser cannot take or cause to be taken by any Person other than Seller, that are required to enable Purchaser to obtain such Authorizations or transfer such Authorizations from Seller to Purchaser,  provided that Seller shall not be obligated to undertake any material Liabilities or other obligations, individually or in the aggregate, relating to such obligations.  Notwithstanding the foregoing, Purchaser shall not be obligated to consent to the imposition of materially burdensome conditions on Purchaser or its lenders in order to obtain the Authorizations it being specifically understood and agreed that conditions required under the North Carolina Regulations (or any Federal corollary) shall not constitute a materially burdensome condition.

5.3    **Conduct of Business**.

(a)    Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall:

(i)    operate the Business in the Ordinary Course of Business in all material respects;

(ii)    use commercially reasonable efforts to (A) maintain the Assets in good working order and condition consistent with past practices and (B) maintain the insurance coverage currently in place with respect to the Assets or obtain comparable replacement coverage;

(iii)    perform when due all undisputed post-petition obligations under its contracts, including leases of Real Property or personal property to the extent of available funds;

(iv)    comply in all material respects with all Laws and Orders pertaining to the Business and the Assets;

(v)    without being obligated to make any payment to any Person to preserve any goodwill or relationship, and subject to changes incident to Debtor's bankruptcy filing and related intention to sell its assets, use commercially reasonable efforts reasonably consistent with past practices to preserve the goodwill thereof and Debtor's relationships with the patients, employees, physicians, suppliers, and others with whom it deals; and

(vi)     perform all undisputed post-petition obligations under Excluded Contracts and timely pay, perform, and discharge in accordance with their respective terms the undisputed post-petition Excluded Liabilities to the extent of available funds.

(b)     Prior to the Closing, except as otherwise contemplated by this Agreement or required by applicable Law or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), Seller shall not:

(i)     make or enter into any Contract that would be required to be assumed by Purchaser;

(ii)     other than in the Ordinary Course of Business, (A) increase the annual level of compensation of any employee or other Person who works in the Business, (B) grant any bonus, similar benefit, or increase in other direct or indirect compensation to any employee or other Person who works in the Business, (C) with respect to any employee or other Person who works in the Business, increase the coverage or benefits available under any (or create any new) employee benefits plan, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition, or similar agreement (or amend any such agreement) with any employee or other Person who works in the Business, except, as to each of clauses (A) through (D), as required by applicable Law from time to time in effect, by any employee benefits plan maintained or sponsored by Debtor or by any existing Contract or CBA made available to Purchaser that the Seller is a party to or bound by;

(iii)     subject any of the Assets to any Lien, other than (A) any Permitted Encumbrances or (B) as approved by Order of the Bankruptcy Court;

(iv)     other than pursuant to an existing Contract made available to Purchaser, acquire or lease any material assets that would be Assets or sell, assign, license, transfer, convey, lease, or otherwise dispose of any of the Assets, provided that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets;

(v)     cancel or compromise any material debt or claim or waive or release any material right of Debtor that constitutes an Asset except in the Ordinary Course of Business;

(vi)     permit or allow relocation of (other than within the Hospital or the Hospital's owned Real Property), any services or programs of the Business; or

(vii)     other than in the Ordinary Course of Business or pursuant to an existing Contract made available to Purchaser, remove from the Real Property any furniture, equipment, or other tangible personal property used in the Ordinary Course of Business provided further that any other removal shall be permitted if the assets removed, taken as a whole, are replaced with reasonably equivalent or better assets.

5.4    **Commercially Reasonable Efforts**.    Each Party shall use its commercially reasonable efforts to fulfill or cause the fulfillment of the conditions of the Closing, including, without limitation, the execution and delivery of all agreements contemplated hereunder to be so executed and delivered provided that it shall be the responsibility of Purchaser to obtain the

Authorizations and any required consents with respect to the assumption of the Assumed Contracts and satisfy conditions required under the North Carolina Regulations.

5.5 **Adequacy of Purchaser's Review**.  Purchaser agrees that it (a) had a full and complete opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its bid and executing and delivering this Agreement, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties of any kind or nature, including, without limitation, any that are express, are implied, arise by operation of law, or that may otherwise be deemed to apply, regarding the Assets, or the completeness of any information provided in connection therewith except, as to clauses (b) and (c), solely for Seller's representations and warranties that are contained in Article 3 of this Agreement.

5.6 **Intentionally Deleted**.

5.7 **Tax Matters**.

(a) The Parties agree to request that the Bankruptcy Court find that the sale of the Assets constitutes a sale in furtherance of effectuating a plan of reorganization, and, in accordance with section 1146(a) of the Bankruptcy Code, all transfers in connection therewith shall be exempt from any and all Transfer Taxes.  To the extent that the Bankruptcy Court does not so order, Purchaser shall be responsible for the payment of all Transfer Taxes (whether or not payable by Seller as a matter of law), including that Purchaser shall promptly reimburse Seller for its share of all Transfer Taxes paid by Seller upon receipt of reasonable documentation evidencing such amount.  Purchaser and Seller will cooperate in the timely preparation and filing of any Tax return that must be filed in connection with any Transfer Taxes.  Any such Taxes or fees resulting from any subsequent transfer of the acquired Assets or Assumed Contracts shall be borne by Purchaser.

(b) After the Closing Date, Seller and Purchaser shall, and shall cause their respective Affiliates to:

(i) assist the other Party and its Affiliates in preparing any tax returns that such Party is responsible for preparing and filing relating to the Assets, the Excluded Assets or the Business;

(ii) cooperate fully in preparing for any tax audit relating to or arising out of the ownership or use of the Assets or the Business;

(iii) make available to the other Party and its Affiliates and to any Taxing Authority as reasonably requested all information, Books and Records, and documents relating to Taxes arising out of the conduct of the Business or the ownership or use of the Assets; and

(iv) furnish the other Party with copies of all correspondence received from any Taxing Authority in connection with any tax audit relating to the conduct of the Business or the ownership or use of the Assets with respect to any such taxable period.

5.8    **Announcement**.  Other than confirming information that is already a part of the public record or that is contained in filings a Party hereafter makes with the Bankruptcy Court, Seller will not issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), except as may be required by applicable Law or the applicable regulations of any exchange.  Subject to the last sentence of this Section 5.8, if Seller is required by Law or pursuant to applicable regulations of any exchange to issue a press release or otherwise make any public statement or disclosure with respect to this Agreement and the transactions contemplated hereby, Seller will use commercially reasonable efforts to promptly notify Purchaser so that Purchaser may seek a protective order or other appropriate remedy, and in the event that no such protective order or other remedy is obtained, Seller may make such disclosure as Purchaser is advised in writing by counsel as may be required by Law or pursuant to applicable regulations of any exchange.  The preceding sentence shall not apply to any filing that Seller reasonably concludes may be required to be made with, or is appropriate to be made with, the Bankruptcy Court.

5.9    **Post-Closing Business Operations Commitment.**  Purchaser shall operate the Hospital as an acute care hospital with an open and accessible emergency department and medical/surgical services for a period of not less than five (5) years after the Closing Date.

