**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| IN RE: ) | |
| ) | **Case No. 19-00730-5-JNC** |
| CAH ACQUISITION COMPANY #1, ) | |
| LLC, d/b/a WASHINGTON COUNTY ) | **Chapter 11** |
| HOSPITAL, *et al.*,[1] ) | |
| ) | |
| **Debtors.** ) | |
| ) | |

**BRIEF AND MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR (I) AN ORDER (A) ESTABLISHING BIDDING PROCEDURES, (B) APPROVING STALKING HORSE BIDDER, (C) APPROVING FORM AND MANNER OF NOTICES, (D) SCHEDULING HEARING TO CONSIDER FINAL APPROVAL OF SALE AND TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

**NOW COMES** Thomas W. Waldrep, Jr., Chapter 11 trustee (the "Trustee") for the above-captioned debtor and the three other debtors in these jointly administered cases (each, a "Debtor", and collectively the "Debtors"), by and through the undersigned counsel, hereby files this Brief and Memorandum of Law in support of the Trustee's motion to, among other things, sell certain assets free and clear of liens, claims, interests, and encumbrances, and, in support thereof, states as follows:

---

[1] This brief and memorandum applies to only four of the seven jointly administered cases, as follows: (i) CAH Acquisition Company #1, LLC, Case No. 19-00730-5-JNC; (ii) CAH Acquisition Company 7, LLC, Case No. 19-01298-5-JNC; (iii) CAH Acquisition Company 12, LLC, Case No. 19-01697-5-JNC; and (iv) CAH Acquisition Company #16, LLC, Case No. 19-01227-5-JNC.

The Trustee does not seek to transfer a Provider Agreement, as that term is defined herein, in the following cases: (i) CAH Acquisition Company #2, LLC, Case No. 19-01230-5-JNC; (ii) CAH Acquisition Company #3, LLC, Case No. 19-01180-5-JNC; and (iii) CAH Acquisition Company 6, LLC, Case No. 19-01300-5-JNC. As such, this brief and memorandum do not apply.

**FACTS AND ISSUES APPLICABLE TO ALL FOUR CASES REGARDING THE TRANSFER OF THE PROVIDER AGREEMENTS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES[2]**

1. On November 6, 2019, the Trustee filed in each case a substantially similar styled as a *Motion for (I) an Order (A) Establishing Bidding Procedures, (B) Approving Stalking Horse Bidder, (C) Approving Form and Manner of Notices, (D) Scheduling Hearing to Consider Final Approval of Sale and Treatment of Executory Contracts and Unexpired Leases, and (E) Granting Related Relief; and (II) an Order (A) Approving Sale Free and Clear of All Liens, Claims, and Encumbrances, (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Dkt. No. 519 in Case No. 19-0730-5-JNC; Dkt. No. 322 in Case No. 19-01227-5-JNC; Dkt. No. 341 in Case No. 19-01298-5-JNC; and Dkt. No. 330 in Case No. 19-01697-5-JNC] (the "Motion"). Included in the assets and property rights the Trustee seeks to assign are each Debtors' Provider Agreements, as defined herein, free and clear of any successor liability to CMS for pre-assignment overpayments, if any, to a Debtor.

2. Each Debtor operates, or operated pre-petition, as a Critical Access Hospital pursuant to applicable statutes and regulations. In connection therewith, each Debtor received a provider number and certain licenses, and entered into a provider agreement (collectively, the "Provider Agreement")[3] with the Centers for Medicare and Medicaid Services ("CMS") (together with the Debtor, the "Parties"), a federal agency within the United States Department of Health and Human Services ("DHHS"). A separate entity acted as the fiscal intermediary between the Debtor and CMS pursuant to 48 C.F.R. §§ 421.400—.404.

---

[2] Due to the limited nature of this Brief, a complete recitation of all general facts in this Chapter 11 case is not included. Please refer to the Motion for a more general recitation of the facts.

[3] For brevity, the term "Provider Agreement" as used herein shall encompass all property and interests related thereto, including, but not limited to, the provider agreement, the Debtor's provider number, and any and all related licenses.

