## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-00730-5-JNC** |
| **CAH ACQUISITION COMPANY #1,** | ) | |
| **LLC, d/b/a WASHINGTON COUNTY** | ) | **CHAPTER 11** |
| **HOSPITAL,** *et al.* | ) | |
| | ) | |
| **Debtors.** | ) | |

**OBJECTION OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES TO TRUSTEE'S MOTION FOR (I) AN ORDER (A) ESTABLISHING BIDDING PROCEDURES, (B) APPROVING STALKING HORSE BIDDER, (C) APPROVING FORM AND MANNER OF NOTICES, (D) SCHEDULING HEARING TO CONSIDER FINAL APPROVAL OF SALE AND TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING SALE FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

The United States Department of Health and Human Services ("DHHS"), by and through the United States Attorney, submits this objection to the Trustee's motion to sell assets (ECF No. 519).   DHHS operates the Medicare program, the federal health insurance program for the elderly and disabled, through its component agency the Centers for Medicare & Medicaid Services ("CMS").  Certain of the Debtors currently hold Medicare provider agreements with DHHS, pursuant to which the Debtors receive Medicare payments for services rendered to Medicare beneficiaries. The Trustee now proposes to sell the certain Debtors' assets free and clear of "any

successor liability associated with the Medicare/Medicaid Provider Agreements," which the Trustee labels the "CMS Agreements." ECF No. 519 at p.5, ¶13. [1] The Trustee's proposal is inconsistent with the applicable law of Medicare.

The Trustee specifies that his motion applies to four of the jointly-administered bankruptcy cases. ECF No. 519 at p.1, n.1. Accordingly, DHHS submits this objection with full force and applicability to the proposed sales in those same four bankruptcy cases.

## Introduction

The Trustee's proposed treatment of the Debtors' Medicare provider agreements is contrary to the law governing the Medicare provider agreement and to the law governing the Medicare payment system. Medicare law has long recognized that a health care business should "expect no less than to be held to the most demanding standards in its quest for public funds" from the Medicare program. *See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984). A participant in the Medicare program has a "duty to familiarize itself" with the program's legal requirements, *id.* at 64, because it subscribes itself fully to those

---

[1]  Although the Federal Government supplies a very large share of the funding for Medicaid, each State Government actually administers the Medicaid program in its State. *See Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006) (describing Federal and State roles in Medicaid). Accordingly, to the extent the Trustee purports to transfer the Debtor's *Medicaid* provider agreement, it is the applicable State Government that must be given notice and opportunity to respond.

2

requirements when it chooses to do business with Medicare. Those legal requirements remain unchanged by bankruptcy. The law of bankruptcy "does not permit anything and everything that might advance" a debtor's or a trustee's goals. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, -- U.S. --, 139 S.Ct. 1652, 1665 (2019). A trustee "cannot possess any more than the debtor itself did outside of bankruptcy." *Id.* at 1663.

The Medicare provider agreement, pursuant to which a healthcare business receives payments for certain services that the business renders to Medicare patients, has been well-recognized as an executory contract in most jurisdictions for many years. Nearly 40 years ago, one court dismissed the attempt to characterize the provider agreement as something other than an executory contract as mere "interesting reading . . . that  . . .  in no way reflects the reality of the relationship" between DHHS and the provider. *See In re Monsour Med. Ctr.*, 11 B.R. 1014, 1018 (W.D. Penn. 1981). The majority of courts "considering the Medicare-provider relationship conclude that the Medicare provider agreement, with its attendant benefits and burdens, is an executory contract." *See In re Santiago*, 563 B.R. 457, 474 (Bankr. D.P.R. 2017) (citation omitted). However, it is not the label or designation that matters most. Even if one were to characterize the provider agreement as something other than an executory contract, the aspect of the Medicare provider agreement that the Trustee is trying to avoid – the recoupment of Medicare overpayments that have been made under that provider agreement -- cannot be

3

avoided, because recoupment is a key and integral element of the Medicare payment system, and is, in fact, a required element in the calculation of lawful Medicare payment.

For the following reasons, the Trustee's motion should be denied.

### The nature and purpose of the Medicare program

1.     Medicare is a program of the Social Security Act, at Title XVIII, codified at 42 U.S.C. §§ 1395 *et seq.* It is an enormous national health insurance program that processes over a billion claims for payment each year. *See Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1156 (9th Cir. 2012) (citation omitted). Medicare is a "phenomenally regulated system." *In the Matter of Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 119 (Bankr. M.D. Fla. 1990); *see Shalala v. Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 13 (2000) (describing Medicare as "a massive, complex health . . . program . . . embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations . . .")

2.     A healthcare business may seek to participate in the Medicare program, in order to receive Medicare payments as business revenues, for services that it renders to the elderly and disabled persons insured by Medicare. These elderly and disabled persons are the intended beneficiaries of the program. *See Baylor Univ. Med. Clinic v. Heckler*, 758  F.2d 1052, 1059 (5th Cir. 1985) (purpose of Medicare is "to recompense the aged and disabled for their medical expenses"). The courts have long recognized that healthcare businesses are merely incidental beneficiaries of

4

governmental healthcare payment programs. *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, -- U.S. --, 135 S.Ct. 1378, 1387 (2015); *Dialysis Ctrs., Ltd. v. Schweiker*, 657 F.2d 135, 138 (7th Cir. 1981); *Native Angels Home Health, Inc. v. Burwell*, 123 F. Supp. 3d 775, 778 (E.D.N.C. 2015) (citations omitted). A healthcare business that chooses to participate in Medicare does so with "no guarantee of solvency" or of any desired financial outcome. *See Livingston Care Ctr., Inc.. v. United States*, 934 F.2d 719, 720-21 (6th Cir. 1991).

### The Medicare provider agreement

3.     A Medicare provider agreement is a unique agreement between a health care business and the Secretary of DHHS. 42 U.S.C. § 1395cc. Without a valid Medicare provider agreement, a business cannot seek Medicare payments for services it renders to Medicare beneficiaries. 42 U.S.C. § 1395f(a). The Medicare provider agreement comprehensively incorporates among its governing terms the entire set of applicable Medicare statutory and regulatory provisions. *See, e.g., In re Neumann*, 55 B.R. 702, 705 (S.D.N.Y. 1985); *Monsour Med. Ctr.*, 11 B.R. at 1018; *In re St. John's Home Health Agency, Inc.*, 173 B.R. 238, 247 (Bankr. S.D. Fla. 1994).

4.     In choosing to enter into a Medicare provider agreement with DHHS, a health care business subscribes itself fully to the applicable law of Medicare. The provider agreement is the basis of the legal relationship between DHHS and the

business.[2]  The business agrees to maintain compliance with Medicare's health and safety requirements for a provider of the applicable type (*e.g.*, hospital, hospice, nursing facility, *etc.*) and to adhere to the myriad terms, conditions, and criteria that govern proper Medicare billing.  In return, DHHS agrees to pay the business for certain healthcare services delivered to the Medicare program's beneficiaries, with payments made in accordance with the terms of Medicare law.[3]

**The payment system under a Medicare provider agreement**

5.    The Medicare payments that are issued to a provider under a Medicare provider agreement are well-recognized as a single, ongoing transaction of up-front, estimated amounts that remain subject to later accounting and adjustment.  *E.g.*, *U.S. v. Consumer Health Servs. of America*, 108 F.3d 390, 394-96 (D.C. Cir. 1997). The payment provision of the Medicare statute, at 42 U.S.C. § 1395g(a), calls for

---

[2]  The Trustee's brief, ECF No. 524, makes reference to "provider numbers."  A Medicare "provider number" is a 6-digit administrative identifier associated with a particular Medicare provider agreement.  The provider number has no independent legal significance.

