## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Case No. 19-00730-5-JNC** |
| CAH ACQUISITION COMPANY #1, LLC, d/b/a WASHINGTON COUNTY HOSPITAL, | ) ) ) ) | **Chapter 11** |
| Debtor. | ) ) | |
| IN RE: | ) ) ) | |
| CAH ACQUISITION COMPANY 7, LLC, dba PRAGUE COMMUNITY HOSPITAL, | ) ) ) | **Case No. 19-01298-5-JNC** **Chapter 11** |
| Debtor. | ) ) | |
| IN RE: | ) ) ) | |
| CAH ACQUISITION COMPANY 12, LLC, dba FAIRFAX COMMUNITY HOSPITAL, | ) ) ) | **Case No. 19-01697-5-JNC** **Chapter 11** |
| Debtor. | ) ) | |
| IN RE: | ) ) ) | |
| CAH ACQUISITION COMPANY 16, LLC, dba HASKELL COUNTY COMMUNITY HOSPITAL, | ) ) ) ) | **Case No. 19-01227-5-JNC** **Chapter 11** |
| Debtor. | ) | |

**OBJECTION OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES TO TRUSTEE'S MOTION FOR (I) AN ORDER CONFIRMING THAT (A) CERTAIN STIMULUS FUNDS WERE USED IN ACCORDANCE WITH APPLICABLE TERMS AND CONDITIONS AND (B) TRUSTEE MAY TRANSFER ANY REMAINING STIMULUS FUNDS TO PURCHASERS; AND (II) AN ORDER ELIMINATING ANY LIABILITY OF TRUSTEE OR DEBTORS' ESTATES FOR USE OF STIMULUS FUNDS**

## I.    <u>Introduction</u>

The United States Department of Health and Human Services ("DHHS"), by and through the United States Attorney, submits this objection to the Trustee's Motion for (I) An Order Confirming That (A) Certain Stimulus Funds Were Used in Accordance with Applicable Terms and Conditions and (B) Trustee May Transfer Any Remaining Stimulus Funds to Purchasers; and (II) An Order Eliminating Any Liability of Trustee or Debtors' Estates for Use of Stimulus Funds (Doc. 791) ("Trustee's Motion").  By order entered February 27, 2020, this Court approved the sales of the four small rural hospitals operated by the above-named Debtors, (Doc. 686).  The sales have closed only more recently.  In the interim, certain federal payments were issued to the hospitals from a fund created by Congress in response to the COVID-19 crisis, in accordance with the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116-136 [HR 748], 134 Stat. 281 (signed into law Mar. 27, 2020) (CARES Act).  Congress entrusted the administration of this fund to the Secretary of DHHS (Secretary).  The Trustee now seeks to involve the Court in aspects of the receipt and acceptance of these funds, in a manner inconsistent with applicable law.

The Trustee asks for several forms of declaratory and related relief.  First, the Trustee asks for confirmation from the Court that he may "pass" unused portions of these payments to the purchasers of the hospitals.  Doc. 791 at ☐84.  More problematic is the Trustee's additional request that the Court "confirm" that the Debtor hospitals' uses of the federal funds comport with the applicable terms and conditions,  Doc. 791 at ☐ 83, which is a determination that only the Secretary can

make.  The Trustee then asks that the Court enter an injunctive order "barring [the Secretary] from holding the Trustee [and "the bankruptcy estates of the Hospitals"] liable for any potential violation of any T[erms] [and] C[onditions] related" to the payments.    Doc. 791 at □87; *also see* p.17 (final paragraph requesting relief).   In effect, the Trustee asks this Court to inject itself into administrative decisions that Congress has expressly entrusted to the Secretary.  Because it would fall far outside the role of a bankruptcy court to determine whether these federal funds have been put to proper use, or to interfere with any enforcement related to any improper use of those moneys, the Trustee's Motion should be denied.

## II.    The Fund for healthcare providers in the COVID-19 pandemic

In response to the national health care emergency of the COVID-19 pandemic, Congress promptly passed far-reaching legislation to address aspects of the problems presented by the pandemic.  The CARES Act created, among many other measures, a Public Health and Social Services Emergency Fund ("Fund"). One purpose of the Fund is "to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus."   CARES Act, 134 Stat. at 563. It is the Fund that is the subject of the Trustee's motion.

In creating the Fund, Congress was clear and direct about the terms and criteria that govern the administration and the uses of the Fund.  The payments to be made from the Fund to eligible health care providers were to be made through "grants or other mechanisms."  *Id*.  Payments from the Fund are to be made only to

"eligible health care providers" ("providers"), *id*, as defined in the legislation.

Use of payments from the Fund are subject to restrictions.  Providers are to use the payments "for health care related expenses or lost revenues that are attributable to coronavirus." *Id*.  There are explicit prohibitions:  payments may not be used "to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse." *Id*.  Congress affirmatively specified the proper use of the payments from the Fund.  These uses include "building or construction of temporary structures, leasing of properties, medical supplies and equipment including personal protective equipment and testing supplies, increased workforce and trainings, emergency operation centers, retrofitting facilities, and surge capacity." *Id*.

Congress also imposed accountability on providers.  A provider that believes it is eligible must "submit to the Secretary an application that includes a statement justifying the need of the provider for the payment." *Id*.  Payments from the Fund are, again, subject to significant controls.  A provider that receives payment from the Fund "shall submit reports and maintain documentation as the Secretary . . . determines are needed to ensure compliance with conditions that are imposed by [the legislation]. . . for such payments, and such reports and documentation shall be in such form, with such content, and in such time as the Secretary may prescribe for such purpose." *Id*.  The Secretary may call for such reports and documentation in the future.

As is already apparent, the legislation vests authority for oversight and control

over the administration of the Fund in the Secretary. It is the Secretary who "reviews applications and makes payments." *Id.* Distributions from the Fund are to be "as determined appropriate by the Secretary." *Id.* And it is the Secretary, through his Office of Inspector General, who will be required to report "audit findings" to Congress on the administration of the Fund. *Id.*

Congress also directed the Secretary to implement the "most efficient payment systems practicable to provide emergency payment." *Id.* Indeed, the Secretary has implemented the legislation expeditiously, in response to the dire health care crisis that the legislation sought to address. The Secretary's implementation of the duty and authority assigned by Congress is discussed on the DHHS website, at *www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html*).

To expedite relief, the Secretary made prompt distributions from the Fund. A provider need not accept the funds: it may return them. But "[r]etention and use of funds are subject to certain terms and conditions." *See* Exhibit A *www.hhs.gov/sites/default/files/provider-relief-fund-general-distribution-faqs.pdf*) (last visited May 18, 2020). If a provider chooses to retain the funds, the provider must complete and submit an attestation that the provider meets the applicable terms and conditions. The provider does so through a Payment Attestation Portal created by DHHS. Moreover, "[p]er the Terms and Conditions, all recipients will be required to submit documents that substantiate that these funds were used for increased healthcare-related expenses or lost revenue attributable to coronavirus, and that those expenses or losses were not reimbursed from other sources and other

sources were not obligated to reimburse them" *Id.* DHHS advised, furthermore, that "significant anti-fraud monitoring" will be in place. *Id.*

The specific Terms and Conditions are delineated on the website at www.hhs.gov/coronavirus/cares-act-provider-relief-fund/terms-conditions/index.html. The Terms and Conditions include, *inter alia*, that the provider acknowledges that any deliberate misrepresentation, omission, or falsification may give rise to civil, criminal, or administrative liability.

