UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
OTHER DIVISION

IN RE:                                              )
                                                    )
CAH ACQUISITION COMPANY 7, LLC,      )          No. 19-0129805-JNC
                              Debtor.       )          Chapter 11

**TRANSCENDENTAL UNION WITH LOVE AND SPIRITUAL ADVANCEMENT'S OBJECTION TO TRUSTEE'S MOTION FOR ORDER CONFIRMING (A) CERTAIN STIMULUS FUNDS WERE USED IN ACCORDANCE WITH APPLICABLE TERMS AND CONDITIONS AND (B) (II) AN ORDER ELIMINATING ANY LIABILITY OF TRUSTEE AND DEBTOR'S ESTATES FOR USE OF STIMULUS FUNDS AND APPLICATION FOR DISTRIBUTION OF FUNDS**

NOW COME Transcendental Union with Love and Spiritual Advancement (hereinafter "TULSA"), and object to the *Trustee's motion for (I) An Order Confirming that (A) Certain Stimulus Funds were Used in Accordance with Applicable Terms and Conditions and (B) (II) An Order Eliminating Any Liability of Trustee and Debtor's Estates for Use of Stimulus Funds* [Case No. 19-01298-5-JNC, Dkt. No. 573], ("Trustee's Motion") as follows:

1.    TULSA objects to the Trustee's Motion and believe it should be denied. TULSA, a 501(c)(3) not-for-profit, files this response as the purchaser of the Prague Community Hospital, a Critical Access Hospital ("CAH").

2.    TULSA and Trustee executed an Asset Purchase Agreement dated as of May 2, 2020 with an effective time of closing of May 4, 2020 at 12:01 AM CST. TULSA and Trustee executed an Addendum to the Asset Purchase Agreement on May 2, 2020 with an effective date of May 2, 2020 that specifically outlined a protocol how to handle funds received from HHS through the CARES Act, SHIP, HRSA, and OHA prior to the closing, and addresses ownership of any funds received post-closing through the programs. The Addendum was negotiated to address

1

the continuing liabilities and developing regulatory scheme from the grants.  Similar to the liabilities which TULSA, as the purchaser of Prague Community Hospital assumed, Trustee expressed that it was not willing to assume the liabilities of the use of funds from the CARES Act, SHIP, HRSA, and OHA programs.  Accordingly, the Parties negotiated the terms of the Addendum to address the concerns of TULSA that it would assume additional liabilities without the benefit of the grant made from HHS for a specific purpose. *See* Attached Addendum to APA as Exhibit A.

3.    While Paragraph 11 of Trustee's Motion is specific to Washington County, the description of the CARES Act Provider Relief Fund, Pub. L. 116-136 are applicable to Prague Community Hospital as well.  It is worth noting that the full context of the statement is: "[i]f you ceased operation as a result of the COVID-19 pandemic, you are still eligible to receive funds so long as you provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19. Care does not have to be specific to treating COVID-19. The Department of Health and Human Services ("HHS") broadly views every patient as a possible case of COVID-19." This is the only instance in which such a broad statement is made, is not part of the terms and conditions, and it seems to contradict the actual terms and conditions requiring all recipients be required to submit documents sufficient to ensure that these funds were used for healthcare-related expenses or lost revenue attributable to coronavirus. HHS guidance also states that "[t]here will be significant anti-fraud and auditing work done by HHS, including the work of the Office of the Inspector General." *See* attached Term and Conditions of HHS for Pub. L. 116-136 attached hereto as Exhibit B.

4.      Paragraph 12 of Trustee's Motion The phrase "attributable to coronavirus" refers to earlier statement in the same sentence that "the Payment will only be used to prevent, prepare for, and respond to coronavirus." In other words, the First-Round funds can only be used for health care expenses or lost revenues related to the prevention, preparation and response to coronavirus. The terms and conditions also include specific reporting requirements concerning the use of the funds. Specifically, by accepting the funds, "[t]he Recipient shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment, and such reports shall be in such form, with such content, as specified by the Secretary in future program instructions directed to all Recipients." Those who receive more than $150,000.00 under the CARES Act and other coronavirus legislation, collectively, must submit a report within 10 days after the end of each calendar quarter. Such quarterly report must contain: "the total amount of funds received from HHS under one of the foregoing enumerated Acts; the amount of funds received that were expended or obligated for reach project or activity; a detailed list of all projects or activities for which large covered funds were expended or obligated, including: the name and description of the project or activity, and the estimated number of jobs created or retained by the project or activity, where applicable; and detailed information on any level of sub-contracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees . . . . "  It goes onto state that "any deliberate omission, misrepresentation, or falsification of any information contained in this Payment application or future reports may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment." TULSA emphasizes that there are significant future reporting requirements and liabilities related

3

to the acceptance and use of CARES Act funds, which obligations and liabilities were not assigned under the APA.