5.10    **Risk of Loss; Casualty Loss**.  All risk of loss or damage to or destruction of the Assets, in whole or in part, shall be and remain with Seller until the Effective Time and from and after the Effective Time, the risk of loss or damages to or destruction of the Assets in whole or in part shall be and remain with Purchaser.  If, between the date of this Agreement and the Closing, any of the Assets having a value in excess of $100,000, individually or in the aggregate, shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause (the "Casualty"), individually or in the aggregate, then, with respect to a loss in value in excess of $100,000 (a) Purchaser shall have the option to acquire such Assets on an "as is" basis and take an assignment, without representation, warranty or recourse, from Seller of any insurance proceeds payable to Seller in respect of the Casualty (excluding proceeds under any directors or officers insurance policies) or (b) Seller shall have the option exercisable on or before the Closing Date by the delivery of written notice thereof to Purchaser (i) to fix such Casualty within sixty (60) days after the Closing Date, or (ii) pay Purchaser the loss in value arising from such Casualty, and if Seller does not elect within twenty (20) days of the occurrence of the Casualty an option set forth in (b)(i) or (b)(ii) above, then Seller shall be deemed to have elected the option in clause (b)(ii).

5.11    **Bankruptcy Actions**.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Assets are subject to Bankruptcy Court approval and entry of the Sale Order.

(b)    If an appeal is taken or a stay pending appeal is requested, with respect to the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request.  Seller shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from such order.  In the event of an appeal of the Sale Order, Seller shall, at its own

26

expense, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

(c)     From and after the date hereof, Seller shall not take any action that is intended to reverse, void, materially modify, or stay the Sale Order.

(d)     Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) related to the Assets, the Business, or any appeal as described in paragraph 5.11(b), prior to the filing thereof in the Bankruptcy Case, except any involving adversarial matters between Seller and Purchaser.

5.12    **Intentionally Deleted.**

5.13    **DISCLAIMERS**.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE TO PURCHASER, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREBY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN ARTICLE 3, OR EXCEPT AS EXPRESSLY SET FORTH IN THE SALE ORDER, THE ASSETS TO BE SOLD AND TRANSFERRED HEREUNDER SHALL BE SOLD (A) IN THEIR THEN EXISTING PHYSICAL CONDITION, WITH ALL DEFECTS, IF ANY, AND SUBJECT TO WEAR AND TEAR FROM THE DATE HEREOF TO THE CLOSING DATE AND (B) ON AN "AS IS, WHERE IS" BASIS

5.14    **Further Assurances**.  Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated herein and (ii) cause the fulfillment at the earliest practicable date of all the conditions to their respective obligations to consummate same.  Without limiting the generality of the foregoing, promptly after the discovery by Seller of any item included within the definition of Assets but not transferred, conveyed, or assigned to Purchaser, (x) Seller will deliver written notice to Purchaser of the existence and non-transfer, non-conveyance, or non-assumption of such item and provide Purchaser with all the information in Seller's possession about, and with access to such item in Seller's possession as Purchaser may reasonably request, and (y) if requested by Purchaser, Seller shall use commercially reasonable efforts to transfer, convey, or assign to Purchaser such item in the manner and on the terms and conditions as applicable to an Asset.

5.15    **Confidentiality**.

(a)     From and after the date hereof, Purchaser shall maintain in confidence, including that it shall not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Seller's Confidential Information relating to or obtained from Seller; provided, however, the foregoing restriction shall not apply to any disclosure by Purchaser of Seller's Confidential Information to any Affiliate of Purchaser or to its lenders and legal and financial advisors.  For purposes of this Section 5.15, "Seller's Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Assets, the Assumed Liabilities, the Business, the Excluded Assets, or the Excluded Liabilities, including

27

methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Seller's Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its agents or other representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate Seller's Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by Purchaser; and provided further, that upon the Closing, the restrictions contained in this Section 5.15 shall not apply to confidential or proprietary information related primarily to the Assets, the Assumed Liabilities or the Business. Purchaser may disclose Seller's Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential. Purchaser shall instruct such Persons having access to Seller's Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom they has transmitted Seller's Confidential Information subject to the confidentiality obligations herein becomes legally compelled, including, but not limited to, through an action brought pursuant to N.C. Gen. Stat. § 130A-131.16 and N.C. Gen. Stat. § 15A-266.12 to disclose any of such Confidential Information, Purchaser shall provide Seller with notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 5.15(a), Purchaser shall furnish only that portion of Seller's Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed. Purchaser shall have no liability to Seller with respect to the disclosure of Seller's Confidential Information ordered by a court of competent jurisdiction pursuant to North Carolina §130A-131.16; §15A-266.12 or other applicable law, or required by law or regulatory or accrediting agencies.

(b)     From and after the date on which the Sale Order is entered, unless this Agreement is terminated, Seller shall maintain in confidence, not disclose to any third party without the prior written consent of Purchaser, and not use to the detriment of Purchaser, any Business Confidential Information, other than in connection with (i) operating the Business in the Ordinary Course of Business prior to the Closing Date, (ii) any investigations by any Governmental Authority or any filings with the Bankruptcy Court, (iii) compliance activities prior to or after the Closing related to periods occurring prior to the Closing Date; (iv) any legal proceedings; (v) enforcing any rights or other claims of Seller under this Agreement or otherwise; and (vi) performing any obligations of Seller under this Agreement. For purposes of this Section 5.15(b), "Business Confidential Information" means any information that is confidential or proprietary in nature that is related to Purchaser or to the Assets, the Assumed Liabilities or the Business, other than information primarily pertaining to the Excluded Assets, or the Excluded Liabilities, including methods of operation, patient information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided, however, that Business Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Seller (other than in connection with filings with the Bankruptcy Court), (ii) becomes

28

available to Seller on a non-confidential basis from a source other than Purchaser, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Purchaser or (iii) is lawfully received by Seller from a third party having the right to disseminate the Business Confidential Information without restriction on disclosure. Seller may disclose Business Confidential Information to those who need to know it for the purpose of effectuating the transactions contemplated herein and who agree to keep it confidential subject to the same confidentiality obligations herein. Seller shall instruct such Persons having access to Business Confidential Information of such obligation of confidentiality. If Seller or anyone to whom it has transmitted Business Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Business Confidential Information (other than in connection with filings with the Bankruptcy Court), Seller shall provide Purchaser with prompt notice prior to making any disclosure so that Purchaser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Purchaser waives compliance with the provisions of this Section 5.15(b), Seller shall furnish only that portion of the Business Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed.

(c)     The obligations contained in this Section 5.15 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

5.16    **Acceptance and Discharge**. Except to the extent, if at all, Liabilities of Seller to Purchaser are specifically stated herein to survive the Closing, (i) Seller shall cease to have any Liability of any kind or nature relating to its representations and warranties hereunder and/or covenants and agreements to be performed prior to the Effective Time, and (ii) Seller will, without any further writing or other act by Purchaser, at such time be fully and forever, irrevocably and unconditionally, released and discharged from all such Liabilities.

5.17    **Cooperation**. Seller and Purchaser agree to reasonably cooperate with each other in good faith from the date hereof up through and following the Closing Date, in any effort to satisfy all further conditions, undertakings and agreements contemplated by this Agreement to be effected after the Closing.

5.18    **Surrender of License**. Following the Closing and in accordance with the timing and other requirements of applicable Law, Seller shall surrender all licenses and operating certificates issued to it relating to the Business, except for the licenses and operating certificates transferred to Purchaser pursuant to this Agreement.

5.19    **Removal of Certain Liens**. If any Liens other than Permitted Encumbrances encumber any Assets, Seller shall have the right, within thirty (30) days of Seller's receiving Purchaser's written notice of any such Lien, to cause such Lien to be removed.