3. Under applicable law, a Debtor provides medical services to patients who receive benefits under the Medicare and Medicaid programs. The fiscal intermediary issues interim reimbursements to the Debtor from Medicare and Medicaid funds pursuant to 42 U.S.C. § 1395g(e)(2); 42 C.F.R. 418.307; and 42 C.F.R. 413.64(h)(2)(v). The Debtor, in turn, must submit annual cost reports in order to verify the actual amount of reimbursements from CMS. 42 C.F.R. 413.1, 413.20, 413.24(f); see 42 U.S.C. §§ 1395g and 1395hh (authorizing the Secretary of DHHS to require the submission of cost reports by providers). The fiscal intermediary audits the cost reports on behalf of CMS pursuant to 42 U.S.C. §§ 1395g and 1395x(v)(1)(A)(ii) and 42 C.F.R. § 413.24 to determine the Debtor's actual entitlement to reimbursement, which can result in additional payment to the Debtor or, in the event of interim overpayments, a liability for the amount of such overpayment.

4. CMS may assert that the Debtor's estate owes money to CMS because of an overpayment that CMS made to the Debtor prior to the transfer of the Provider Agreement (the "Potential Liability"). After a cost report is filed, CMS, through audit or other means, can determine that an overpayment exists. CMS can audit cost reports, for cause, one to four years after they are filed, but CMS can audit cost reports, upon a showing a fraud, ten years after they are filed. The Trustee has not identified a Potential Liability, nor has CMS. As long as CMS has the ability to audit past cost reports, the possibility that CMS may yet identify a Potential Liability still exists. Outside of bankruptcy, the transferee of a provider agreement takes it subject to any overpayment liability.

5. To obtain its Provider Agreement, the Debtor qualified for its initial certification pursuant to 42 C.F.R. §§ 488.1, 488.3, 489.1, 489.2, and 489.10. The Debtor qualified under the

relevant federal regulations, as evidenced by its Provider Agreement. 42 C.F.R. §§ 489.10–12 contains the grounds for denial of certification.

6.  Outside of bankruptcy, a provider may automatically assign a provider agreement pursuant to 42 C.F.R. § 489.18 upon a "change of ownership" event and upon validation by CMS. In such an assignment, the assignee must agree to assume liability for any pre-assignment overpayments from CMS to the assignor. See United States v. Vernon Home Health, Inc., 21 F.3d 693, 696 (5th Cir. 1994) (citing 42 C.F.R. § 489.18(a), (d)). The Trustee asserts, as discussed in greater detail below, that he may transfer each Provider Agreement pursuant to Section 363(f) of the Bankruptcy Code free and clear of liens, claims, interests, and encumbrances, including but not limited to any Potential Overpayment and any other successor liability.

## ARGUMENT REGARDING PROVIDER AGREEMENTS

7.  This Court should find and hold that the Trustee may transfer each Provider Agreement to a buyer free and clear of liens, claims, interests, and encumbrances pursuant to Section 363(f). A Provider Agreement is not an executory contract, as a Provider Agreement lacks the necessary elements of a contract, namely mutual obligations and valid consideration. Instead, a Provider Agreement is a statutory entitlement, substantially the same as any other transferable federal, state, or local license. A Debtor's interest in a Provider Agreement can be assigned free and clear of successor liability pursuant to Section 363(f) of the Bankruptcy Code.

**I.  Each Provider Agreement Is Not a Contract; Therefore, It Cannot Be an Executory Contract Pursuant to Section 365(b) of the Bankruptcy Code.**

8.  Section 365(a) of the Bankruptcy Code permits a trustee to assume or reject an executory contract on a debtor's behalf. Assignment of an executory contract to a buyer requires that the Trustee first assume that contract. To assume a contract under which a debtor has

defaulted, the trustee must either cure the debtor's default or provide adequate assurance of a future cure. 11 U.S.C. § 365(b).

9. Courts administering bankruptcy cases have generally presumed, without significant analysis, that provider agreements are executory contracts subject to assumption and that any such assignment requires the assignee to assume successor liability for any defaults or overpayments existing at the time of assignment pursuant to Section 365(b) of the Bankruptcy Code. See, e.g., In re Charter Behavioral Health Syss., LLC, 45 Fed. App'x 150, 150 n.1, 2002 WL 2004651, at *1 n.1 (3d Cir. June 3. 2002) (citing 42 C.F.R. § 489.18(d); Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100, 1103–05 (8th Cir. 2000); United States v. Vernon Home Health, Inc., 21 F.3d 693, 696 (5th Cir. 1994)); In re Berks Behavioral Health, LLC, No. 10-10290, 2010 WL 4922173, at *5 (Bankr. E.D. Pa. Aug. 17, 2010).