[3]  As such, the Medicare provider agreement serves a purpose and function not unlike a provider agreement between any other insurance plan and a health care business.  *See generally Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 214 (1979) (describing insurer's provider agreements as arrangements "for the purchase of goods and services" by the insurer from health care businesses); *Int'l Healthcare Mgt. v. Haw. Coal. for Health*, 332 F.3d 600, 602 n.2 (9th Cir. 2003) ("A participating provider agreement is a [health care business'] contract with a health plan.  It establishes the [business'] rights and responsibilities in providing medical services to insured patients.").

"necessary adjustments on account of previously made overpayments and underpayments" when determining the amount of payment presently due. This provision is critical. Section 1395g(a) defines the Medicare program's substantive payment liability to a provider. *Consumer Health Servs.*, 108 F.3d at 394-95. It cannot be overridden. *In re S. Inst. for Treatment & Evaluation*, 217 B.R. 962, 966 (Bankr. S.D. Fla. 1998). It is "the fundamental payment provision which underlies Medicare reimbursement[;] [t]here is no evading it or circumventing it under any authority or at any time." *In re Tri County Home Health Servs. Inc.*, 230 B.R. 106, 112 (Bankr. W.D. Tenn. 1999).

6. Typically, the determination of a previous overpayment or underpayment occurs when the provider's required annual Medicare cost report is audited by DHHS (through its Medicare contractors). In addition, interim rate reviews are often conducted in the middle of a fiscal year. It is "inherent" in the nature of the Medicare payment system that retrospective reviews and audits can – and very often do -- reveal that an overpayment or an underpayment has occurred. *See Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosps., Inc.)*, 224 F.3d 1008, 1014 (9th Cir. 2000).

7. The possibility of overpayments or underpayments is perhaps especially high in the case of operations such as the Debtors' operations. The Debtors operate small rural hospitals certified as a type of provider called a critical access hospital by Medicare law. This type of provider gets paid by Medicare on the basis of the

individual provider's "reasonable costs." 42 U.S.C. § 1395f(l)(1); 42 C.F.R. §§ 413.70(a)(1), 413.70(b)(2)(i). [4]

8.      Because the costs incurred in a fiscal period cannot be known until the Medicare cost report is filed (after the end of the period) and is then audited (for reasonableness and for consistency with the applicable Medicare criteria), the amounts that get issued to the provider during the course of the fiscal period are merely estimates of the amount that may be legally due.

9.      By the terms of Medicare law, overpayments must be accounted for in the course of calculating the amount of Medicare payment presently due. *See* 42 U.S.C. § 1395g(a). The process by which a Medicare overpayment gets accounted for is *recoupment*: the amount of the previous overpayment is withheld from the provider's current payments. The "overwhelming majority of district and bankruptcy courts nationwide which have ruled" on the matter have recognized this payment adjustment process as recoupment. *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004); *see, e.g., Sims*, 224 F.3d 1008; *Consumer Health Servs.*, 108 F.3d 390; *S. Inst. for Treatment & Evaluation*, 217 B.R. 962; *Tri County Home Health Servs.*, 230 B.R. 106; *St. John's Home Health*, 173 B.R. 238*; Visiting Nurse Ass'n of Tampa Bay*, 121 B.R. 114; *also see In re Dt. Mem'l Hosp. of SW N. Carolina, Inc.*, 297 B.R.

---

[4]   In the past, Medicare paid many types of providers on a "reasonable cost" basis. Today, however, the vast majority of provider types are paid by means of prospectively-set rates.

451 (Bankr. W.D.N.C. 2002) (Medicaid recoupment case); *In re Ravenwood Healthcare, Inc.*, Case No. 02-5-9516, 2006 WL 4481985 (Bankr. Md. Oct. 12, 2006) (same).

10.    A challenge to a payment determination made by the Medicare program must be made through the applicable administrative appeal process. *See Hopewell Nursing Home v. Heckler*, 784 F.2d 554, 557-58 (4th Cir. 1986).[5]

11.    Over the course of the instant bankruptcy cases, Medicare recoupment has proceeded, as it customarily does, as a key and integral element of the Medicare payment system.

### The assignment of a Medicare provider agreement
### (whether in or out of bankruptcy)

12.    A Medicare provider agreement is not something that can be sold.  42 C.F.R. § 424.550 (a provider is "prohibited from selling its Medicare billing number

---

[5]    Medicare law contains its own comprehensive and exclusive remedial scheme for hearing a provider's legal or factual challenges to Medicare determinations.  There are, for example, specified processes by which a provider may challenge a Medicare cost report determination, 42 U.S.C. § 1395oo; or may challenge a payment determination on an individual Medicare claim, 42 U.S.C. § 1395ff; or may challenge the termination of a Medicare provider agreement by DHHS, 42 U.S.C. § 1395cc(h); *etc.*  Suits sounding in tort, contract, or other theories are not permitted. *See* S. Rep. No. 404, 89th Cong., 1st Sess. 1965, 1965 USCCAN 1943, 1995 (June 30, 1965) (legislative history to Medicare statute, stating "It is intended that the remedies provided by these review procedures shall be exclusive.").  In a vast national program of the size and scope of Medicare, with many thousands of providers seeking Medicare revenues, and with over a billion claims for payment submitted every year, Congress reasonably chose to standardize the rights, the recourse, and the remedies available.

or privileges to any individual or entity, or allowing another individual or entity to use its Medicare billing number").   Under the law of Medicare, the one circumstance in which a Medicare provider agreement may be transferred is in the context of a change of ownership of a provider as a going concern.   In this circumstance, a Medicare provider agreement may be *assigned* to a third party, subject to regulatory approval by DHHS.   The governing regulation is 42 C.F.R. § 489.18.   An assignee takes assignment of the Medicare provider agreement "subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued." 42 C.F.R. § 489.18(d).  With the assignment of a Medicare provider agreement, the new owner of the provider (and assignee of the provider agreement) "merely steps into the shoes of the prior owner." *Eagle Healthcare, Inc. v. Sebelius*, 969 F.Supp.2d 38, 40 (D.D.C. 2013) (citations omitted).[6]

13.   Accordingly, the Medicare provider agreement is assigned with all of its associated rights to payment, privileges, responsibilities, fiscal liabilities, and

---

[6]   'Provider [of services]' is a statutory term, 42 U.S.C. 1395x(u), which refers to the Medicare-certified healthcare operation itself.   This statutory term does not refer to the corporation that may own the hospital now or the corporation(s) that may have owned the hospital previously.   Though the corporate ownership may change, the "provider" itself remains the same.   *Eagle Healthcare*, 969 F.Supp.2d 38 at 40; *see Delta Health Grp, Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F.Supp.2d 1207, 1210 (N.D. Fla. 2006) (though the provider may be sold to a new owner, "the actual *provider* itself remains the same") (emphasis in original); *see also Baptist Health v. Thompson*, 458 F,3d 768, 778-79 (8th Cir. 2006) ("[T]he Medicare reimbursement system is based on the costs incurred by individual provider hospitals, *without regard to the underlying ownership* structure.") (emphasis added).

obligations flowing to the assignee.  It is assigned *in toto*.   In the oft-cited *United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994), the Fifth Circuit held that the applicable Medicare law "unambiguously" requires the assignee of the provider agreement to take liability for the Medicare overpayments that were made to the assignor.  *See also Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100 (8th Cir. 2000) (holding that assignee of Medicare provider agreement is liable for monetary penalty imposed under that provider agreement prior to the assignment); *Triad at Jeffersonville I v. Leavitt*, 563 F. Supp. 2d 1, 6 (D.D.C. 2008) (discussing terms applicable to assignment of Medicare provider agreement).