The four hospitals operated by the above-captioned Debtors have all used payments, in whole or in part, that they received from the Fund. *See* Doc. 791 at □□ 26-27, 29; 35, 51, 54; 65, 68; 78, 82. They had no legal requirement to accept a payment from the Fund. Payments could have been refused or returned.

But having accepted payments, the *uses* of those payments, and *accountability* for those uses, are necessarily subject to the terms and conditions imposed by Congress, who created the Fund, and by the Secretary, who is charged by Congress with the administration and the stewardship of the Fund. Any provider in the nation who participates in the acceptance or use of payments from the Fund is subject to the same terms and conditions, the same monitoring, and the same accountability. Ensuring that accountability is a task that Congress assigned to the Secretary, who must, ultimately, report to Congress with audit findings on the administration of the Fund under his stewardship.

The Trustee's motion asks this Court to commandeer the Secretary's express duty and to determine for itself whether the "terms and conditions" governing receipt

or use of the payments were satisfied regarding the hospitals covered by this Motion. This the Court may not do.  Nor may a bankruptcy court enter an order that enjoins the Secretary or absolves anyone of any potential liability for misrepresentation or misuse of these funds, as the Trustee also asks.  Accountability for the payments, and determinations as to the propriety of the uses of the payments, falls solely within the authority of the Secretary.

## III.   Argument

## A.   The Court Lacks Jurisdiction to Entertain the Trustee's Motion

> 1.   Disposition of Post-Petition Covid-19 Funds Conditionally Held by Debtors Are Not Within the Bankruptcy Court's Jurisdiction

"Federal bankruptcy courts, like the federal district courts, are courts of limited jurisdiction." *Canal Corp. v. Finnman (In re Johnson )*, 960 F.2d 396, 399 (4th Cir.1992).  Two statutes govern jurisdiction over bankruptcy proceedings,  28 U.S.C. §§ 157 and  1334. The Trustee cites solely these two provisions as the jurisdictional basis for his motion.  Trustee's Motion ¶ 1.  Under the latter statute, district courts "have original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases until title 11." § 1334(a), (b).  Here, the funds at issue – including Debtors' receipt and conditional right to retain any funds – spring from the new CARES Act and the Secretary's exercise of discretion wholly independent of this case.  Under controlling law of the Fourth Circuit, therefore, the Trustee's motion concerning those funds cannot, by definition, arise under title 11 or relate to the bankruptcy case.

"A claim 'aris[es] under Title 11' if it is a cause of action created by the Bankruptcy Code, and which lacks existence outside the context of bankruptcy." *In re Kirkland*, 600 F.3d 310, 316 (4th Cir. 2010) (citing *Aheong v. Mellon Mortgage Co. (In re Aheong )*, 276 B.R. 233, 242–46 (B.A.P. 9th Cir. 2002)). As in *Kirkland*, the Trustee's request for a declaration as to the use of post-petition federal payments does not satisfy this requirement. Moreover, the Trustee's request, in essence, seeks an advisory opinion from the Court concerning his handling of these federal funds, when Congress has assigned such review to the Secretary of DHHS.[1]

As the Trustee admits, when this Court approved the sales of the hospitals, neither COVID-19 nor any federal funds related thereto, were considered by the parties or the Court because "[n]either the parties nor the Court had any knowledge of them." Trustee's Motion, ¶ 19. Indeed, the CARES Act, which became law on March 27, 2020, did not exist on February 27, 2020, when the Court approved the sale of the Debtors' hospitals (Doc. 686). Thus, the receipt of the funds and any conditional interest in them are based solely on the CARES Act and arose entirely outside the bankruptcy case. Under *Kirkland* the Trustee's Motion concerns matters not subject to this Court's jurisdiction.[2]

---

[1] The Trustee's request is, at bottom, a claim for declaratory judgment and injunctive relief, which can only be sought through an adversary proceeding. Fed. R. Bankr. P. 7001.

[2] Bankruptcy does not "expand the debtor's rights against others beyond what rights existed at the commencement of the case." *See Claybrook v. Consol. Foods, Inc. (In re Bake-Line Group, LLC)*, 359 B.R. 566, 570 (D. Del. 2007) (citing 5 Collier on Bankruptcy § 541.04 (15th ed. 2006)).

**B.    The Trustee is Responsible for Attesting that the Debtors Complied with all Applicable Terms and Conditions Attached to Use of the Funds**

A chapter 11 trustee "is charged with the duty of acting as the chief executive officer of a corporate debtor," *In re Lowry Graphics, Inc.*, 86 B.R. 74, 76 (Bankr. S.D. Tex. 1988), and "may be liable for intentional or negligent violations of duties imposed upon him by law." *Bennett v. Williams*, 892 F.2d 822, 823 (9th Cir. 1989)(internal quotation marks and citation omitted). Here, after agreeing to sell the hospitals, the Trustee obtained the funds from DHHS for the benefit of Debtors' hospitals, allowed the hospitals to use those funds, and is responsible for completing and submitting an attestation to the Secretary that the hospitals' use of the funds comply with all applicable terms and conditions imposed by the CARES Act. *See* Trustee's Motion ¶ 19 (funds were dispersed during Trustees' control of the Debtors' hospitals). The Attestation Statement is not the end of the matter. As reflected in the Terms and Conditions governing the payments from the Fund, the Secretary may call for reporting in the future, in order to ensure that the payments have been used in conformance with the Terms and Conditions and with the CARES Act.

To the extent the Trustee seeks to shield himself from liability regarding his handling and disposition of the funds, the Court lacks authority to confer such protection. No authority exists to remove the matter from review by the designated authority, the Secretary of DHHS, or to exculpate or excuse anyone for any potential violation of the CARES Act. *Cf. In re PWS Holding Corp.,* 228 F. 3d 224, 246 (3rd Cir. 2000) (holding that professionals remain liable for willful misconduct or *ultra*

*vires* acts and thus cannot obtain exculpation for such acts).

### IV.    Conclusion

For the foregoing reasons, the Court should sustain this Objection and deny the Trustee's motion.

Respectfully submitted this the 20th day of May, 2020.