5.      In paragraph 37 of Trustee's Motion, he leaves out the very important reference to the Addendum to the Asset Purchase Agreement for Prague that was a significant consideration for closing the transaction.  The Addendum to the Asset Purchase Agreement contemplated how the funds would be requested, considered and approved by this Court, with notice provided to HHS for their opportunity to approve or object to the intended use of such funds.  The funds provided by HHS are generally available for health care expenses and revenue losses incurred after Jan. 31, 2020, as related to the prevention, preparation and response to coronavirus. To the extent the funds are used in such manner, the timing is not important; and, to the extent that they are not used in such manner, they should either be transferred to TULSA for future uses in accordance with the CARES Act, or returned to HHS.  The CARES Act funds are not "cash" or equivalents as the funds are government money unless the provider can demonstrate proper uses under the Act.

6.      The Trustee was aware of all expenses and losses incurred at the time of the sale, and the purchase price was negotiated on that basis, specifically excluding cash and without reserving rights to future receipts (except for accrued A/R).  The additional grant funds were specifically addressed in the Addendum to the APA, paragraph 2, where it was agreed by the Trustee and TULSA that "[a]ny payments by HHS pursuant to the CARES Act, SHIP Program, or OHCA [*sic*] received by either Party after transferring ownership of the Assets from Seller to Purchaser <u>belong to Purchaser</u>, who shall have all rights, responsibilities and liabilities in connection therewith" (emphasis added).  The Addendum to the APA also required the Trustee to file an application with this Court, providing notice to the granting governmental entities for a

4

determination and priority of the use of funds received prior to the closing that includes the amount sought and the Party's intended use of the Funds for the three programs.  If the funds are not used in accordance with the very specific terms and conditions of HHS, the Trustee, as the Seller, would receive a windfall that was not part of the bargained-for exchange reflected in the Purchase Price. Further, the Trustee would not be in a position to use the CARES Act funds as required by Congress, since the Trustee no longer owns nor controls the assets.

7.    The OHA Grant referenced in paragraphs 38-42 of Trustee's Motion is also subject to the Addendum to the APA.  In Trustee's Motion, the program rules are attached, however, there is no delineation as to what expenses are permitted uses for this program specifically.  As TULSA is now the licensee with the state of Oklahoma, there are liabilities that come with the use of said funds.  The liabilities that TULSA assumed are one of the many reasons the Addendum to the APA required the Trustee to delineate out the specifics of their requests to the applicable program. TULSA also does not find that the Trustee has provided adequate notice to OHA as required by the APA Addendum.  The only expenses that appear to be eligible for the application of this grant is listed on Trustee's Motion Exhibit D and totals $4,684.57.

8.    The SHIP Program discussed in paragraphs 43-47 of Trustee's Motion is also subject to the APA Addendum.  The specific uses of this program were attached in Exhibit C of Trustee's Motion.  Trustee merely recites that these funds were not sold to TULSA because they were excluded assets.  The funds that were being held, again were for very specific purposes that also carry liabilities that TULSA, as the licensee of the hospital is exposed.  The Trustee's Motion does not delineate or explain how their requested application of funds would qualify for the specific uses of these funds outside of the $4,684.57.  Accordingly, these funds should be

transferred to TULSA, the current owner and operator of the hospital who can utilize the funds in the manner which has been approved.

9.      The Rural Relief Funds discussed in paragraphs 48-50 of Trustee's Motion are also subject to the Addendum to the APA.  The Trustee did not possess, nor have any rights to, the funds at the time of the closing of the sale, so the Trustee could not have "sold" the funds to TULSA. In fact, the Trustee is not the proper recipient of the funds.  At the time the funds were distributed, 2 days after the effective time of closing, the Trustee no longer held an interest in nor control of the Medicare provider contract for whom the funds were meant to be received.  Accordingly, TULSA is the proper recipient of the Rural Relief Funds and they should be transferred to TULSA immediately.  Under the terms of the APA Addendum, the Trustee already acknowledged it agreed that such funds received after the closing belong to TULSA.

10.      The total disbursements which should be considered by this Court are only the funds which were received prior to the closing date including the First-Round funds, OHA Grant and SHIP Grant that total $344,913.02.  The proceeds of the Rural Relief Fund were received by the Trustee after the Prague Closing Date and per the APA Addendum, the post-sale funds totaling $2,896,348.19 should be transferred to TULSA.