5.20    **Insurance**. Neither Purchaser nor Seller shall have an obligation to purchase tail director and officer insurance coverage or tail professional liability insurance coverage.

5.21    **Final Cost Report.** Purchaser shall file or cause to be filed on Seller's behalf, at Purchaser's sole cost, the final Cost Reports for the period prior to the Closing required to be filed with the Medicare or Medicaid programs or any other Third-Party Payor or Governmental Body

as a result of the consummation of the contemplated transactions.  Any payments owed and paid to Seller for final settled Cost Reports for any periods prior to Closing are acknowledged as part of the Excluded Assets and are not conveyed to Purchaser by this Agreement.  All Cost Reports shall be prepared in accordance with applicable Law and consistent with past practices.

## ARTICLE VI
## CONDITIONS TO PURCHASER'S AND SELLER'S OBLIGATIONS

The obligations of the Parties to consummate the transaction provided for in this Agreement shall be subject to the satisfaction of the following conditions on or before the Closing Date:

6.1    **Entry of the Sale Order**.  The Bankruptcy Court shall have entered a sale order in form and substance reasonably satisfactory to the Parties (the "Sale Order"), which approves this Agreement and the consummation of the transactions contemplated hereby in their entirety; and which provides for the following rulings and/or findings: (a) Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; (b) timely, adequate, and sufficient notice of the sale was provided; (c) the Assets to be transferred to the Purchaser are property of the bankruptcy estate and Seller has all requisite authority and approval to transfer the Assets; (d) the total consideration to be realized by Seller represents fair consideration and reasonably equivalent value in the context of any state or federal law governing the rights of creditors; (e) the conveyance and assignment of the Assets pursuant to this Agreement is a legal, valid, and effective transfer of the Assets to the Purchaser, and will vest the Purchaser with all right, title, and interest of Seller in and to the Assets free and clear of all Liens, Claims, interests and encumbrances except for those (i) liabilities to be assumed by Purchaser pursuant to this Agreement and (ii) Permitted Encumbrances, and (f) neither Seller nor Purchaser has engaged in any conduct that would cause or permit the Agreement, or the transfers contemplated thereby, to be avoided under Section 363(n) of the Bankruptcy Code.  In addition, unless waived by Purchaser in writing in its sole discretion, the Sale Order shall have become a final, non-appealable order.

6.2    **No Injunctions**.   No injunction or restraining Order (whether temporary, preliminary or permanent) of any Governmental Authority shall exist against Purchaser or Seller that prevents the transactions contemplated hereby and approved in the Sale Order.  No other Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any statute, rule, regulation, or non-appealable judgment which prohibits or renders illegal the consummation of the Closing or the transactions provided for herein and approved in the Sale Order.

6.3    **Compliance with Applicable Law**.  To the extent required by Law, the filing and waiting period requirements relating to any and all approvals necessary under the Healthcare Regulatory Consents and any other applicable Law, if necessary, relating to consummation of the Closing or the transactions provided for herein shall have been duly complied with and/or such approvals shall have been obtained.

6.4    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations that Purchaser is required to apply for

and/or obtain in order to operate the Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the North Carolina Regulations.

    6.5    **Intentionally Deleted**.

# ARTICLE VII
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Purchaser, in its sole discretion, to waive any one or more of the conditions set forth below:

    7.1    **Representations and Warranties of Seller**.  The representations and warranties of Seller contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made only as of a specified date, in which case the accuracy of such representation or warranty shall be measured as of such date, and except to the extent of changes permitted by the terms of this Agreement.

    7.2    **Schedules**.  The matters set forth on the Schedules shall be true and correct in all material respects on the Closing Date, except to the extent of changes permitted by the terms of this Agreement.

    7.3    **Documents**.  Purchaser shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing, together with copies of all other documents and certificates to be executed and delivered by Seller at Closing.

    7.4    **Performance of Obligations**.  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date.

    7.5    **No Changes to Business**.  Since the date of this Agreement, there shall have been no material changes to the Business or Assets that, in the aggregate, have had a material adverse effect on the Business, excluding adverse changes that (i) were projected to occur in any forecast or budget provided by Seller and/or (ii) relate to a proposed sale of all or substantially all of Debtor's assets, thereby leaving Seller without an operating business.

    7.6    **Intentionally Deleted**.

    7.7    **Release of Liens**.  All Liens on the Assets shall have been released, satisfied or otherwise removed or discharged pursuant to Bankruptcy Court order or otherwise, except for the Permitted Encumbrances.

    7.8    **Consents**.  Purchaser shall have obtained (or shall have had transferred to it) those Healthcare Regulatory Consents and other Authorizations, including any judicial proceedings and appeals related thereto, which Purchaser is required to apply for and obtain in order to operate the

Business, it being specifically understood and agreed that Purchaser shall be required to satisfy conditions required under the North Carolina Regulations.

    7.9    **Intentionally Deleted**.

    7.10    **Intentionally Deleted.**

**ARTICLE VIII**
**CONDITIONS TO SELLER'S OBLIGATIONS**

The obligations of Seller to consummate the transactions provided for in this Agreement shall be subject to the satisfaction of each of the following conditions on or before the Closing Date, subject to the right of Seller, in its sole discretion to waive any one or more of the conditions set forth below:

    8.1    **Representations and Warranties of Purchaser**.  The representations and warranties of Purchaser contained in this Agreement, taken as a whole, shall be true and correct in all material respects on the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true in all material respects as of such date, and except to the extent of changes permitted by the terms of this Agreement.

    8.2    **Performance of this Agreement**.  Purchaser shall have materially performed or complied with all of the obligations to be performed or complied with by it under the terms of this Agreement on or prior to the Closing Date.  The Purchaser shall have delivered to the Seller a certificate signed by a duly authorized officer of the Purchaser, dated as of the Closing Date, to the foregoing effect.

    8.3    **Payment of Purchase Price and Assumption of Liabilities and Assumed Contracts**.  Seller shall receive from Purchaser on the Closing Date the Purchase Price pursuant to Section 2.12 of this Agreement and Purchaser shall have assumed the Assumed Liabilities pursuant to a document that is reasonably satisfactory to Seller.

    8.4    **Documents**.  Seller shall have received a signed copy of this Agreement with all Schedules and Exhibits attached, as updated through and including the Closing and copies of all such other documents and certificates executed and delivered hereunder.

**ARTICLE IX**
**SURVIVAL**

    9.1    **Survival**.  Sections 2.7, 2.8, 2.9, 2.20, 5.1, 5.5, 5.7, 5.8, 5.9, 5.13, 5.14, 5.15, 5.16, 5.17, 5.18, 5.19, 5.20 and 5.21, this Section 9.1 and Article 11, and all defined terms used therein, shall survive the Closing, except to the extent (if at all) that such survival is expressly limited herein.  The representations and warranties of the Parties shall expire upon the consummation of the Closing.