10. Bankruptcy courts that have explicitly analyzed the issue have concluded that provider agreements are not executory contracts. See In re Verity Health Sys. of California, Inc., No. 2:18-BK-20151-ER, 2019 WL 4729457, at *3 (Bankr. C.D. Cal. Sept. 26, 2019) ("The first issue the Court must confront, then, is whether the Provider Agreements are contracts. The Court finds that they are not."). See also In re B.D.K. Health Mgmt., Inc., No. 98-00609-6B1, 1998 WL 34188241, at *6 (Bankr. M.D. Fla. Nov. 16, 1998) ("the provider numbers are statutory entitlements, not contracts"); In re Kings Terrace Nursing Home & Health Related Facility, No. 91 B 11478 (FGC), 1995 WL 65531, at *9 (Bankr. S.D.N.Y. Jan. 27, 1995), aff'd, 184 B.R. 200 (S.D.N.Y. 1995) ("[T]he Debtor's right to reimbursement and the DSS's right to recover payments do not arise from any contract, but rather from statutory and regulatory requirements completely independent of a contract.").

11. Executory contracts are "contract[s] that neither party has finished performing." Mission Prod. Holdings, Inc. v. Tempnology, LLC, — U.S. —, 139 S. Ct. 1652, 1657 (2019) (emphasis added). An executory contract must, by definition, be a contract. Non-bankruptcy law governs the analysis of whether the Provider Agreement is a contract. Verity Health System, 2019 WL 4729457 at *3 (citing Butner v. United States, 440 U.S. 48, 55 (1979)).

12. In the context of contracts with federal entities, the United States Court of Appeals for the District of Columbia defines a contract as "a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Henke v. U.S. Dept. of Commerce, 83 F.3d 1445, 1450 (D.C. Cir. 1996) (citing Restatement (Second) of Contracts (1979) §1). "A contract has certain essential elements, to wit, competent parties, lawful subject matter, legal consideration, mutuality of assent and mutuality of obligation." Henke, 83 F.3d at 1450 (citing 1 Williston, Contracts § 1.1 (4th ed. 1990)).

13. Further, the law of Delaware, the Debtor's state of organization, subscribes to substantially the same definition of a contract—offer and acceptance (mutual assent) and valid consideration. Park v. Georgia Gulf Corp., No. 91-569, 1992 WL 714968, at *3 (D. De. Sept. 14, 1992) (citing, e.g., In re Radiology Assoc., Inc., 1990 WL 67839, at *1 (Del. Ch. Ct. May 16, 1990); Hindes v. Wilmington Poetry Soc'y, 138 A.2d 501, 503 (Del. Ch. Ct. 1958)).

14. CMS has no duties to the Debtor except to ensure reimbursement for services provided to Medicare and Medicaid patients in accordance with federal law. In turn, federal law governs the Debtor's eligibility to participate in the Medicare and Medicaid reimbursement program. See 42 C.F.R. § 489.3 (defining "provider agreement"); 42 C.F.R. §§ 489.10–11 (defining the qualifications to participate under a reimbursement provider agreement, all of which require only compliance with federal laws and regulations). The bases provided to deny a

6

provider's participation in a provider agreement, enumerated at 42 C.F.R. §§ 489.12, are all determined as matters of regulatory or statutory compliance.

15. Neither any Debtor nor CMS has agreed to undertake any action other than to obey the statutes and regulations dictated by Congress and the Secretary of DHHS. An agreement to comply with existing regulatory and statutory provisions does not provide valuable consideration. E.g., Wharton v. Comcast Corp., 912 F. Supp. 2d 655, 660 (N.D. Ill. 2012) (citing Restatement (Second) of Contracts § 71); see also Verity Health Systems, 2019 WL 4729457 at *5 (holding that a California Medicare Provider agreement was not a contract as the bases for qualification "merely restate[d] the Debtors' pre-existing legal obligations"); Larobina v. Wells Fargo Bank, N.A., No. 3:10-cv-01279, 2014 WL 3419534, at *3 (D. Conn. July 10, 2014) (stating that an agreement to comply with applicable law does not constitute consideration); Rao v. Covansys Corp., No. 06 C 5451, 2007 WL 3232492, at *4 (N.D. Ill. Nov. 1, 2007) (same). Outside of bankruptcy, federal courts have held consistently that the providers under provider agreements lack legal remedies under contract law to benefit from or enforce such agreements. Verity Health Systems, 2019 WL 4729457 at *4–6 (citing the cases to follow).