14.    The upshot is this:  "If the new owner [of a provider] elects to take assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments" and all other associated liabilities.  *Official Comm. of Unsecured Creditors v. Chase Manhattan Bank (In re Charter Behavioral Health Sys., LLC),* 45 Fed. Appx. 150, 2002 WL 2004651 n.1 (3rd Cir. June 3, 2002).  Once again, under the applicable law, the impact of the assignment of a Medicare provider agreement is that the assignee "merely steps into the shoes" of the assignor.  *See Eagle Healthcare*, 969 F.Supp.2d at 40.

15.    Bankruptcy does not alter the operation of Medicare law over the Medicare provider agreement or its payment system.  A Medicare provider agreement in bankruptcy does not entail  "any more [or less] than the debtor [had under the

Medicare provider agreement] outside of bankruptcy." *See generally Mission Prod. Holdings*, 139 S.Ct. at 1663.

16.     The Medicare provider agreement has long been recognized as due the treatment of an executory contract in bankruptcy.  *See, e.g., Monsour Med. Ctr.*, 11 B.R. at 1018; *In re Heffernan Mem'l Hosp.*, 192 B.R. 228, 231 n.4 (Bankr. S.D. Cal. 1996); *St. John's Home Health*, 173 B.R. at 242 n.1; *In re Tidewater Mem'l Hosp., Inc.*, 106 B.R. 876, 880 (Bankr. E.D. Va. 1989); *In re Provident Hosp. & Training Ass'n*, Case No. 87 B 11069, 1987 WL 383355, at *2 (Bankr. N.D. Ill. Sept. 16, 1987).  Indeed, the Trustee himself acknowledges the treatment of the Medicare provider agreement as an executory contract as "the common presumption of courts administering bankruptcy cases."  ECF No. 524 at 9, ☐ 21.

17.     The application of section 365 to Medicare provider agreements is appropriate to the extent that it does not undermine the fundamental principle and purpose of the Medicare statute, namely providing healthcare to the elderly while protecting the public fisc.  *See In re Vitalsigns Homecare, Inc.,* 396 B.R. 232, 240-41 (Bankr. D. Mass. 2008).  Requiring the provider agreement to be assumed pursuant to section 365 prior to the assignment of that agreement to a third-party assignee harmonizes the Medicare statute and the Bankruptcy Code.  *Id.*  "'[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. The courts are not at liberty to pick and choose among congressional enactments.'"  *Id.* at

12

240 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  Moreover, applying section 365 to the Medicare provider agreement is also consistent with the Medicare statute because assumption and assignment do not strip away Medicare overpayment liabilities from the provider agreement in the way a section 363(f) sale would allegedly do.

18.    Accordingly, the appropriate authorization for the transfer of a Medicare provider agreement from a debtor to the transferee who becomes the owner and operator of the provider is an authorization of debtor's assumption and assignment of the provider agreement pursuant to 11 U.S.C. § 365.[7]   In other words, one takes the provider agreement on its own terms, or one does not take it at all.  What matters most is that the terms of the Medicare provider agreement are those terms set forth in Medicare law, which entails Medicare's complex reimbursement system of upfront estimated payments and ongoing reviews and adjustments, outlined *supra*.  As one bankruptcy court put it succinctly:

> [T]o the extent Debtor assumes and assigns its Medicare provider agreements to [the transferee of Debtor's health care operations], such assumption and assignment shall be fully consistent with and subject to applicable laws and regulations governing Medicare provider agreements.

---

[7] An executory contract may only be assumed and/or assigned *as is*.  *See Adventure Res. v. Holland*, 137 F.3d 786, 798 (4th Cir. 1998) (citation omitted); *also see City of Covington v. Covington Landing P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995) (neither debtor nor court may excise contract obligations).

13

*In re Barnwell County Hosp., Inc.*, 491 B.R. 408, 419 (Bankr. D.S.C. 2013). *See In re Interim Healthcare of W. North Carolina, Inc.*, Bankr. E.D.N.C. Case No 00-01851 (ordered entered Nov. 30, 2000; approving assumption and assignment of debtor's Medicare provider agreement, at ¶ 7) (appended as Exhibit 1); *In re Healthsphere of America, Inc.*, Bankr. W.D. Tenn. Case No. 99-26854 (order entered Oct. 5, 2000; approving same at ¶ 8) (Exhibit 2); *In re New Am. Healthcare Corp.*, Bankr. M.D. Tenn. Case No. 00-03373 (order entered June 22, 2000; approving same at ¶12) (Exhibit 3).

19.    Courts and debtors have treated provider agreements as executory contracts, allowing them to be assumed and assigned under section 365, because if they are not executory contracts, a debtor has no property interest in the provider agreement that could be sold under section 363.[8]

20.    Now, Medicare law does not require that a purchaser of a healthcare business must take assignment of the previous operator's existing Medicare provider agreement. *See Vernon Home Health*, 21 F.3d at 696. In the alternative, the new

---

[8]  In the takings context, numerous appellate courts have held that a Medicare provider has no property interest in continued Medicare participation. "[B]ecause health care providers 'are not the intended beneficiaries of the federal health care programs . . . they therefore do not have a property interest in continued participation or reimbursement.'" *Shah v. Azar*, 920 F.3d 987, 997-98 (5th Cir. 2019) (quoting *Parrino v. Price*, 869 F.3d 392, 398 (6th Cir. 2017)); *Erickson v. U.S. ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 862 (9th Cir. 1995); *Koerpel v. Heckler*, 797 F.2d 858, 863-65 (10th Cir. 1986); *Cervoni v. Sec'y of Health, Ed. & Welfare*, 581 F.2d 1010, 1018-19 (1st Cir. 1978).

14

operator may simply choose not to do business with the Medicare program at all, because doing business with Medicare is a purely voluntary choice. Or, as another alternative, the new operator may choose to seek a new provider agreement with DHHS. Under this last alternative, the new operator must first obtain provider certification by DHHS: the new operator must demonstrate and establish to the satisfaction of DHHS that the healthcare operation meets all the applicable current criteria for certification. Now, the certification process necessarily takes some time, for which no Medicare payments may ever be sought. However, the trade-off is that if a new provider agreement is sought, the new operator will not be liable for the previous overpayments (or any other incident) of the previous operator's Medicare provider agreement. These, then, are the various alternatives that any prospective purchaser must weigh and consider, regardless whether it is purchasing a healthcare operation through bankruptcy or outside of bankruptcy: Do I want to take assignment of the seller's existing Medicare provider agreement, which means taking it as it is? Do I choose not to do business with Medicare? Or, will I seek to enter into a new provider agreement with DHHS?