ROBERT J. HIGDON, JR.
United States Attorney

By:  /s/ Lauren A. Golden
LAUREN A. GOLDEN
Attorney for DHHS
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4870
Email: lauren.golden@usdoj.gov
N.C. Bar # 43071

UNITED STATES OF AMERICA

By:  /s/ Michael J. Quinn
MICHAEL J. QUINN
Attorney for U.S. Dept. of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 307-0243
Email: Michael.quinn3@usdoj.gov
D.C. Bar No. 401376

CERTIFICATE OF SERVICE

I do hereby certify that I have this 20th day of May, 2020, served a copy of the foregoing upon the below-listed parties electronically, addressed as follows:

Rayford K. Adams, III
Attorney for Debtors

Thomas W. Waldrep, Jr.
Trustee

Jason L. Hendren
Attorney for the Trustee

ROBERT J. HIGDON, JR.
United States Attorney

By:  /s/ Lauren A. Golden
LAUREN A. GOLDEN
Attorney for DHHS
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4870
Email: lauren.golden@usdoj.gov
N.C. Bar # 43071

UNITED STATES OF AMERICA

By:  /s/ Michael J. Quinn
MICHAEL J. QUINN
Attorney for U.S. Dept. of Justice
P.O. Box 875, Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 307-0243
Email: Michael.quinn3@usdoj.gov
D.C. Bar No. 401376

# EXHIBIT A

**CARES Act Provider Relief Fund**
**Frequently Asked Questions**

**Provider Relief Fund-General Information**

    Overview

    Attestation Process

    Rejecting Payments

    Terms and Conditions

    Appeals

    Publication of Payment Data

**General Distribution**

    Overview and Eligibility

    Payment Application Portal (i.e., DocuSign)

    Determining Additional Payments

    Data Sharing

**Targeted Distribution**

    Rural Targeted Distribution

    High Impact Area Hospitals

## PROVIDER RELIEF FUND—GENERAL INFORMATION

**Overview**

**Who is eligible to receive payments from the Provider Relief Fund?**
Provider Relief Funds are being disbursed via both "General" and "Targeted" Distributions.

*General Distribution*
To be eligible for the general distribution, a provider must have billed Medicare in 2019 and provide or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19. HHS broadly views every patient as a possible case of COVID-19. $50 billion will be disbursed in the General Distribution.

All providers retaining funds must sign an attestation and accept the terms and conditions associated with payment. Providers must also submit tax documents and financial loss estimates if they wish to be eligible for additional funds.

*Targeted Distributions*

A description of the eligibility for the announced Targeted Distributions can be found here.

U.S. healthcare providers may be eligible for payments from the remaining funds through Targeted Distributions. Information on future distributions will be shared when publicly available.

**Q: Is this a loan or a grant that I will need to pay back?**
A: Retention and use of these funds are subject to certain terms and conditions. If these terms and conditions are met, payments do not need to be repaid at a later date. These terms and conditions can be found here.

**My organization bills Medicare through the Medicare Advantage program.  I did not receive funding in the general distribution.  When can I expect to receive funding?** *(Added 5/12/2020)*
Providers that did not receive funding under the General Distribution may be included in future allocations under the Provider Relief Fund.  Additional information will be posted as available at https://www.hhs.gov/provider-relief/index.html.

**How will additional stimulus payments be processed or handled?**

A description of additional disbursements can be found here.

**<u>Attestation</u>**

**What action does a provider need to take after receiving a Provider Relief Fund payment?** *(Added 5/12/2020)*
The CARES Act requires that providers meet certain terms and conditions if a provider retains a Provider Relief Fund payment.  If a provider chooses to retain the funds, it must attest that it meet these terms and conditions of the payment.  The <u>CARES Act Provider Relief Fund Payment Attestation Portal</u> will guide you through the attestation process to accept or reject the funds. Not returning the payment within 45 days of receipt will be viewed as acceptance of the <u>Terms and Conditions</u>.  A provider must attest for each of the Provider Relief Fund distributions received.

**Does the Provider Relief Fund Payment Attestation Portal require payment recipients to attest that the payment amount was received?** *(Added 5/12/2020)*
Yes. The Payment Attestation Portal requires payment recipients to (1) confirm they received a payment and the specific payment amount that was received; and (2) agree to the Terms and Conditions of the payment.

**If a provider received two direct payments through the General Distribution, can a provider accept one payment and then reject the other payment?** *(Added 5/12/2020)*
Yes.  If a provider would like to reject one payment, the provider may still accept future distribution payments. The provider must use the Payment Attestation Portal to accept or reject payments.

**Rejecting Payments**

**How can I return a payment I received under the Provider Relief Fund? (*Added 5/6/2020*)**
Providers may return a payment by going into the attestation portal within 45 days of receiving payment and indicating they are rejecting the funds.  The CARES Act Provider Relief Fund Payment Attestation Portal will guide providers through the attestation process to reject the funds.

To return the money, the provider needs to contact their financial institution and ask the institution to refuse the received Automated Clearinghouse (ACH) credit by initiating an ACH return using the ACH return code of "R23 - Credit Entry Refused by Receiver." If a provider received the money via ACH they must return the money via ACH. If a provider was paid via paper check, after rejecting the payment in the attestation portal, the provider should destroy the check if not deposited or mail a paper check to UnitedHealth Group with notification of their request to return the funds.

**How should a provider return a payment it received via check? (*Added 5/12/2020*)**
If the provider received a payment via check and has not yet deposited it, destroy, shred, or securely dispose of it.  If the provider has already deposited the check, mail a refund check for the full amount, payable to "UnitedHealth Group" to the address below. Please list the check number from the original Provider Relief Fund ACH payment or check in the memo.

> UnitedHealth Group
> Attention: CARES Act Provider Relief Fund
> PO Box 31376
> Salt Lake City, UT 84131-0376

**How does a provider who received an electronic payment return funding if their financial institution will not allow them to return the payment electronically? (*Added 5/12/2020*)**
Contact UnitedHealth Group's Provider Support Line at (866) 569-3522.

**Terms and Conditions**

**What is the definition of individuals with possible or actual cases of COVID-19? (*Added 5/6/2020*)**
Unless the payment is associated with specific claims for reimbursement for COVID-19 testing or treatment provided on or after February 4, 2020 to uninsured patients, under the Terms and Conditions associated with payment, providers are eligible only if they provide or provided after January 31, 2020, diagnoses, testing or care for individuals with possible or actual cases of COVID-19. HHS broadly views every patient as a possible case of COVID-19.

Not every possible case of COVID-19 is a presumptive case of COVID 19. For clarification as it relates to presumptive COVID 19 cases, refer to the Frequently Asked Question that defines a presumptive case of COVID-19

**What oversight and enforcement mechanisms will HHS use to ensure providers meet the Terms and Conditions of the Provider Relief Fund payments?** *(Added 5/6/2020)*
Failure by a provider that received a payment from the Provider Relief Fund to comply with any term or condition can subject the provider to recoupment of some or all of the payment. Per the Terms and Conditions, all recipients will be required to submit documents to substantiate that these funds were used for increased healthcare-related expenses or lost revenue attributable to coronavirus, and that those expenses or losses were not reimbursed from other sources and other sources were not obligated to reimburse them.  HHS will have significant anti-fraud monitoring of the funds distributed, and the Office of Inspector General will provide oversight as required in the CARES ACT to ensure that Federal dollars are used appropriately.