11.      The methodology for calculating how much the Trustee believes they should be entitled to retain in Trustee's Motion paragraphs 52-55 is flawed.  First, they are comparing 2018 to 2020 revenue levels.  As HHS specifically addressed in the full text from their FAQs, "[y]ou may use a reasonable method of estimating the revenue during March and April compared to the same period had COVID-19 not appeared. For example, if you have a budget prepared without taking into account the impact of COVID-19, the estimated lost revenue could be the difference

between your budgeted revenue and actual revenue. It would also be reasonable to compare the revenues to the same period last year." Additionally, the Trustee grouped all the different grant programs into one "bucket." There was a total of $344,913.02 received and available for use by Trustee before the sale was closed. Additionally, the SHIP program funds that have an even more limited use should not be used in the "lost revenue" model the Trustee has attempted to outline.

### Relief Requested

12.     TULSA seeks a denial of their application for the use of the funds as outlined. They have failed to specifically outline how certain funds they received prior to the closing would meet the terms and conditions put forth and are ongoing by HHS. As described herein, there are ongoing reporting requirements and obligations for the use of the funds.

13.     TULSA does not believe the Trustee has outlined its specific compliance with the T&C of the funds received from the First-Round CARES ACT funds from HHS and therefore request that all funds received and held by Trustee prior to the closing be transferred to the owner/operator of the hospital, TULSA.

14.     TULSA does agree that the Trustee has outlined the specific use of funds which are eligible for coverage from OHA in the amount of $4,684.57. TULSA would request this Court order the remaining OHA funds be transferred to the owner/operator of the hospital, TULSA.

15.     The Trustee did not provide any specific detail or application for funds that would qualify for application of funds received through the SHIP program and accordingly, TULSA requests this Court order the entirety of the SHIP funds, $78,499.00 be transferred to the owner/operator of the hospital, TULSA.

7

16.     TULSA requests this court follow the negotiated and agreed to Addendum to the APA and order the funds received after the closing from the Rural Relief Fund, in the amount of $2,896,348.19 be transferred to the owner/operator of the hospital, TULSA (subject to the terms and conditions of the HHS program.)

17.     While the Trustee has requested this Court bar HHS from holding the Trustee liable for any potential violation of any T&C related to the Funds, if the Trustee is going to request this Court to disburse funds received pursuant to the HHS T&C, it cannot also provide a blanket bar to being responsible for its application and retention of such funds.

18.     TULSA does agree with the prayer that the unused funds referenced above be passed to the Purchaser.  Additionally, TULSA agrees with paragraphs 85 and 86 of Trustee's Motion compliance with the T&C of the funds.

Hugh M. Robert
Oklahoma Bar No. 22441
SHERWOOD, McCORMICK & ROBERT
Bank of America Center
15 W. 6th St., Ste. 2800
Tulsa, OK  74119
P:  (918) 592-1144
F:  (918) 592-1149
E:  hugh@sm-oklaw.com

- AND -

/s William C. Smith

William C. Smith, Jr.
NC Bar No. 14199

Manning Fulton & Skinner, PA
3605 Glenwood Ave., Suite 500
Raleigh, NC  27612
P:  919-787-8880
F:  919-325-4623
Email:  smith@manningfulton.com
Local Rule 83.1(d) Counsel

Attorneys for Transcendental Union with
Love and Spiritual Advancement

# EXHIBIT A

## ADDENDUM TO ASSET PURCHASE AGREEMENT

This Addendum to Asset Purchase Agreement ("Addendum") is made as of May 2, 2020 ("Effective Date"), by and between Thomas W. Waldrep, Jr., as Chapter 11 Trustee ("Seller" or "Trustee") for CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital ("Debtor") and Transcendental Union with Love and Spiritual Advancement, an Oklahoma not-for-profit corporation ("Purchaser").

A.    Seller and Purchaser are parties to an Asset Purchase Agreement, dated May 2, 2020 ("Agreement"), pursuant to which Seller is selling and Purchaser is purchasing substantially all the assets of Debtor ("Assets"). Certain Assets were excluded in Schedule 1 to the Agreement, including "all cash and cash equivalents on hand as of the Closing." This Addendum is to clarify and provide a mutual agreement of the Parties for cash Funds received prior to the closing but subject to certain Terms and Conditions ("T&Cs") for various programs as described herein.