**ARTICLE X**
**LIMITED AGREEMENT TERMINATION RIGHTS**

32

10.1    **Termination of Agreement**.  This Agreement and the transactions contemplated hereby may be terminated prior to the Closing Date only as follows:

(a)    by mutual written consent of Purchaser and Seller;

(b)    except as otherwise provided in this Agreement, by either Party if the Closing shall not have occurred on or before the Closing Date;

(c)    by Purchaser if any of the conditions to the obligations of Purchaser to close set forth in Article VII shall have become incapable of fulfillment other than because of a breach by Purchaser of any covenant or agreement contained in this Agreement and such condition is not waived by Purchaser;

(d)    by Purchaser if there shall be a material breach by Seller, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach;

(e)    by Seller if any of the conditions to the obligations of Seller to close set forth in Article VIII shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement and such condition is not waived by Seller;

(f)    by Seller if there is a material breach by Purchaser, as determined by the Bankruptcy Court, of the representations and warranties, taken as a whole, or of any material covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach; or

(g)    by Seller or Purchaser if the Bankruptcy Court fails to approve this Agreement and enter the Sale Order by [], subject to Seller's right to extend the date of Closing as provided in the definition of Closing Date.

10.2    **Procedure for Termination**.  If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 10.1, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 10.1) the transactions contemplated hereunder shall be abandoned and this Agreement shall terminate to the extent and with the effect provided in Section 10.3, without further action by the parties.

10.3    **Effects of Termination**.  If this Agreement is validly terminated as provided herein, then each party shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to any party; provided, however, that (i) the obligations of the parties set forth in Article XI of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement, shall survive any such termination and shall be enforceable in accordance with their terms, and (ii) if this Agreement is terminated as provided herein, each party shall upon request

redeliver or destroy as soon as practicable any or all documents, work papers and other material of the other party relating to its business or affairs or the transactions contemplated hereunder, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record. Nothing in this Section 10.3 shall relieve the parties of any Liability for a breach of this Agreement prior to the date of termination or alter the right of Seller to retain the Deposit if permitted to do so pursuant to this Agreement. Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the transactions contemplated herein, or out-of-pocket expense reimbursement or other fees, shall be payable to any party upon termination of this Agreement pursuant to Section 10.1.

## ARTICLE XI
## MISCELLANEOUS

11.1    **Assignment; Binding Agreement**.

(a)    Except as set forth in Section 11.1(c), neither this Agreement nor any rights or obligations of a Party hereunder may be assigned or delegated without the other Party's prior written consent. Any purported assignment or delegation without such consent shall be void. Provided, however, Purchaser may assign any or all of its rights under this Agreement, provided that it remains responsible for performance hereunder. Purchaser intends to operate the Hospital as a not-for-profit entity, separately formed to hold the provider contracts.

(b)    This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the Parties hereto and to their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights, remedies, obligations, or Liabilities.

(c)    Purchaser shall have the right to assign its rights and obligations under this Agreement including, without limitation, its right to acquire all or any portion of the Assets to its Affiliates, any successor to Purchaser, and/or to its lender if a sale/leaseback transaction is used to finance the transactions contemplated by this Agreement. Notwithstanding any transfer permitted by this Section 11.1(c), Purchaser shall remain liable to Seller with respect to its obligations under this Agreement.

11.2    **Post-Closing Cooperation**. From time to time after the Closing, Seller will execute and deliver, or cause to be executed and delivered, such documents to Purchaser as Purchaser shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, the transfer of the Assets to Purchaser. From time to time after the Closing, Purchaser will execute and deliver, or cause to be executed and delivered, such documents to Seller as Seller shall reasonably request in order to consummate more effectively the transactions contemplated by this Agreement, including, without limitation, Purchaser's assumption of the Assumed Liabilities. From and after the Closing, Seller shall use its commercially reasonable efforts to deliver to Purchaser all such books, reports and other documents that constitute or relate to Assets (which may be redacted to the extent not relevant to the Assets) as may be requested by Purchaser which were not delivered on or before the Closing Date, and to assist the Purchaser in obtaining any Authorizations not obtained by Purchaser prior to the Closing.

11.3    **Expenses**.  Except as set forth in this Agreement, each Party shall pay the fees and expenses of its respective counsel, accountants, and other experts and shall pay all other expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and the consummation of the transactions contemplated hereby.

11.4    **Entire Agreement and Modification**.  This Agreement, including any Exhibits and Schedules attached hereto and thereto and any other documents hereby required to be delivered at the Closing, and any confidentiality agreement previously executed by Seller and Purchaser or Purchaser's Affiliate, constitute the entire agreement between the Parties and supersede all prior discussions, negotiations, or agreements relating to the subject matter of this Agreement.  No changes of, additions to, or other modifications of this Agreement shall be valid unless the same is in writing and signed by the Parties.

11.5    **Severability**.  If any provision of this Agreement shall be determined to be contrary to Law and unenforceable by any Court, the remaining provisions shall be severable and enforceable in accordance with their terms.  To the extent any provision of this Agreement is enforceable in part but not in whole, such provision shall be enforced to the maximum extent permitted by applicable Law.

11.6    **Waiver**.  Any of the conditions to Closing set forth in this Agreement, except for those set forth in Article VI, may be waived at any time prior to or at the Closing hereunder by the Party entitled to the benefit thereof.  Any such waiver shall only be effective if it is in writing and signed by the Party to be charged with such waiver.  The failure of any Party hereto to enforce at any time any of the provisions of this Agreement shall in no way be construed to be a waiver of any other breach of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement shall be held to be a waiver of any other or subsequent breach or non-compliance.

11.7    **Counterparts**.  This Agreement may be executed in multiple counterparts, by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  All signatures of the Parties to this Agreement may be transmitted by email or facsimile, and such email or facsimile of signature will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces and will be binding upon such Party.

11.8    **Headings; Interpretation**.  The table of contents and article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11.9    **Governing Law**.  This Agreement shall be construed and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.  All of the conveyance documents executed and delivered pursuant to the terms hereof shall be governed by and continued and interpreted according to the Laws of the State of North Carolina, without regard to the application of the choice of law principles thereof.

11.10   **Bankruptcy Court Jurisdiction**.

(a)     Purchaser and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes, Claims, and other controversies (collectively, "Disputes") and other matters relating to (a) the interpretation and enforcement of this Agreement or any document executed pursuant hereto; (b) the Assets; (c) the Assumed Liabilities and other obligations assumed by the Purchaser under this Agreement; and (d) any obligations surviving Closing, as long as the Bankruptcy Court reserves such jurisdiction, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.

(b)     The parties shall jointly request that the Bankruptcy Court reserve jurisdiction to consider Disputes arising under this Agreement even after the closing of the Bankruptcy Case.  To the extent allowed under existing and controlling law in the Fourth Circuit as of the Closing Date, the parties consent to the jurisdiction of the Bankruptcy Court to hear all such Disputes and to enter final orders with respect to all matters and issues raised therein.

11.11   **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if the same shall be in writing and shall be delivered or sent (a) by personal delivery against a receipted copy, (b) by certified mail, return receipt requested, or (c) by e-mail if the addressee confirms receipt of the e-mail, and addressed as set forth below:

If to Purchaser to:                      If to Seller, to:

Affinity Health Partners LLC             Thomas W. Waldrep, Jr.
or Appointed Entity                       Waldrep LLP
7920 Beltline Road, Suite 215            101 S. Stratford Rd., Suite 210
Dallas, Texas 75254.                     Winston-Salem, NC 27104
E-Mail: tmobley@affinity-hp.net          E-Mail: twaldrep@waldrepllp.com

A Party may change the address to which notices hereunder are to be sent to it by giving notice of such change of address in the manner provided above.  Any notice delivered personally shall be deemed to have been given on the date it is so delivered, or upon attempted delivery if acceptance of delivery is refused.