16. In 2014, the United States Court of Appeals for the Ninth Circuit held that a hospital, a party to a provider agreement, could not challenge a decision by the Secretary of DHHS to reduce that hospital's reimbursement eligibility by asserting the contractual doctrine of "substantial compliance." PAMC, Ltd. v. Sebelius, 747 F.3d 1221 (9th Cir. 2014). Hospitals, "[u]pon joining the Medicare program . . . receive[] a statutory entitlement, not a contractual right" to enforce provider agreements with contract remedies. Id. (quoting Mem'l Hosp. v. Heckler, 706 F.2d 1130, 1136 (11th Cir. 1983) (emphasis added)).

17. The 1983 opinion of the United States Court of Appeals for the Eleventh Circuit in Memorial Hospital v. Heckler, quoted by the Ninth Circuit in PAMC, held that legislative reductions of hospitals' Medicare reimbursements did not abrogate any contractual rights to reimbursement vested in the hospitals because Medicare provider agreements are not contracts at all, but participation in a statutory entitlement program. Memorial Hosp., 706 F.3d at 1136.

18. That same year, the United States Court of Appeals for the Third Circuit, in Germantown Hospital and Medical Center v. Schweiker, 738 F.2d 631 (3d Cir. 1983), affirmed a lower court that reached the same conclusion as the Ninth Circuit in PAMC: "upon joining the Medicare program, providers gain a statutory entitlement to reimbursement" and not a contractual right. Germantown Hosp. and Med. Ctr. v. Heckler, 590 F. Supp. 24, 30–31 (E.D. Penn. 1983).

19. The United States Court of Appeals for the Seventh Circuit has also held that hospitals lack a vested contractual right to specific Medicare reimbursement costs under provider agreements. The applicable federal statutes and Congressional intent specifically govern the reimbursement terms thereunder. Johnson Cty. Mem'l Hosp. v. Schweiker, 698 F.2d 1347, 1350 (7th Cir. 1983). The United States District Court for the Northern District of Texas reached the same conclusion in Greater Dallas Home Care All. V. United States, 10 F. Supp. 2d 638 (N.D. Tex. 1998), where that court stated that "the right to receive payments under the Medicare Act is a manifestation of Government policy and . . . is a statutory rather than a contractual right." 10 F. Supp. 2d at 647. See also Bennett v. Ky. Dept. of Educ., 470 U.S. 656, 657 (1985) (an entitlement program should not be construed as "a bilateral contract" subject to a liberal construction against the drafter, the federal government).

20. The court in Verity Health System, cited throughout this brief, found that a California "Med-Cal" provider agreement bore "no meaningful difference" from a provider

agreement with CMS and that such provider agreements are not executory contracts subject to assumption and assignment. 2019 WL 4729457 at *4–6.

21. Under the Provider Agreement at issue here, neither any Debtor nor CMS owe each other any reciprocal obligations beyond compliance with legal and regulatory mandates. No valid consideration exists. The Provider Agreement, despite the common presumption of courts administering bankruptcy cases, results from a statutory entitlement and does not rise to the level of a contract. The provisions of Section 365 of the Bankruptcy Code do not apply to the assignment of the Provider Agreement.

22. Non-bankruptcy case law holding that provider agreements are non-contractual statutory entitlements cannot be reconciled with the body of bankruptcy case law presuming such agreements are bilateral executory contracts. The Third Circuit, in University Medical Center v. Sullivan (In re University Medical Center), 973 F.2d 1065 (3d Cir. 1992),[4] presumed that a Medicare provider agreement was an executory contract subject to assumption in bankruptcy, which is irreconcilable with the Third Circuit's prior affirmation of the Germantown Hospital and Medical Center decision eight years prior. 2019 WL 4729457 at *6. Compare University Med. Ctr, 973 F.2d at 1074, 1079 with Germantown Hosp. and Med. Ctr. v. Heckler, 590 F. Supp. at 30–31, aff'd sub nom. Germantown Hosp. and Med. Ctr. v. Schweiker, 738 F.2d at 633. Under the weight of authority, this Court should find that the cases finding that provider agreements are executory contracts are incorrect and that the Provider Agreement is not an executory contract.