21.    To the extent that the Trustee seeks to sell assets of certain Debtors as going concerns, and to the extent that the purchaser of those assets does want to take assignment of the respective Debtors' Medicare provider agreements with DHHS, *the assignment of the Medicare provider agreements must comport fully with Medicare law*. The provider agreement may only be assigned on its own terms. Section 365 of

15

the Bankruptcy Code substantially echoes this outcome.  But it is Medicare law that most fundamentally drives the process.  Neither the Trustee nor any prospective purchaser of assets may alter, re-define, or limit the overpayment obligations that may exist under a particular Medicare provider agreement to suit his own preferences or wishes.

22.    The Trustee relies primarily on *In re Verity Health Sys. of California, Inc.*, No. 2:18-BK-20151-ER, 2019 WL 4729457 (Bankr. C.D. Cal. Sept. 26, 2019), in support of his contention that the Debtors' provider agreements may be sold "free and clear" under § 363(f).  ECF No. 524 at 5-11 (citing *Verity* at least once on every page).  The *Verity* court, however, has vacated its decision.  *Verity*, No. 2:18-BK-20151-ER, ECF No. 3787 (Bankr. C.D. Cal. Dec. 9, 2019) (Exhibit 4).  A vacated decision is "officially gone," has "no legal effect whatever," and is "void."  *United States. v. Sigma Intern., Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002).  "None of the statements made in [it] has any remaining force."  *Id.*

23.    The Trustee also relies upon *In re BDK Health Mgmt., Inc.*, No. 98-00609-6B1, 1998 WL 34188241 (Bankr. M.D. Fla. Nov. 16, 1998).  ECF No. 524 at 5 , ¶ 10.  *BDK* is an anomalous ruling.  Although it was decided more than 20 years ago, *BDK* has been cited in only *one* subsequent reported decision, and the citing court rejected the holding of *BDK.*.  *See Vitalsigns Homecare*, 396 B.R. at 239.  Moreover, *BDK* does not even make reference to the Medicare regulations on changes of

ownership, let alone explain how the transfer of a Medicare provider agreement without successor liability could be consistent with those regulations.[9]

### Recoupment is not extinguishable by a sale

24.     Even if one finds a reason not to characterize the Medicare provider agreement as an executory contract, the legal reality remains that the recoupment of Medicare overpayments  -- a fundamental and intrinsic element of the Medicare reimbursement system -- cannot be expunged.  The payment adjustment process created by 42 U.S.C. § 1395g(a), which requires taking account of a previous overpayment in calculating the amount of payment due, is *the vehicle by which federal law defines the Medicare program's substantive legal liability* for making payment.

25.     The nature of the common law doctrine of recoupment lends further legal support.  The purpose of recoupment is simply to reach a proper determination as to what a payer owes.  *See Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993) (citing Collier on Bankruptcy).  Funds that are subject to recoupment are not the debtor's property.  *In the Matter of U.S. Abatement Corp.*, 79 F.3d 393, 398 (5th Cir. 1996); *In*

---

[9]   The Trustee also relies upon *In re Kings Terrace Nursing Home & Health Related Facility*, No. 91 B 11478 (FGC), 1995 WL 65531 (Bankr. S.D.N.Y. Jan. 27, 1995), which is inapplicable here.  ECF No. 524 at 5 ¶ 10.  *In Kings Terrace*, which was specific to New York Medicaid law, there was no Medicare provider agreement at issue.  Moreover, the question before the court was whether to allow, post-confirmation, a state agency's claim for Medicaid reimbursement.  Those are not the facts here.

*re Madigan*, 270 B.R. 749, 754 (9th BAP 2001). Furthermore, recoupment is not a "claim" or an "interest." *Brown v. Gen. Motors Corp.*, 152 B.R. 935, 938 (W.D. Wis. 1993); *In re Bram*, 179 B.R. 824, 827 (Bankr. E.D. Tex. 1995); *In re ABCO Indus., Inc.*, 270 B.R. 58, 63 (Bankr. N.D. Tex. 2001). To the contrary, recoupment operates as a defense to another entity's claim for payment. *In re Seko Inv., Inc.*, 156 F.3d 1005, 1009 (9th Cir. 1997); *In re Jones*, 289 B.R. 188, 191 (Bankr. M.D. Fla. 2002); *In re Denby Stores, Inc.*, 86 B.R. 768, 781 (Bankr. S.D.N.Y. 1988). Accordingly, recoupment is not subject to limitation in bankruptcy. Indeed, the Bankruptcy Code does not even address recoupment at all. *United Structures v. G.R.G. Eng'g*, SE, 9 F.3d 996, 999 (1st Cir. 1993). The automatic stay does not apply to recoupment. *E.g.*, *In re Malinowski*, 156 F.3d 131, 133 (2nd Cir. 1998); *In re LaPierre*, 180 B.R. 95, 101 (Bankr. D.S.C. 1994); *In re Graves*, 234 B.R. 149, 151 (Bankr. M.D. Fla. 1999). Nor is recoupment subject to the discharge injunction. *E.g.*, *In re Beaumont*, 586 F.2d 776, 781 (10th Cir. 2009); *In re Fischbach*, 464 B.R. 258 (Bankr. D.S.C. 2012), *aff'd* Civil Action No. 1:12-cv-00513-JMC, 2013 WL 1194850 (D.S.C. Mar. 22, 2013); *In re Powell*, 284 B.R. 573, 576 (Bankr. D. Md. 2002).

26.    And most important for the matter at hand: because recoupment is not a "claim" or an "interest," rights of recoupment cannot be extinguished by a sale in bankruptcy. *E.g.*, *In re Revel AC Inc.*, 909 F.3d 597, 603-04 (3rd Cir. 2018); *Folger Adams Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 261 (3rd Cir. 2000); *Hispanic Indep. Television Sales, LLC v. Kaza Azteca America, Inc.,* No. 10 Civ 932,

18

2012 WL 1079959, at *5 (S.D.N.Y. Mar. 30, 2012).

27.    Accordingly, the Trustee errs in invoking 11 U.S.C. § 363(f) in the attempt to avoid the recoupment of Medicare overpayments.

### Calling a Medicare provider agreement a "statutory entitlement" is unavailing

28.    The Trustee's chief argument appears to be that a Medicare provider agreement should be characterized as a "statutory entitlement."  *See* ECF No. 524, at 13, ¶ 33.  The Trustee's characterization is not supported by law or fact.  "Statutory entitlement" is a public policy term that refers to a government benefit available to a person who qualifies for the benefit.  For instance, welfare benefits for impoverished individuals or families "are a matter of statutory entitlement for persons qualified to receive them" on account of their poverty, *Goldberg v. Kelly*, 397 U.S. 254, 261-62 (1970); and physically or mentally impaired persons who meet the Social Security Act's "statutory prerequisites" for disability have an "entitlement to disability insurance benefits," *Walton v. Apfel*, 235 F.3d 184, 189 (4th Cir. 2000).  Money to these individuals flows solely because the individual qualifies for the benefit, not because the individual performs in any way.  Moreover, a statutory entitlement is unique to the person who is entitled: an entitlement cannot be transferred.  *See*, *e.g.*, 42 U.S.C. § 407(a) (the right to Social Security benefit payments "shall not be transferable or assignable, at law or in equity").  In the instance of Medicare, any Medicare benefits are for the elderly and disabled.  Providers are at most participants

in the Medicare program that may receive reimbursements for services rendered to Medicare beneficiaries.