### *Reporting Requirements*

**What are the reporting requirements for providers attesting to receipt of Provider Relief Fund payments and when will reporting begin?** *(Added 5/6/2020)*
All providers receiving Provider Relief Fund payments will be required to comply with the reporting requirements described in the <u>Terms and Conditions</u> and specified in future directions issued by the Secretary.  The specific reporting obligations imposed on providers receiving $150,000 or more from any Act primarily making appropriations for the coronavirus response and related activities, which is a statutory requirement, begins for the calendar quarter ending June 30.  The Secretary may request additional reports prior to that date.  HHS will provide guidance in the future about the type of documentation we expect recipients to submit. Additional guidance will be posted at https://www.hhs.gov/provider-relief/index.html.

### *Balance Billing*

**Do the Terms and Conditions for the General, Rural or High Impact Distributions require attesting to a ban on balance billing for all patients and/or all care, because "HHS broadly views every patient as a possible case of COVID-19"?** *(Added 5/6/2020)*
No. As set forth in the Terms and Conditions, the prohibition on balance billing applies to "all care for a presumptive or actual case of COVID-19."

**The Terms and Conditions provision related to balance billing suggests that providers that provide out-of-network care to an insured, presumptive or actual COVID-19 patient can bill the patient's insurer any amount, as long as they don't bill the patient directly. Is that correct?** *(Added 5/6/2020)*
The Terms and Conditions do not impose any limitations on the ability of a provider to submit a claim for payment to the patient's insurance company.  However, an out-of-network provider delivering COVID-19-related care to an insured patient may not seek to collect from the patient out-of-pocket expenses, including deductibles, copayments, or balance billing, in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network provider.

**The Terms and Conditions associated with the two General Distribution payments and the Rural and High Impact payments require that "for all care for a presumptive or actual case of COVID-19, Recipient certifies that it will not seek to collect from the patient out-of-**

pocket expenses in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network Recipient." How does HHS define a presumptive case of COVID-19? *(Added 5/6/2020)*
A presumptive case of COVID-19 is a case where a patient's medical record documentation supports a diagnosis of COVID-19, even if the patient does not have a positive in vitro diagnostic test result in his or her medical record.

**How will a provider know the in-network rates to be able to comply with the requirement to bill a presumptive or actual COVID-19 patient for cost-sharing at the in-network rate?** *(Added 5/6/2020)*
Providers accepting the Provider Relief Fund payment should submit a claim to the patient's health insurer for their services. Most health insurers have publicly stated their commitment to reimbursing out-of-network providers that treat health plan members for COVID-19-related care at the insurer's prevailing in-network rate. If the health insurer is not willing to do so, the out-of-network provider may seek to collect from the patient out-of-pocket expenses, including deductibles, copayments, or balance billing, in an amount that is no greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network provider.

**If a hospital receives a Provider Relief Fund payment under the General, Rural or High Impact Distribution and the hospital contracts with an independently contracted provider (e.g., anesthesiologist or laboratory), is that independently contracted provider banned from balance billing for care provided to a "presumptive or actual COVID-19 patient"?** *(Added 5/6/2020)*
Yes, if the independently contracted provider also attested to receiving a payment from the Provider Relief Fund.

## Appeals

**Who determines the amount my organization will receive?**
HHS will apportion relief funds to US healthcare providers with the intention of optimizing the beneficial impact of the funds.

**Who can I talk to at HHS about my distribution payment?**
HHS is not taking direct inquiries from providers, and no remedy or appeals process will be available. For additional information, please call the provider support line at (866) 569-3522.

**How do I appeal or dispute a decision made?**
There is no appeals or dispute process.

## Publication of Payment Data

**Is there a publicly available list of providers and the payments they received through the Provider Relief Fund?** *(Added 5/12/2020)*
HHS has posted a public list of providers and their payments once they attest to receiving the

money and agree to the Terms and Conditions.  All providers that received a payment from the Provider Relief Fund and retain that payment for at least 45 days without rejecting the funds are deemed to have accepted the Terms and Conditions.  Providers that affirmatively attest through the provider portal or that retain the funds past 45 days of receipt but do not attest will be included in the public release of providers and payments.  The list includes current total amounts attested to by providers from each of the Provider Relief Fund distributions, including the General Distribution, Rural Distribution, and High-Impact Areas Distribution. The list is available here.

**What providers are included in the Provider Relief Fund data file on the CDC website?**
*(Added 5/12/2020)*
The data that are posted here represent the list of providers that received one or more payments from the Provider Relief Fund and that have attested to receiving at least one payment and agreed to the associated Terms and Conditions.  If a provider has received more than one payment but has not accepted all of the payments (by attesting and agreeing to the Terms and Conditions), only the dollar amount associated with the accepted payment or payments will appear.  These data displayed on the website will be updated biweekly.

**Why might a provider not be listed or listed with a different address than their service location?** *(Added 5/12/2020)*
Provider Relief Fund payments are being made to providers or groups of providers that are organized within a Tax Identification Number (TIN).  The information displayed is of providers by billing TIN that have received at least one payment, which they have attested to, and the address associated with that billing TIN. Providers will not be listed if they have not yet attested to the payment terms and conditions or if they are within a larger billing entity that received payment.  In addition, the address listed for the billing TIN often corresponds with the billing location (based on CMS's Provider Enrollment, Chain, and Ownership System (PECOS)), and may not align with the physical location of a health care practice site. Updated data will be made available on the CDC's website.

**How often will the public reporting of payments data file on the CDC website be updated?**
*(Added 5/12/2020)*
HHS will update the data biweekly.

**Will HHS release additional data such as provider types, payment amount per distribution, or payment recipients' NPIs on the public reporting of payments data file on the CDC website?** *(Added 5/12/2020)*
HHS does not have plans to include additional data fields in this report.

## GENERAL DISTRIBUTION FAQs

### Overview and Eligibility

**Which types of providers are eligible to receive a General Distribution Provider Relief Payment?** *(Added 5/6/2020)*
To be eligible for a General Distribution payment, providers must have billed Medicare on a fee-for- service basis (Parts A or B) in Calendar Year 2019. Additionally, under the Terms and Conditions associated with payment, these providers are eligible only if they provide or provided after January 31, 2020, diagnoses, testing or care for individuals with possible or actual cases of COVID-19. HHS broadly views every patient as a possible case of COVID-19.

All providers retaining funds must sign an attestation and accept the terms and conditions associated with payment. Providers must also submit tax documents and financial loss estimates if they wish to be eligible for additional funds.

**How did HHS determine the additional payments under the General Distribution?** *(Added 5/14/2020)*
HHS is distributing an additional $20 billion of the General Distribution to providers to augment their initial allocation so that $50 billion is allocated proportional to providers' share of 2018 net patient revenue.  The allocation methodology is designed to provide relief to providers, who bill Medicare fee-for-service, with at least 2% of that provider's net patient revenue regardless of the provider's payer mix. Payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) net patient revenue or the sum of incurred losses for March and April.  If the initial General Distribution payment you received between April 10 and April 17 was determined to be at least 2% of your annual patient revenue, you will not receive additional General Distribution payments.