B.    On April 10, 2020, Seller received a cash payment from the U.S. Department of Health and Human Services ("HHS") in the amount of $260,869.02, pursuant to the CARES Act Provider Relief Fund ("CARES Act"), a Grant from the Small Rural Hospital Improvement Program ("SHIP") in the amount of $78,499.00, pursuant to Health Resources and Services Administration ("HRSA") guidelines, and an Oklahoma Health Care Authority ("OHCA") Grant in the amount of $5,545.00 ("Funds").

C.    By accepting the Funds, Seller agreed to certain T&Cs) promulgated and required by HHS, SHIP, and OHCA in connection with the receipt and use of such Funds.

D.    The Funds may be used by Seller in accordance with the T&Cs for costs incurred or revenue lost before transferring ownership of the Assets pursuant to the Agreement ("Pre-Sale Uses").

E.    Any remaining Funds may be used by Purchaser in accordance with the T&Cs for costs incurred or revenue lost after transferring ownership of the Assets pursuant to the Agreement ("Post-Sale Uses").

F.    All Funds must be used for permitted purposes and are subject to various documentation, reporting, audit, and other compliance requirements under the T&Cs, the CARES Act, and any regulations promulgated pursuant thereto ("Compliance Requirements").

G.    Substantially all the Compliance Requirements will have to be satisfied by Seller, Purchaser, or both after closing under the Agreement.

H.    Seller and Purchaser desire to enter into this Addendum to set forth their understanding and agreement regarding the Pre-Sale and Post-Sale Uses of the Funds and fulfillment of all Compliance Requirements in connection with the Funds.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      **Recitals.** The foregoing recitals are true and correct and are incorporated in this Addendum by this reference.

2.      **Defined Terms.** All terms used but not defined herein have the meanings ascribed to them in the Agreement.

3.      **Scope of Addendum.** This Addendum applies only to Funds received by Seller before transferring ownership of the Assets pursuant to the Agreement. Any payments by HHS pursuant to the CARES Act, SHIP Program, or OHCA received by either Party after transferring ownership of the Assets from Seller to Purchaser belong to Purchaser, who shall have all rights, responsibilities and liabilities in connection therewith.

4.      **Conditions to Distribution.** Before any Funds are distributed from Debtor's bankruptcy estate, the following conditions must be satisfied to the reasonable satisfaction of the other Party:

          a.      Application and notice must be filed with the Bankruptcy Court, in accordance with the Bankruptcy Code and applicable rules of procedure, including notice to both Purchaser and Seller.  Such application should include the amount sought and the Party's intended use of the Funds for the three programs of which it seeks disbursement;

          b.      The Bankruptcy Court must approve such application for a distribution of the Funds; and

          c.      Seller must include HHS as a notice party on the application filed with the Bankruptcy Court.

          d.      Seller must include OHCA as a notice party on the application filed with the Bankruptcy Court.

5.      **Priority of Distribution.** All distributions for Pre-Sale Uses shall be made before any distribution for Post-Sale Uses may be made; provided, however, all applications for the former shall be filed with the Bankruptcy Court within fourteen (14) days after the Effective Date. Purchaser shall be entitled to make application for the remainder of Funds not otherwise requested by Seller in his application immediately after Seller has filed his application for Pre-Sale Uses, or if Seller does not file such application, upon the expiration of the fourteen day period described herein.

6.      **Costs of Compliance Requirements.** All costs associated with fulfilling the Compliance Requirements related to Pre-Sale Uses of the Funds, whether borne by Seller, or Purchaser, shall be paid as "administrative expenses" of the Debtor's bankruptcy estate, if approved as such by the Bankruptcy Court.  All costs associated with fulfilling the Compliance Requirements related to the Post-Sale Uses of the Funds, whether borne by Seller or Purchaser,

shall be the responsibility of the Purchaser. After the Bankruptcy Case is closed, each Party shall be responsible for its own costs associated with fulfilling the Compliance Requirements.

7. **Representations and Warranties.**

    a.      Seller represents and warrants to Purchaser as follows:

        i.      Seller has accepted and will use the Funds for Pre-Sale Uses in accordance with the CARES Act, the Small Rural Hospital Improvement Program, OHCA, and all T&Cs;

        ii.      Seller has taken or will take all actions reasonably necessary to fulfill the Compliance Requirements; and

        iii.      Seller is not aware of any fact or circumstance relating to its receipt and acceptance of the Funds or its use of the Funds for Pre-Sale Uses that would result or reasonably could result in a violation of Law, including without limitation with respect to the Compliance Requirements.