11.12   **Effectiveness**.  This Agreement shall be effective only when duly signed by Seller in accordance with the order of the Bankruptcy Court approving the sale to Purchaser.

11.13   **No Third Party Beneficiaries.**  Nothing expressed or referred to in this Agreement will be construed to give any person other than the  Parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement, except as such rights as shall inure to a successor or permitted assignee pursuant to this Agreement; provided Washington County shall be an express third-party beneficiary hereof solely for the purpose of enforcing Purchaser's obligations under Section 2.12(b) of this Agreement on behalf of Seller or any successor thereto.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

36

SELLER: Thomas W. Waldrep, Jr., as
Chapter 11 Trustee for CAH Acquisition
Company #1 d/b/a Washington County
Hospital


By:_____
Print Name: Thomas W. Waldrep, Jr.
Title: Trustee


PURCHASER: Affinity Health Partners
LLC or Appointed Entity


By:_____
Print Name:
Title:

**Schedules and Exhibits**

| | |
|---|---|
| Schedule 1 | List of Excluded Assets |
| Schedule 2 | Selected Senior Managers of Purchaser |
| Schedule 5 | List of Permitted Encumbrances |
| Schedule 6 | List of Real Property |
| Schedule 7 | List of Taxes and Assessments |
| Schedule 2.7 | Assumed Contracts |
| | |
| Exhibit A | Form of Deed |
| Exhibit B | Form of Bill of Sale and Assignments |

**SCHEDULE 1**

**Excluded Assets**

"Excluded Assets" means the following assets, properties, interests, and rights of Seller:

(a)     all cash and cash equivalents on hand as of the Closing;

(b)     any rights, Claims, counterclaims, third party Claims or causes of action of Seller against any Person and any actions under Chapter 5 of the Bankruptcy Code, including, without limitation, under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code;

(c)     all Actions and/or causes of actions that Seller has brought and/or may bring against any Person relating to any Excluded Asset and/or Excluded Liabilities, including, without limitation, all Actions and/or causes of action that Seller may bring against any current or former director, officer, employee or consultant;

(d)     all insurance policies and all rights to proceeds thereunder, including, without limitation, any director or officer insurance policies relating to any matter, event or circumstance occurring on or prior to the Closing Date, except as otherwise provided for in Section 5.10;

(e)     the residual rights in and proceeds of any employee benefits plans that are not transferred to Seller;

(f)     all Contracts, Permits, and other assets that require a consent (taking into consideration the provisions of the Bankruptcy Code), to transfer same unless (i) such written consent is obtained and (ii) the Purchaser assumes all liabilities arising thereunder, including all Cure Payments, if applicable (it being understood that Seller shall not be required to obtain or attempt to obtain any such consent);

(g)     all rights or documents relating to any Excluded Liability or other Excluded Asset;

(h)     any rights or remedies provided to Seller under this Agreement and applicable Law and each other document executed in connection with the Closing;

(i)     all rights relating to all applications for grants filed prior to the Effective Time, including all proceeds of grants awarded (including awards made and/or grant funds provided after the Closing);

(j)     any (i) personnel files for employees of Seller who are not hired by Purchaser; (ii) other books and records that Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right, at Purchaser's sole expense, to receive or make copies of any portions of such retained books and records that relate to the Business as conducted before the Closing or that relate to any of the Assets; (iii) documents which Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to

39

a copy of such documents referred to in this clause (v)).  With respect to documents necessary to prepare cost reports, which shall be specified in writing by the Purchaser, the Purchaser shall receive the original document (to the extent such original can reasonably be located by Seller) and Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(k)     all of Debtor's deposits and other prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(l)     any assets disposed of or consumed in the ordinary course of business (except any disposed of or consumed in breach of the provisions of this Agreement) during the period between the date hereof and the Closing Date;

(m)     Debtor's minute book and similar corporate records;

(n)     payments received from any Medicare Dependent Status claim made prior to the Closing Date;

(o)     any payments from, and all rights to payments that may become due from, Medicare or Medicaid programs based on adjustments to cost reports covering services prior to the Effective Time, including the Final Cost Reports;

(p)     any Privilege that relates to any Excluded Asset or any Excluded Liability; and

(q)     All funds with respect to the Debtors' self-funded (i) insurance, (ii) benefits, or (iii) similar programs.

40

## SCHEDULE 2

### Selected Senior Managers of Purchaser

[To Be Determined]

**SCHEDULE 5**

**Permitted Encumbrances**

Track Title Report

1.	[To Be Determined]

**SCHEDULE 6**

**Real Property**

| Address | Parcel No. |
|---|---|
| 958 US Highway 64 East<br>Plymouth, NC 27962 | 6777.10-26-8761 |
| **Property Description** ||
| The Debtor's Real Property is comprised of that certain tract of land approximately twenty (20) acres in size conveyed to the Debtor by General Warranty Deed dated May 31, 2007 and recorded June 1, 2007 at the Washington County Register of Deeds at Deed Book 445, Page 697. ||

**SCHEDULE 7**

**Taxes and Assessments**

[To Be Determined]

**SCHEDULE 2.7**

**Assumed Contracts**

[To Be Determined]

EXHIBIT A

[To Be Provided]

EXHIBIT B

[To Be Provided]

EXHIBIT C

The project consists of a replacement hospital that is approximately 60,000 square feet to replace the existing Washington Regional Medical Center ("WRMC").  The replacement hospital project is a multi-phase master plan for WRMC.  The site for the replacement hospital is currently targeted as the undeveloped land parcel in either "Area 1" 11.80 Acres Southwest of the existing facility or "Area 2" 10.6 Acres Southeast of the existing facility.  As part of the master plan, some of the Buildings Southeast of the existing structure will be demolished to make way for new facilities to make the site available for the construction of the replacement hospital.  The replacement hospital construction will be required to be completed in two phases.  Phase 1 will include the demolition of some of the existing clinic buildings, site preparation for the replacement hospital building and the construction of the replacement hospital building.  Phase 2 of the project will either be demolition of the existing Washington Regional Medical Center after occupancy of the replacement hospital and/or construction of the new parking structure and site features on the site of the current medical center building.  Construction of the replacement hospital is anticipated to begin in 2021 or 2022 with occupancy of the building in approximately 36 months following the start of construction.





Designing the new replacement hospital for WRMC will be a complex and difficult process. This process will take the vision of Purchaser and the support of the State of North Carolina, Washington County, and federal agencies from concept through schematic design to final approval of the design development.