---

[4] In re University Medical Center was cited, among various bankruptcy court decisions, by DHHS and CMS in their collective objection to the debtor's motion to sell its assets, including provider agreements, free and clear of liens and interests, in Verity Health System, Case No. 2:18-bk-20151-ER, Dkt. No. 1346 at 8 (Bankr. C.D. Cal. Jan. 25, 2019). The Verity Health System Court rejected the argument of CMS and DHHS.

### II.     A Provider Agreement Is a Statutory Entitlement Capable of Assignment Free and Clear of Interests Under Section 363(f) of the Bankruptcy Code.

23. The Provider Agreements provide each Debtor an intangible right to participate in, and receive reimbursements from, Medicare and Medicaid programs administered by CMS. The Trustee may assign each Provider Agreement to a purchaser, free and clear of successor liability for the Alleged Overpayment, pursuant to Section 363(f) of the Bankruptcy Code.

24. Section 363(f) of the Bankruptcy Code provides that a trustee may sell property of the estate under Sections 363(b) or (c) "free and clear of any interest in such property of an entity other than the estate" if any one of five conditions is met: (1) non-bankruptcy law permits such a transfer, (2) the entity consents, (3) the interest is a lien and sale price of the property is greater than the value of all liens on the property, (4) the interest is disputed, or (5) the "entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

25. Each Debtor's interests in the Provider Agreement constitute property of the Debtor's respective estate pursuant to Section 541(a) of the Bankruptcy Code. "Courts have held that interests such as the Provider Agreements constitute 'property of the estate' under § 541 that may be sold under § 363." Verity Health System, 2019 WL 4729457, at *6. The ability to participate in a government program through which a debtor receives benefits based on statutory and regulatory qualifications, such as money or the ability to operate in a regulated field, is akin to a license and general intangible under the Uniform Commercial Code. See Verity Health System, 2019 WL 4729457 at *6 (citing MLQ Inv'rs, L.P. v. Pac. Quadracasting, Inc., 146 F.3d 746, 749 (9th Cir. 1998) and Matter of Fugazy Exp., Inc., 124 B.R. 426, 430 (S.D.N.Y. 1991)). Such interests are not excluded under Section 541(b) of the Bankruptcy Code.

26. The interest of CMS in the Potential Liability is an interest in property of each estate; the fact that an obligation is imposed by statute or regulation is immaterial to that

determination. See Verity Health System, 2019 WL 4729457, at *6 ("The [overpayment liabilities] are an "interest in property" within the meaning of § 363(f). The [overpayment liabilities] arise because the Hospitals have elected to exercise their statutory entitlement to provide medical services, and receive reimbursement for providing such services, under the Provider Agreements. As such, the [overpayment liabilities] are a monetary obligation arising from the ownership of property (the property being the reimbursement rights associated with the Provider Agreements)."). Cf. Mass. Dep't of Unemployment Assistance v. OPK Biotech, LLC (In re PPBPC, Inc.), 484 B.R. 860, 869–70 (1st Cir. BAP 2013) (construing the words "any interest" in Section 363(f) of the Bankruptcy Code broadly, based on precedent from the Second, Third, Fourth, and Seventh Circuits, so as to include Massachusetts unemployment insurance taxes within that Section); United Mine Workers of Am. Combined Benefit Fund v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573, 581 (4th Cir. 1996) (holding that obligations imposed by the Coal Industry Retiree Health Benefit Act were included under Section 363(f)); see also United States v. Gonzales, 520 U.S. 1, 5 (1997) (noting that the use of the word "any" in a provision of a federal statute indicates Congressional intent to construe such provision broadly).

27. The Trustee need satisfy only one of the provisions of Section 365(f) to be transfer the Provider Agreement free and clear of the Potential Liability. The Trustee asserts that he may do so pursuant to Sections 365(f)(4) and 365(f)(5).