29.    Even if the Medicare provider agreement were, somehow, susceptible to being characterized as a "statutory entitlement," and even if a statutory entitlement were transferable or assignable, that entitlement is created and defined by statute, and the nature and extent of property rights in bankruptcy are determined by the underlying substantive law. *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Butner v. United States*, 440 U.S. 48, 55 (1979). Here, the Medicare statute and its regulations make plain that no provider has any contractual right, property interest, legitimate expectation, or statutory entitlement to participate in Medicare without complying with fundamental conditions. *See* 42 U.S.C. § 1395cc(a)(1) (only providers of services that comply with statutory and regulatory conditions of participation are qualified to hold a provider agreement with the Secretary of DHHS and to receive payment for services rendered). *Furthermore*, it is *the Medicare statute* that then requires that the calculation of the proper amount of current Medicare payment due to a provider must take account of previous overpayments. 42 U.S.C. § 1395g(a).

30.    Moreover, the Medicare regulations prohibit the sale of the right to bill the Medicare program.[10] *See* 42 C.F.R. § 424.550 ("prohibit[ing a provider] from

---

[10]    The Trustee apparently assumes that calling the Medicare provider agreement a "statutory entitlement" permits the holder of that entitlement to freely dispose of it. But the Trustee identifies nothing in the Medicare statute or regulations that states or implies such a right.

20

selling its Medicare billing number or privileges to any individual or entity, or allowing another individual or entity to use its Medicare billing number" except where there is a change of ownership in accordance with the terms of the Medicare regulations at 42 C.F.R. Part 489). This defines the extent of the Debtors' interest, and bankruptcy does not afford a debtor a greater property interest than it had pre-petition.

31.    The bankruptcy estate generally includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added). Congress explained that "[t]hough this paragraph will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367-68 (1977); *see Mission Prod. Holdings*, 139 S. Ct. at 1663 ("[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy."). Thus, even if the Court were to regard the Debtors' provider agreements as 'statutory entitlements,' the Trustee may not sell those entitlements "free and clear" under § 363(f) by contravening the Medicare statute and its regulations.

21

## Conclusion

For the foregoing reasons, DHHS respectfully asserts the Trustee's motion (ECF No. 519) should be denied insofar as the motion purports to treat Debtor's Medicare provider agreement with DHHS in a manner inconsistent with Medicare law.

Respectfully submitted this 27th day of December, 2019.

ROBERT J. HIGDON, JR.
United States Attorney


/s/ Dennis M. Duffy
DENNIS M. DUFFY
Assistant United States Attorney
Attorney for DHHS
150 Fayetteville Street, Suite 2100
Raleigh, NC  27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
dennis.duffy@usdoj.gov
N.C. Bar No. 27225

## CERTIFICATE OF SERVICE

I do hereby certify that I have this 27th day of December, 2019, served a copy of the foregoing upon the below-listed parties electronically and/or by placing a copy of the same in the U.S. Mail, addressed as follows:

CAH Acquisition Company 1, LLC d/b/a Washington County Hospital
958 U.S. Highway 64 East
Plymouth, NC 27962

**Served by CM/ECF system:**

Rayford K. Adams, III
Attorney for Debtor

Thomas W. Waldrep, Jr.
Trustee

Jason L. Hendren
Attorney for the Trustee

ROBERT J. HIGDON, JR.
United States Attorney

/s/ Dennis M. Duffy
DENNIS M. DUFFY
Assistant United States Attorney
Attorney for DHHS
150 Fayetteville Street, Suite 2100
Raleigh, NC  27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
dennis.duffy@usdoj.gov
N.C. Bar No. 27225

23

Exhibit 1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:                                                    CASE NO.

INTERIM HEALTHCARE OF
WESTERN NORTH CAROLINA, INC.                              00-01851-5-ATS
Tax ID #56-1282323

INTERIM HEALTHCARE OF THE SOUTHEAST, INC.
f/k/a Interim Healthcare of TN/AL, Inc.                   00-01848-5-ATS
Tax ID #56-1727858

INTERIM HEALTHCARE OF                    F I L E D         00-01849-5-ATS
GREATER CHARLESTON, INC.
Tax ID #56-1619249                       NOV 3 0 2000

INTERIM HEALTHCARE OF               PEGGY B. DEANS, CLERK   00-01850-5-ATS
RALEIGH-DURHAM, INC.                U.S. BANKRUPTCY COURT
Tax ID #56-1177534                  EASTERN DISTRICT OF NC
                    DEBTORS                                CHAPTER 11

ORDER ALLOWING MOTION FOR AUTHORITY TO SELL ASSETS AND
ASSUME AND ASSIGN  EXECUTORY CONTRACTS OF INTERIM
HEALTHCARE OF GREATER CHARLESTON, INC TO  WINYAH HOME
HEALTH CARE, INC.

THIS MATTER came before the undersigned United States Bankruptcy Judge upon
motion of Interim Healthcare of Greater Charleston, Inc. Debtor and Debtor-in-Possession,
in the above captioned case (the "Debtor"), for an order authorizing the sale of certain assets
of the Debtor to Winyah Home Health Care, Inc. and an order to assume and assign certain
executory contracts and unexpired leases. Following the testimony of the Debtor including
at an initial hearing held on November 21, 2000, arguments of counsel and review of the
pleadings, the court finds as follows:

1.     The Debtor filed its voluntary petition under Chapter 11 of the United States
Bankruptcy Code on August 23, 2000 (the "Petition Date").

2.      The Debtor was, on the Petition Date, engaged in home health care, continuous care, and facility staffing in Beaufort, Berkeley, Charleston, Colleton, Dorchester, Hampton and Jasper counties, South Carolina.

3.      Winyah Home Health Care, Inc. ("Winyah") has contracted to purchase the certain assets upon the terms and conditions of that certain Asset Purchase Agreement ("Agreement") attached hereto as Exhibit A and incorporated herein.

4.      Pursuant to the Agreement, Winyah will pay $394,905.96 for assets as follows:

all of the assets, properties and rights of every kind, nature, character and description, whether real, personal or mixed, whether tangible or intangible, whether accrued, contingent or otherwise (other than the Excluded Assets) relating to or utilized in the Business as defined in the Agreement, directly or indirectly, in whole or in part, in existence on November 1, 2000, and any additions thereto on or before the Closing Date (as defined in Section 4 of the Agreement), whether or not owned in the name of Debtor or either of the Kings or any Other King Entity or any other affiliate of Debtor or either of the Kings all as defined in the Agreement, and wherever located, including but not limited to the following: all of the patient and other business records relating to Debtor's intermittent care skilled care patients (Medicare, Medicaid, Private Insurance/Private Pay) served under a Certificate of Need, Debtor's Medicare Provider Number 42-7027 and the related Medicare Provider Agreement ("Provider Agreement"), furnishings, fixtures, medical equipment, real property leases, equipment leases, supplies and inventory, phones and phone numbers, certificates of need and licenses issued to Debtor by the South Carolina Department of Health and Environmental Control, and any other licenses, permits, and certificates, Medicare-certified employees and the employment contracts involving such employees, contracts, trade names, trademarks, service marks and

know-how. Schedule 1(a)(i) contains a complete and correct list of all of the Assets. Notwithstanding the foregoing, Debtor shall retain, and Winyah shall not purchase, the accounts receivable and the accounts payable of Debtor and any business records and other assets related exclusively to the Excluded Businesses, all of which are listed on Schedule 1(a)(ii) of the Agreement (the "Excluded Assets")

5. The Debtor currently intends to continue with its non-skilled care home health business and subcontract with Winyah regarding use of some space and equipment being bought by Winyah.