**How can I estimate 2% of patient revenue to determine my approximate General Distribution payment?**  *(Added 5/14/2020)*
In general, providers can estimate payments from the General Distribution of approximately 2% of 2018 (or most recent complete tax year) patient revenue.  To estimate your payment, use this equation:
(Individual Provider Revenues/$2.5 Trillion) X $50 Billion = Expected Combined General Distribution.

To estimate your payment, you may need to use "Gross Receipts or Sales" or "Program Service Revenue."  Providers should work with a tax professional for accurate submission.

This includes any payments under the first $30 billion general distribution as well as under the $20 billion general distribution allocations. Providers may not receive a second distribution payment if the provider received a first distribution payment of equal to or more than 2% of patient revenue.

**I am a healthcare provider that received a previous General Distribution payment and I submitted my revenue information through DocuSign. Why am I not receiving an additional payment?** *(Added 5/14/2020)*
HHS is distributing an additional $20 billion of the General Distribution to providers to augment their initial allocation so that $50 billion is allocated proportional to providers' share of 2018 net patient revenue.  Payments are determined based on the lesser of 2% of a provider's 2018 (or most recent complete tax year) net patient revenue or the sum of incurred losses for March and April.  If the initial General Distribution payment you received between April 10 and April 17 was determined to be at least 2% of your annual patient revenue, you will not receive additional General Distribution payments.  There may be additional distributions in the future for which providers are eligible.

**I submitted my financial information on the Provider Relief Fund Payment Portal. Why have I not received funds yet?** *(Added 5/14/2020)*
HHS is reviewing providers' uploaded financial information. Payments will go out weekly, on a rolling basis, as information is validated.  HHS may seek additional information from providers as necessary to complete its review.

**I did not receive any payments from the previous General Distribution. Can I still receive funding though the additional General Distribution?** *(Added 5/14/2020)*
No, only providers that received a previous payment under the General Distribution are eligible to receive funding through this additional distribution.

**Can I receive additional funding through the Targeted Distribution if I received a General Distribution payment?** *(Added 5/14/2020)*
Yes, you may receive additional funding through Targeted Distribution payments related to COVID-19.  Additional allocations will be made separately from General Distribution payments. You may also file claims for testing and treatment of uninsured COVID-19 patients.

**Can I modify my application?** *(Added 5/14/2020)*
Yes, providers can resubmit a General Distribution application.  HHS will review the most recent request.

**What should a provider do if a General Distribution payment is greater than expected or received in error?**  *(Modified 5/19/2020)*
Providers that have been allocated a payment must sign an attestation confirming receipt of the funds and agree to the Terms and Conditions within 45 days of payment. If a provider believes it was overpaid or may have received a payment in error, it should reject the entire General Distribution payment and submit the appropriate revenue documents through the General Distribution portal to facilitate HHS determining their correct payment.  If a provider believes they are underpaid, they should accept the payment and submit their revenues in the provider portal to determine their correct payment.

**Does HHS intend to recoup any payments made to providers not tied to specific claims for reimbursement, such as the General Distribution payments?** *(Added 5/6/2020)*
The Provider Relief Fund and the Terms and Conditions require that recipients be able to

demonstrate that lost revenues and increased expenses attributable to COVID-19, excluding expenses and losses that have been reimbursed from other sources or that other sources are obligated to reimburse, exceed total payments from the Relief Fund.  Generally, HHS does not intend to recoup funds as long as a provider's lost revenue and increased expenses exceed the amount of Provider Relief funding a provider has received. HHS reserves the right to audit Relief Fund recipients in the future to ensure that this requirement is met and collect any Relief Fund amounts that were made in error or exceed lost revenue or increased expenses due to COVID-19. Failure to comply with the Terms and Conditions may be grounds for recoupment.

**If, as a result of the sale of a practice/hospital, the TIN that received a General Distribution payment is no longer providing health care services as of January 31, 2020, is it required to return the General Distribution payment?** *(Added 5/19/2020)*
Yes. If, as a result of the sale of a practice/hospital, the TIN that received a General Distribution payment did not provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 on or after January 31, 2020, the provider must reject the payment. The CARES Act Provider Relief Fund Payment Attestation Portal will guide you through the attestation process to reject the payment.

**An organization purchased a practice during or after the year of the organization's most recent tax filing and the purchased practice's revenues are not reflected in the most recent tax return. How does the organization account for these acquisitions when submitting revenue information in the Payment Portal?** *(Added 5/19/2020)*
An organization's adjusted gross receipts should be calculated as gross receipts as shown on the organization's most recent tax return plus gross receipts of the practice acquired not reflected in the organization's tax return minus gross receipts of providers sold not reflected in the organization's tax return. If an organization's adjusted gross receipts exceed the gross receipts shown in the tax return by more than 20%, the organization is eligible to enter the adjusted gross receipts figure in the Provider Relief Fund Payment Portal. Otherwise, the organization should enter the gross receipts figure as shown on the tax return. Organizations that have already submitted an application in the Payment Portal can resubmit a revised application using the adjusted gross receipts number accounting for acquisitions, if the adjusted gross receipts exceeds the gross receipts shown in the tax return by more than 20%.  Gross receipts of acquired entities that provide care as of January 31, 2020 and file their own tax returns cannot be included in such adjusted gross receipts figure, because they should submit their own application as tax return filers.

**Can an organization that sold its only practice or facility under a change in ownership in 2019 and is no longer providing services, accept payment and transfer it to the new owner?** *(Added 5/19/2020)*
No.  A provider that sold its only practice or facility must reject the Provider Relief Fund payment because it cannot attest that it was providing diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 on or after January 31, 2020, as required by the Terms and Conditions.  Seller organizations should not transfer a payment received from HHS to another entity.  If the current TIN owner has not yet received any payment from the Provider Relief Fund, it may still receive funds in other distributions.

**Can a provider that purchased a TIN in 2019 accept a Provider Relief Fund payment from a previous owner and complete the attestation for the Terms and Conditions?** *(Added 5/19/2020)*
No. The new TIN owner cannot accept the payment from another entity nor attest to the Terms and Conditions on behalf of the previous owner in order to retain the Provider Relief Fund payment.  If the new TIN owner did not receive a direct payment under the General Distribution, it is not eligible to receive a payment under the General Distribution.  However, the new TIN owner may still receive funds in other distributions.

**How does HHS calculate who gets specific amounts of funding?**
HRSA distributed the initial $30 billion in Provider Relief funds in proportion to a provider's 2019 Medicare Fee for Service billings. A description of the allocation methodologies is provided here.

**Are hospitals and health systems in all states and territories eligible?**
Yes.

**If a provider owns several hospitals, can the provider retain the funds or must the provider distribute the funds throughout their system?** *(Added 5/12/2020)*
The Provider Relief Fund payment recipient has discretion in allocating the Provider Relief funds to support health care related expenses or lost revenue attributable to COVID-19, so long as they are not reimbursed from other sources and other sources were not obligated to reimburse them.