    b.      Purchaser represents and warrants to Seller as follows:

        i.      Purchaser will accept and use the Funds, if at all, for Post-Sale Uses in accordance with the CARES Act, the Small Rural Hospital Improvement Program, OHCA, and all T&Cs;

        ii.      Purchaser will take all actions reasonably necessary to fulfill the Compliance Requirements; and

        iii.      Purchaser is not aware of any fact or circumstance relating to its receipt and acceptance of the Funds or its use of the Funds for Post-Sale Uses that would result or reasonably could result in a violation of Law, including without limitation with respect to the Compliance Requirements.

    c.      The foregoing representations and warranties of Seller and Purchaser are made as of the Effective Date but shall be continuing until termination of this Addendum. In the event either Party becomes aware of any fact or circumstance that renders any aspect of its representations and warranties herein untrue in any respect, such Party shall immediately notify the other Party thereof in writing.

**8. Termination.** The provisions of this Addendum shall terminate two (2) years after the Effective Date, unless expressly provided otherwise.

**9. Counterparts.** This Addendum may be executed by the Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. All signatures of the Parties to this Addendum may be transmitted by email or facsimile, and such email or facsimile of a Party's

signature will, for all purposes, be deemed to be the original signature of such Party and will be binding upon such Party.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the Effective Date.

SELLER: Thomas W. Waldrep, Jr., as Chapter 11 Trustee for CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital

By:_____
Print Name: Thomas W. Waldrep, Jr.
Title: Trustee

PURCHASER: Transcendental Union with Love and Spiritual Advancement

By:_____
Print Name: Dr. Vishal Aggarwal, M.D.
Title: President

signature will, for all purposes, be deemed to be the original signature of such Party and will be binding upon such Party.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the Effective Date.

SELLER: Thomas W. Waldrep, Jr., as Chapter 11 Trustee for CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital

By:_____
Print Name: Thomas W. Waldrep, Jr.
Title: Trustee

PURCHASER: Transcendental Union with Love and Spiritual Advancement

By:_____
Print Name: Dr. Vishal Aggarwal, M.D.
Title: President

4

# EXHIBIT B



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

**Acceptance of Terms and Conditions**

If you receive a payment from funds appropriated in the Public Health and Social Services Emergency Fund for provider relief ("Relief Fund") under Public Law 116-136 and retain that payment for at least 30 days without contacting HHS regarding remittance of those funds, you are deemed to have accepted the following Terms and Conditions. Please also indicate your acceptance below. This is not an exhaustive list and you must comply with any other relevant statutes and regulations, as applicable.

Your commitment to full compliance with all Terms and Conditions is material to the Secretary's decision to disburse these funds to you. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payment made from the Relief Fund.

These Terms and Conditions apply directly to the recipient of payment from the Relief Fund. In general, the requirements that apply to the recipient also apply to subrecipients and contractors, unless an exception is specified.

<u>Relief Fund Payment from Initial $30 Billion General Distribution Terms and Conditions</u>

- The "Payment" means the funds received from the Public Health and Social Services Emergency Fund ("Relief Fund"). The Recipient means the healthcare provider, whether an individual or an entity, receiving the Payment.

- The Recipient certifies that it billed Medicare in 2019; provides or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19; is not currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; is not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and does not currently have Medicare billing privileges revoked.

- The Recipient certifies that the Payment will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus.

- The Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse.

- The Recipient shall submit reports as the Secretary determines are needed to ensure compliance with conditions that are imposed on this Payment, and such reports shall be in such form, with such content, as specified by the Secretary in future program instructions directed to all Recipients.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

- The Recipient certifies that all information it provides as part of its application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of the Secretary or Inspector General, are true, accurate and complete, to the best of its knowledge. The Recipient acknowledges that any deliberate omission, misrepresentation, or falsification of any information contained in this Payment application or future reports may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment.

- Not later than 10 days after the end of each calendar quarter, any Recipient that is an entity receiving more than $150,000 total in funds under the Coronavirus Aid, Relief, and Economics Security Act (P.L. 116-136), the Coronavirus Preparedness and Response Supplemental Appropriations Act (P.L. 116-123), the Families First Coronavirus Response Act (P.L. 116-127), or any other Act primarily making appropriations for the coronavirus response and related activities, shall submit to the Secretary and the Pandemic Response Accountability Committee a report. This report shall contain: the total amount of funds received from HHS under one of the foregoing enumerated Acts; the amount of funds received that were expended or obligated for reach project or activity; a detailed list of all projects or activities for which large covered funds were expended or obligated, including: the name and description of the project or activity, and the estimated number of jobs created or retained by the project or activity, where applicable; and detailed information on any level of sub-contracts or subgrants awarded by the covered recipient or its subcontractors or subgrantees, to include the data elements required to comply with the Federal Funding Accountability and Transparency Act of 2006 allowing aggregate reporting on awards below $50,000 or to individuals, as prescribed by the Director of the Office of Management and Budget.