# EXHIBIT B

Bidding Procedures Order

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-00730-5-JNC** |
| **CAH ACQUISITION COMPANY #1,** | ) | |
| **LLC d/b/a WASHINGTON COUNTY** | ) | **Chapter 11** |
| **HOSPITAL,** | ) | |
| | ) | |
| Debtor. | ) | |

**ORDER (A) ESTABLISHING BIDDING PROCEDURES, (B) APPROVING STALKING HORSE BIDDER, (C) APPROVING FORM AND MANNER OF NOTICES, (D) SCHEDULING HEARING TO CONSIDER FINAL APPROVAL OF SALE AND TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) <u>GRANTING RELATED RELIEF</u>**

Upon the *Trustee's Motion for (I) an Order (A) Establishing Bidding Procedures, (B) Approving Stalking Horse Bidder, (C) Approving Form and Manner of Notices, (D) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases and, (E) Granting Related Relief, and (II) an Order (A) Approving Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances, (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket. No. ___] (the "<u>Motion</u>") filed by Thomas W. Waldrep, Jr., the duly appointed Chapter 11 Trustee (the "<u>Trustee</u>" or "<u>Seller</u>") in the case of CAH Acquisition Company #1, LLC d/b/a Washington

County Hospital (the "Debtor"), in the above-captioned Chapter 11 case, seeking, among other things, approval of certain bidding procedures related to a sale of substantially all of its assets free and clear of all liens, claims, interests, and encumbrances under 11 U.S.C. § 363(f), all as more fully set forth in the Motion; the Court having reviewed the Motion, its supporting materials, and all responses thereto, if any, and having heard the statements of counsel in support of the relief requested therein at the hearing before the Court on November __, 2019 (the "Hearing"); the Court having found and concluded that (i) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (iii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409, (iv) notice of the Motion was sufficient under the circumstances, and (v) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and this Court having determined that granting the relief requested in the Motion as set forth herein is in the best interests of the Debtor, its estate and its creditors; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as provided herein.

2.      The following bidding procedures are hereby approved:

## I.      Assets to be Sold

The Trustee shall have the right, consistent with the procedures set forth herein, to sell (the "Sale") substantially all of the assets of the Debtor's bankruptcy estate (the "Transferred Assets"). Certain assets of the Debtor's bankruptcy estate are not being sold as part of the proposed sale transaction; these excluded assets include cash, cash equivalents (including investments), restricted use assets, causes of action under Chapter 5 of the Bankruptcy Code, any claims or causes of action (other than claims or causes of action arising under any Assumed Contract), any amounts payable to the Debtor as a result of any underpayments to the Debtor based on any cost reports (including Medicare and Medicaid cost reports) for the periods prior to the closing of the Sale, any grants, payments, or subsidies payable to the Debtor relating to the Debtor's operations prior to the closing of the Sale, any insurance policies and the rights and proceeds thereunder, and any other assets that the Trustee may determine to exclude from the Sale.

## II.   Summary of Important Dates[1]

| | |
|---|---|
| December 12, 2019, 5:00 p.m. Eastern Time | • Deadline for prospective bidders to submit Bids |
| December 16, 2019, 5:00 p.m. Eastern time | • Deadline for Trustee to file notice of Qualified Bidders |
| December 18, 2019 | • Deadline for Trustee to designate and communicate Starting Bid to Qualified Bidders |
| December 19, 2019, 10:00 a.m. Eastern Time | • Auction to be conducted at _____ [2] |
| December 20, 2019[3] | • Deadline for Trustee to file notice of Successful Bidder and Next-Highest Bidder |
| December 23, 2019 | • Deadline to object to Sale and Cure Amount (if applicable) |
| December 27, 2019, 2:00 p.m. Eastern Time | • Sale Hearing, to be conducted at the U.S. Bankruptcy Court for the Eastern District of North Carolina [courtroom TBD] |

## III.   Bid Protections

Pursuant to the Sale Agreement, the Trustee agreed pay a break-up fee equal to 4% of the cash purchase offer, or $140,000, Stalking Horse Bidder is not the Successful Bidder at the Auction (the "Break-Up Fee").  In addition, any overbid must offer a purchase price for the Transferred Assets that exceeds the purchase price offered by the Stalking Horse Bidder in its Sale Agreement by an amount greater than the Break-Up Fee plus $50,000.00.

## IV.   Bid Requirements

All bids (each hereinafter, a "Bid") must (collectively, the "Bid Requirements"):

(a)     be accompanied by a letter:

(i)      stating with specificity (i) the Transferred Assets (including the specific executory contracts and unexpired leases) contemplated in the Bid any person seeking to acquire any of the Transferred Assets (a "Potential Bidder") wishes to bid on, together with a schedule allocating the value of

---

[1] All terms used in the schedule below shall have the meanings ascribed to them in this Order.

[2] The Auction location will be chosen prior to the hearing on this Motion.

[3] If the Auction continues past December 19, 2019, the notice of Successful Bidder and Next-Highest Bidder shall be filed one (1) business day after the conclusion of the Auction.

the Bid across its component Transferred Assets (the "<u>Allocation</u>")[4], and (ii) the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(ii)    agreeing that the Potential Bidder's offer is binding and irrevocable until the earlier of (i) the Closing Date (as defined herein), or (ii) ten (10) days after the Sale Hearing (unless selected as the Next-Highest Bidder (as defined below)), in which case such offer will remain open until the Closing Date);

(iii)    providing evidence of committed financing or available capital sufficient to consummate the transaction and stating that such Bid is not subject to any due diligence or financing contingency;

(iv)    providing that the Potential Bidder agrees to serve as a backup bidder (the "<u>Next-Highest Bidder</u>") if the Potential Bidder's Qualified Bid (as defined below) is the next highest and best bid after the Successful Bid (as defined below) (the "<u>Next-Highest Bid</u>") with respect to the relevant Assets; and

(v)    be accompanied by adequate assurance of future performance information (the "<u>Adequate Assurance Information</u>"), including (i) information about the Potential Bidder's financial statements and federal tax returns for two years, and bank account statements, (ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, (iv) the identity and exact legal name of the Potential Bidder (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale), including the legal name of the entity that the Potential Bidder intends to be the assignee of any leases that are included in the Bid, (v) a summary of the Potential Bidder's operational experience for hospitals and skilled nursing facilities if the Potential Bidder intends to operate the hospital or skilled nursing facility as such a facility, (vi) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Trustee may disseminate their Adequate Assurance Information to affected contract counterparties and the Consultation Parties, among others, in the event that the Trustee determines such bid to be a Qualified Bid (as defined below); and

(b)    be accompanied by a duly executed purchase agreement substantially in the form of the Sale Agreement (a "<u>Purchase Agreement</u>").

---

[4] The Debtor and the Consultation Parties reserve the right to request additional details regarding the Allocation.  All disputes related to the Allocation shall be reserved for the Sale Hearing.

The closing shall not be contingent in any way on the Successful Bidder's financing or such other evidence of ability to consummate the transaction(s) as the Debtor may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided that such commitments may have covenants and conditions acceptable to the Debtor).

## V.    Qualified Bidders

Only Qualified Bidders may participate in the Auction (as defined below). To become a Qualified Bidder, a Potential Bidder must (i) execute and deliver to the Trustee a confidentiality agreement prepared by the Trustee, (ii) deposit with counsel for the Trustee ten percent (10%) of the Bid amount (the "Bidder's Deposit"), which deposit shall be refundable only as described below; (iii) submit to the Trustee an unqualified and binding bid that meets the Bid Requirements; (iv) describe the Potential Bidder's ability to obtain any regulatory approvals necessary to consummate the Sale sufficient to allow the Trustee, in consultation with the Bankruptcy Administrator and Washington County (the "County," and collectively with the Bankruptcy Administrator, the "Consultation Parties"), to make a reasonable determination as to the ability of such Potential Bidder to consummate a Sale as contemplated herein; and (v) if applicable, provide that the Potential Bidder, if successful, will accept assignment of the Debtor's Medicare and Medicaid provider agreements or will obtain its own within a timeframe acceptable to the Trustee in consultation with the Consultation Parties (each, a "Qualified Bid"). The Trustee shall timely provide copies of all Bids received to counsel to the Consultation Parties, and shall determine, in consultation with the Consultation Parties, which Bids, if any, constitute Qualified Bids.