28. Section 363(f)(4) allows the Trustee to transfer the Provider Agreement free and clear if there exists a bona fide dispute as to the Potential Liability. The Trustee asserts that no Potential Liability exists with respect to any Debtor. So long as CMS can assert that any Potential Liability exists, CMS will not agree that there is no Potential Liability, and such dispute satisfies Section 363(f)(4).

29. Section 363(f)(5) of the Bankruptcy Code provides that an entity's interest in a debtor's property can be transferred free and clear of that interest if that "entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." In other words, if the interest of CMS in each Provider Agreement—the Potential Liability—could be extinguished by money satisfaction in a legal or equitable action, then the Provider Agreements can be assigned free and clear of any Potential Liability and any successor liability.

30. CMS holds only the right to receive a monetary payment for the Potential Liability pursuant to the statutes and regulations governing each Provider Agreement, and only a monetary satisfaction could satisfy the Potential Liability. See In re P.K.R. Convalescent Ctrs., Inc., 189 B.R. 90, 94 (Bankr. E.D. Va. 1995) (holding that a debtor's liability to the Virginia Department of Medical Assistance Services, or "DMAS," for $1,700,000 in depreciation recapture would not transfer to a purchaser of the debtor's facility pursuant to Section 365(f)(5) because any interest DMAS had in the debtor's facility would be fully extinguished by the payment of the depreciation recapture).

31. The Potential Liability to CMS is substantially different than a regulatory liability that requires non-monetary satisfaction to purge such liabilities, that is, the requirement to comply with state or federal environmental statutes. See P.K.R. Convalescent Centers, 289 B.R. at 95 (citing Torwico Elecs., Inc. v. New Jersey Dep't of Envtl. Protection (In re Torwico Elecs., Inc.), 8 F.3d 146, 150–51 (3d Cir. 1993), and In re Borne Chemical Co., 54 B.R. 126, 128 (Bankr. D.N.J. 1984)). A Debtor can satisfy a Potential Liability only by payment of money, thus satisfying Section 363(f)(5).

32. To the extent that 42 C.F.R. § 489.18(d) purports to mandate successor liability upon a "change of ownership" event that results in the automatic assignment of a provider

agreement pursuant to 42 C.F.R. §§ 489.18(a) and (c), such mandate directly conflicts with the express language and purpose of Section 363(f) of the Bankruptcy Code. "Where reconciliation of the objectives of the Bankruptcy Code with those of another statutory scheme reveals that the effect of the non-bankruptcy statute is to restructure the debtor/creditor relationship rather than advance its own fundamental concerns, the intersecting non-bankruptcy statute must yield to the Bankruptcy Code." In re Medicar Ambulance Co., Inc., 166 B.R. 918, 925 (Bankr. N.D. Cal. 1994).

33. A Debtor's interest in the Provider Agreement is a statutory entitlement to participate in a government reimbursement program so long as the Debtor complies with applicable laws and regulations. Therefore, each Provider Agreement constitutes an estate property interest transferrable and assignable under Section 363(b) of the Bankruptcy Code. A Debtor could satisfy any Potential Liability only through payment of money. Therefore, each Provider Agreement can be assigned free and clear of successor liability pursuant to Section 363(f)(5) of the Bankruptcy Code.

**BACKGROUND FACTS AND ISSUES PRESENTED APPLICABLE IN ONLY *IN RE: CAH ACQUISITION COMPANY #1, LLC*, CASE NO. 19-00730-5-JNC REGARDING WASHINGTON COUNTY'S REVERSIONARY INTEREST**

34. On or about May 31, 2007, the Debtor purchased from the County of Washington, North Carolina ("Washington County") certain real estate (the "Real Property"). The hospital, the rural health clinic, and certain other buildings are located on the Real Property. A copy of the deed (the "Deed") relating to that transfer is attached hereto as Exhibit A and is incorporated herein by reference.

35. The Deed contains the following language:

This conveyance of the Property to Grantee, its successors and assigns, conveys a fee simple determinable interest. Should Grantee fail to comply with the terms and

conditions of the Asset Purchase Agreement as described in Sections 10.6 and 10.10 of the Asset Purchase Agreement, as the same may be amended from time to time, all the Property, together with all improvements, additions and replacements thereto as described in Section 10.7 of the Asset Purchase Agreement, shall automatically revert and transfer to Grantor, or its successors and assigns, and the estate held by Grantee shall automatically terminate.