6. Pursuant to the Agreement, the non-residential real property leases which will be assumed and assigned to Winyah are as follows:

Lease of 4,180 square feet at 7410 Northside Drive, North Charleston, South Carolina; term of September 1, 1992 through June 30, 2002; base rent of $4,935 per month for July 1, 2000 to June 30, 2002; rent paid through November, 2000

Lease of 2000 square feet in the Triad Medical Complex on Robertson Boulevard, Walterboro, S.C.; annual rent of $23,000 payable in monthly installments of $1,916.67; term of August 1, 1997 through August 1, 2005; paid through November, 2000.

Lease of 1,500 square fee at 21 Cardinal Road, Suite 104, Hilton Head; rent of $1,968.75 per month through June, 2001; paid through November, 2000.

7. Pursuant to the Agreement, other executory contracts held by the Debtor which will also be assumed and assigned are as follows:

Springs Leasing: The Debtor obtained a new telephone system from Springs Leasing in July, 2000 as follows: Walterboro, lease for 60 months at $147 per month.

Provider Agreement: Debtor's Provider Agreement as referenced herein.

Contract with Medical University Hospital Authority - an employee of the Debtor works with MUHA to facilitate the smooth transfers of patients to the Debtor for home health.

Franchise Agreement. Debtor will assume and assign the Franchise Agreement with Interim Healthcare, Inc. to permit Winyah to operate under the Debtor's Franchise Agreement by and between Interim and the Debtor. Winyah will provide the Debtor with the rights to be a sub-franchisee under said franchise. The Debtor will pay the amounts as Franchisor may establish to cure any default and assume all obligations under the Franchise Agreement as existed as of October 31, 2000. The payment will be over a ten month period with interest at 10% per annum.

8.     Winyah will use computers and software belonging to the King Group, Inc., and located in the South Carolina locations, for a period of 120 days or such lesser period as Winyah may specify following consummation of the sale. Winyah shall compensate the Debtor for such use of its computers and software at a rate comparable as set forth in ¶ 1 b of the Agreement.

9.     Winyah agrees to reimburse the Debtor's approximately $290,000.00 as follows:

(i) payroll expenses attendant to the medicare business on December 1, 2000 of approximately $90,000.00; (ii) approximately $100,000.00 after Winyah determines that HCFA will no longer offset or recoup amounts owed under the Provider Agreement for periods prior to November 1, 2000; and (iii) the remaining $100,000.00 on June 1, 2001.

10.    The sale to Winyah will be free and clear of all liens and liabilities of the Debtor of any kind with the exception of liabilities associated with assumed and assigned contracts.  DVI Business Credit holds a blanket lien on present and future accounts, contracts, contract rights, chattel paper, instruments, documents, security agreement, general intangibles, deposit accounts, inventory, equipment and fixtures, books, and proceeds

thereof. DVI Business Credit will be entitled to all of the proceeds. DVI Business Credit's lien shall attach to the proceeds from the sale of the assets.

NOW THEREFORE, it is

ORDERED ADJUDGED AND DECREED that the Debtor is authorized to enter into the Agreement and thereby to sell the assets specified in the motion to Winyah under section 363 free and clear of any liens, claims, and interests of any kind, as well as the assignment of leases and executory contracts under section 365, said leases and executory contracts to be assumed and assigned in conjunction with the sale, pursuant to the terms and conditions as set forth in the motion; and it is further

ORDERED, ADJUDGED AND DECREED that the sale to Winyah is made in good faith, for value, and otherwise complies with and are entitled to the protections of section 363(m) ; and it is further

ORDERED, ADJUDGED AND DECREED that the automatic stay, to the extent applicable, is vacated as to Winyah to take any and all steps it deems necessary and appropriate in connection with the Agreement including, without limitation, termination of the Agreement to the extent that it is entitled to in accordance with the terms of the Agreement; and it is further

ORDERED, ADJUDGED AND DECREED that, in aid of its jurisdiction and for purposes of enforcing this order, this Court hereby reserves exclusive jurisdiction over any claims of any person or entity that may be brought against Winyah arising out of or related to the sale to Winyah of the Assets free and clear of any liens, claims, and interests of any kind and the provisions of the Agreement and enjoins the assertion of such claims in violation of the Agreement in any other forum.

DATED: NOV 3 0 2019

United States Bankruptcy Judge

Exhibit 2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES BANKRUPTCY COURT
WESTERN DIVISION
FILED

OCT 0 5 2000

JED G. WEINTRAUB
CLERK OF COURT

In re:

HEALTHSPHERE OF AMERICA, INC.          Case No. 99-26854 WHB

HOME-BOUND MEDICAL SYSTEMS, INC.       Case No. 99-26855 WHB

HOME-BOUND INFUSION SOLUTIONS, INC.    Case No. 99-26857 WHB

HOME-BOUND MEDICAL CARE
OF MIDDLE TENNESSEE, INC.               Case No. 99-26859 WHB

HOME-BOUND MEDICAL SYSTEMS
OF NORTHERN ARKANSAS, INC.             Case No. 99-26860 WHB

Debtors                                 JOINTLY ADMINISTERED
                                        CHAPTER 11 CASES

---

ORDER AUTHORIZING DEBTOR TO ASSUME EXECUTORY CONTRACTS AND
TO SELL ASSETS OF HOME-BOUND MEDICAL CARE OF MIDDLE TENNESSEE,
INC. PURSUANT TO SECTION 363 WITH ASSETS AND LIABILITIES

---

This cause came to be heard on the 26th day of September, 2000, before the Honorable

William Houston Brown, U.S. bankruptcy court Judge upon the motion of the Debtor for an

order pursuant to Section 363 authorizing the sale of certain assets of Home-Bound Medical Care

of Middle Tennessee, Inc. and upon the statements of Counsel for the Debtor and the Assistant

United States Attorney and Counsel for the purchaser and upon the entire record as a whole from

all of which it appears to the Court:

    1.    This is a core proceeding under 11 U.S.C. Section 157(b)(2) and this Court has

jurisdiction to enter this Final Order.

    2.    Debtor has solicited and received offers to purchase the assets of Home-Bound

Medical Care of Middle, Tennessee, Inc.

K:\LCD\PREMIER COUNSULTING\Lcd pld - order authorizing debtor to assume executory contracts.doc

198

3.    Debtor believes that the offer from Caresource, LLC for the purchase of the operation of Home-Bound Medical Care of Middle Tennessee, Inc. as set forth in the letter of intent from its attorney dated September 6, 2000, is the highest and best offer for the assets.

4.    The purchaser is not related personally or financially to the Debtor and its officers. Neither the Debtor nor its officers have any contacts for future employment or relationships with the purchasers. The sale price was not controlled by an agreement among potential bidders.

5.    Acceptance of said offer is in the best interest of the Debtor, the creditors, and the estate and there is a sound business reason for authorizing this sale under Section 363.