**Payment Portal**

**Why does the General Distribution website say I have to attest before requesting additional funds?**
The CARES Act requires that providers meet certain terms and conditions to receive Provider Relief Funds. In order to keep the initial General Distribution payment, and in order to be eligible to receive additional General Distribution funds, you must attest that you meet these terms and conditions and you must submit your financial and tax information.

**Why do I need to upload my tax forms?**

The $50 billion general allocation is apportioned based on provider revenue.  Tax forms are needed to ascertain and confirm provider revenue.

**What documents do I need to begin entering in the payment portal?**
1. TIN that received prior Provider Relief Fund payments
2. TIN(s) of subsidiary organizations that received prior Provider Relief Funds but do not file separate tax forms (i.e., subsidiary organizations that are accounted for in the parent organization's tax filing)
3. Amount of payments received
4. Relief Fund payment transaction numbers / check numbers
5. A copy of your most recently filed tax forms

**Who is eligible to receive additional payments through the Provider Relief Fund Payment Portal?**
Any provider who received a payment from the Provider Relief Fund as of 5:00 pm EST Friday, April 24, 2020 can apply for additional funding via the Provider Relief Fund Payment Portal.

Providers who have not received funding as of 5:00 pm EST Friday April 24, 2020 are not eligible to use the Provider Relief Fund Payment Portal. However these providers may still be eligible for payments from the Provider Relief Fund through other mechanisms, including the Targeted Distributions.

**What information is HHS collecting in the Provider Relief Fund Payment Portal?**
The Provider Relief Fund Payment Portal has been deployed to collect information from providers who received General Distribution payments prior to April 24, 2020 at 5:00 pm EST.

The Provider Relief Fund Payment Portal collects four pieces of information to allocate remaining General Distribution funds:

1) a provider's "Gross Receipts or Sales" or "Program Service Revenue" as submitted on its federal income tax return;
2) the provider's estimated revenue losses in March 2020 and April 2020 due to COVID;
3) a copy of the provider's most recently filed federal income tax return;
4) a listing of the TINs for any of the provider's subsidiary organizations that received relief funds but DO NOT file separate tax returns.

This information may also be used to allocate other Provider Relief Fund distributions.

HHS is collecting: the "gross receipt or sales" or "program service revenue" data to have an understanding of a provider's usual operations; the revenue loss information to have an understanding of COVID impact; and, tax forms to verify the self- reported information. HHS is collecting information about organizational structure and subsidiary TINs so that we do not overpay or underpay providers who file tax returns covering multiple legal entities (e.g. consolidated tax returns).

Providers meeting the following criteria are required to submit a separate portal application:
(a) Provider has received Provider Relief Fund payments as of 5:00pm EST Friday April 24, 2020 **AND**
(b) Provider has filed a federal income tax return for 2017, 2018, or 2019.

As such, each entity that files a federal income tax return is required to file an application even if it is part of a provider group. However, a group of corporations that files one consolidated return will have only the tax return filer apply.

Each provider submitting an application is required to list the TINs of each subsidiary that (a) has received Provider Relief Fund payments as of 5:00 EST Friday April 24, 2020 **AND** (b) **has not filed** federal income tax returns for 2017, 2018, or 2019.

Do not list any subsidiary's TIN that has filed a federal income tax return, because such subsidiary is required to submit a separate application.

For example:

1)  A parent entity and two subsidiaries received Provider Relief Fund payments. The parent filed a federal income tax return, but the two subsidiaries did not as they are consolidated with the parent.

The parent should submit an application and list the subsidiary TINs therein. The subsidiaries cannot submit an application as they did not file a tax return.

2)  A parent entity and two subsidiaries A and B received Provider Relief Fund payments. The parent and subsidiary A filed a federal income tax return, but the subsidiary B did not as it is consolidated with the parent.

The parent and subsidiary A should submit separate applications. The parent would list the TIN subsidiary B in its application.

**What information do I need before I start the application process?**
❑ Eligibility
To enter the Provider Relief Fund Payment Portal you must meet two criteria:
1.  You must have already received a Provider Relief Fund Payment by 5:00 pm EST, Friday April 24, 2020
2.  You must attest to having received the payment via the Provider Attestation Portal, and you must agree to the Terms and Conditions on the attestation portal.
❑ Data
Before you initiate your application via the Provider Relief Fund Payment Portal, please collect the following data
1.  The Taxpayer Identification Number for the organization applying for Provider Relief funds. ("Application TIN")
2.  The Taxpayer Identification Number(s) of any subsidiary organizations if and only if those organizations do not file separate tax returns, but rather consolidate into the returns of the "Application TIN". If your organization has subsidiaries that file separate tax returns, a separate application must be made for each subsidiary that files a separate return.
3.  An estimate of the organization's lost revenue for March 2020 and April 2020. Lost revenue can be estimated by comparing year-over-year revenue, or by comparing budgeted revenue to actual revenue.  For April 2020, an estimate of the total monthly loss based on data from the first few weeks in April or by extrapolation from March data is acceptable.
4.  A copy of the most recent tax form filed by the organization associated with the Application TIN.

**Who should fill out this form?**
Any person authorized by the provider organization may complete this form. We recommend it be completed by an organization's corporate office, specifically, the CFO or other accounting professional.

**Will I be penalized if I take several days to collect the necessary information?**
No. HHS will be processing applications in batches every week. Funds will not be disbursed on a first-come-first-served basis, which is to say, an applicant will be given equal consideration regardless of when they apply.

**Why does the website say my TIN is not eligible?**
HHS is collecting tax and financial loss data from *providers who have already received payments* under the General Distribution. If you have not already received a Provider Relief Fund payment you are not eligible to submit your tax and financial loss information to the Provider Relief Fund Payment Portal. However, this does not mean that you are ineligible for forthcoming Provider Relief funds.

If you received a General Distribution payment by 5:00 pm EST, Friday April 24, 2020 and are being told that your TIN is ineligible, please check to see if you entered your TIN correctly and check to see that the TIN matches the TIN for the organization that received a Provider Relief Fund payment.

**Are Tax ID's that did not receive initial General Distribution payment eligible?**
Organizations that have not received any General Distribution payments as of April 24, 2020 may be eligible for relief funds in future distributions. The Provider Relief Fund Payment Portal is only collecting tax IDs from providers who have received a General Distribution payment.

**What is a Federal Tax Classification?**
The Federal Tax Classification describes the type of tax filer that the applicant is for purposes of the applicant's federal income tax return with the IRS, for example Partnership or S Corporation.

**How do I know if I'm a sole proprietor/disregarded entity? C Corporation? S Corporation? Partnership? Trust? Tax-Exempt Organization?**
The answer is determined by the type of the applicant's entity and any tax elections the applicant has made.

**Which tax form did the applicant file for the most recent year?**
- Form 1040      The applicant is a sole proprietor or provides services as the sole member of an LLC.
- Form 1065      The applicant is a partnership.
- Form 1120      The applicant is a C corporation.
- Form 1120-S   The applicant is an S corporation.
- Form 990       The applicant is a tax-exempt organization.
- Form 1041      The applicant is a trust.