- The Recipient shall maintain appropriate records and cost documentation including, as applicable, documentation described in 45 CFR § 75.302 – Financial management and 45 CFR § 75.361 through 75.365 – Record Retention and Access, and other information required by future program instructions to substantiate the reimbursement of costs under this award. The Recipient shall promptly submit copies of such records and cost documentation upon the request of the Secretary, and Recipient agrees to fully cooperate in all audits the Secretary, Inspector General, or Pandemic Response Accountability Committee conducts to ensure compliance with these Terms and Conditions.

- The Secretary has concluded that the COVID-19 public health emergency has caused many healthcare providers to have capacity constraints. As a result, patients that would ordinarily be able to choose to receive all care from in-network healthcare providers may no longer be able to receive such care in-network. Accordingly, for all care for a presumptive or actual case of COVID-19, Recipient certifies that it will not seek to collect from the patient out-of-pocket expenses in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network Recipient.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

The following statutory provisions also apply:

**General Provisions in FY 2020 Consolidated Appropriation**

**SEC. 202. Executive Pay.** None of the funds appropriated in this title shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of Executive Level II.

**SEC. 210. Funding Prohibition for Gun Control Advocacy**. None of the funds made available in this title may be used, in whole or in part, to advocate or promote gun control.

**SEC. 503. Lobbying**

(a) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, electronic communication, radio, television, or video presentation designed to support or defeat the enactment of legislation before the Congress or any State or local legislature or legislative body, except in presentation to the Congress or any State or local legislature itself, or designed to support or defeat any proposed or pending regulation, administrative action, or order issued by the executive branch of any State or local government, except in presentation to the executive branch of any State or local government itself.

(b) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before the Congress or any State government, State legislature or local legislature or legislative body, other than for normal and recognized executive-legislative relationships or participation by an agency or officer of a State, local or tribal government in policymaking and administrative processes within the executive branch of that government.

(c) The prohibitions in subsections (a) and (b) shall include any activity to advocate or promote any proposed, pending or future Federal, State or local tax increase, or any proposed, pending, or future requirement or restriction on any legal consumer product, including its sale or marketing, including but not limited to the advocacy or promotion of gun control.

**SEC. 506. Prohibits Use of Federal Funds for Abortions.**

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

(a) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for any abortion.

(b) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for health benefits coverage that includes coverage of abortion.

(c) The term ''health benefits coverage'' means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement.

## SEC. 507 Limitations on Abortion Funding Prohibition

 (a) The limitations established in the preceding section shall not apply to an abortion—

(1) if the pregnancy is the result of an act of rape or incest; or

(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

(b) Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

(c) Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds).

(d)(1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

 (2) In this subsection, the term ''health care entity'' includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

Prohibits Use of Funds for Embryo Research

## SEC. 508. Prohibits Use of Funds for Embryo Research



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

(a) None of the funds made available in this Act may be used for—

(1) the creation of a human embryo or embryos for research purposes; or

(2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.204(b) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term ''human embryo or embryos'' includes any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes or human diploid cells.

## SEC. 509. Prohibits Promotion of Legalization of Controlled Substances

(a) None of the funds made available in this Act may be used for any activity that promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established by section 202 of the Controlled Substances Act except for normal and recognized executive-congressional communications.

(b) The limitation in subsection (a) shall not apply when there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that federally sponsored clinical trials are being conducted to determine therapeutic advantage.

SEC. 515. (b) Prohibits Asking Candidates for Federal Scientific Advisory Committees Their Political Affiliations; Prohibits Distribution of Intentionally False Information

(b) None of the funds made available in this Act may be used to disseminate information that is deliberately false or misleading.

## SEC. 520. Pornography.

(a) None of the funds made available in this Act may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography.

(b) Nothing in subsection (a) shall limit the use of funds necessary for any Federal, State, tribal, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities.

## SEC. 521. Prohibits Funding ACORN or Its Affiliates or Subsidiaries. None of the funds made available under this or any other Act, or any prior Appropriations Act, may be provided to



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

the Association of Community Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, allied organizations, or successors.