The Trustee, in his business judgment, and in consultation with the Consultation Parties, reserves the right to reject any Bid if such Bid, among other things:

(a)    lacks adequate consideration for the assets being purchased;

(b)    requires any indemnification of the Potential Bidder in its purchase agreement;

(c)    is not received by the Bid Deadline (as defined below);

(d)    is subject to any contingencies (including representations, warranties, covenants and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Transferred Assets; or

(e)    does not, in the Trustee's determination (after consultation with the Consultation Parties), include a fair and adequate price, the acceptance of which would not be in the best interests of the Debtor's bankruptcy estate.

Any Bid rejected pursuant to the preceding paragraph shall not be deemed to be a Qualified Bid.

## VI.    <u>Bid Deadline</u>

Bids must be delivered to the Trustee, Thomas W. Waldrep, Jr., via email (twaldrep@waldrepllp.com) on or before **5:00 p.m. Eastern Time on December 12, 2019** (the "<u>Bid Deadline</u>").

## VII.    <u>Notice of Qualified Bidders</u>

On or before **5:00 p.m. Eastern Time on December 16, 2019**, the Trustee shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received without attaching copies of the accompanying letters outlined in III(a).  Also on or before 5:00 p.m. Eastern Time on December 16, 2019, the Trustee shall serve a copy of the notice and the corresponding bids without attaching the accompanying letters outlined above on all Qualified Bidders by (a) facsimile; (b) electronic mail; or (c) overnight delivery.

## VIII.    <u>Auction</u>

If one or more timely Qualified Bids are received, an open auction (the "<u>Auction</u>") for the Transferred Assets will be conducted on **December 19, 2019, commencing at 10:00 a.m. Eastern Time**, or such other time as the Trustee may announce, at a location to be determined by the Trustee prior to the hearing upon this Motion.  Only Qualified Bidders may participate in the Auction.  The following parties shall be entitled to attend but not participate in the Auction (unless they are also a Qualified Bidder): (i) the Bankruptcy Administrator, (ii) the Consultation Parties and their respective professionals (including professionals for any member of such Consultation Party), and (iii) any creditor providing written notice to Trustee's counsel of their intention to attend and observe the Auction on or before the Bid Deadline.

Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the bidding process, and (b) its Qualified Bid is a good faith, bona fide offer that it intends to consummate if selected as the Successful Bidder (as defined below).

The Trustee will conduct the Auction and shall determine, after consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for the Transferred Assets (the "<u>Starting Bid</u>"), which determination will be communicated to Qualified Bidders on or before **December 18,**.

Bidding at the Auction for the Transferred Assets that are subject to Qualified Bids will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid and (ii) the Trustee reasonably determines, in consultation with the Consultation Parties, is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below) (a "<u>Subsequent Bid</u>").   Each Subsequent Bid at the Auction shall provide net value to the estate in a minimum amount to be announced at or prior the Auction ("<u>Incremental Overbid</u>") over the Starting Bid or the Leading Bid (as defined below), as the case may be, as determined by the Trustee in the exercise of his reasonable business judgment and in consultation with the Consultation Parties.  After the first round of bidding and between each

subsequent round of bidding, the Trustee shall announce the bid that he believes to be the highest or otherwise best offer for the Transferred Assets (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Starting Bid or Leading Bid, as applicable, subject to the Trustee's authority to revise the Auction procedures as set forth below. Qualified Bidders may not pass or otherwise decline to bid in any round of bidding without forfeiting their standing in the Auction. The Auction will not be concluded until the Further Bidding (described below) is concluded.

All Qualified Bidders must be physically present at the Auction. Authorized representatives of such Qualified Bidders, with prior consent of the Consultation Parties, may be physically present or present via teleconference at the Auction.

The Trustee may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (e.g., the maximum amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids, or other rules to facilitate the Auction) for conducting the Auction or otherwise modify these Bid Procedures; provided that such rules (1) are not materially inconsistent with the Bankruptcy Code or any Order of the Bankruptcy Court, and (2) are disclosed to each Qualified Bidder during the Auction. The bidding at the Auction shall be transcribed or videotaped, and the Trustee shall maintain a transcript of all Bids made and announced at the Auction.

Notwithstanding anything to the contrary herein, the Trustee, in consultation with its professionals and in consultation with the Consultation Parties, may conduct the Auction in any manner that may result in one or more of the highest or best offers for the Transferred Assets that will maximize the value of any of the Transferred Assets. Further, the Trustee, in consultation with the Consultation Parties, reserves the right to decline any or all the Bids received at auction as insufficient to proceed with a sale of the Transferred Assets or otherwise unacceptable.

All Potential and Qualified Bidders at the Auction will be deemed to have consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to jury trial in connection with any disputes relating to the Auction, the Sale, and the construction and enforcement of any Purchase Agreement and all other agreements entered into in connection with any proposed Sale transaction. Further, by participating in the bidding process, all Potential Bidders will be deemed to have waived any right to seek a claim for substantial contribution pursuant to Section 503 of the Bankruptcy Code or the payment of any fees or costs, including, but not limited to, any break-up, termination or similar fee. Except as otherwise ordered by this Court, there shall be no payment of any broker fees or costs in connection with the Sale.

## IX.    **Further Bidding with Other Hospitals**

Immediately after the completion of (a) the Auction and (b) the auctions of other individual CAH hospitals, as identified in the Plan (the "Other Hospitals"), the Trustee will give certain Qualified Bidders the opportunity to group two or more hospitals for further bidding ("Further Bidding"). Only Qualified Bidders who are qualified to bid on each of the hospitals for which they want to bid will be eligible for Further Bidding. For purposes of Further Bidding, the minimum bidding increment for any group of two or more hospitals shall be one percent (1%) more than the sum of the highest bid of each individual hospital that comprises the group that is to be bid upon.

Further Bidding on the grouped hospitals will be allowed until a best bid is reached for the grouped hospitals.  This process will continue until no further groupings are requested by Qualified Bidders.

## X.    Selection of the Successful Bid

Immediately prior to the conclusion of the Auction and the Further Bidding, the Trustee, in consultation with the Consultation Parties will, for the Transferred Assets that were subject to the Auction: (a) determine, consistent with these bid procedures, which bid constitutes the highest or otherwise best bid (the "Successful Bid"); and (b) notify all Qualified Bidders at the Auction for the subject Assets, prior to its conclusion, of the name of the party submitting the Successful Bid (the "Successful Bidder") with respect to the subject Transferred Assets, and the amount and other material terms of the Successful Bid.  The Trustee may, in its discretion after consultation with the Consultation Parties, designate the Next-Highest Bidder (and the corresponding Next-Highest Bid) to close with respect to the Transferred Assets in the event that the Successful Bidder does not close the Sale. Unless the Bankruptcy Court orders otherwise upon application by the Trustee, the Trustee shall not consider any Bids or Subsequent Bids submitted after the conclusion of the Auction and any and all such Bids and Subsequent Bids shall be deemed untimely and shall not constitute Qualified Bids.

The Trustee may seek approval of any Successful Bid and any Next-Highest Bid at the Sale Hearing (defined below).  If, for any reason, the Qualified Bidder submitting the Successful Bid fails to timely consummate the purchase of the Transferred Assets, the Trustee may seek to consummate the Sale based on the Next-Highest Bid without further approval by the Court.  The Next-Highest Bid and the obligation of the party submitting such bid to consummate the purchase of the Transferred Assets shall remain open and in full force, including with respect to the Bidder's Deposit, until the close of a Sale of the Transferred Assets to the party making the Successful Bid or the party making the Next-Highest Bid.