36. The Asset Purchase Agreement is attached to the Deed as an exhibit. The Asset Purchase Agreement provides, in relevant part, as follows:

As required by N.C. Gen. Stat. §131E-13(a), Buyer agrees that if it fails to substantially comply with the covenants set forth in Section 10.6, or if it fails to operate the Business as a community general hospital open to the general public and free of discrimination based on race, creed, color, sex, or national origin unless relieved of this responsibility by operation of Legal Requirement, or if Buyer dissolves without a successor to carry out the terms and conditions of the Agreement, all ownership or other rights in the Purchased Assets, including the Facilities associated with the Business, shall revert to the County; provided that any building, land, or equipment associated with the Facilities that Buyer or any of its subsidiaries or affiliates has constructed or acquired since the Closing may revert only upon payment to Buyer of a sum equal to the cost less depreciation of the building, land, or equipment; and provided further that this section shall not apply to leases, sales, or conveyances of non-medical services or commercial activities, including any gift shop, cafeteria, flower shop or other retail or commercial activity, or to surplus Hospital property that is not required in the delivery of necessary hospital services at the Effective Time.

37. N.C.G.S. § 131E-13(a) provides in pertinent part as follows:

The corporation shall further agree that if it fails to substantially comply with these conditions, or if it fails to operate the facility as a community general hospital open to the general public and free of discrimination based on race, creed, color, sex, or national origin unless relieved of this responsibility by operation of law, or if the corporation dissolves without a successor corporation to carry out the terms and conditions of the lease, agreement of sale, or agreement of conveyance, all ownership or other rights in the hospital facility, including the building, land and equipment associated with the hospital, shall revert to the municipality or hospital authority or successor entity originally conveying the hospital; provided that any building, land, or equipment associated with the hospital facility that the corporation has constructed or acquired since the sale may revert only upon payment to the corporation of a sum equal to the cost less depreciation of the building, land, or equipment.

This section shall not apply to leases, sales, or conveyances of nonmedical services or commercial activities, including the gift shop, cafeteria, the flower shop, or to

surplus hospital property that is not required in the delivery of necessary hospital services at the time of the lease, sale, or conveyance

## ARGUMENT REGARDING FEE SIMPLE DETERMINABLE AND THE ALLEGED AUTOMATIC TRANSFER BACK TO WASHINGTON COUNTY

38. The Deed transferring the Subject Real Property appears to create a fee simple determinable estate, governed by North Carolina real property law. The North Carolina Supreme Court has stated the following regarding fee simple determinable estates:

> [A] fee simple determinable constitutes the entire estate throughout its continuance. It retains its defeasible quality, however, until the happening of the stated event by which it is to be determined, or until it is converted into a fee simple absolute. A fee simple determinable is converted into a fee simple absolute when the stated event on which it is limited becomes impossible of occurrence.
>
> When the owner of land in fee simple absolute devises it in fee simple determinable, a possibility of reverter, which is a reversionary interest subject to a condition precedent, springs up. It arises without being created by any specific words in the will, and exists in the eligible heirs of the devisor while the fee simple determinable is outstanding in the devisee or his successors in interest, that is to say, until that estate ends by the happening of the stated event on which it is limited, or until that estate is converted into a fee simple absolute. . . .
>
> These things being true, a possibility of reverter arising on the creation of a fee simple determinable is not an estate in land, but is a mere possibility of acquiring an estate in land at a future time upon the happening of a condition precedent, i. e., the occurrence of the stated event on which the fee is limited.

Elmore v. Austin, 232 N.C. 13, 21, 59 S.E.2d 205, 211 (1950)

39. Washington County has asserted that events occurred which caused the reversion of the Real Property to the County, namely that the Debtor ceased operating a community general hospital on the Real Property. The Trustee disputes these assertions and, instead, asserts that the Real Property remains property of the estate. The Trustee further asserts that he can, notwithstanding Washington County's assertions, sell the Real Property free and clear of Washington County's claimed ownership of the land and that such interest, if any, would attach to the proceeds of the sale pursuant to Section 363(f)(4).