6.    The consideration granted by Buyer is fair and reasonable and constitutes adequate consideration for the assets to be conveyed by Debtor.

7.    This offer is contingent on the adequate assurances obtained through due diligence by the purchaser within 30 days of the entry of this order.

8.    Pursuant to 11 U.S.C. § 365, upon the Closing of the sale, the Debtor shall assume the Medicare provider agreement with the Health Care Financing Administration ("HCFA") and assign it to the purchaser. As assignee, the purchaser will *shall BMZ* take the Medicare provider agreement subject to all of the assets and liabilities of that particular provider agreement.

WHEREFORE, IT IS ORDERED by the Court that the Debtor be and the same is hereby authorized to enter into a sale of the assets by Home-Bound Medical Care of Middle Tennessee, Inc., contingent on the adequate assurances obtained through due diligence by the purchaser within 30 days of the entry of this order in accordance with the provisions of the letter of intent attached to the motion seeking such authority, with the exception that should the sale be

K:\LCD\PREMIER COUNSULTING\ord pld - order authorizing debtor to assume executory contracts.doc

completed, the purchaser shall purchase the Medicare provider agreement subject to the assets and liabilities owed to HCFA for that particular provider agreement, and to execute any and all documents necessary to effectuate said purchase.

William H. Brown
United States Bankruptcy Judge

10-5-00

APPROVED FOR ENTRY
Veronica F. Coleman
United States Attorney

***By: Barbara Morris Zoccola
Barbara Morris Zoccola (BPR #13020)
Assistant U.S. Attorney
200 Jefferson Ave., Suite 811
Memphis, TN 38103
(901) 544-4010

John Ryder, attorney for Debtor
One Commerce Square, Suite 2700
Memphis, TN 38103

Leonard Dunavant, attorney for CareSource, LLC
81 Monroe Ave., Suite 600
Memphis, TN 38103

As to Form

Sean Haynes, Staff Attorney  (M881)
U.S. Trustee's Office
200 Jefferson Ave., Suite 400
Memphis, TN 38103

☐ Motion ☑ Order ☐ Other
☑ Entered on the Court docket on
OCT 05 2000 and mailed to:
☐ Debtor(s), Debtor(s) Attorney, Trustee
☐ Servicing by Court
☐ Certificate of Mailing to Matrix
☑ For servicing by Movant

By V. Love, Deputy Clerk

K:\LCO\PREMIER COUNSULTING\led pld - order authorizing debtor to assume executory contracts.doc

Exhibit 3

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| NEW AMERICAN HEALTHCARE CORPORATION, ) | Bk. No. 00-03171-MH1-11 |
| NAHC FINANCIAL, INC. ) | Chapter 11 |
| NAHC OF MISSISSIPPI, INC. ) | Jointly Administered |
| NAHC OF MISSOURI, INC. ) | Judge Harrison |
| NAHC OF OREGON, INC. ) | |
| NAHC II OF OREGON, INC. ) | |
| NAHC III OF OREGON, INC. ) | |
| NAHC OF TEXAS, INC. ) | |
| NAHC II OF TEXAS, INC. ) | |
| NAHC OF WASHINGTON, INC. ) | |
| NAHC OF WYOMING, INC., and ) | |
| MEMORIAL HOSPITAL OF ADEL, INC., ) | |
| ) | |
| Debtors. ) | |

**RECEIVED FOR ENTRY**

JUN 2 2 2000

By: C. Chellman

DEPUTY CLERK

ORDER APPROVING SALE OF ASSETS UTILIZED
IN OPERATION OF CROSBY MEMORIAL HOSPITAL
AND APPROVING COMPROMISE AND SETTLEMENT
OF CLAIMS RELATED TO CROSBY MEMORIAL HOSPITAL

This matter came on for hearing on the 22nd day of June, 2000, before the Honorable Marian F. Harrison, United States Bankruptcy Judge, upon motions filed by New American Healthcare Corporation and certain of its subsidiaries (the "Debtors"), namely, the Motion for Approval of Sale of Assets Free and Clear of Interests, Liens, Claims, and Encumbrances and Authorizing the Assumption of and Assignment of Unexpired Leases and Executory Contracts, Including Expedited Approval of Competitive Bidding Procedures, Breakup Fee Arrangement and Topping Bid Provisions and Form and Manner of Notice (the "Sale Motion") and the objections thereto and Motion for Authorization to Settle Claims Related to Crosby Memorial Hospital (the "Settlement Motion") and the objections thereto.

The Court heard and considered testimony of witnesses and also considered the admitted documentary exhibits, the entire record, including the pleadings filed herein, and the statements and arguments of counsel.  Based upon all the foregoing and for the reasons stated below and any additional findings recorded in open court pursuant to Fed. R. Bankr. P. 7052, the Court

FINDS AND CONCLUDES:

1. The notice of the proposed sale of the assets utilized in operation of Crosby Memorial Hospital ("Asset Sale") was proper and adequate and in compliance with the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, local rules, and prior orders of this Court.

2. Parties in interest were given reasonable and adequate opportunity to object to the Asset Sale.

3. The bidding procedures previously approved by this Court as implemented by the Debtors at the Overbid Conference on June 21, 2000, were fair and reasonable and the sale process was conducted in good faith.

4. The Debtors' efforts to market the Assets were reasonable and adequate and resulted in the best offer to the estate, that being the offer of Piceyune Clinic, LLC.

5. Sound business reasons exist, as described by testimony in the hearing with which the Court agrees and accepts as its findings, for the sale of the Assets pursuant to § 363 of the Bankruptcy Code and applicable case law and the Asset Sale is in the best interests of creditors and the estate.  Any objections to the Asset Sale not otherwise resolved are overruled.

6. The purchase price as set forth in the Asset Purchase Agreement made an exhibit to the hearing and filed separately in this case constitutes reasonable equivalent value and fair consideration for the Assets.

2

7. The Debtors have good and marketable title to the Assets and are authorized to sell the Assets to Picayune Clinic, LLC on the terms and conditions described in the Asset Purchase Agreement. Said sale is free and clear of all liens, claims, interests, and encumbrances, with the liens of TD Texas, as agent for the pre-petition lenders, and the DIP lender attaching to the proceeds thereof.

8. The proceeds generated from the sale of the Assets, after escrow of the amounts described in the Asset Purchase Agreement or provided for herein, shall be paid to TD Texas, to be applied in accordance with the DIP Credit Agreement and the Pre-Petition Credit Agreement.