**Which type of supporting documentation should I submit if I am an institution without IRS filings?** *(Added 5/14/2020)*
All providers that have filed tax returns in 2019 or 2018 should submit the filings as supporting documentation. If a particular healthcare provider has a legitimate reason (e.g. tax exempt) for not having IRS filings, then alternative financial statements are acceptable.  If the entity is tax exempt, the entity should use Net Patient Revenues from its most recent audited annual financial

statements as a substitute for "Program Services Revenue" when prompted. Further, the entity should submit its most recent audited financial statements as a substitute for the federal income tax return Form 990 requested.

**Where do I find my Gross Receipts or Sales?**
- Form 1040      Box 1 of Schedule C
- Form 1065      Box 1a
- Form 1120      Box 1a
- Form 1120-S  Box 1a
- Form 990       Use Part I, 9 "Program Services revenue"
- Form 1041      Box 1 of Form 1040 Schedule C

[Note: you use a Form 1040 Schedule C also for Form 1041]

**Which information should be submitted in the Provider Relief Fund Payment Portal by a state-run entity (e.g. state university medical center) that has no parent organization that files a federal income tax return?**
The applying state entity should select "Tax-Exempt Organization" in the dropdown menu for "Federal Tax Classification." The state entity should use Net Patient Revenues from its most recent audited annual financial statements as a substitute for "Program Services Revenue". Further, the state entity should submit its most recent audited financial statements as a substitute for the federal income tax return Form 990.

**How do I estimate lost revenue in March or April?**
You may use a reasonable method of estimating the revenue during March and April compared to the same period had COVID-19 not appeared. For example, if you have a budget prepared without taking into account the impact of COVID-19, the estimated lost revenue could be the difference between your budgeted revenue and actual revenue. It would also be reasonable to compare the revenues to the same period last year.

**Why is the Provider Relief Fund Payment Portal asking for Gross Receipts or Sales?**
HHS is asking for Gross Receipts because it is a measure of revenues you received during the applicable filing period.

**Why is the Provider Relief Fund Payment Portal asking me to estimate my revenue?**
HHS realizes that a final revenue number may not be available until a certain time after the end of April. As the program seeks to provide liquidity support to the healthcare system in a timely manner we are using estimated revenues.

**Where do I find program service revenue if I am a tax exempt organization?**
Box 9 of the Form 990.

**Do I submit 2019 or 2018 forms?**
Submit the most recent form that you have filed with the IRS (typically 2017, 2018 or 2019).

**What if I haven't filed taxes for the year being requested?**
If you are required to, but have not filed a tax return in 2017 or 2018, you are ineligible to apply. You should file the applicable tax return and then re-apply.

**If I have more than one Tax ID but I either have not attested or did not receive payments on some or all of them, am I eligible?**
You must attest for all payments received to be eligible for additional General Distribution funding. You are only eligible to apply for additional funding through the Provider Relief Fund Payment Portal if you have TINs that have received prior relief fund payments. Fill out one application for each eligible TIN that has received a Provider Relief Fund payment and for which there is a corresponding tax filing. If you are a subsidiary of a tax filing organization, and do not file a separate tax return, you are ineligible to apply for additional funds.

**Where do I find my Medicare ID?**
Providers may find their Medicare ID number by logging into the Medicare Provider Enrollment, Chain, and Ownership System (PECOS).

**What is a CAQH Provider ID? Where do I find it?**
Council for Affordable Quality Healthcare (CAQH) Provider ID number is the unique identifier assigned to each CAQH ProView user at the time of registration. If you have been invited to join CAQH ProView by a health plan, hospital or other participating organization, you may have received a welcome letter with your CAQH Provider ID Number. New users also have the option to self-register through the CAQH ProView Provider portal: https://proview.caqh.org/pr. Upon completion of the self-registration process, users will receive a welcome email with their unique CAQH Provider ID Number.

**How many requests should I make?**
You may make one request for each TIN that has received prior Provider Relief Fund payments.

**Determining Additional Payments**

**How can I estimate the total payment amount I can anticipate through the General Distribution?** *(Added 5/14/2020)*
In general, providers can estimate payments from the General Distribution of approximately 2% of 2018 (or most recent complete tax year) patient revenue. To estimate your payment, use this equation:

(Individual Provider Revenues/$2.5 Trillion) X $50 Billion = Expected Combined General Distribution.

To estimate your payment, you may need to use "Gross Receipts or Sales" or "Program Service Revenue." Providers should work with a tax professional for accurate submission.

This includes any payments under the first $30 billion general distribution as well as under the $20 billion general distribution allocations. Providers may not receive a second distribution payment if the provider received a first distribution payment of equal to or more than 2% of patient revenue.

**How long does it take for HHS to make a decision on additional General Distribution funding?**
For providers submitting tax and financial loss information, HHS intends to distribute additional funds within 10 business days of the submission. It is the Department's intention to distribute relief funds as quickly as possible.

**How do I find out if my funding request was not approved?**
If you have attested and submitted tax forms and loss estimates, you should receive a payment or other response within 10 business days.

**How will HHS notify me that my application has been processed?**
You will receive an email when your application is completed. You will receive no notification from HHS as to the status of your application once submitted. You should expect additional funds, if you are to receive any, within 10 business days of completing your application.

**How will HHS notify me if they need additional information?**
If additional information is requested, HHS will use the email address used to access the Provider Relief Fund Payment Portal.

**When can I expect to receive additional funds?**
Funds should be disbursed within 10 days of the submission of your application.

**<u>Data Sharing</u>**

**Why am I being redirected to DocuSign to fill out certain elements?**
HHS is using DocuSign to securely pass encrypted data to HHS. Neither DocuSign nor UnitedHealth Group will have access to your data.

**What is DocuSign doing with my data?**
DocuSign is securely passing your data to HHS in encrypted files. Neither DocuSign nor UnitedHealth Group will have access to your data.

**What information is shared with UnitedHealth Group, UnitedHealthcare, Optum, or any other subsidiary of UnitedHealth Group?**
UnitedHealth Group and its subsidiaries will not have access to any information collected from providers, nor do they participate in determining the methodology used to allocate Provider Relief Fund payments. UnitedHealth Group will know the amounts of relief funding paid to providers, as UnitedHealth Group is processing the payments.

**Who has access to my revenue data?**
HHS will have access to your revenue data to optimally allocate Provider Relief Funds. HHS will not share your revenue data with any other entities, in or outside of government, except as prescribed by law.

## TARGETED DISTRIBUTIONS FAQs

### Rural Targeted Distribution

**What was the formula used to make the Rural Distribution payment to rural hospitals?** *(Added 5/12/2020)*
Rural Distribution payments were made to rural acute care general hospitals and Critical Access Hospitals (CAHs), Rural Health Clinics (RHCs), and Community Health Centers located in rural areas. Hospitals and RHCs will each receive a minimum base payment plus a percent of their annual expenses. This method accounts for operating cost and lost revenue incurred by rural hospitals for both inpatient and outpatient services. The base payment will account for RHCs with no reported Medicare claims, such as pediatric RHCs, and CHCs lacking expense data, by ensuring that all clinical, non-hospital sites receive a minimum level of support no less than $100,000, with additional payment based on operating expenses. Rural acute care general hospitals and CAHs will receive a minimum level of support of no less than $1,000,000, with additional payment based on operating expenses.