**SEC. 527. Prohibits Federal Funding for Needle Exchange Except in Limited Circumstances.** Notwithstanding any other provision of this Act, no funds appropriated in this Act shall be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug: *Provided*, That such limitation does not apply to the use of funds for elements of a program other than making such purchases if the relevant State or local health department, in consultation with the Centers for Disease Control and Prevention, determines that the State or local jurisdiction, as applicable, is experiencing, or is at risk for, a significant increase in hepatitis infections or an HIV outbreak due to injection drug use, and such program is operating in accordance with State and local law.

**Government-wide General Provisions**

**SEC. 718. Propaganda.** No part of any appropriation contained in this or any other Act shall be used directly or indirectly, including by private contractor, for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.

**SEC. 732. Privacy Act.** None of the funds made available in this Act may be used in contravention of section 552a of title 5, United States Code (popularly known as the Privacy Act), and regulations implementing that section.

**SEC. 742. Confidentiality Agreements**.

(a) None of the funds appropriated or otherwise made available by this or any other Act may be available for a contract, grant, or cooperative agreement with an entity that requires employees or contractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contactors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.

(b) The limitation in subsection (a) shall not contravene requirements applicable to Standard Form 312, Form 4414, or any other form issued by a Federal department or agency governing the nondisclosure of classified information.

**SEC. 743. Nondisclosure Agreements**

(a) No funds appropriated in this or any other Act may be used to implement or enforce the agreements in Standard Forms 312 and 4414 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These provisions are consistent with and do not supersede, conflict with, or



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this SEC. 743. (a) No funds appropriated in this or any other Act may be used to implement or enforce the agreements in Standard Forms 312 and 4414 of the Government or any other nondisclosure policy, form, or agreement if such policy, form, or agreement does not contain the following provisions: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.": *Provided*, That notwithstanding the preceding provision of this section, a nondisclosure policy form or agreement that is to be executed by a person connected with the conduct of an intelligence or intelligence-related activity, other than an employee or officer of the United States Government, may contain provisions appropriate to the particular activity for which such document is to be used. Such form or agreement shall, at a minimum, require that the person will not disclose any classified information received in the course of such activity unless specifically authorized to do so by the United States Government. Such nondisclosure forms shall also make it clear that they do not bar disclosures to Congress, or to an authorized official of an executive agency or the Department of Justice, that are essential to reporting a substantial violation of law.

(b) A nondisclosure agreement may continue to be implemented and enforced notwithstanding subsection (a) if it complies with the requirements for such agreement that were in effect when the agreement was entered into.

(c) No funds appropriated in this or any other Act may be used to implement or enforce any agreement entered into during fiscal year 2014 which does not contain substantially similar language to that required in subsection (a).

**SEC. 744. Unpaid Federal Tax Liability**. None of the funds made available by this or any other Act may be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that has



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government.

**SEC. 745. Criminal Felony Limitation.** None of the funds made available by this or any other Act may be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and has made a determination that this further action is not necessary to protect the interests of the Government.


**Other Appropriations Provisions**

**42 U.S.C. 289d note** No funds appropriated under this Act or subsequent Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Acts shall be used by the National Institutes of Health, or any other Federal agency, or recipient of Federal funds on any project that entails the capture or procurement of chimpanzees obtained from the wild. For purposes of this section, the term 'recipient of Federal funds' includes private citizens, corporations, or other research institutions located outside of the United States that are recipients of Federal funds.

**Other Statutory Provisions**

**Trafficking in Persons**
This award is subject to the requirements of Section 106 (g) of the Trafficking Victims Protection Act of 2000, as amended (22 U.S.C. 7104)

***a. Provisions applicable to a recipient that is a private entity.***
1. You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not
i.       Engage in severe forms of trafficking in persons during the period of time that the award is in effect;
ii.      Procure a commercial sex act during the period of time that the award is in effect; or
iii.     Use forced labor in the performance of the award or subawards under the award.
2. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity –
i. Is determined to have violated a prohibition in paragraph a.1 of this award term; or



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

ii. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph a.1 of this award term through conduct that is either-
A. Associated with performance under this award; or
B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 376.

### b. Provision applicable to a recipient other than a private entity.
We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity-
1. Is determined to have violated an applicable prohibition in paragraph a.1 of this award term; or
2. Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a.1 of this award term through conduct that is either
i. Associated with performance under this award; or
ii. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 376

### c. Provisions applicable to any recipient.
1. You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph a.1 of this award term
2. Our right to terminate unilaterally that is described in paragraph a.2 or b of this section:
i. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended
(22 U.S.C. 7104(g)), and
ii. Is in addition to all other remedies for noncompliance that are available to us under this award.
3. You must include the requirements of paragraph a.1 of this award term in any subaward you make
to a private entity.