The Trustee's presentation to the Bankruptcy Court for approval of a selected Bid as a Successful Bid does not constitute the Trustee's acceptance of such Bid.  The Trustee will have accepted the Successful Bid only when such Successful Bid has been approved by the Bankruptcy Court at the Sale Hearing.  The Trustee intends to close the Sale(s) within thirty (30) days after the Sale(s) is approved by the Bankruptcy Court, unless another time or date, or both, are agreed to in writing by the Trustee and the Successful Bidder (the "Closing Date"), or upon direction from the Bankruptcy Court.

## XI.    Notice of Successful Bid and Next-Highest Bid

On **December 20, 2019**, the Trustee shall file a notice with the Court identifying the Successful Bidder and the Next-Highest Bidder.  If the Auction continues past December 19, 2019, the notice shall be filed one (1) business day after the conclusion of the Auction.

## XII.    Sale Hearing

A hearing to approve a sale based on the Successful Bid (the "Sale Hearing") shall take place on **December 27, 2019, at 2:00 p.m. Eastern Time** in the United States Bankruptcy Court, Greenville, North Carolina.  The Sale Hearing may be adjourned by the Trustee in consultation

with the Consultation Parties from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice on the docket of the Debtor's Chapter 11 case.

## XIII.  **Objections to Sale**

All objections to the proposed Sale must be filed on or before **December 23, 2019**.  All rights of Consultation Parties to object to the proposed Sale, including under Section 363(f) of the Bankruptcy Code, are preserved.

## XIV.  **Return of Deposits**

Within three business days after the conclusion of the Auction described above, the Trustee shall return by check or wire the full amount of the Bidder's Deposit submitted by each party that is not selected as submitting the Successful Bid or the Next-Highest Bid.  If the Sale of the Transferred Assets is consummated with the party submitting the Successful Bid, the Bidder's Deposit of the party that is declared to have submitted the Next-Highest Bid shall be returned by check or wire transfer within three (3) business days after the closing of the Sale to the party submitting the Successful Bid.  If the party submitting the Successful Bid fails to consummate the Sale of Transferred Assets, the deposit of the party submitting the Successful Bid will not be returned and will be retained by the Trustee as liquidated damages.

## XV.  **Notice of Bid Procedures, Auction, and Sale Hearing**

Within the next business day following the entry of the Bidding Procedures Order, the Trustee will serve by first-class mail a copy of the Bidding Procedures Order and a notice containing the date of the Auction, the Sale Hearing, and the deadline to file objections to the Sale, substantially in the form attached hereto as <u>Exhibit C</u> to: (i) all potential purchasers previously identified or solicited by the Trustee and its professionals; (ii) the Office of the Bankruptcy Administrator; (iii) all parties that are known to possess or assert a lien, claim, encumbrance, or interest in or upon any of the Transferred Assets; (iv) all applicable United States, state, and local regulatory or taxing authorities, recording offices, or any governmental entity that have a reasonably known interest in the Transferred Assets; and (v) all parties on the most current master service list filed in this case.  Such notice shall be sufficient and proper notice of the sale with respect to known interested parties.

## XVI.  **Reservation of Rights and Modifications**

Notwithstanding any of the foregoing, the Trustee, in consultation with the Consultation Parties, reserves the right to modify these Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Qualified Bid requirements), impose additional terms and conditions with respect to any or all potential bidders, adjourn or cancel or change the location of the Auction at or prior to the Auction, and adjourn the Sale Hearing.

3.      Each of the Consultation Parties, including the County, expressly reserves and preserves any rights and claims regarding the valuation of the Transferred Assets for purposes of Section 506 of the Bankruptcy Code or otherwise and any Allocation of a Transferred Asset by a Potential Bidder shall not bind any Consultation Party to the value ascribed thereto.  Any valuation of any Transferred Asset for purposes of Section 506 of the Bankruptcy Code or otherwise shall be subject to further Order of this Court.

4.      The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order.

5.      The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

--End of Document--

# EXHIBIT C

Notice of Entry of Bidding Procedures Order

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No. 19-00730-5-JNC** |
| **CAH ACQUISITION COMPANY #1,** | ) | |
| **LLC, d/b/a WASHINGTON COUNTY** | ) | **Chapter 11** |
| **HOSPITAL,** | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**NOTICE OF ENTRY OF ORDER (A) ESTABLISHING BIDDING PROCEDURES, (B) APPROVING STALKING HORSE BIDDER, (C) APPROVING FORM AND MANNER OF NOTICES, (D) SCHEDULING HEARING TO CONSIDER FINAL APPROVAL OF SALE AND TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) GRANTING RELATED RELIEF**
**(Docket No. ___)**

       **PLEASE TAKE NOTICE** that the *Order (A) Establishing Bidding Procedures, (B) Approving Stalking Horse Bidder, (C) Approving Form and Manner of Notices, (D) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (E) Granting Related Relief* (the "Bid Procedures Order") was entered in the above-captioned matter on November __, 2019.  A true and correct copy of the Bid Procedures Order is attached as **Exhibit A** to this Notice.

       **PLEASE TAKE FURTHER NOTICE** that:

       1.    **Bid Deadline**.  Only Qualified Bidders[1] may participate in the bidding process. Bids of Qualified Bidders must be delivered to the Trustee, Thomas W. Waldrep, Jr., via email (twaldrep@waldrepllp.com) on or before **5:00 p.m. Eastern Time on December 12, 2019** (the "Bid Deadline").

       2.    **Auction**.  If one or more timely Qualified Bids are received, an open auction (the "Auction") for the Transferred Assets will be conducted on **December 19, 2019, commencing at 10:00 a.m. Eastern Time,** or such other time as the Trustee may announce, may announce, at a location to be determined by the Trustee prior to the hearing upon the Motion.  Only Qualified Bidders may participate in the Auction.  The following parties shall be entitled to attend but not participate in the Auction (unless they are also a Qualified Bidder): (i) the Bankruptcy Administrator, (ii) the Consultation Parties and their respective professionals (including professionals for any member of such Consultation Party), and (iii) any creditor providing written notice to Trustee's counsel of their intention to attend and observe the Auction on or before the Bid Deadline.

---

[1] Defined terms shall have the same meaning as those ascribed to them in the Bid Procedures Order.

3.      **Sale Hearing**.  A hearing to approve a sale based on the Successful Bid (the "Sale Hearing") shall take place on **December 27, 2019, at 2:00 p.m. Eastern Time** in the United States Bankruptcy Court, Greenville, North Carolina.  The Sale Hearing may be adjourned by the Trustee in consultation with the Consultation Parties from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice on the docket of the Debtor's Chapter 11 case.

4.      **Objections to Sale**.  All objections to the proposed Sale must be filed on or before **December 23, 2019**.  All rights of Consultation Parties to object to the proposed Sale, including under Section 363(f) of the Bankruptcy Code, are preserved.

DATE OF NOTICE: November __, 2019

**WALDREP LLP**

*/s/ James C. Lanik*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
Francisco T. Morales (NC Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

**- and –**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
        rredwine@hendrenmalone.com

*Attorneys for the Trustee*