40. Courts have held that Section 363(f)(4) allows a trustee to sell property subject to contested ownership issues free and clear of such disputes. See In re Genesys Research Inst., Inc., No. 15-12794-JNF, 2016 Bankr. LEXIS 2376, at *69 (Bankr. D. Mass. June 24, 2016) (denying reconsideration of a prior decision that debtor could sell equipment pursuant to Section 363(f)(4) despite a bone fide dispute as to ownership); In re Hindu Temple & Cmty. Ctr. of Ga., Inc., No. 09-82915, 2013 Bankr. LEXIS 5612, at *24 (Bankr. N.D. Ga. Mar. 5, 2013) ("The court authorized the sale pursuant to 11 U.S.C. § 363(f)(4), which permits the sale of property that is subject to a dispute as to ownership"); In re Durango Ga. Paper Co., 336 B.R. 594, 597-98 (Bankr. S.D. Ga. 2005) (authorizing the sale of groundwater despite a bona fide dispute as to ownership).

41. "The threshold determination as to the existence of a bona fide dispute necessarily requires a finding that the disputed property is or could become property of the bankruptcy estate." In re Robotic Vision Sys., 322 B.R. 502 (Bank. D. N. H. 2005) (emphasis added). In the present case, the Trustee disputes that ownership of the Real Property has reverted to Washington County, and he asserts that the Real Property remains, as has always remained, property of the estate. The Trustee's bona fide claim to ownership of the Real Property, in contest to the County's contrary assertion, warrants a sale pursuant to Section 363(f)(4).

42. "[T]he purpose behind § 363(f)(4) 'is to allow the sale of property of the estate free and clear of disputed interests so the liquidation of the assets is not unnecessarily delayed while the disputes are being litigated." In re NJ Affordable Homes Corp., No. 05-60442 (DHS), 2006 Bankr. LEXIS 4498, at *40 (Bankr. D.N.J. June 29, 2006). Such power allows a debtor or trustee to promptly sell estate property without the necessity of resolving all disputes regarding such property prior to the sale. Doing so could take a significant amount of time and could materially and adversely affect the value of the property.

43. That rationale applies to this situation. Resolving all disputes with Washington County as to the ownership of the Real Property could take months, if not years, of litigation. Delaying a sale of the Real Property until the end of that litigation could seriously impact its ultimate sale price and could cost the estate a substantial amount of money. This Court should thus allow the sale of the Real Property, free and clear of Washington County's claim of ownership pursuant to terms of the Deed and the Asset Purchase Agreement, with such interests to attach to the proceeds of the sale.

## CONCLUSION

44. The Provider Agreements are not contracts; therefore, none can be an executory contract subject to the assumption and assignment requirements of Section 365(b). A Provider Agreement merely memorializes the participation of a Debtor and CMS in a statutory entitlement program under which the parties comply with relevant laws and regulations. Outside of bankruptcy, no court would permit a Debtor to enforce a Provider Agreement against CMS or DHHS under traditional principals of contract law.

45. Each Provider Agreement is property of the estate under Section 541(a) of the Bankruptcy Code, as it is akin to a governmental license to participate in a statutory entitlement program. Each Provider Agreement can be assigned free and clear of successor liability (i.e., the Potential Liability) pursuant to Sections 363(f)(4) and 365(f)(5) of the Bankruptcy Code, as the Trustee disputes that any Potential Liability exists. A monetary satisfaction in a legal or equitable proceeding would eliminate any interest held by CMS against the Provider Agreement for such liability.

46. On these bases, the Court should permit the Trustee to assign each Provider Agreement to the purchaser thereof free and clear of successor liability for the Alleged Overpayment, as proposed in the Sale Motion.

47. Further, the Trustee and Washington County dispute whether ownership of the Real Property in that case has reverted to the County. Such dispute warrants sale of the Real Property free and clear of the County's alleged interest pursuant to Section 363(f)(4).

Respectfully submitted, this the 7th day of November, 2019.

**WALDREP LLP**

/s/ *James C. Lanik*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC Bar No. 39871)
Francisco T. Morales (NC Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104
Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

**- and –**

**HENDREN, REDWINE & MALONE, PLLC**

Jason L. Hendren (NC State Bar No. 26869)
Rebecca F. Redwine (NC Bar No. 37012)
4600 Marriott Drive, Suite 150
Raleigh, NC 27612
Telephone: 919-420-7867
Telefax: 919-420-0475
Email: jhendren@hendrenmalone.com
       rredwine@hendrenmalone.com

*Attorneys for the Trustee*