9. Picayune Clinic, LLC is a good faith purchaser for value within the meaning of § 363(m) of the Bankruptcy Code.

10. In accordance with the Court's previous order of June 2, 2000, the Debtors are authorized to assume and assign to Picayune Clinic, LLC any unexpired leases and executory contracts as identified in the Notice filed on June 22, 2000 and made an exhibit to the hearing is approved with the cure amounts as stated in the Notice, notice thereof having been adequate and reasonable. The Debtors are further authorized to assume and assign to Picayune Clinic, LLC any other executory contracts and unexpired leases referenced in the Asset Purchase Agreement for which cure amounts have not yet been established, as identified in the Notice (the "Additional Contracts"), upon payment of the stated cure amounts without further hearing, unless the parties to such contracts object as required herein. Within three (3) business days of entry of this Order, counsel for the Debtors shall give notice of the proposed cure amounts and assumption and assignment of the Additional Contracts. Any party in interest objecting to the assumption and assignment, including the proposed cure amount, shall file a written objection on or before July 5, 2000, and a serve a copy

3

by facsimile transmission upon the Debtors' counsel at the address and telephone number below and counsel for Picayune Clinic, LLC, Marc T. McNamee, 2000 First Union Tower, 150 Fourth Avenue, No., Nashville, TN, 37219, Fax (615) 726-0573 and Steven L. Lefkovitz, 530 Church Street, Suite 202, Nashville, TN, Fax (615) 255-4516. Any such objections shall be heard on the 11th day of July, 2000, at 9:00 a.m., in Courtroom Three, Customs House, 701 Broadway, Nashville, Tennessee. Any applicable notice periods are reduced to correspond to this Order.

11. Executory contracts not assumed and assigned by this Order are deemed rejected effective as of the date of closing of the sale to Picayune Clinic (the "Closing Date"). The rejection shall be accomplished by the Debtors providing contracting parties with a notice of rejection and filing the same with the Court. Pursuant to prior orders of this Court, the time within which the Debtors must perform under executory contracts and leases pursuant to § 365(d)(3) and (d)(10) are extended until the Closing Date.

12. The Debtors are authorized to assume and assign the Medicare provider agreements held by Crosby Memorial Hospital without further notice or hearing.

13. The proposed termination fees to Province Healthcare Company were approved by prior Order of this Court and no further action is necessary.

14. The settlement with Southern Regional Corporation ("SRC") is fair and equitable and in the best interests of the estate, as described by testimony in the hearing with which the Court agrees and accepts as its findings. Settlement Motion is, therefore, granted and the proposed settlement with SRC is approved, notice having been adequate and reasonable.

15. The objection of the City of Picayune to the Settlement Motion is overruled, including specifically, to the extent the objection constitutes or is construed as an objection to the Sale Motion.

4

16.   The payment to be made by SRC under the terms of the Settlement Motion shall be paid over to TD Texas to be applied in accordance with the DIP Credit Agreement and the Pre-Petition Credit Agreement.

17.   This Court shall retain jurisdiction to resolve any disputes over the Asset Sale or claims made in connection therewith.

IT IS SO ORDERED AS SET FORTH ABOVE this 21st day of June, 2000.



MARIAN F. HARRISON
U.S. BANKRUPTCY JUDGE

Submitted for entry by:

HARWELL HOWARD HYNE
GABBERT & MANNER, P.C.

By: _____
Craig V. Gabbert, Jr.
Barbara D. Holmes
1800 AmSouth Center
315 Deaderick Street
Nashville, TN 37238
(615) 256-0500
(615) 251-1058 Fax

Attorneys for Debtors

Exhibit 4

1  SAMUEL R. MAIZEL (Bar No. 189301)
   samuel.maizel@dentons.com
2  TANIA M. MOYRON (Bar No. 235736)
   tania.moyron@dentons.com
3  DENTONS US LLP
   601 South Figueroa Street, Suite 2500
4  Los Angeles, California 90017-5704
   Tel: (213) 623-9300 / Fax: (213) 623-9924
5
   Attorneys for the Chapter 11 Debtors and
6  Debtors In Possession

**FILED & ENTERED**

**DEC 09 2019**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

**CHANGES MADE BY COURT**

8            **UNITED STATES BANKRUPTCY COURT**
9  **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

10  In re

11  VERITY HEALTH SYSTEM OF
    CALIFORNIA, INC., *et al.*,
12
          Debtors and Debtors In
13  Possession.

14  ☒ Affects All Debtors

15  ☐ Affects Verity Health System of
       California, Inc.
16  ☐ Affects O'Connor Hospital
    ☐ Affects Saint Louise Regional Hospital
17  ☐ Affects St. Francis Medical Center
    ☐ Affects St. Vincent Medical Center
18  ☐ Affects Seton Medical Center
    ☐ Affects O'Connor Hospital Foundation
19  ☐ Affects Saint Louise Regional Hospital
       Foundation
20  ☐ Affects St. Francis Medical Center of
       Lynwood Foundation
21  ☐ Affects St. Vincent Foundation
    ☐ Affects St. Vincent Dialysis Center, Inc.
22  ☐ Affects Seton Medical Center Foundation
    ☐ Affects Verity Business Services
23  ☐ Affects Verity Medical Foundation
    ☐ Affects Verity Holdings, LLC
24  ☐ Affects De Paul Ventures, LLC
    ☐ Affects De Paul Ventures - San Jose
25     ASC, LLC

26       Debtors and Debtors In
    Possession.

Lead Case No. 18-bk-20151-ER

Jointly Administered With:
Case No. 2:18-bk-20162-ER
Case No. 2:18-bk-20163-ER
Case No. 2:18-bk-20164-ER
Case No. 2:18-bk-20165-ER
Case No. 2:18-bk-20167-ER
Case No. 2:18-bk-20168-ER
Case No. 2:18-bk-20169-ER
Case No. 2:18-bk-20171-ER
Case No. 2:18-bk-20172-ER
Case No. 2:18-bk-20173-ER
Case No. 2:18-bk-20175-ER
Case No. 2:18-bk-20176-ER
Case No. 2:18-bk-20178-ER
Case No. 2:18-bk-20179-ER
Case No. 2:18-bk-20180-ER
Case No. 2:18-bk-20181-ER

Hon. Ernest M. Robles

**ORDER APPROVING STIPULATION RE:
ASSUMPTION AND ASSIGNMENT OF MEDI-
CAL PROVIDER AGREEMENTS TO
STRATEGIC GLOBAL MANAGEMENT, INC.**

**[RELATED DOCKET NOS. 2306, 3786]**

- 1 -

113790016\V-2

1    The Court, having reviewed the *Stipulation Re: Assumption And Assignment Of Medi-Cal*

2  *Provider Agreements to Strategic Global Management, Inc.* (the "Stipulation"), filed as Docket No.

3  3786, entered into by and among Verity Health System of California, Inc., St. Francis Medical

4  Center, a California nonprofit public benefit corporation, St. Vincent Medical Center, a California

5  nonprofit public benefit corporation, St. Vincent Dialysis Center, a California nonprofit public

6  benefit corporation, and Seton Medical Center, a California nonprofit public benefit corporation,

7  on the one hand, and the California Department of Health Care Services on its behalf and on behalf

8  of the State of California, on the other hand, and good cause appearing,

9    HEREBY ORDERS AS FOLLOWS:

10   A.    The Stipulation and the terms therein are approved.

11   B.    This Court shall retain jurisdiction to hear and resolve any disputes arising under the

12  Stipulation.

13   C.    ~~This Court will vacate its~~ The Memorandum of Decision (Docket No. 3146) and

14  *Order Authorizing Debtors to Sell Medi-Cal Provider Agreements, Free and Clear of Interests*

15  *Asserted by the California Department of Health Care Services, Pursuant to 11 U.S.C. §§ 363(b)*

16  *and (f)(5)* (Docket No. 3372) are hereby VACATED.

17

18   **IT IS SO ORDERED.**

19

20                                          ###

21

22

23

24  Date: December 9, 2019

25                                          Ernest M. Robles
                                            United States Bankruptcy Judge

26

27

28

- 2 -

113790016\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300