**Is it accurate that rural hospitals would receive 4% of operating expenses from the Rural Distribution?  What year's Medicare cost report was used?** *(Added 5/12/2020)*
Rural hospitals received a graduated base payment plus approximately 2% of total operating expenses reported on their most recent, publicly available cost reports.  The base payment gradually increases from $1 to $3 million depending on hospital operating expenses and establishes a floor for rural hospitals to support their financial stability during the COVID-19-pandemic.  The additional amount is a percentage of each individual hospital's total operating expenses so that payments are related to the actual operating expenses that rural hospitals are incurring.  Worksheet G-3, Line 4 of the Medicare hospital cost report was used for total operating expenses.  If cost reports were more or less than a year in length, then total operating expenses were adjusted to reflect a full year.

**Will the Rural Distribution include urban health care hospitals that have obtained classifications as rural facilities under a 42 CFR 412.103 exception?** *(Added 5/12/2020)*
No. Eligibility for Rural Distribution payments is limited to rural acute care general hospitals, Critical Access Hospitals (CAHs), Rural Health Clinics (RHCs), and Community Health Centers that are located in a rural area as defined by HHS's Federal Office of Rural Health Policy. The 42 CFR 412.103 exception hospitals include a significant number of very large urban facilities.  The Rural Distribution payments focused on smaller rural hospitals that are struggling to remain financially viable.

**How were rural providers identified for the Rural Distribution?** *(Added 5/14/2020)*
Rural facilities were identified based on their provider type and the physical addresses of the hospital or clinic site as reported to CMS for rural acute care general hospitals, critical access hospitals (CAHs), and independent rural health clinics (RHCs), and to HRSA for Community Health Centers, regardless of affiliation with organizations based in urban areas. HHS used the December 2019 CMS Provider of Services file to identify hospitals, CAHs, and RHCs. Due to data constraints, facilities that were not included in the December 2019 Provider of Services file were not included in the Rural Distribution.

**How does HHS define rural for these payments?** *(Added 5/12/2020)*
For the Rural Distribution, HHS used the Federal Office of Rural Health Policy's definition of rural, which includes:

1. All non-Metro counties.
2. All Census Tracts within a Metropolitan county that have a Rural-Urban Commuting Area (RUCA) code of 4-10. The RUCA codes allow the identification of rural Census Tracts in Metropolitan counties.
3. 132 large area census tracts with RUCA codes 2 or 3. These tracts are at least 400 square miles in area with a population density of no more than 35 people per square mile.

**Did both freestanding and provider-based rural health clinics receive funding under the Rural Distribution?** *(Added 5/14/2020)*
If the RHC is owned by a rural hospital or CAH, the hospital received the payment. Rural hospitals that own RHCs (also known as provider-based RHCs) report their RHCs' operating expenses as part of the hospital cost report. Since provider-based clinics operate under the ownership and administrative and financial control of the hospital, the RHC expenses are included in the base payments and additional payments calculated for the rural hospital. These provider-based RHCs did not receive separate payments. Urban hospitals did not receive Rural Distribution payments and neither did provider-based RHCs. If the RHC is a freestanding, independent facility, then it received the payment directly.

**Which rural providers received a payment under the Rural Distribution?** *(Added 5/14/2020)*
Rural Distribution funding is targeted at organizations that provide acute and primary care in rural areas. Acute care hospitals in rural areas and Critical Access Hospitals (CAHs) in rural areas and non-rural areas are eligible for Rural Provider Relief funding. CAHs outside of rural areas are included in the rural provider distribution because CAHs have a unique safety net role and statutory charge.  That statute also initially gave state governors the authority to designate necessary provider CAHs, a number of which did not make a distinction between rural and urban designations.

In addition to hospitals, the following types of organizations received payments: freestanding (not provider-based) Rural Health Clinics (RHCs) and Community Health Centers. For provider-based RHCs, RHC funds were distributed through the rural hospital and CAH allocation.

**Which data sources did you use for operating costs for hospitals, rural health clinics, and other facility types?  How recent was the data used?** *(Added 5/14/2020)*
HHS analyzed the following files to identify facility locations and operating costs:

- Provider of Services Files, December 2019 update, https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Provider-of-Services/index
- Healthcare Cost Report Information System (HCRIS), 1/17/2020 update, https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Cost-Reports contains the most recent cost report data available. For most hospitals, this is the 2018 fiscal year.  We used hospital data from 2016 to replace missing data for two hospitals and 2017 data for 16 hospitals.

- The HRSA Bureau of Primary Health Care extracted data from the most recent Uniform Data System (UDS) to identify rural Community Health Center sites.

**Our hospital's operating costs have gone up dramatically in recent months after COVID-19 started.  Will our increased operating costs be reflected in the Rural Distribution formulas?** *(Added 5/14/2020)*
No. Rural provider allocations are based on historical operating expense data to enable rapid distribution of funds to meet immediate rural needs.

## High-Impact Area Targeted Distribution

**How were COVID-19 High Impact Area funds allocated?** *(Added 5/12/2020)*
Of the $12 billion distribution, $10 billion was allocated based on a fixed amount per COVID-19 inpatient admission. The remaining $2 billion of the $12 billion was distributed based off each hospital's portion of Medicare Disproportionate Share Hospital (DSH) payments and Medicare Uncompensated Care Payments (UCP).

**How many payments did HHS make under the COVID-19 High Impact Area Distribution?** *(Added 5/12/2020)*
HHS made 336 COVID-19 High Impact Area Distribution payments to 395 hospitals and health systems that provided inpatient care for 100 or more COVID-19 patients through April 10, 2020. Some payments were made to hospitals and health systems that operate more than one hospital.

**Why is HHS targeting these hospitals for COVID-19 High Impact Area funding?** *(Added 5/12/2020)*
In allocating the funds, the Administration is working to address both the economic harm across the entire healthcare system due to COVID-19 and the economic impact on providers directly treating patients with COVID-19. The distribution takes into consideration the challenges faced by facilities serving a significantly disproportionate number of low-income patients and that inpatient admissions are a primary driver of costs to hospitals related to COVID-19.

**Should providers continue to update their high-impact data?** *(Modified 5/19/2020)*
Providers should update their capacity and COVID-19 census data to ensure that HHS can make timely payments in the event that the provider becomes a high-impact provider.  Providers can continue to update their information through the same method they used previously.

**How were COVID-19 High Impact Area payments distributed?** *(Added 5/12/2020)*
HHS partnered with UnitedHealth Group to deliver funds. Payment were sent via Automated Clearing House (ACH). The automatic payments were sent via Optum Bank with "CARES Act HighImpactAreaPmt*HHS.GOV" in the payment description. Payments were sent to the group's central billing office. All relief payments were made to provider billing organizations based on their TINs.