### d. Definitions. For purposes of this award term:
1. "Employee" means either:
i. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or
ii. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.
2. "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

3. "Private entity":

i. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.

ii. Includes:

A. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the definition of Indian tribe at 2 CFR 175.25(b).

B A for-profit organization.

4. "Severe forms of trafficking in persons," "commercial sex act," and "coercion" have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102)

**Whistleblower Protections**

You are hereby given notice that the 48 CFR section 3.908, implementing section 828, entitled "Pilot

Program for Enhancement of Contractor Employee Whistleblower protections," of the National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2013 (Pub. L. 112-239, enacted January 2,

2013) applies to this award.

**Human Subjects Protections**

If any activities under this project will involve human subjects in any research activities, you must provide satisfactory assurance of compliance with the participant protection requirement of the HHS/OASH Office of Human Research Protection (OHRP) prior to implementation of those research components. This assurance should be submitted to the OHRP in accordance with the appropriate regulations.

**Fraud, Abuse and Waste**:

The HHS Inspector General accepts tips and complaints from all sources about potential fraud, waste, abuse, and mismanagement in Department of Health and Human Services' programs. Your information will be reviewed promptly by a professional staff member. Due to the high volume of information that they receive, they are unable to reply to submissions. You may reach the OIG through various channels.

Internet: https://forms.oig.hhs.gov/hotlineoperations/index.aspx

Phone: 1-800-HHS-TIPS (1-800-447-8477)

Mail: US Department of Health and Human Services

Office of Inspector General

ATTN: OIG HOTLINE OPERATIONS

PO Box 23489

Washington, DC 20026

For additional information visit https://oig.hhs.gov/fraud/report-fraud/index.asp

<u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that on this 20th day of May, 2020, the foregoing Notice of Special Appearance was filed via CM/ECF upon the following:

Rayford K. Adams, III on behalf of Debtor

Jason L. Hendren on behalf of Trustee Thomas W. Waldrep, Jr.

Rebeca F. Redwine on behalf of Trustee Thomas W. Waldrep, Jr.

Benjamin E.F.B. Waller on behalf of Trustee Thomas W. Waldrep, Jr.

James C. Lanik on behalf of Trustee Thomas W. Waldrep, Jr.

Jennifer B. Lyday on behalf of Trustee Thomas W. Waldrep, Jr.

Thomas W. Waldrep, Jr. on behalf of Trustee Thomas W. Waldrep, Jr.

Marjorie K. Lynch on behalf of Bankruptcy Administrator Marjorie K. Lynch

Kirstin E. Gardner on behalf of Bankruptcy Administrator Marjorie K. Lynch

John Paul H. Cournoyer on behalf of Creditor Sun Finance, Inc., Creditor Paul L. Nusbaum, Creditor Steven F. White, and Interested Party Rural Community Hospitals of America, LLC

Nancy A. Peterman on behalf of Health Care Ombudsman Suzanne Koenig

Brian R. Anderson on behalf of Health Care Ombudsman Suzanne Koenig

William Walt Pettit on behalf of Creditor Complete Business Solutions Group, Inc.

Paul A. Fanning on behalf of Interested Party Cohesive Healthcare Management & Consulting, LLC

William P. Janvier on behalf of Boa Vida Foundation, Inc.

Ross A. Plourde on behalf of Cohesive Healthcare Management & Consulting, LLC

The undersigned does further certify that a copy of the foregoing has been mailed via electronic mail to:

Quinn, Michael J. (CIV), Michael.Quinn3@usdoj.gov, on behalf of the U.S. Department of Health & Human Services

Seligman, Phillip (CIV), Phillip.Seligman@usdoj.gov, on behalf of the U.S. Department of Health & Human Services

_____

Hugh M. Robert
Oklahoma Bar No. 22441
SHERWOOD, McCORMICK & ROBERT
Bank of America Center
15 W. 6th St., Ste. 2800
Tulsa, OK  74119
P:  (918) 592-1144
F:  (918) 592-1149
E:  hugh@sm-oklaw.com

Attorney for Transcendental Union with
Love and Spiritual Advancement



- AND -

/s William C. Smith

_____

William C. Smith, Jr.
NC Bar No. 14199
Manning Fulton & Skinner, PA
3605 Glenwood Ave., Suite 500
Raleigh, NC  27612
P:  919-787-8880
F:  919-325-4623
Email:  smith@manningfulton.com

Attorneys for Transcendental Union with
Love and Spiritual Advancement